# EXHIBIT A

**IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT**
**LAKE COUNTY, ILLINOIS**

| | | |
|---|---|---|
| BRITNEE KENYON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2024 LA 441 |
| v. | ) | |
| | ) | |
| BOARD OF EDUCATION TOWNSHIP | ) | |
| HIGH SCHOOL DISTRICT 113, DANIEL | ) | **JURY DEMAND** |
| STRUCK, Individually and in his Official | ) | |
| Capacity, THOMAS KRIEGER, | ) | |
| Individually and in his Official Capacity, | ) | |
| and MICHELLE HAMMER BERNSTEIN, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| J.L., | ) | |
| | ) | |
| Respondent-In-Discovery. | ) | |

## VERIFIED AMENDED COMPLAINT AT LAW

NOW COMES Plaintiff, Britnee Kenyon ("Plaintiff" or "Ms. Kenyon"), by and through

her attorneys, Miller Berger, LLC, and for her Verified Amended Complaint at Law against the

BOARD OF EDUCATION TOWNSHIP HIGH SCHOOL DISTRICT 113, DANIEL STRUCK,

Individually and in his Official Capacity, THOMAS KRIEGER, Individually and in his Official

Capacity, and MICHELLE HAMMER BERNSTEIN, hereby states as follows:

## PARTIES, JURISDICTION, and VENUE

1.      At all times relevant, Britnee Kenyon ("Ms. Kenyon") was employed by the Board

of Education of Township High School District 113 as the Deerfield High School ("DHS") Theatre

Director.  Ms. Kenyon is Jewish.

2.      Defendant Board of Education Township of High School District 113 ("Board of

Education") is a group of private citizens who have been elected to their offices and have all

powers given to them, express or implied, by § 5/10 of the Illinois School Code.

3. Defendant Daniel Struck ("Struck"), was at all times relevant to the matters at issue in this Verified Complaint the President of the Board of Education, who on information and belief, resides in the Village of Deerfield, State of Illinois. Struck is named in his individual and official capacities. Struck resigned from his position as Board President on or about February 7, 2024, in connection with the matters at issue in this Verified Complaint.

4. Defendant Thomas Krieger ("Krieger") is the Chief Human Resources Officer for the Board of Education, who on information and belief, resides in the Village of Deerfield, State of Illinois. Krieger is named in his individual and official capacities.

5. Defendant Michelle Hammer Bernstein ("Bernstein") is an individual, who on information and belief, resides at 1430 Waukegan Road, in the Village of Deerfield, State of Illinois.

6. Respondent-in-discovery J.L. is an individual, who on information and belief, resides at 1580 Country Lane, in the Village of Deerfield, State of Illinois.

7. Jurisdiction is proper under 735 ILCS 5/2-209(b)(2), as Struck, Krieger, Bernstein, and J.L. are natural persons domiciled within this State when the causes of action herein arose.

8. Venue is proper in Lake County pursuant to 735 ILCS 5/2-101 since Lake County is the county of residence of the Board of Education, Struck, Krieger, Bernstein, and J.L. who are joined in this lawsuit in good faith and with probable cause for the purpose of obtaining judgment against them, and not solely for the purpose of fixing venue in this County.

## FACTS COMMON TO ALL COUNTS

9. Ms. Kenyon has been employed as DHS's Theatre Director since 2019.

10. In Ms. Kenyon's capacity as DHS's Theatre Director, Ms. Kenyon is considered a "public employee."

#447731v1

11.     Prior to the beginning of the 2023-2024 school year, the Board of Education and the union of which Ms. Kenyon is a member, District 113 Education Association, IEA-NEA, executed a certain Collective Bargaining Agreement ("CBA"). A copy of the signed CBA is attached hereto as Exhibit A.

12.     The CBA provides in relevant part,

**ARTICLE IV – RIGHTS OF LICENSED STAFF MEMBERS ["LSM"]**

\*     \*     \*

**D. Privacy / Non-School Activities**

Neither the Board nor the Administration shall make regulations that attempt to govern employees' non-school activities save in exceptional circumstances where such activities can be proven to have had a substantial negative impact on the LSMs ability to perform the duties associated with their assigned role.

\*     \*     \*

**M. Parent Complaints**

Any complaint by a parent of a student directed toward an LSM which is to be used for evaluative purposes shall be reported to the LSM in writing. No disciplinary action shall be taken without following the guidelines established within this Agreement.

\*     \*     \*

**ARTICLE V – DISCIPLINE**

**C.  Investigation of Complaints and Alleged Misconduct**

Complaints regarding an LSM upon which disciplinary action may occur will be reported to the LSM within five (5) school days. In the event a meeting with an administrator is required to discuss and/or investigate such a complaint or allegation, the LSM may be accompanied to such a meeting by a DEA representative. LSMs will be provided at least 24 hours notice of such a meeting and informed of their right to have a DEA representative present at the meeting. Where a complaint or allegation involves a matter related to the safety of a student or the school community, 24 hours notice shall not be required.

Notice will be provided in writing and will state the complaint or allegation being investigated. The LSM will have the opportunity to respond to the complaint/investigation. The Administration may direct that during the investigation, all information related to the complaint or allegation remain confidential. Retaliation against any individual who makes a complaint is not permitted.

3

*    *    *

**C. Just Cause**

The District shall inform an employee of the right to Association representation during a meeting which may lead to disciplinary action. The District shall give an employee 24 hours notice before holding a meeting related to potential disciplinary action except in an egregious situation.

Employees shall only be disciplined for just cause.

The Association and the District agree that discipline should be timely, progressive (when appropriate) and accompanied by counseling (where appropriate). The Parties agree that progressive discipline typically includes, in order: oral reprimand; written reprimand; suspension; and termination. The District may combine steps of progressive discipline if the severity and facts of the situation warrant such action.

*    *    *

*Id.* at §§ IV(D); IV(M); V(A); and V(C).

13.     At all times relevant, Ms. Kenyon was, and continues to be, generally well-liked by DHS students, parents, colleagues, and the community at large.

14.     During Ms. Kenyon's tenure as DHS's Theatre Director, she has received all positive performance evaluations from her supervisors.

15.     Throughout her employment at DHS, Ms. Kenyon received numerous compliments and accolades from students, parents, teachers, and the community at large for her hard work, dedication, and successful direction of the DHS Theater program. In fact, in February of 2022, Ms. Kenyon was selected as one of the thirty (30) finalists for the 2022 Golden Apple Award for Excellence in Teaching.

16.     One exception to that is J.L., who, in 2020, targeted Ms. Kenyon with both private and public campaigns of harassment, defamation, and coercion.

17.     In December of 2020, a DHS student's mother, J.L., contacted Ms. Kenyon via a direct message on Ms. Kenyon's personal Instagram account. J.L.'s communication was unsolicited.

4

18.     The purpose of the unsolicited personal Instagram message was to verbally attack Ms. Kenyon for not assigning her son (who was at that time a Senior) the role of "dance captain" and for allowing Juniors to be cast in lead roles.  A true and accurate copy of J.L.'s Instagram message is attached hereto as <u>Exhibit B</u>.

19.     Due to the harassing and abusive nature of J.L.'s messages, Ms. Kenyon blocked her from further direct Instagram communications.

20.     J.L. then complained to DHS Principal Kathryn Anderson, Assistant Principal and 504 Co-Coordinator Dan Chamberlin, Superintendent Bruce Law, and Fine Arts Department Chair Paul Hengels (each individually and collectively "DHS Administration") that she could no longer communicate with Ms. Kenyon via her personal Instagram account.  J.L. did not provide DHS Administration copies of the harassing and abusive direct messages she sent to Ms. Kenyon.

21.     DHS Administration sided with J.L..

22.     In the fall of 2021, J.L. emailed Ms. Kenyon to demand that Ms. Kenyon cast J.L.'s daughter in the DHS musical.  In that email, J.L. states that "Whatever happens, I promise you will not hear one word from me on this topic/these issues again."  This statement was false when made.

23.     After J.L. was not cast in the DHS musical based on merit (meaning she simply did not have the same level of singing or dancing talent as the other students who did get cast), J.L. again contacted DHS Administration to falsely and maliciously accuse Ms. Kenyon of violating J.L.'s daughter's special education 504 plan [1].

---

[1] In Illinois, a "504 plan" refers to Section 504 of the Illinois Rehabilitation Act of 1973 which outlines the accommodations, modifications, and services a student with disabilities can receive to help her participate in her educational and school-related activities.

24.     J.L. then met with DHS Administration, which followed up by sending Ms. Kenyon an email which took J.L.'s side and contained numerous lies.  Ms. Kenyon was never given the same opportunity to meet with Administration.

25.     In the fall of 2022, J.L. contacted DHS Administration to maliciously disparage Ms. Kenyon as an anti-Semite (even though Ms. Kenyon is Jewish).  J.L.'s accusations included, but were not limited to the following: (1) that Ms. Kenyon was discriminating against Jews for having auditions on Yom Kippur prior to sundown and in the allotted time dictated by the DHS Activities Director; and (2) Ms. Kenyon was violating J.L.'s daughter's special education 504 plan by not giving J.L.'s daughter priority access to audition sign-ups.

26.     Once again, the DHS Administration sided with J.L. and ordered Ms. Kenyon to cast J.L. in the show, regardless of the quality of her audition.  Ms. Kenyon complied.

27.     In the winter of 2022, J.L. again falsely and maliciously accused Ms. Kenyon of violating J.L.'s daughter's special education 504 plan.  She was not privy to the conversations J.L. had with DHS Administration about this new round of allegations.

28.     In April or May 2023, Ms. Kenyon's student teacher and Drama 2 class chose "Columbinus" for the class staged reading.  Columbinus is a play about the events that led to the well-known Columbine High School shooting.  The choice was based on the students' interest in addressing the July 2022 parade shooting in Highland Park in a creative and thought-provoking manner.  J.L.'s daughter voted to do that play and said she would play any role in it.  She never expressed any discomfort to Ms. Kenyon, the student teacher, or the rest of the class.

29.     Despite those facts, J.L. falsely claimed to DHS Administration that J.L.'s daughter was "damaged" by the choice of reading and "terrified" that she would have to play the shooter.

#447731v1

J.L. also orchestrated a public Facebook post attacking Ms. Kenyon in virtually identical wording as the emails she sent to DHS Administration.

30.     DHS Administration again sided with J.L. and Ms. Kenyon again complied with the demand to provide J.L. with an alternative assignment.  The alternative assignment was for her to read play and create a community outreach plan.  J.L. requested a play that focused on women's issues, so that is what was provided.

31.     Yet again, J.L. contacted DHS Administration to attack Ms. Kenyon under the guise of concern over the choice of play J.L.'s daughter chose to read.  Yet again, DHS Administration sided with J.L. and forced Ms. Kenyon to personally meet with J.L. in its presence.  The purpose of the meeting was to intimidate and coerce Ms. Kenyon into apologizing to J.L. for offering the "women's issues" play as an alternative to the Columbinus play.  This was particularly outrageous because the same three plays offered by Ms. Kenyon to J.L.'s daughter have been used as curricular materials in other nearby high schools.

32.     The tone of the meeting was very demeaning and patronizing. Nonetheless, Ms. Kenyon apologized to J.L. that the issues had caused her stress.

33.     In the fall of 2023 school year, J.L.'s daughter approached Ms. Kenyon and proceeded to apologize to her for everything J.L. had done to her in the past school year.  J.L.'s daughter admitted that she never had an issue with anything Ms. Kenyon had done.  J.L.'s daughter explained that J.L. is "crazy" and uncontrollable.  J.L.'s daughter also stated that J.L. used her 504 plan as a weapon.  Ms. Kenyon reported the substance of this meeting to DHS Administration.

34.     On September 14, 2023 DHS Administration (by way of Kathryn Anderson) contacted Ms. Kenyon to advise her that DHS Administration was launching a formal investigation into allegations of "retaliation" against J.L. during the casting process of the play "Mean Girls."

#447731v1

The allegations of retaliation made by J.L. were false and made for the purpose of subjecting Ms. Kenyon to prejudicial scrutiny and attempting to get her fired from her position as DHS Theater Director.

35.     At that time, final casting decisions were made by three people: Anastasia Balmer, Nikki Lazzaretto, and Ms. Kenyon ("Casting Committee").

36.     The Casting Committee used a rubric created by the Educational Theatre Association to score each audition.  The Casting Committee's scores for each student are then averaged and calculated as a percentage.

37.     The year of the "Mean Girls" audition, the Casting Committee cut every auditioner who scored under 60%.

38.     J.L.'s daughter received 73% so she was not cut.  The emails sent by J.L. to DHS Administration were false and willfully intended to defame Ms. Kenyon in order to get her punished or fired.

39.     Prior to December 2023, and other than the harassing communications received from J.L. as described above, Ms. Kenyon had never been accused of any wrongdoing or inappropriate behavior by the Board of Education, her peers, her students, or parents of students.

40.     Prior to December 2023, Ms. Kenyon has never been subjected to disciplinary action or warning by either DHS or the Board of Education on any allegation of misconduct.

41.     On Saturday, December 9, 2023, Ms. Kenyon shared a story on her private Instagram account ("December 9 Instagram Story").  A screenshot of the December 9 Instagram Story is attached hereto as <u>Exhibit C</u>.

#447731v1

42.     The December 9 Instagram Story was not Ms. Kenyon's original post; it was a repost of an "antiracist" author named Ibram X. Kendi concerning the military conflict in Israel and Gaza.

43.     The December 9 Instagram Story was automatically removed from Ms. Kenyon's Instagram account 24 hours after it was shared.

44.     The December 9 Instagram Story did not in any way relate to, involve, interfere with, or detract from her employment as DHS's Theatre Director.

45.     Ms. Kenyon posted the December 9 Instagram Story privately.  It was *not* published for the purpose of expressing her political views and/or beliefs in her capacity as DHS's Theatre Director.

46.     Ms. Kenyon began following Ibram X. Kendi in 2019 after District 113 Associate Superintendent of Diversity, Equity, and Inclusion, Mirah Anti, organized a book study of Ibram X. Kendi's book, *How to be an Anti-Racist*.

47.     Mirah Anti's book study of Ibram X. Kendi's book, *How to be an Anti-Racist* was authorized and endorsed by School District 113, which includes DHS.

48.     Defendant Bernstein saw or otherwise learned about the December 9 Instagram Story.

49.     In response to the December 9 Instagram Story, Defendant Bernstein, using the pseudonym "Michelle Leah," created a post on the DHS Parent Group Facebook Page accusing Ms. Kenyon, a Jewish woman, of posting "memes" that "slandered" Israel ("Bernstein's First Facebook Post").  A copy of Bernstein's First Facebook Post is attached hereto as <u>Exhibit D</u>.

50.     At no time had Ms. Kenyon ever posted memes that slandered Israel.

51.     Defendant Bernstein's First Facebook Post demanded that parents "call Bruce [Law] and send to the [Board of Education] if you agree." *Id.*

52.     Defendant Bernstein also posted the content of Bernstein's First Facebook Post on "Deerfield High School – Friend of the Arts" Facebook Page ("Bernstein's Second Facebook Post"), then again on the "Highland Park / Highwood, Planning Our Future" Facebook page ("Bernstein's Third Facebook Post"). Bernstein's Second Facebook Post and Bernstein's Third Facebook Post are attached hereto as Exhibit E and Exhibit F, respectively.

53.     On December 14, 2023, at 1:15 p.m., Defendant Krieger emailed Ms. Kenyon and ordered her to attend a pre-disciplinary meeting on December 15, 2023, at 2:27 p.m. concerning the December 9 Instagram Story.  Krieger only advised Ms. Kenyon that her private sharing of a story constituted "harassment or bullying."

54.     On December 14, 2023, at approximately 4:00 p.m., Ms. Kenyon spoke with DHS Principal Kathryn Anderson about Defendant Bernstein's false and defamatory Facebook posts circulating throughout the greater Deerfield community.

55.     Upon information and belief, and based on Defendant Bernstein's three Facebook posts, Defendant Bernstein complained to the Board of Education, falsely claiming that Ms. Kenyon was an anti-Semite and that her December 9 Instagram Story "slandered" Israel.

56.     At approximately 6:10 p.m. on December 14, 2023 and in response to the December 9 Instagram Story, Defendant Struck, purporting to act on the Board of Education's behalf, issued the statement ("December 14 Statement") attached hereto as Exhibit G.

57.     Struck's December 14 Statement maliciously and recklessly portrayed Ms. Kenyon as an anti-Semite who "disparages the personal beliefs and human decency of a substantial portion of our student body."  *Id.*

#447731v1

58.     Lending credence to the claims of anti-Semitism and an attack on the "human decency of a substantial portion of our student body," Struck then maliciously described the situation with Ms. Kenyon as an "ongoing personnel matter" which "we are taking…very seriously." *Id.*

59.     Upon information and belief, the December 14 Statement was issued in direct response to Ms. Kenyon's December 9 Instagram Story following the false claims of "harassment" and "antisemitism" circulated by Defendant Bernstein.

60.     Upon information and belief, the December 14 Statement was published to more than 40,000 individuals in the in the Deerfield, Bannockburn, Riverwoods, Highland Park, and Highwood communities.

61.     The December 14 Statement maliciously and recklessly accused Ms. Kenyon of "disparag[ing] the personal belief and human decency of a substantial portion of our student body." *Id.*

62.     The December 14 Statement was published to the greater Deerfield community before any DHS Administration, school official, or Board of Education member communicated with Ms. Kenyon to gather necessary facts and information.

63.     Defendant Struck never communicated with Ms. Kenyon to gather necessary facts before issuing the December 14 Statement.

64.     Defendant Struck's December 14 Statement directly violated the CBA by attempting to restrain Ms. Kenyon's personal free speech and regulate Ms. Kenyon's non-school-related activities.

65.     After the December 14 Statement was published by Struck, the amount of patently false, harassing, and threatening communications Ms. Kenyon received from parents in the

community increased exponentially. Those communications accused Ms. Kenyon of being an antisemite and called for Ms. Kenyon's termination.

66. On December 15, 2023, Ms. Kenyon met with Defendant Krieger, DEA Representative Jason Smith, and DHS Principal Kathryn Anderson pursuant to Krieger's prior email regarding the pre-disciplinary meeting ("First Pre-Disciplinary Meeting").

67. During the First Pre-Disciplinary Meeting, Ms. Kenyon explained that she shared the December 9 Instagram Story because she firmly believed that it was not an "anti-Israel" post, but rather a call for peace. Ms. Kenyon further explained that as a practicing Jewish woman, Ms. Kenyon would never speak out against Jewish people.

68. On December 15, 2023, at approximately 4:35 p.m., Krieger advised Ms. Kenyon that the Board of Education scheduled a second pre-disciplinary meeting on December 18, 2023, at 9:00 a.m. "to discuss complaints received regarding [Ms. Kenyon's] use of Snapchat to communicate with students, in violation of Board Policy 5-125 and 5-125 Aps 1 and 2." ("Second Pre-Disciplinary Meeting").

69. Ms. Kenyon, Ms. Kenyon's representative Jason Smith, DHS Principal Kathryn Anderson, IEA Uniserv Director Mark Stein, and Board of Education attorney Dana Fattore Crumley attended the Second Pre-Disciplinary Meeting

70. After the Second Pre-Disciplinary Meeting, the Board of Education conducted an investigation into Ms. Keyon's use of Instagram and Snapchat.

71. The Board of Education's investigation failed to comply with the requirements set forth in the CBA, the District's Written Policies and Procedures, and Illinois Law by:

   a. Failing to ensure Ms. Kenyon had an equal opportunity to present evidence during the investigation;

   b. Failing to produce and/or provide Ms. Kenyon with statements from the complainant;

#447731v1

c. Failing to remain objective during the investigation; and

d. Failing to keep the investigation and findings confidential.

72. On January 9, 2024, Defendant Krieger sent Ms. Kenyon a document titled "Written Reprimand." The Written Reprimand was to be made a part of her employment record and used as a basis for limiting her freedom of speech and expression as well as future discipline and/or termination.

73. The Written Reprimand included a narrative section revealing that Krieger had investigated Ms. Kenyon's past posts on her private Instagram account and her allegedly inappropriate communication with students using Snapchat's messaging feature. Krieger took these actions to manufacture a reason to discipline Ms. Kenyon.

74. For example, Krieger claimed that pictures on Ms. Kenyon's private Instagram account which were admittedly "personal in nature" were also somehow violative of school or District policy. The personal photographs referenced included Ms. Kenyon in a bathing suit, Ms. Kenyon in bed, and Ms. Kenyon smoking a cigarette.

75. One of the photographs referenced in Krieger's Written Reprimand related to a post detailing Ms. Kenyon's experience as a victim of sexual assault at age 19.

76. The Written Reprimand stated, "The caption on at least one of the photos referenced your experience with sexual assault when you were 19." Krieger's reference to Ms. Kenyon's sexual assault was made with reckless disregard to the effects it would have and ultimately did have upon Ms. Kenyon's mental, emotional, and physical health and wellbeing.

77. The Written Reprimand also falsely accused Ms. Kenyon of "communicating with students on Snapchat about inappropriate topics, such as birth control."

78. Ms. Kenyon never initiated contact with any students via Snapchat. Instead, it was the students who initiated contact with Ms. Kenyon.

13

79. Based on his willful and wanton invasion of Ms. Kenyon's privacy, Krieger determined, on behalf of the Board of Education, that Ms. Kenyon violated:

   a. Policy 5-120, Exhibit 5-120 E2 and Administrative Procedure 5-120-AP2 by allowing students to follow Ms. Kenyon's Snapchat and Instagram accounts;

   b. Policy 5-120, Exhibit 5-120 E2 and Administrative Procedure 5-120-AP2 by permitting students to view personal photographs of Ms. Kenyon in which she was drinking alcohol, smoking a cigarette, and partially unclothed; and

   c. Policy 5-125, and Administrative Procedures 5-125 AP1 and AP2 by communicating with current students on her personal Instagram and Snapchat accounts.

80. Defendant Krieger concluded the Written Reprimand by stating,

It is without question that the content in question, both in regard to the Dr. Kendi quote and photographs where you are partially clothed and engaged in adult activities, has undermined your ability to maintain the standards set forth above, and has undermined the trust that parents have in us to provide a safe and appropriate climate for instruction.

81. The Written Reprimand was not supported by any documentary evidence and did not identify any complainant, in violation of the CBA and District Policy.

82. Ms. Kenyon objected to the Written Reprimand on both substantive and procedural grounds. She was advised that the Written Reprimand was likely to be released to the public. As a result, she asked to edit it so that it did not contain references to her sexual assault.

83. On January 19, 2024, Krieger and Ms. Kenyon met to discuss Ms. Kenyon's proposed amendments to the Written Reprimand.

84. Defendant Krieger, DHS Principal Kathryn Anderson, DEA President Marty Esgar, and representative Jason Smith attended the January 19, 2024 meeting.

85. During the January 19, 2024 meeting, Ms. Kenyon presented proposed changes to the Written Reprimand.

86. Before Defendant Krieger would consider Ms. Kenyon's proposed edits to the Written Reprimand, it forced Ms. Kenyon to describe why she posted about her sexual assault on

14

her private Instagram account, forced Ms. Kenyon to recount her traumatic experience, and forced Ms. Kenyon to defend herself from Krieger's and the Board of Education's sexist and false accusations of impropriety.

87.     The forced recounting of her sexual assault trauma was willful, wanton, and reckless on the part of the Board of Education, DHS Administration, Struck, and Krieger and caused Ms. Kenyon great mental, emotional, and physical damage.

88.     On January 25, 2024, Krieger sent Ms. Kenyon the revised Written Reprimand ("Final Written Reprimand").  A true and accurate copy of the Final Written Reprimand will be filed under-seal as <u>Exhibit H</u> following the entry of a protective and confidentiality order.

89.     While the Final Reprimand removed reference to Ms. Kenyon's sexual assault, it also removed the full quote from the December 9 Instagram Story.  This had the effect of camouflaging the truth behind the purpose of the December 9 Instagram Story and materially altering the meaning of the Kendi post.  All other findings and conclusions from the Written Reprimand remained intact as originally intended.

90.     The Final Written Reprimand was placed in Ms. Kenyon's personnel file, where it will remain in perpetuity to diminish Ms. Kenyon's future employment opportunities.

91.     Defendants' foregoing accusations of wrongdoing were false and known to be false at the time they were made.

92.     The allegations of wrongdoing and the subsequent investigation by the Board of Education, Struck, and Krieger concerning Ms. Kenyon's use of Instagram and Snapchat was pretextual.  They were done to curtail Ms. Kenyon's freedom of speech and expression and to form a basis for either a direct or constructive termination of Ms. Kenyon's employment.

#447731v1

93.	The Board of Education, Struck, and Krieger launched the campaign to harass Ms. Kenyon and force a direct or constructive termination of Ms. Kenyon's employment because they were under pressure to do so by the Board of Education and/or the above-described members of the greater Deerfield community, including Defendant Bernstein and J.L., who disagreed with Ms. Kenyon's personal beliefs.

94.	Because of the Board of Education's pretextual investigation into Ms. Keyon's Instagram and Snapchat accounts, Ms. Kenyon has been the recipient of incessant harassment and abuse from members of the community.

95.	Upon information and belief, the Board of Education and/or Krieger released the contents of the investigation to members of the community, including but not limited to, Bernstein.

96.	After Defendant Bernstein learned that Ms. Kenyon was not terminated from her position as DHS's Theatre Director, Bernstein once again disseminated patently false and disparaging statements concerning Ms. Kenyon ("Bernstein's Fourth Facebook Post"), as depicted below and attached hereto as <u>Exhibit I</u>:



16

97.     Defendant Bernstein's Fourth Facebook Post, like Bernstein's First Facebook Post, Bernstein's Second Facebook Post, and Bernstein's Third Facebook Post, falsely and maliciously asserts that Ms. Kenyon is antisemitic without any factual basis and with reckless disregard for truth of Defendant Bernstein's published statements. *Id.*

98.     As a direct result of Defendant Bernstein's Fourth Facebook Post and Struck's December 14, Statement, Ms. Kenyon received additional threats and harassment, including one believed to be someone from as far away as Canada.

99.     Because of the constant harassment, bullying, and abuse, Ms. Kenyon was forced to take a mental health leave of absence from her position as DHS's Theatre Director and undergo extensive therapy.

100.     As a result of Stuck's publication of the December 14 Statement, Ms. Kenyon was unfairly targeted, harassed, bullied, and abused, causing irreparable damage to Ms. Kenyon's professional reputation and mental well-being, effectively creating an environment of hostility and prejudice.

101.     Krieger's reckless and malicious actions in reopening Ms. Kenyon's past traumatic events unrelated to any legitimate investigation of wrongdoing had a profound impact on Ms. Kenyon's mental health.  Krieger's disregard for Ms. Kenyon's mental and emotional well-being magnifies the stress and anxiety Ms. Kenyon was forced to endure.

102.     The December 14 Statement and release of confidential information from the Board of Education's investigation to parents in the community subjected Ms. Kenyon to constant abuse and harassment and the further dissemination of false statements concerning Ms. Kenyon.  The relentless nature of the harassment instills fear and anxiety, making it increasingly difficult for Ms.

#447731v1

Kenyon to fulfill her professional duties and maintain a healthy mental, emotional, or physical state.

103.    Struck and the Board of Education felt it was necessary to share the "Board of Education's" political view and stance on the Israel-Gaza conflict by explicitly stating to the parents and students in the community which political views are "correct."

104.    The mental anguish that Ms. Kenyon was forced to endure would have been avoided had Struck communicated with Ms. Kenyon before issuing the December 14 Statement to 40,000+ members of the District 113 Community.

105.    The December 14 Statement was published with reckless disregard of any consequences it could have, and did have, on Ms. Kenyon's wellbeing and professional reputation.

106.    The December 14 Statement and the pretextual investigation which followed caused irreparable harm to Ms. Kenyon's mental, emotional, and physical health and professional reputation.

## COUNT I – FIRST AMENDMENT VIOLATION, 42 U.S.C. § 1983
### (*Britnee Kenyon v. Board of Education Township of High School District 113*)

107.    Ms. Kenyon reincorporates and realleges Paragraphs 1 through and including 106 as though fully set forth herein as Paragraph 107 of Count I of Ms. Kenyon's Verified Complaint at Law.

108.    Ms. Kenyon was harassed, targeted, and subject to a pretextual investigation, solely because Ms. Kenyon exercised her First Amendment rights by sharing the December 9 Instagram Story on her private Instagram account.

109.    The Board of Education is the entity with final policy-making authority in the decision to investigate and subsequently reprimand Ms. Kenyon resulting from the expression of her First Amendment rights. By sharing the December 9 Instagram Story on her private Instagram

18

account, Ms. Kenyon was speaking as a citizen engaged in Constitutionally protected First Amendment activity and was not acting as an employee of the Board of Education.

110.     The Constitutionally protected First Amendment includes Ms. Kenyon's right to express her political opinion regarding the ongoing conflict in Gaza, and more specifically, calling for peace.

111.     The adverse action taken by the Board of Education against Ms. Kenyon was motivated as a response to Ms. Kenyon's exercise of her Constitutional free speech rights.

112.     Ms. Kenyon's free speech was a matter of public concern as it related to her political opinions and beliefs as a private citizen.

113.     Ms. Kenyon has a valid interest as a citizen of the community to comment on matters of public concern, which outweighs any purported concerns of the Board of Education, which led to the Board of Education reprimanding Ms. Kenyon and subjecting Ms. Kenyon to harassment by parents in the community.

114.     The Board of Education's adverse action against Ms. Kenyon has caused Ms. Kenyon to suffer mental, emotional, physical, and economic injuries that are likely to chill a person of ordinary firmness from engaging in Constitutionally protected free speech.

WHEREORE, Britnee Kenyon respectfully requests the Court enters judgment in her favor and against Defendant Board of Education Township of High School District 113 on Count I of Ms. Kenyon's Verified Complaint at Law and awards damages in excess of $50,000, plus attorneys' fees, costs, punitive damages, prejudgment interest, and for such other or further relief the Court deems just and proper.

## COUNT II – BREACH OF COLLECTIVE BARGAINING AGREEMENT
### (*Britnee Kenyon v. Board of Education Township of High School District 113*)

#447731v1

115. Ms. Kenyon reincorporates and realleges Paragraphs 1 through and including 114 as though fully set forth herein as Paragraph 115 of Count II of Ms. Kenyon's Verified Complaint at Law.

116. The CBA is a valid and enforceable contract between, among others, Ms. Kenyon and the Board of Education.

117. At all times relevant, Ms. Kenyon performed all the duties and obligations of her employment pursuant to the CBA.

118. The Board of Education breached the CBA in the following respects:

   a. Reprimanded Ms. Kenyon for engaging in non-school related activities, namely, posting the December 9 Instagram Story on her private Instagram account, in violation of Article IV (D) of the CBA;

   b. Failed to ensure Ms. Kenyon had an equal opportunity to present evidence during the Board of Education's investigation;

   c. Failed to produce and/or provide Ms. Kenyon with statements from the complainant in connection with the Board of Education's investigation.

   d. Failed to identify the complainant.

   e. Failed to remain objective during the investigation;

   f. Failed to keep the investigation and findings confidential and released sensitive information concerning the investigation to Defendant Bernstein; and

   g. Issued a Written Reprimand to Ms. Kenyon despite failing to abide by the investigation requirements set forth in the CBA.

119. As a direct and proximate cause of the Board of Education's material breaches of the CBA, Ms. Kenyon has suffered monetary, mental, and emotional damages, and has been subjected to harassment from a substantial portion of the greater Deerfield community.

WHEREORE, Britnee Kenyon respectfully requests the Court enters judgment in her favor and against Defendant Board of Education Township of High School District 113 on Count II of Ms. Kenyon's Verified Complaint at Law and awards damages in excess of $50,000, plus

#447731v1

attorneys' fees, costs, punitive damages, prejudgment interest, and for such other or further relief the Court deems necessary and just.

## COUNT III – DEFAMATION *PER SE*
### (*Britnee Kenyon v. Daniel Struck*)

120.     Ms. Kenyon reincorporates and realleges Paragraphs 1 through and including 106 as though fully set forth herein as Paragraph 120 of Count III of Ms. Kenyon's Verified Complaint at Law.

121.     Defendant Struck's December 14 Statement falsely, maliciously, and recklessly portrayed Ms. Kenyon as an anti-Semite who "disparages the personal beliefs and human decency of a substantial portion of our student body." Exhibit G.

122.     Defendant Struck's December 14 Statement was disseminated to the greater Deerfield community, which compromises of roughly 40,000 individuals, in response to Ms. Kenyon's December 9 Instagram Story.

123.     Defendant Struck's December 14 Statement was published before any DHS Administration, school official, or Board of Education member communicated with Ms. Kenyon to gather necessary facts and information.

124.     After the December 14 Statement was published by Struck, the amount of patently false, harassing, and threatening communications Ms. Kenyon received from parents in the community increased exponentially.  Those communications accused Ms. Kenyon of being an antisemite and called for Ms. Kenyon's termination.

125.     Struck's December 14 Statement was false and defamatory, and constitutes defamation *per se* in that it imputes an inability to perform or want of integrity in the discharge of the duties of Ms. Kenyon's employment, and in that it prejudiced Ms. Kenyon, and imputed a lack of ability in her trade, profession, and business.

21

126. Defendant Struck's statement was made with knowledge that the statement was false or made with a reckless disregard for its truth or falsity, which constitutes actual malice to Ms. Kenyon's reputation.

127. Defendant Struck's December 14 Statement was made with a direct intent of injuring Ms. Kenyon, in an effort to appease certain members of the greater Deerfield community.

128. As a direct and proximate result of Defendant Struck's December 14 Statement, Ms. Kenyon suffered humiliation, loss of reputation, and emotional and mental anguish.

WHEREORE, Britnee Kenyon respectfully requests the Court enters judgment in her favor and against Defendant Daniel Struck on Count III of Ms. Kenyon's Verified Complaint at Law and awards damages in excess of $50,000, plus attorneys' fees, costs, punitive damages, prejudgment interest, and for such other or further relief the Court deems just and proper.

## COUNT IV – FALSE-LIGHT INVASION OF PRIVACY
### (*Britnee Kenyon v. Daniel Struck*)

129. Ms. Kenyon reincorporates and realleges Paragraphs 1 through and including 119 as though fully set forth herein as Paragraph 129 of Count IV of Ms. Kenyon's Verified Complaint at Law.

130. Defendant Struck's December 14 Statement falsely, maliciously, and recklessly portrayed Ms. Kenyon as an anti-Semite who "disparages the personal beliefs and human decency of a substantial portion of our student body." Exhibit G.

131. Defendant Struck's December 14 Statement was disseminated to the greater Deerfield community, which is comprised of roughly 40,000 individuals, in response to Ms. Kenyon's December 9 Instagram Story.

22

132.    Defendant Struck's December 14 Statement was published before any DHS Administration, school official, or Board of Education member communicated with Ms. Kenyon to gather necessary facts and information.

133.    After the December 14 Statement was published by Defendant Struck, the amount of patently false, harassing, and threatening communications Ms. Kenyon received from parents in the community increased exponentially.  Those communications accused Ms. Kenyon of being an antisemite and called for Ms. Kenyon's termination.

134.    Defendant Struck's December 14 Statement placed Ms. Kenyon in a false light before the public.

135.    Defendant Struck's false December 14 Statement that Ms. Kenyon's December 9 Instagram Story "disparages the personal beliefs and human decency of a substantial portion of our student body" was highly offensive to a reasonable person.

136.    Defendant Struck intended to cause Ms. Kenyon loss of reputation, humiliation, and mortification.

137.    As a result of Defendant Struck placing Ms. Kenyon in a false light before the public, Ms. Kenyon suffered loss of reputation, humiliation, mental and emotional distress, and mortification.

138.    The foregoing demonstrates that Defendant Struck acted with actual malice. As such, Ms. Kenyon is entitled to punitive damages.

WHEREORE, Britnee Kenyon respectfully requests the Court enters judgment in her favor and against Defendant Daniel Struck on Count IV of Ms. Kenyon's Verified Complaint at Law and awards damages in excess of $50,000, plus attorneys' fees, costs, punitive damages, prejudgment interest, and for such other or further relief the Court deems just and proper.

#447731v1

## COUNT V – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (*Britnee Kenyon v. Daniel Struck*)

139.    Ms. Kenyon reincorporates and realleges Paragraphs 1 through and including 138 as though fully set forth herein as Paragraph 139 of Count V of Ms. Kenyon's Verified Complaint at Law.

140.    The intentional conduct of Defendant Struck, namely, disseminating the December 14 Statement to the greater Deerfield community in response to Ms. Kenyon exercising her Constitutional right to free speech was extreme and outrageous, going well-beyond the ordinary bounds of decency.

141.    By wrongfully, maliciously, and recklessly portraying Ms. Kenyon as an anti-Semite who "disparages the personal beliefs and human decency of a substantial portion of our student body[,]" Defendant Struck knowingly and recklessly subjected Ms. Kenyon to personal attacks and harassment from a substantial portion of the Deerfield community.

142.    As a direct and proximate result of the Defendant Struck's unlawful, reckless, and malicious conduct, Ms. Kenyon has suffered severe emotional distress, humiliation, embarrassment, mental and emotional distress, anxiety, economic harm, and such other consequential damages flowing from the Defendant Struck's conduct.

WHEREORE, Britnee Kenyon respectfully requests the Court enters judgment in her favor and against Defendant Daniel Struck on Count V of Ms. Kenyon's Verified Complaint at Law and awards damages in excess of $50,000, plus attorneys' fees, costs, punitive damages, prejudgment interest, and for such other or further relief the Court deems just and proper.

## COUNT VI – INTENTIONAL INFLICTION OF EMOTION DISTRESS
### (*Britnee Kenyon v. Thomas Krieger*)

#447731v1

143.     Ms. Kenyon reincorporates and realleges Paragraphs 1 through and including 106 as though fully set forth herein as Paragraph 143 of Count VI of Ms. Kenyon's Verified Complaint at Law.

144.     The intentional conduct of Krieger, including Krieger's reference in the Written Reprimand to a photograph shared on Ms. Kenyon's private Instagram Account detailing Ms. Kenyon's experience as a victim of sexual assault at age 19, and forcing Ms. Kenyon to recount and describe why she posted about her sexual assault on her private Instagram Account before the Board of Education would consider editing the Written Reprimand, was extreme and outrageous, going beyond the ordinary bounds of decency.

145.     Krieger acted with reckless disregard for the physical, mental, and emotional well-being of Ms. Kenyon by forcing her to recount her past sexual assault before the Board of Education.

146.     As a direct and proximate result of the Defendant Krieger's unlawful, reckless, and malicious conduct, Ms. Kenyon has suffered severe emotional distress, humiliation, embarrassment, mental and emotional distress, anxiety, economic harm, and such other consequential damages flowing from the Defendant Krieger's conduct.

WHEREORE, Britnee Kenyon respectfully requests the Court enters judgment in her favor and against Defendant Thomas Krieger on Count VI of Ms. Kenyon's Verified Complaint at Law and awards damages in excess of $50,000, plus attorneys' fees, costs, punitive damages, prejudgment interest, and for such other or further relief the Court deems just and proper.

## COUNT VII – INDEMNIFICATION
### (*Britnee Kenyon v. Board of Education Township of High School District 113*)

#447731v1

147.     Ms. Kenyon reincorporates and realleges Paragraphs 1 through and including 146 as though fully set forth herein as Paragraph 147 of Count VII of Ms. Kenyon's Verified Complaint at Law.

148.     Public entities are required by law to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

149.     Defendants Struck and Krieger were employees of the Board of Education, who acted within the scope of their employment in committing the tortious acts alleged herein.

WHEREFORE, should Defendants Daniel Struck and/or Thomas Krieger be found liable for the acts alleged herein, Defendant Board of Education Township of High School District 113 would be liable to pay any judgment obtained against those defendants.

## COUNT VIII – DEFAMATION *PER SE*
### (*Britnee Kenyon v. Michelle Hammer Bernstein*)

150.     Ms. Kenyon reincorporates and realleges Paragraphs 1 through and including 106 as though fully set forth herein as Paragraph 150 of Count VIII of Ms. Kenyon's Verified Complaint at Law.

151.     Defendant Bernstein, using the pseudonym "Michelle Leah," created and published the First Facebook Post, maliciously, and intentionally accusing Ms. Kenyon, a Jewish woman, of posting anti-Semitic "memes" that "slandered" Israel.  *See* Exhibit D.

152.     Defendant Bernstein's First Facebook Post demanded that parents "call Bruce [Law] and send to the [Board of Education] if you agree." *Id.*   The obvious intent behind Bernstein's First Facebook Post was to harm Ms. Kenyon and motivate Bruce Law to terminate her.

#447731v1

153. Defendant Bernstein also posted the content of Bernstein's First Facebook Post on "Deerfield High School – Friend of the Arts" Facebook Page, then again on the "Highland Park / Highwood, Planning Our Future" Facebook page.  Exhibit E and Exhibit F.

154. After Bernstein learned that Ms. Keynon was not terminated from her position as DHS's Theatre Director, Bernstein once again disseminated patently false and disparaging statements concerning Ms. Kenyon, once again falsely declaring that Ms. Kenyon is "antisemitic." *See* Exhibit I.

155. Defendant Bernstein's First, Second, Third, and Fourth Facebook Posts contain statements regarding Ms. Kenyon that were unequivocally false and maliciously accused Ms. Kenyon of being anti-Semitic without any factual basis and with reckless disregard for the truth.

156. Bernstein's First, Second, Third, and Fourth Facebook Posts concerning Ms. Kenyon were published and disseminated to thousands of individuals in the greater Deerfield community.

157. As a direct result of Defendant Bernstein's various Facebook posts concerning Ms. Kenyon, Ms. Kenyon received numerous threats and harassing communications from people she did not know, including one believed to be someone from as far away as Canada.

158. Bernstein's First, Second, Third, and Fourth Facebook Posts concerning Ms. Kenyon were false and defamatory and constitute defamation *per se* in that they impute an inability to perform or want of integrity in the discharge of the duties of Ms. Kenyon's employment, and in that they prejudiced Ms. Kenyon, and imputed a lack of ability in her trade, profession, and business.

159. Bernstein's statements were made and published with the direct intent of injuring Ms. Kenyon.

160.    As a direct and proximate result of Defendant Bernstein's statements, Ms. Kenyon suffered humiliation, loss of reputation, and emotional and mental anguish.

WHEREORE, Britnee Kenyon respectfully requests the Court enters judgment in her favor and against Defendant Michelle Hammer Bernstein on Count VIII of Ms. Kenyon's Verified Complaint at Law and awards damages in excess of $50,000, plus attorneys' fees, costs, punitive damages, prejudgment interest, and for such other or further relief the Court deems just and proper.

## COUNT IX – FALSE-LIGHT INVASION OF PRIVACY
### (*Britnee Kenyon v. Michelle Hammer Bernstein*)

161.    Ms. Kenyon reincorporates and realleges Paragraphs 1 through and including 106 as though fully set forth herein as Paragraph 161 of Count IX of Ms. Kenyon's Verified Complaint at Law.

162.    Defendant Bernstein, using the pseudonym "Michelle Leah," created and published the First Facebook Post, maliciously, and intentionally accusing Ms. Kenyon, a Jewish woman, of posting anti-Semitic "memes" that "slandered" Israel. *See* Exhibit D.

163.    Defendant Bernstein's First Facebook Post demanded that parents "call Bruce [Law] and send to the [Board of Education] if you agree." *Id.*   The obvious intent behind Bernstein's First Facebook Post was to harm Ms. Kenyon and motivate Bruce Law to terminate her.

164.    Defendant Bernstein also posted the content of Bernstein's First Facebook Post on "Deerfield High School – Friend of the Arts" Facebook Page, then again on the "Highland Park / Highwood, Planning Our Future" Facebook page. Exhibit E and Exhibit F.

165.    After Bernstein learned that Ms. Keynon was not terminated from her position as DHS's Theatre Director, Bernstein once again disseminated patently false and disparaging

statements concerning Ms. Kenyon, once again falsely declaring that Ms. Kenyon is "antisemitic." *See* Exhibit I.

166.     Defendant Bernstein's First, Second, Third, and Fourth Facebook Posts concerning Ms. Kenyon were unequivocally false and each maliciously accused Ms. Kenyon of being antisemitic without any factual basis and with reckless disregard for the truth.

167.     Bernstein's First, Second, Third, and Fourth Facebook Posts concerning Ms. Kenyon were published and disseminated to thousands of individuals in the greater Deerfield 113 community.

168.     Bernstein's First, Second, Third, and Fourth Facebook Posts concerning Ms. Kenyon placed Ms. Kenyon in a false light before the public.

169.     The false statements contained in Defendant Bernstein's First, Second, Third, and Fourth Facebook Posts concerning Ms. Kenyon were highly offensive to a reasonable person.

170.     Bernstein intended to cause Ms. Kenyon loss of reputation, humiliation, and mortification.

171.     As a result of Bernstein placing Ms. Kenyon in a false light before the public, Ms. Kenyon suffered loss of reputation, humiliation, mental and emotional distress, and mortification.

172.     The foregoing demonstrates that Defendant Bernstein acted with actual malice. As such, Ms. Kenyon is entitled to punitive damages.

WHEREORE, Britnee Kenyon respectfully requests the Court enters judgment in her favor and against Defendant Michelle Hammer Bernstein on Count IX of Ms. Kenyon's Verified Complaint at Law and awards damages in excess of $50,000, plus attorneys' fees, costs, punitive damages, prejudgment interest, and for such other or further relief the Court deems just and proper.

## COUNT X – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (*Britnee Kenyon v. Michelle Hammer Bernstein*)

#447731v1

173.    Ms. Kenyon reincorporates and realleges Paragraphs 1 through and including 106 and Paragraphs 150 through and including 172 as though fully set forth herein as paragraph 173 of Count X of Ms. Kenyon's Verified Complaint at Law.

174.    The CBA constitutes a valid and enforceable contract between Ms. Kenyon and the Board of Education.

175.    Bernstein had knowledge of the CBA between Ms. Kenyon and the Board of Education, as Defendant Bernstein was aware that Ms. Kenyon was employed as DHS Theatre Director and actively called for Ms. Kenyon's termination.

176.    Bernstein intentionally and without justification, induced and caused the Board of Education to breach the CBA via her relentless—yet patently false—claims to the Board of Education of "harassment" and "antisemitism" in response to Ms. Kenyon's December 9 Instagram Story. Defendant Bernstein on numerous occasions called for Ms. Kenyon's termination. *See* Exhibit D.

177.    As a direct and proximate result of Bernstein's unjustified inducement, the Board of Education breached the CBA via its erroneous investigation aimed at harassing Ms. Kenyon and forcing a direct or constructive termination of Ms. Kenyon because of Ms. Kenyon's exercise of protected free speech via her December 9 Instagram Story.

178.    Ms. Kenyon has suffered and continues to suffer damages, including but not limited to economic loss and mental, physical, and emotional damage as a result of Bernstein's unjustified inducement of the Board of Education's breach of the CBA.

WHEREORE, Britnee Kenyon respectfully requests the Court enters judgment in her favor and against Defendant Michelle Hammer Bernstein on Count X of Ms. Kenyon's Verified

#447731v1

Complaint at Law and awards damages in excess of $50,000, plus attorneys' fees, costs, punitive damages, prejudgment interest, and for such other or further relief the Court deems just and proper.

**COUNT XI – RESPONDENT-IN-DISCOVERY**
***(J.L.)***

179.     Ms. Kenyon reincorporates and realleges Paragraphs 1 through and including 106 as though fully set forth herein as Paragraph 179 of Count XI of Ms. Kenyon's Verified Complaint at Law.

180.     Pursuant to 735 ILCS 5/2-402, Ms. Kenyon has a good faith belief that J.L. has information essential to the determination of who should properly be named as additional defendants to this action, including, without limitation, J.L.

WHEREFORE, Ms. Kenyon requests this Court to enter an order requiring respondent-in-discovery J.L. to promptly respond to all discovery within the time allocated by the Illinois Supreme Court rules.

**JURY DEMAND**

Ms. Kenyon demands a trial by jury on all issues so triable.

Respectfully submitted,

Britnee Kenyon,

By:     */s/ Adam M. Berger*　　　　　
　　　　One of Her Attorneys

Adam M. Berger (ARDC No.  6269402)
Myles R. Carroll  (ARDC No. 6335660)
MILLER BERGER, LLC
20 N. Clark St., Ste. 525
Chicago, IL 60602
(312) 283-4563
Firm No.: 64620
Adam@MillerBerger.com
Myles@MillerBerger.com

31

## **VERIFICATION**

Under penalties as provided by law pursuant to Section 5/1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in the foregoing Amended Complaint are true and correct, except as to those matters stated to be on information and belief, and as to such matters, the undersigned certifies as aforesaid that she verily believes the same to be true.

By: _____
Britnee Kenyon

#447731v1

## IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
## LAKE COUNTY, ILLINOIS

|  |  |  |
|---|---|---|
| BRITNEE KENYON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2024 LA 441 |
| v. | ) | |
| | ) | |
| BOARD OF EDUCATION TOWNSHIP | ) | |
| HIGH SCHOOL DISTRICT 113, DANIEL | ) | **JURY DEMAND** |
| STRUCK, Individually and in his Official | ) | |
| Capacity, THOMAS KRIEGER, | ) | |
| Individually and in his Official Capacity, | ) | |
| and MICHELLE HAMMER BERNSTEIN, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| J.L., | ) | |
| | ) | |
| Respondent-In-Discovery | ) | |

### RULE 222(b) AFFIDAVIT

NOW COMES the Affiant, ADAM M. BERGER, and states the following under oath:

1. That he is one of the attorneys for the Plaintiff in this matter;

2. The total money damages sought in this matter exceeds $50,000.00, exclusive of interests and costs.

Further affiant sayeth naught.

*/s/ Adam M. Berger*

[X]    Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, I certify that the statements set forth herein are true and correct.

Adam M. Berger (ARDC No.  6269402)
Myles R. Carroll  (ARDC No. 6335660)
MILLER BERGER, LLC
20 N. Clark St., Ste. 525
Chicago, IL 60602
(312) 283-4563
Firm No.: 64620
Adam@MillerBerger.com
Myles@MillerBerger.com

33

# EXHIBIT A

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

EXHIBIT A



# COLLECTIVE BARGAINING AGREEMENT

between

## The Board of Education of
## Township High School District 113

and

### The District 113 Education Association
### IEA-NEA (DEA)



# COLLECTIVE BARGAINING AGREEMENT

**hereinafter referred to as "The Agreement"**

## between

## The Board of Education of Township High School District 113

## and the District 113 Education Association, IEA-NEA (DEA)

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

# TABLE OF CONTENTS

**ARTICLE I - INTRODUCTION** ................................................................. 7

   **A. Recognition** ................................................................................. 7

   **B. Shared Commitment to Non-Discrimination / Equal Employment Opportunity Practices** ...... 7

**ARTICLE II - ASSOCIATION RIGHTS AND RESPONSIBILITIES** ......................................... 8

   **A. Association's Exclusive Bargaining Rights** ................................................. 8

   **B. Recognition of this Agreement** ............................................................ 8

   **C. Resolution of Questions** ................................................................. 8

   **D. Association Announcements** ............................................................... 8

   **E. Association Meetings** .................................................................... 8

   **F. Dues Deductions** ....................................................................... 9

   **G. DEA Release Time** ...................................................................... 9

   **H. Job Descriptions** ...................................................................... 9

   **I. Association's Right to Information** ...................................................... 9

   **J. Association's Right to Appear before the Board** ........................................ 10

   **K. Association's Right to Address Employees** ............................................. 10

   **L. Association/Administration Meetings** ................................................... 10

   **M. Response to FOIA Requests** ........................................................... 10

   **N. Changes in the Status of Bargaining Unit Members** .................................... 10

   **O. Visits by IEA Representatives** ......................................................... 11

   **P. Association's Use of Phones, Network, Equipment** ..................................... 11

   **Q. Office Space** ......................................................................... 11

   **R. Faculty Handbook** .................................................................... 11

**ARTICLE III - MANAGEMENT RIGHTS AND RESPONSIBILITIES** ........................................ 12

**ARTICLE IV - RIGHTS OF LICENSED STAFF MEMBERS** ............................................... 13

   **A. Non Discrimination Clause** ............................................................ 13

   **B. Shared Discipline Responsibility** ...................................................... 13

   **C. Academic Freedom / Recognition of LSM Professional Judgment** ......................... 13

   **D. Privacy / Non-School Activities** ....................................................... 13

   **E. Outside Employment** .................................................................. 14

   **F. Tentative Teaching/Work Assignments** ................................................. 14

   **G. Substitute Teachers** .................................................................. 14

3249123.1

**H. Mandated Training Tutorials** ..................................................................................14

**I. Building Access/Safety** ........................................................................................14

**J. Biometrics** ...........................................................................................................14

**K. Health Requirements for LSMs** ...........................................................................15

**L. Safe Work Environment** ......................................................................................15

**M. Parent Complaints** .............................................................................................15

**N. LSM Protection from Suit** ...................................................................................15

**ARTICLE V - DISCIPLINE** .......................................................................................16

**A. Investigation of Complaints and Alleged Misconduct** ...........................................16

**B. Meetings / Representation** ...................................................................................16

**C. Just Cause** .........................................................................................................16

**ARTICLE VI - EMPLOYMENT** .................................................................................18

**A. Notice of Vacancies** ............................................................................................18

**B. Voluntary Transfer** ..............................................................................................18

**C. Involuntary Transfer** ...........................................................................................18

**D. Promotion** ..........................................................................................................19

**E. Seniority** .............................................................................................................20

**F. Reduction in Force** ..............................................................................................21

**G. Sequence of Honorable Dismissal** ......................................................................21

**H. Re-employment Procedures for RIFed LSMs (Recall)** ..........................................21

**ARTICLE VII - WORKING CONDITIONS** ..................................................................24

**A. School Year** ........................................................................................................24

**B. LSM Workload and Work Day** .............................................................................24

**C. Full-Time Teaching Load** ....................................................................................24

**D. Class Size** ..........................................................................................................25

**E. Full-Time Non-Classroom LSM Student Assignments** ..........................................26

**F. Homeroom** ..........................................................................................................26

**G. Preparations** ......................................................................................................26

**H. Co-teaching and Interdisciplinary Teaching** .........................................................26

**I. Summer Work** ......................................................................................................27

**J. Overage (Sixth Assignments)** ..............................................................................27

**K. Open House and Graduation** ...............................................................................27

**L. Learning Management System, Student Information System, and Grading** ...............28

M. Internal Substitute Teaching ................................................................................28

N. Letters of Recommendation ................................................................................28

O. New LSM Orientation ........................................................................................28

ARTICLE VIII - SPECIAL EDUCATION ................................................................29

A. Special Education - Teaching Assignments .......................................................29

B. Special Education - Optimal Class Sizes and Caseloads ..................................29

C. IEP Meetings, Paperwork, and Summer Evaluations .......................................29

D. Special Education Workload Plan Committee ...................................................30

ARTICLE IX - PART-TIME LICENSED STAFF MEMBERS ...............................32

A. Part-Time LSM Workload ...................................................................................32

B. Salary and Benefits .............................................................................................32

C. Leaves ...................................................................................................................33

ARTICLE X - LEAVES OF ABSENCE ....................................................................34

A. Sick Leave ............................................................................................................34

B. Temporary Illness or Temporary Incapacity - Tenured Teachers .....................35

C. Religious Leave ....................................................................................................36

D. Personal Leave .....................................................................................................36

E. Parental Leave ......................................................................................................36

F. Grandchild Leave ..................................................................................................37

G. FMLA Leave .........................................................................................................38

H. Unpaid Leaves of Absence ..................................................................................38

I. Procedures for LSMs Granted Part-Time Status .................................................39

J. Catastrophic Leave ...............................................................................................40

K. Bereavement ........................................................................................................41

L. Jury Duty ..............................................................................................................41

ARTICLE XI - SALARY AND BENEFITS ..............................................................42

A. Salary ....................................................................................................................42

B. Additional Compensation / Benefits ...................................................................43

C. PARC (Professional Advancement Review Committee) Funds .........................44

D. Summer School .....................................................................................................46

E. Creditable Earnings ..............................................................................................47

ARTICLE XII - LEADERSHIP STIPENDS AND NON-CLASSROOM LSMs ............48

A. Dean of Students ..................................................................................................48

B. Director of Instructional Technology ....................................................................48

C. Nurse ...................................................................................................................49

D. School Psychologist ...............................................................................................49

E. Social Worker ......................................................................................................49

F. Speech Pathologist ................................................................................................50

G. 504 Coordinator ..................................................................................................50

H. Special Education Team Lead ...............................................................................50

I. Counselor .............................................................................................................51

J. District Outplacement Coordinator .......................................................................51

ARTICLE XIII - ATHLETICS, ACTIVITIES, AND EXTRA DUTIES ...........................52

A. Athletics and Activities .........................................................................................52

B. Stipend Review Advisory Committee (SRAC) ........................................................52

C. Stipends ...............................................................................................................53

D. Chaperone Duty Compensation ............................................................................55

E. Extra Duty Compensation ....................................................................................55

ARTICLE XIV - FRINGE BENEFITS AND INSURANCE ............................................56

A. Insurance Coverage -- Group Coverage ................................................................56

B. Insurance - Health, Dental, Vision ......................................................................56

C. Term Life Insurance ............................................................................................57

D. Accidental Death and Dismemberment Insurance .................................................57

E. Income Protection / Disability Stipend ..................................................................57

F. Flexible Benefits Plan ..........................................................................................57

ARTICLE XV - RETIREMENT ....................................................................................58

A. Voluntary Retirement Incentive Plan ....................................................................58

B. Voluntary Retirement Incentive Plan Eligibility ....................................................58

C. Retirement Incentive Bonuses ..............................................................................58

D. Post-Retirement Insurance Supplement ................................................................61

E. Revocation ...........................................................................................................61

ARTICLE XVI - GRIEVANCE PROCEDURES .............................................................62

A. Grievance - Purpose .............................................................................................62

B. Grievance - Defined .............................................................................................62

C. Informal Resolution .............................................................................................62

D. Procedures for Adjustment of a Grievance ............................................................62

    E. General Provisions ...................................................................................................64

**ARTICLE XVII - PERSONNEL FILES** ............................................................................66

    A. Official Personnel File ..........................................................................................66

    B. File - Defined ........................................................................................................66

    C. Timely Insertion ...................................................................................................66

    D. Right of Access .....................................................................................................66

    E. Confidentiality and Notice ...................................................................................66

    F. Right of Fair Evaluation Record ...........................................................................67

    G. Right of Copy .......................................................................................................67

    H. Right of Addition and Attachment .......................................................................67

    I. Right of Integrity of File ........................................................................................67

    J. Rights When Cleared of a Criminal or Disciplinary Charge ..................................67

    K. Grievances ...........................................................................................................67

**ARTICLE XVIII - DISTRICT COMMITTEES** ................................................................68

    A. Calendar Committee .............................................................................................68

    B. Curriculum, Instruction, and Assessment Committee ...........................................68

    C. Insurance Advisory Committee (IAC) ..................................................................68

    D. Multi-Tiered System of Support (MTSS) Advisory Committee ............................69

    E. Professional Advancement Review Committee (PARC) .........................................69

    F. Performance Evaluation Review Act (PERA) Joint Committee .............................70

    G. Special Education Workload Plan Committee ........................................................70

    H. Stipend Review Advisory Committee (SRAC) ......................................................70

    I. Student Behavior & Security Committee ...............................................................70

    J. Special Committee for a Common Schedule ..........................................................70

    K. Other Working Committees ..................................................................................71

**ARTICLE XIX - EVALUATIONS** ...................................................................................72

**ARTICLE XX - NO STRIKE / NO LOCKOUT** ................................................................73

**ARTICLE XXI - TERM OF THE AGREEMENT** .............................................................74

**APPENDIX A** ................................................................................................................75

**APPENDIX B** ................................................................................................................76

**APPENDIX C** ................................................................................................................77

**APPENDIX D** ................................................................................................................78

**APPENDIX E** ................................................................................................................79

3249123.1

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

**APPENDIX F** ................................................................................................80

**ADDENDUM** ................................................................................................81

    **LSM Step Adjustments**................................................................................81

# ARTICLE I - INTRODUCTION

**A. Recognition**

The bargaining unit is clarified as follows:

**Included**: All full-time and part-time regularly employed licensed staff members ("LSMs") which include teachers, librarians, deans of students, school nurses, school social workers, counselors, psychologists (including building or district level outplacement coordinators), speech pathologists and building level directors/coordinators.

**Excluded**: Department chairs (including the Director of the Highland Park High School Library and the MTSS Directors), special education administrators, athletic directors, activities directors, assistant athletic directors, assistant activities directors, non-certified staff, and all supervisors, managers, confidential and short-term employees as defined in the Illinois Education Labor Relations Act.

**B. Shared Commitment to Non-Discrimination / Equal Employment Opportunity Practices**

The Board and the Association affirm their continued support of the Board's policies prohibiting discrimination on account of race, religion, color, nationality, gender, gender identity, sexual orientation, marital status, age, or disability in accordance with law.

# ARTICLE II - ASSOCIATION RIGHTS AND RESPONSIBILITIES

## A. Association's Exclusive Bargaining Rights

All collective bargaining shall be conducted between the duly authorized representatives of the Association and the Board, and the Board shall not negotiate with any other individual, group, or organization purporting to collectively represent employees covered by this Agreement; provided, however, this Agreement shall not be construed to prevent the Board or any administrator from meeting with an employee or group of employees for the purpose of hearing the views of such employee or group of employees, but not for the purpose of negotiating with any employee or group of employees. There shall be no substantial changes in any terms and conditions of employment specifically set forth in this Agreement, without mutual written agreement between the Association and the Board.

## B. Recognition of this Agreement

This Agreement and all of its provisions shall be the policy of the Board and supersede any Board policy presently to the contrary. Board policy established during the term of this Agreement shall be in conformity with its provisions. Individual LSM contracts shall be so drawn as to indicate that they are subject to the provisions of this Agreement.

## C. Resolution of Questions

The Association and the Board and/or its representatives shall meet within a reasonable time upon request of either party for the purpose of resolving questions concerning the implementation of this Agreement and related matters. When Association representatives meet with the Board, or its duly authorized representatives, to discuss the implementation of this Agreement, they shall suffer no loss of pay or other benefits.

## D. Association Announcements

The Association shall have the right to freely communicate through the intra-district mail system and LSM mailboxes, district email, and bulletin boards in the staff cafeterias. All emails must comport with Board Policy 6-235, Access to Electronic Networks. Only an Association designee shall post or remove materials from Association bulletin boards. The Association shall have the right to make reports and announcements at general, building, and department meetings. Notice of Association activities shall be included and published in general and school calendars.

## E. Association Meetings

The Association shall have the right to conduct meetings using district facilities so long as the facilities are not already reserved or in use. The Association will schedule use of the facility in the same manner that the rooms are currently reserved.

**F. Dues Deductions**

The Board agrees to deduct Association membership dues on standard LSM payroll dates, divided evenly starting in October of each school year and ending in June, from the pay of those employees who individually request in writing that such deductions be made. After the dues deductions are made, they shall be remitted together with an itemized statement to the Treasurer of the Association. Authorization for each deduction shall be in effect for the duration of the Agreement unless a written notice of revocation is given by the DEA to the Board on behalf of the employee. Revocation shall become effective as soon as possible after such notice is given.

**G. DEA Release Time**

The Board shall grant a release of four (4) classes (two for the DEA President and one each for the two DEA Vice Presidents) for each semester of each academic year of this Agreement. The District shall be responsible for the payment of all costs associated with the release granted to the DEA President and to the two Vice Presidents. The FTE granted shall be in addition to each school's standard FTE allotment. In addition, the DEA President and both Vice Presidents shall be exempt from all supervisory assignments, assignments to a homeroom, and all similar assignments given to other LSMs as part of their duties.

The Board shall grant up to twenty-five (25) full days to the Association to allocate for professional duties or professional development of its members. The assignment of these days will be at the sole discretion of the DEA. The DEA shall reimburse the District for the full cost of providing substitutes on these days. The District will continue to provide and pay for substitutes for any meetings that may occur during the school day where DEA and the Administration are negotiating or meeting as part of their joint work together and where substitutes are required.

Association officers shall be granted professional leave to attend national and/or state organization meetings. The Association shall be responsible for all costs relative to attendance at such meetings and shall pay the District the cost of substitutes. A maximum of ten (10) days shall be allowed for this leave.

**H. Job Descriptions**

The Board shall provide the Association with a complete set of job descriptions for all positions covered by this Agreement. If any of the said job descriptions are subsequently revised or modified, the board shall provide the Association with a copy of the new job description. The Association shall have an opportunity to request impact bargaining on any changes, additions, or revisions to any job description prior to implementation.

**I. Association's Right to Information**

The Board shall furnish the Association with the following documents and types of information as they are received, completed, or compiled as otherwise indicated:
1. Board agendas via email notice with link
2. Official minutes of Board meetings via publication on the public website

3. Board School policy and procedures manuals with updated revisions via publication on the public website. The DEA will be provided agendas for all policy committee meetings so that it is aware of proposed additions and revisions to Board policy prior to final approval.
4. Upon request, any and all information, statistics, and records which may be relevant to negotiations or necessary for the proper enforcement of this Agreement, provided nothing herein shall require the Board to research or develop any information or reports that are not already prepared and available.
5. Proposed changes to school or District policy that impact LSM working conditions will be shared with the DEA President via email from the Building Principal or Superintendent/designee.

The Board shall provide to the DEA any information as required by law. Nothing in this provision shall limit what the Board must provide the DEA in compliance with the law.

### J. Association's Right to Appear before the Board

The Association President or their designee shall have the right to address the Board during public comment. The Association speaker, shall, whenever possible, give notice through the Superintendent of their intention to address the Board.

### K. Association's Right to Address Employees

The Association President or their designee shall have the right to address new employees at their new staff orientation meetings near the beginning of the school year. In addition, the President or their designee may address members at the first all-district meeting of the year. The DEA Vice Presidents or their designees may address members at the opening meetings of their respective high schools. The Vice Presidents, or their designees, will also be able to give short announcements at all-staff meetings in the high schools.

### L. Association/Administration Meetings

DEA officers shall meet with district-level administrators monthly to discuss matters concerning the implementation of this Agreement and related matters. The Association Vice Presidents, or their designee, shall meet monthly with the principal of their respective buildings to discuss matters concerning the implementation of this Agreement and related matters.

### M. Response to FOIA Requests

The Association President shall be notified within three (3) business days of the employer's receipt of a Freedom of Information Act (FOIA) request that asks for any information about any bargaining unit member(s).

### N. Changes in the Status of Bargaining Unit Members

After the first day of the school year, the Association will be provided the change in status of any bargaining unit member within ten (10) workdays of the change.

### O. Visits by IEA Representatives

Non-employee representatives of the IEA shall be permitted access to school buildings for the purpose of representing employees covered in this Agreement, provided the official will present identification to the security officers at the building entrance. Any such visits shall be made in a manner so as not to disrupt the operation of the school.

### P. Association's Use of Phones, Network, Equipment

The Association shall have, without charge, use of the school telephones for intra-district calls, use of photocopiers, and use of email and the district network. The DEA will pay for any costs of copies made, and shall comply with current district practices regarding email and use of networks.

### Q. Office Space

The Association will be provided work space in each high school building upon request for such space through the procedures established by each building.

### R. Faculty Handbook

The Faculty Handbook shall be available to all LSMs. DEA Representatives will be provided the opportunity to propose revisions and review changes prior to publication. The Faculty Handbook will be updated annually and posted on the District website by the first day of New Staff Orientation each school year.

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

# ARTICLE III - MANAGEMENT RIGHTS AND RESPONSIBILITIES

The Board shall not be required to bargain over matters of inherent managerial policy, which shall include such areas of discretion or policy as to the functions of the District, standards of service, its overall budget, the organizational structure and selection of new employees, and direction of employees. If there is a dispute concerning whether any issue that arises during the term of this Agreement raises a mandatory subject of bargaining or is a matter of inherent managerial authority, the parties will first attempt to resolve the dispute informally. Nothing in this section prevents the DEA from filing an unfair labor practice in regard to an action which they believe impacts their rights under the Illinois Educational Labor Relations Act.

3249123.1

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

# ARTICLE IV - RIGHTS OF LICENSED STAFF MEMBERS

## A. Non Discrimination Clause

The Board agrees that membership in the Association, participation in any activities of the Association, or the institution of any grievance, complaint, or proceeding under this Agreement, shall not affect the terms or conditions of employment of any LSM. It is understood that opinions and views relating to supervisor-staff member or school board-staff member relationships will not be discussed in the presence of students.

## B. Shared Discipline Responsibility

LSMs will be given reasonable support and assistance by the Board and the Administration with respect to the management and discipline of students. A committee, which includes building principals, deans, classroom teachers selected by DEA, and school mental health professionals will meet at least two (2) times per year to review disciplinary data and discuss current disciplinary practices.

## C. Academic Freedom / Recognition of LSM Professional Judgment

It is the intent of the Parties to ensure that LSMs enjoy academic freedom in the District.

Academic freedom shall mean that LSMs are free to present instructional materials which are pertinent to the subject and level taught, within the outlines of appropriate course content and within the planned instructional program, as determined by the Illinois Learning Standards, as memorialized in Board Policy 6-60 and as approved by the District.

Academic freedom shall also mean that LSMs shall be entitled to freedom of discussion within the classroom on all matters which are relevant to the subject matter under study and within their area of professional competence, assuming that all facts concerning controversial issues shall be presented in a scholarly and objective manner that is viewpoint neutral, and assuming that all discussion shall be maintained within the outlines of appropriate course content, and be pedagogically justifiable.

Any allegation that there has been a violation of academic freedom shall be processed through the grievance procedure provided by this Agreement up to the level of the Board of Education.

## D. Privacy / Non-School Activities

Neither the Board nor the Administration shall make regulations that attempt to govern employees' non-school activities save in exceptional circumstances where such activities can be proven to have had a substantial negative impact on the LSMs ability to perform the duties associated with their assigned role.

3249123.1

### E. Outside Employment

The employment of an LSM outside of the school during the school year shall be at the discretion of the LSM, but any such employment must not interfere with the efficiency of the LSM in the school or conflict with any school responsibility or ethical obligation in relation to their duty as a public school employee.

### F. Tentative Teaching/Work Assignments

LSMs shall be notified prior to the last day of student attendance of the school year of their tentative teaching or work assignments for the following school year. It is understood that some changes may occur.

### G. Substitute Teachers

In no case shall an LSM planning to be absent be held responsible for obtaining a substitute teacher. LSMs shall not be required to substitute for another LSM.

### H. Mandated Training Tutorials

LSMs are required by Illinois law to complete compliance training across various topics. These trainings will be required in accordance with the schedule established by Illinois law and regulations. LSMs may use independent work time or professional duty periods (when not assigned to other professional work duties) to complete such trainings. This section only applies to state-mandated compliance trainings and does not apply to professional development required by the District.

### I. Building Access/Safety

In part of the joint interest in maintaining a safe and welcoming school environment for students, staff, and the community, LSMs understand that controlling access to our buildings is essential. LSMs understand that they will use their building ID whenever entering the school building. An ID swipe may be required when exiting unstaffed security doors at the end of the school day, or at any door when exiting the building during school hours. Recording of LSMs using IDs to enter or leave the building or rooms within the campuses, shall not be used as a part of evaluation or discipline and will only be used to create a record of who is in the building for safety purposes.

### J. Biometrics

Other than those procedures required for background checks and for initial employment purposes, staff shall not be required to provide or use biometric data as part of their employment in the District. This includes fingerprint scans, retina scans, voice scans, face identification, and/or any other biometric data.

Should the District be required to initiate a security system utilizing biometric data of any kind for its network or access to its buildings/facilities, or determine to institute such a system in the interest

of the safety and security of students, staff, and visitors, the Board will initiate impact bargaining with the DEA prior to initiating any such system.

## K. Health Requirements for LSMs

LSMs will only be required to have vaccinations and other medical examinations as required by state law or as a result of an executive order issued by the Illinois Governor, as a condition of employment. Should the Board determine that additional health precautions are necessary for the safe operation of the schools, it will initiate decisional bargaining on this matter with the DEA. Both the Board and the DEA acknowledge their duty to initiate bargaining within two (2) school business days of such determination, and to bargain in good faith on this issue. If no agreement is reached, the provisions of this section will remain in full effect.

## L. Safe Work Environment

An LSM who becomes aware of a potentially unsafe or hazardous condition, such as mold or poor air quality, shall report the situation by submitting a ticket via the Maintenance Direct (or equivalent) platform. A response will be provided to the LSM within five (5) days. Conditions which pose an immediate threat to the health and safety of students or staff members must be immediately reported to the building manager.

## M. Parent Complaints

Any complaint by a parent of a student directed toward an LSM which is to be used for evaluative purposes shall be reported to the LSM in writing. No disciplinary action shall be taken without following the guidelines established within this Agreement.

## N. LSM Protection from Suit

In accordance with the Section 10-20.20 (105 ILCS 5/10-20.20), the Board shall provide indemnification and protection against claims and suits.

An LSM shall not suffer any loss of salary if they are required to be absent from their duties because of court proceedings or related appearances, meetings, or investigations arising out of performance of their duties in accordance with Board policy.

# ARTICLE V - DISCIPLINE

## A. Investigation of Complaints and Alleged Misconduct

Complaints regarding an LSM upon which disciplinary action may occur will be reported to the LSM within five (5) school days. In the event a meeting with an administrator is required to discuss and/or investigate such a complaint or allegation, the LSM may be accompanied to such a meeting by a DEA representative. LSMs will be provided at least 24 hours notice of such a meeting and informed of their right to have a DEA representative present at the meeting. Where a complaint or allegation involves a matter related to the safety of a student or the school community, 24 hours notice shall not be required.

Notice will be provided in writing and will state the complaint or allegation being investigated. The LSM will have the opportunity to respond to the complaint/investigation. The Administration may direct that during the investigation, all information related to the complaint or allegation remain confidential. Retaliation against any individual who makes a complaint is not permitted.

The LSM shall have the right to be accompanied by their DEA representative(s) to any subsequent investigatory meeting, or a meeting to share the results of the investigation. LSMs will be informed, in writing, of the conclusions of an investigation into a complaint or allegation of misconduct at the conclusion of the investigation. In addition, if an investigation is not concluded within ten (10) school days, the administration shall provide an update, and periodic updates of the status of the investigation; the LSM or the DEA representative may also ask for such updates via an email to the administrator conducting the investigation.

Any complaint raised regarding an LSM that implicates a duty under the *Abused and Neglected Child Reporting Act* will be processed in accordance with the requirements of the Act.

Department Chairs, Activities Directors, or any member of the bargaining unit shall not conduct investigations.

## B. Meetings / Representation

In accordance with the *Weingarten* rule, an LSM is entitled to DEA representation at any meeting with a supervisor that may result in disciplinary action.

## C. Just Cause

The District shall inform an employee of the right to Association representation during a meeting which may lead to disciplinary action. The District shall give an employee 24 hours notice before holding a meeting related to potential disciplinary action except in an egregious situation.

Employees shall only be disciplined for just cause.

The Association and the District agree that discipline should be timely, progressive (when appropriate) and accompanied by counseling (where appropriate). The Parties agree that

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

progressive discipline typically includes, in order: oral reprimand; written reprimand; suspension; and termination. The District may combine steps of progressive discipline if the severity and facts of the situation warrant such action.

Tenured LSM dismissal proceedings are not subject to this provision.

# ARTICLE VI - EMPLOYMENT

## A. Notice of Vacancies

A vacancy occurs when an LSM resigns or is terminated from a position or when a new position is created. This provision does not apply to circumstances where there has been a reduction in force and an LSM with recall rights moves into the open position.

During the school year, the Board agrees to post all vacancies on the District website for at least five (5) business days prior to filling the position. The notice shall clearly set forth the specifications and/or qualifications, the compensation for the position, and worksite, when known.

## B. Voluntary Transfer

Any LSM who meets the specified requirements for a vacancy and desires a transfer to a different building or to a different position within the same building shall notify the Human Resources Department in writing within five (5) business days following the announcement of the vacancy. All qualified internal LSM applicants for a vacancy will be offered an opportunity to interview for the position; however, the decision to fill the vacancy remains within the discretion of the District. Internal LSM candidates will be evaluated for the position based on the following factors (in no particular order):

- Qualifications including degree(s) and special expertise
- Seniority
- Experience
- Effect of extra-curricular assignments

In the event that an LSM chooses not to accept a position offered, it shall have no effect upon the LSM's future opportunities for other positions that are created or become vacant.

If the request for transfer is not approved, notice will be provided to the LSM by the Department of Human Resources no later than ten (10) days after the position has been filled, with a statement of the reason for non-approval.

## C. Involuntary Transfer

An involuntary transfer occurs when an LSM's building assignment is changed unrelated to a reduction in force (RIF). Before any involuntary transfer from one building occurs, the Administration shall first seek qualified volunteers. The Administration shall consider the following factors (in no particular order) in determining the LSM to transfer:

1. Qualifications of the LSM, including degree(s), special expertise
2. Seniority
3. Experience
4. LSM preference

5. Effect of extra-curricular assignments
6. Best interest of the District

Notice of involuntary transfer shall be given to the LSM as soon as practicable (no later than May 1st if for the subsequent school year). If notice is given after May 1st, the Principal will notify the Association President of the reason for the post-May 1st notice.

Within ten (10) business days after receipt of notification of an involuntary transfer, an LSM dissatisfied with the new assignment may make a request in writing for a meeting with the principal under whom the LSM was assigned prior to the transfer to discuss reasons for the transfer. Within five (5) business days after such a meeting, the LSM, if dissatisfied with the reasons given for the transfer, shall have the further right to request a meeting with the Superintendent to discuss said reasons. Such meeting shall be held five (5) business days after receipt of a request thereof by the Superintendent. The Association President or designee may be present at the LSM's request in any involuntary transfer meeting.

If circumstances arise where a fully qualified (as determined by licensure and local qualifications) tenured LSM must be offered a full-time position in another building to avoid a reduction in force (RIF), and a vacancy occurs prior to July 1st in their home school, the LSM will be notified by the Chief Human Resources Officer via telephone call to the phone number on record with the District and via email with a description of the open position. The LSM may accept this position and avoid transfer by providing written notice to the Chief Human Resources Officer within 48 hours of receiving notice of the vacancy.

**D. Promotion**

1. **Rationale** - It is desirable to recognize professional employees by promotion from within the ranks whenever practical, educationally desirable, and consistent with the educational needs of the students.

2. **Posting of Promotional Positions -** All permanent vacancies for promotional positions shall be publicized. Notice shall be announced via email to all LSMs and posted internally for at least five (5) calendar days in advance of posting the vacancy publicly. Such notice shall clearly set forth the title of the position, qualifications required, compensation rate or range, and licensure requirements of the position.

3. **Temporary Appointments** - Nothing in this Agreement shall prevent the Board from making temporary appointments until positions are filled on a permanent basis. Temporary appointments are not subject to the posting requirements listed above. At the end of a temporary appointment, if a permanent position is available, the position will be posted for five (5) days internally before the public posting.

4. **Interviewing for Vacant Positions** - All internal candidates who meet all the qualifications listed on the posting shall be granted an interview.

### E. Seniority

**1. Definition of Seniority**

Full-time LSMs and part-time tenured LSMs shall accrue seniority. Seniority shall be determined by the staff member's continuous length of service in District 113 as a full-time LSM and/or part-time tenured LSM. Accumulation of seniority shall begin on the staff member's first day of actual work for the District in a full-time licensed position and shall accrue for each year of service as a full-time LSM or a part-time tenured LSM. Non-tenured part-time LSMs are not eligible for seniority. Full-time LSMs and part-time tenured LSMs granted leaves of absence, both sabbatical and non-sabbatical, will not lose their seniority while on the approved leaves and will continue to accrue seniority while they are on a granted leave of absence.

Beginning with the effective date of this Agreement, for the initial placement on the seniority list, the District will consider total years of service as an LSM, as verified by written documentation from the Illinois State Board of Education or comparable agency issuing such license. Written documentation verifying licensure must be provided within ten (10) calendar days of hire.

> *Example:* if two LSMs are hired in the same school year—one with three years of experience and one with two years—the LSM with three years of experience will be placed above the other LSM. Both of these newly hired LSMs will be placed below all LSMs currently on the Seniority List.

Should there be a tie in seniority after consideration of this information, it will be broken by the drawing of lots. Two (2) members of the central administration along with the President and two (2) Vice Presidents of the DEA will meet to do the drawing of lots. The LSMs will be placed on the seniority list in an order determined by this process, and that seniority shall be maintained over time.

**2. Maintaining and Posting of Seniority Lists**

The Department of Human Resources shall prepare and maintain the District Seniority List. The List shall include all full-time LSMs and part-time tenured LSMs in the District, broken down by areas of certification and any other qualifications agreed upon by the PERA Joint Committee. The Human Resources Department shall submit a copy of the District Seniority List to the President and Vice Presidents of the DEA by November 1st of each school year. The Human Resources Department will distribute an updated District Seniority List to the LSMs by November 15th of each school year.

Within fifteen (15) days of the Seniority List's distribution, LSMs must confirm to the Chief Human Resources Officer in writing (which includes email) that they have seen the list and state whether their placement is accurate/inaccurate. Any corrections or additions to the list will be submitted to the DEA for purposes of maintaining accurate records. Once the fifteen (15) work days have expired, the District Seniority List shall be deemed accurate for that school year.

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

## F. Reduction in Force

In the event of a need for District 113 to implement a reduction in force (RIF), the Chief Human Resources Officer will meet with representatives of the DEA Executive Board to share the details of the pending RIF. While the Administration retains the right to determine if RIFs are necessary, and who will be affected by such RIF, pursuant to the provisions of this Agreement consistent with the law, the meeting allows advance notice to the DEA and the opportunity for DEA representatives to provide feedback and ask questions regarding the pending RIF. In addition, LSMs who may be affected by a RIF will be notified by the Human Resources Department prior to the Board taking final action to approve the RIF. This section not only governs a full dismissal, but also a reduction in a staff member's FTE status.

If any full-time LSM or part-time tenured LSM is removed or dismissed as a result of a decision by the Board of Education to decrease the number of LSMs or to discontinue some particular type of teaching service in the District, then the affected LSM/s shall be given a written statement of honorable dismissal with the reason by April 15th. The statement of honorable dismissal shall be sent by regular mail, and by either certified mail, return receipt requested, or personal delivery with receipt.

Nothing in this Agreement affects the Board's right to dismiss a non-tenured LSM in accordance with Section 24-11 of the Illinois School Code.

## G. Sequence of Honorable Dismissal

Each school year, the District, in consultation with the DEA, will establish a Sequence of Honorable Dismissal List categorized by positions and in groups 1 through 4. All full-time LSMs and part-time tenured LSMs shall be categorized into one or more positions for which the staff members are qualified to hold, based upon legal qualifications and any other qualifications established in a district job description that was in effect on or before May 10th of the previous school year. Copies of this list must be distributed to the DEA at least seventy-five (75) calendar days before the end of the school year.

Among LSMs qualified to hold a position, the staff members shall be dismissed in accordance with the law and any agreements made by the Joint RIF Committee. If the Joint RIF Committee makes changes to these groupings, the changes will be documented and posted on the employee portal.

Performance evaluation ratings from other school districts will not be considered when placing LSMs into a group.

## H. Re-employment Procedures for RIFed LSMs (Recall)

An LSM who is subject to a RIF will be recalled in accord with the law.

With respect to all tenured LSMs (full-time and part-time), if the District has any vacancies for the following school year or within two (2) calendar years from the beginning of the school year following the year in which the staff member was honorably dismissed, the vacancy shall be

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

tendered to the staff members who were dismissed. Licensed staff members shall be recalled based on their group order, seniority, and qualifications (both legal qualifications and those outlined in the district job description posted by May 10th prior to the school year the position becomes available).

With respect to full-time non-tenured LSMs, if the District has any vacancies for the following school year or within one (1) calendar year from the beginning of the school term following the year in which the staff member was honorably dismissed, the vacancy shall be tendered to the staff members who were dismissed. Licensed staff members shall be recalled based on their group order, seniority, and qualifications (both legal qualifications and those outlined in the district job description posted by May 10th prior to the school year the position becomes available).

Recalled LSMs shall be reinstated to the lane and step previously earned. No new waiting period or probationary period is required. The recalled staff member will also be immediately eligible for benefits available to other staff. Vacant positions shall be offered to RIFed licensed staff members in order of their group and their seniority.

> ***Example***: If two RIFed licensed staff members, one from group 3 and one from group 4 are qualified to teach biology, the staff member in group 4 shall be offered the vacant biology position first. If the two RIFed staff members are both in group 4, the staff member with the greatest amount of seniority shall be offered the vacant biology position first.

The District is responsible for sending notice by certified mail, return receipt requested, to the most senior LSM who is qualified for the available position. Notice will be sent to the last address on file with the District. The staff member is responsible for informing the Human Resources Department of any changes in residence by email or by certified mail. The staff member must respond in writing to the acceptance or rejection of the position being offered within ten (10) calendar days of receipt of the District's notice. The notice given to the LSM must contain a copy of this policy and clear specifications that written notice is required within ten (10) calendar days. If the recall notice is issued within fifteen (15) calendar days of the start of the school year, the recalled staff member must accept or reject the position within five (5) calendar days or by the first day of school, whichever is shorter.

Any LSM who does not accept a proper notice of recall for a full-time (1.0 FTE) position will be removed from the recall list.

Temporary or part-time positions will be first offered to LSMs with recall rights in the same order as for full-time or permanent positions. Refusal of a temporary or part-time position will constitute a resignation and removal from the recall list if, and only if, the temporary or part-time position for which the staff member is being recalled is equal to or greater than the FTE held by that staff member at the time of RIF. A staff member offered a temporary or part-time position that is less than the FTE held at the time of RIF may elect to be passed over for the position, in which case the staff member retains the same position on the recall list, and the District will offer the available position to the next most senior qualified LSM. The staff member on the recall list who elects to be passed over for part-time or temporary positions (of lesser FTE than they held at time of RIF) does so by giving written notice to the Human Resources Department within ten (10) calendar days of receiving a notice of recall. If the recall notice is issued within fifteen (15) calendar days

3249123.1

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

of the start of the school year, the recalled staff member must accept the position or elect to be passed over within five (5) calendar days or by the first day of school, whichever is shorter.

Tenured LSMs who have been RIFed shall, upon application and at their option, be granted priority status in serving as a substitute teacher for the District. Those RIFed tenured LSMs with the greatest seniority will receive priority over those with lesser district seniority except in long-term substituting assignments where the RIFed staff member may not be properly licensed and endorsed. Substitute teaching or refusing to substitute teach will not affect recall rights of the LSM.

If an LSM who was RIFed from group 3 or 4 obtains additional licensure and endorsements during the applicable recall period, then, for the purpose of recall to future vacancies, that staff member shall be placed on the recall list for any positions that the staff member is now qualified for. However, the RIFed staff member would not be able to use the newly obtained certification/qualifications to bump a currently employed LSM.

The LSM shall have the responsibility of keeping the District informed of any additional licensure and endorsements. Such additional licensure and endorsements shall not be added to the District Seniority List until verification has been shared with the District by the LSM.

# ARTICLE VII - WORKING CONDITIONS

## A. School Year

LSMs will work according to the school calendar recommended by the Calendar Committee *(See Article XVIII, Section A)* and adopted by the Board.

## B. LSM Workload and Work Day

The Board recognizes the professionalism and commitment of LSMs in educating our students. All full-time LSMs will be on-duty, in the building, for seven (7) periods out of the eight (8) period day (or for an equivalent amount of time for non-classroom LSMs). With the current schedules at Deerfield and Highland Park, that equates to twenty-eight (28) on-duty periods out of thirty-two (32) total periods per typical week.

LSMs are considered "on-duty" when instructing classes, planning for instruction, meeting with students, collaborating with colleagues, attending IEP meetings, calling parents, conducting any business or work associated with their assigned responsibilities, or performing an assigned supervisory assignment.

LSMs will complete supervision duties not to exceed any of the following: two (2) supervision periods per week, no more than one (1) daily, and a maximum of 97 minutes in total.

All LSMs will have one duty-free lunch.

Department chairs will consider LSM requests for the first and/or last period of unscheduled time, in a fair, equitable, and transparent manner, as allowed by the master schedule.

## C. Full-Time Teaching Load

The workload for a full-time teacher consists of:
- Five (5) instructional periods (consisting of five 0.2 FTE courses or four 0.25 courses plus the associated lab work time)
- Two (2) professional duty periods (planning for instruction, meeting with students, attending IEP and other meetings, meetings with supervisors/department chairs, or performing an assigned supervisory assignment)
- One (1) independent work period
- One (1) homeroom
- One (1) duty-free lunch

LSMs who have the following assignments will be exempt from the supervision requirement:
- LSMs assigned to teach an overage or AP science
- LSMs assigned to teach special education
- LSMs with four (4) different course preparations

- LSMs participating in the mentoring program. Mentees and mentors will be exempt from supervisory assignments in year one of the mentoring program; in year two, only mentors will be exempt.
- Non-classroom LSMs as specified in *Article XII: Leadership Stipends and Non-Classroom LSMs*.
- DEA President and Vice President

The DEA and the Building Administration may agree upon additional release from supervisory assignments on a temporary basis when special projects or other circumstances arise.

In the case an LSM's FTE is less than 1.0, as a result of being assigned one or more 0.25 FTE courses, they will be considered to be 1.0 by being assigned additional duties as determined by the Building Principal and Department Chair in consultation with the LSM.

Licensed staff members may be assigned to an early bird schedule. In making such assignments, the administration will consider teacher qualifications, overall caseload/class assignment, and teacher preference. Licensed staff members assigned to an early bird schedule will be given notification of the assignment no later than one week prior to the end of the previous school year. Early bird teachers will not be assigned to teach the period that most frequently falls at the end of the day, unless so requested by the teacher.

### D. Class Size

**Sectioning:**

The divisors set forth below will be used for initial sectioning purposes.

- Standard, Honors and AP classes = **25**
- Any class that has been de-surveyed within the last four (4) years = **20**
- Interdisciplinary classes = **50** (25 per course)
- Physical Education classes = **35** (including PE leaders)
- Specialty PE classes (e.g., yoga, outdoor education, health) = **25**
- Traffic Safety = **6** per car available at the individual school per semester
- Science Laboratory classes = **24**
- Computer Science and Fine/Applied Arts classes = limited to a maximum room space or number of supplies
- EL (English Language Learners) will be sectioned according to 23 Ill. Adm Code 228.30.
- Band, Orchestra, and Chorale, Theater = according to the activity

1. **Day Ten of Student Attendance / Class Overages:**

   The roster for each class cannot exceed the divisor plus one (1) student *(for example 25+1 in a standard class)* on the tenth (10th) day of student attendance.

   Students moved into the course after the tenth (10th) day of student attendance cannot exceed the initial sectioning divisor plus three (3) students *(for example 25+3 in a standard class)*.

Where a class size exceeds the maximum for more than ten (10) school days per semester, LSMs will be compensated an extra $1000 per class, per semester. No LSM will be assigned more than two (2) classes that are above the maximum class size.

2. **Additional Requirements:**
Where safety, number of workstations, or physical size of the classroom is at issue, the number of students per class will be limited in accordance with these considerations.

When a new class is created, the divisor shall be set at the level which reflects the intended purpose of the instruction and the needs of the students being taught.

### E. Full-Time Non-Classroom LSM Student Assignments

1. **School Counseling:**
The total number of students assigned to school counselors will be consistent with recommendations set forth by the American School Counselor Association, which is 250 students. Should the number of students assigned to a counselor exceed the recommendation by more than 10%, the counselor may set a meeting with the Department Chair to review whether additional support will be needed.

2. **Post-Secondary Counseling:**
The total number of seniors assigned to a post-secondary counselor will be consistent with recommendations set forth by the American School Counselor Association, which is 250 students. Should the number of seniors assigned to a post-secondary counselor exceed the recommendation by more than 10%, the post-secondary counselor may set a meeting with the Department Chair to review whether additional support will be needed.

### F. Homeroom

LSMs shall be provided a script for implementation of any lessons beyond surveys and announcements, and will not be required to create curriculum.

### G. Preparations

A preparation shall be defined as any portion of a teaching assignment that requires planning (course, level, etc.). Homeroom is not considered a preparation. Where it is necessary to assign more than three (3) preparations to an LSM, such assignments shall be reasonable and equitable and in the best interests of the students' and teachers' needs.

### H. Co-teaching and Interdisciplinary Teaching

For LSMs assigned to a co-teaching or interdisciplinary teaching, the District shall make every effort to:
- provide teachers engaged in co-teaching and interdisciplinary teaching a common planning time of at least two (2) periods per week.
- consider co-teacher and interdisciplinary partner requests based on departmental need and identified staff.

## I. Summer Work

1. **Curriculum Planning and Review**

   The DEA and the Board recognize that summer work may be necessary to plan curriculum and provide for quality programming. LSMs may present proposals for summer curriculum work to their Department Chair for approval. The proposal will include the number of hours expected to complete the work, as well as a description of the final product to be created by the working group. Such proposals must be approved in writing by the Department Chair and Building Principal prior to starting the work, and the final product will be presented to the Department Chair. Curriculum planning and review work may also be designated by the Department Chair. All summer work to plan and review curriculum will be paid at the curriculum rate established in *Article XIII, Section E, Extra Duty Compensation,* of this Agreement.

2. **Summer Case Study Evaluations / IEP and 504 Meetings under IDEA and 504**

   In accordance with applicable state/federal law, the District may be required to complete a case study evaluation of a student under the Individuals with Disabilities Education Act or Section 504 of the Rehabilitation Act of 1973 during the summer months. Summer evaluations will be paid at a per diem hourly rate and will be assigned on a voluntary and rotating basis. If there are no volunteers, the District may use outside contractors to complete such evaluations.

## J. Overage (Sixth Assignments)

The Administration may ask an LSM to work an overage in situations where it is difficult to hire a qualified part-time or full-time LSM to take the assignment. Overages will be compensated with additional salary based on the length of the assignment, as a percentage of the individual LSM's per diem rate based on their salary grid placement.

## K. Open House and Graduation

1. **Open House**

   Early in the first semester, LSMs shall be required to attend a two-hour and thirty minute Open House under the following parameters:

   - LSMs are free to leave the building before Open House.
   - The following school day there shall be a late arrival day for students and LSMs.

2. **Graduation**

   All LSMs will attend graduation. Should an LSM have a legitimate conflict with the ceremony date and time, they may be excused from this duty by their building Principal.

   - LSMs are free to leave the building before graduation.
   - The following school day there shall be a late arrival day for students and LSMs.

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

### L. Learning Management System, Student Information System, and Grading

Grades are to be entered directly into the Learning Management System (LMS) or Student Information System (SIS) selected by the District. The LSM is responsible for syncing of grades from one system to another if they choose to use both systems. Grades shall be updated every two (2) weeks. Semester grading deadlines will be determined by each building's administrative team and shared with teachers well in advance of summative assessment week. There will be adequate time provided at the beginning of each semester to ensure that gradebooks and syncing are configured correctly.

No grade shall be changed without notifying the teacher of the nature and reason(s) for the change. The person who makes the change shall initial the change and shall become responsible thereupon for the revised grade or evaluation.

LSMs shall post their current schedule, course syllabi, and course rules and procedures on their classroom LMS pages. Teachers will not be required to create or maintain any additional website or online class page.

### M. Internal Substitute Teaching

The Administration will continue to make every effort to secure a substitute teacher for all full-day and long-term absences, multiple-period meetings, and professional development training involving large numbers of staff. The purpose of the internal substitution program is to fill unexpected substitute needs that occur throughout the school day and those needs that require less than a full day of service.

Internal substitute teaching will be voluntary. All LSMs interested in serving as an internal substitute will notify the administration of their intent on an annual basis. Building Principals have the discretion to determine who will be assigned to internal subbing.

Due to the unique school code and work requirements of nurses, the District will make all efforts to bring in substitute nurses, so that internal substitute teaching is voluntary for District 113 nurses.

### N. Letters of Recommendation

Licensed staff members may have a conversation with their supervisor to determine reasonable release time to write letters on behalf of their students and may be approved by their supervisor for a half or full-day of professional leave.

### O. New LSM Orientation

The Board may require new LSMs to attend and participate in new LSM orientation shortly before the beginning of the school year. Such orientation will consist of up to two (2) weekdays preceding the day on which the returning faculty report. New LSMs shall be paid a stipend of $250 per day of orientation attended, and shall be paid on or before the last day of August.

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

# ARTICLE VIII - SPECIAL EDUCATION

## A. Special Education - Teaching Assignments

Special Education teaching assignments shall be made after considering the LSM's preparation, preference, experience, current co-teacher(s), as well as the assignments being offered. The duties of an LSM assigned to the roles of case manager, learning strategies teacher, or co-teacher will be set forth in the job descriptions for each role.

LSMs will only be assigned case management duties for students who are placed in their Learning Strategies or Learning Methods class(es). An LSM may be assigned as a case manager for a student in their co-taught class that is not in the LSM's Learning Strategies or Learning Methods class. This will occur if the student is not scheduled for any Learning Strategies or Learning Methods class. Special Education Teachers will fulfill case management responsibilities exclusively for students on their caseloads.

## B. Special Education - Optimal Class Sizes and Caseloads

Special Education class sizes and caseloads will be evaluated in accordance with the District's workload plan, and will not exceed the limitations set forth in 23 Ill. Admin. Code 226.730; however, starting with the 2024-2025 school year, the District will identify optimal class sizes/caseloads boundaries as set forth below for special education classes:

- Learning Methods Only: **14** students per class
- Combined Learning Methods + Learning Strategies: **12** students per class
- Learning Strategies: **10** students per class
- Self-Contained: **8** students per class
- Regular education class co-taught with a Special Education teacher: **8** students with IEPs per class

LSMs assigned as related service providers will have a caseload limited by the number of instructional minutes available for providing services. An LSM related service provider will be assigned instructional minutes (including individual, group, and consult minutes) which do not exceed the number of instructional minutes taught within a 1.0 FTE classroom LSM. Licensed staff members assigned as related service providers who have concerns about their caseload assignment may follow the process set forth in *Section D, Special Education Workload Plan Committee,* below.

Team Leads will be assigned to teaching duties for two (2) periods only. The team lead's caseload will not exceed eight (8) students, not including bridging students who may be assigned.

## C. IEP Meetings, Paperwork, and Summer Evaluations

All LSMs may be required to attend IEP meetings for students assigned to their classes. Every effort will be made to schedule IEP meetings outside an LSM's duty-free lunch period. If

3249123.1

unavoidable, LSM's will be compensated at the internal substitute rate for IEP meetings scheduled during their duty-free lunch period.

Release time for legal paperwork will be considered in the formation of the special education workload plan. LSMs who believe their paperwork responsibilities exceed what is designated by the workload plan may either request additional release time from their department chair or access the process set forth in *Section D, Special Education Workload Plan Committee,* below. Summer evaluations will be paid at a per diem hourly rate and assigned on a voluntary and rotating basis; the District reserves the right to use an outside provider where LSMs are not available to conduct a summer case study evaluation.

## D. Special Education Workload Plan Committee

1. **Special Education Teacher and Related Service Workload Committee**
   There will be an annual Workload Committee meeting to review all areas under 23 Illinois Administrative Code 226.735. The Workload Committee will consist of six (6) administrators, six (6) special education DEA members, and one (1) DEA executive board member serving in an advisory role.

   The committee will work to reach consensus on the workload recommendations. The first meeting will be set no later than October 15th of the year preceding the implementation of the workload plan. Additional meetings will be scheduled as needed. The recommended Special Education Workload Plan will be provided to the Superintendent by January 15th.

2. **Process for Addressing Workload Concerns**
   If a special education LSM has an assignment that exceeds the optimal class sizes set forth above, or other factors of the special education LSM's assignment create an unmanageable workload, the LSM may address their assignment through the following process:
   a. The LSM will schedule a meeting with their Department Chair to present data including class size assignment, caseload, required service minutes, collaboration time, required documentation and recordkeeping, and other factors that support the workload concern.
   b. The Department Chair will review the concern and develop a written document setting forth options and strategies to address the LSMs workload concern. This document will be provided to the LSM within three (3) school days of the meeting. The Building Administrator responsible for Special Education will be copied on this document. If the Department Chair determines that the present assignment is in the best interest of the students and there is no reasonable adjustment that can be made to remedy the workload concern, the LSM will receive a $1000 stipend per semester.
   c. A follow-up meeting will take place no later than ten (10) school days from the initial discussion, to determine if the strategies were effective. If the LSM does not believe their situation has been resolved, the LSM may appeal to the Assistant Superintendent of Student Services.
   d. The Assistant Superintendent of Student Services will issue a determination to the LSM within five (5) school days.

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

e.  If the LSM is not satisfied with the determination of the Assistant Superintendent of Student Services, they may grieve the determination up to Step 3 of the Grievance Procedure, as set forth in *Article XVI, Section D, Procedures for Adjustment of a Grievance*.

# ARTICLE IX - PART-TIME LICENSED STAFF MEMBERS

## A. Part-Time LSM Workload

1. **Homeroom** - LSMs with less than 0.6 FTE shall not be assigned a homeroom unless teacher-student ratio requires assignment of part-time staff to such roles; the District will fill such roles with volunteer part-time LSMs prior to making assignments. Part-time LSMs who request a homeroom will be considered for a homeroom assignment.

2. **Collaboration / Building Meetings** - As part-time LSMs are integral to the success of the District's instructional program, they will be required to attend course team /department / staff collaboration meetings proportional to the LSM's part-time teaching load. This assignment will be determined after discussion with their supervisor. Part-time LSMs will be responsible for reviewing minutes of course team meetings, keeping abreast of course team work, and implementing decisions or other initiatives as determined by the course team and department.

3. **Institute / Inservice Days and Required Trainings** - Part-time LSMs will be required to attend all institute/inservice days and complete online trainings required by Illinois law.

4. **Supervision** - LSMs who have an assignment of 0.5 FTE or more will complete a supervision (totaling of a maximum of 97 minutes per week) for one semester only. Part-time LSMs who work less than 0.5 FTE may volunteer for a supervision assignment.

5. **Special Schedules** - It is the intention of the Parties to limit the number of school days with special schedules. However, special schedules will be in place to accommodate SAT/PSAT, pep rallies and all-school assemblies, Focus on the Arts, Open House, Graduation, and final exams. If an event arises that requires a special schedule but is not listed herein, the Principal will meet with the DEA building leadership to determine the schedule to accommodate the event.

   Should a special schedule be required with less than two (2) weeks' notice to part-time LSMs, the part-time LSM will have the option of taking a personal day, which cannot be denied. If working pursuant to a special schedule requires an LSM to exceed their assigned FTE for each semester, the District will compensate for the additional FTE at their per diem rate, using the increments set forth in *Article X, Section A, Sick Leave.*

## B. Salary and Benefits

Part-time employees' salaries will be prorated according to their assigned percentage of full-time employment. Advancement on the salary schedule will proceed according to the fraction of the teaching assignment. Thus, a part-time assignment does not advance the faculty member on the salary schedule until successive part-time assignments equal the equivalent of a full-time assignment (i.e. 10/10ths). Placement on the salary schedule will be determined at the start of each school year and will remain in effect for that school year.

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

Employees who have a part-time assignment of 0.5 FTE or more will receive the same benefits as full-time LSMs.

**C. Leaves**

Part-time LSMs will be granted leaves in accordance with the provisions of *Article X, Leaves of Absence*.

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

# ARTICLE X - LEAVES OF ABSENCE

**A. Sick Leave**

1. **Full-Time, Full School Year LSMs**
   The normal allotment of sick leave days for LSMs who are employed full-time for the full school year is as follows:
   a. Upon hire, thirty (30) days for the first full school year of full-time employment in the District.
   b. 150 days at the start of the second consecutive full school year of full-time employment in the District; however, if the LSM has already completed one full school year of full-time employment in the District before the start of the 2023-2024 school year, 150 days at the start of the 2023-2024 school year.
   c. 15 days at the start of each school year after the school year in which the LSM receives 150 days.
   d. Unused personal leave days converted to sick leave in accordance with *Section D, Personal Leave,* below, in this Agreement.

2. **Part-Time LSMs**
   The normal allotment of sick leave days for part-time LSMs (employed for less than 1.0 full-time equivalency ("FTE")) who work a full school year is as follows:
   a. 30 days for the first full school year of employment.
   b. 15 days at the start of each full school year after the school year in which the LSM receives 30 days.
   c. Unused personal leave days converted to sick leave in accordance with *Section D, Personal Leave,* below, in this Agreement.

3. **Proration of the Normal Allotment**
   For full-time and part-time LSMs who begin work after the start of the school year or who are contracted to work only for a portion of the school year, the normal allotment of thirty (30) sick days, provided for in *Sections 1 and 2* above, shall be prorated days after the start date to the completion of the school year or, if applicable, the contract end date.

4. **Accrual, Accumulation and Use**
   a. The sequence of benefits, provided for in *Sections 1 and 2* above, will not start until the first full school year of employment.
   b. All sick leave days accrue in full, and are immediately available for use, as of the start of the applicable school year, or, if later, as of the work start date.
   c. All sick leave days accumulate without limit.
   d. All sick leave days are subject to reduction to the extent the Illinois Teachers' Retirement System's three-part test is applicable in the school year for which the days are granted.
   e. Sick leave may be taken in whole-day, half-day (3.5 hours, 8:00–11:30 or 11:30-3:00) or one-quarter day (less than 2 hours) increments.
   f. Sick leave may be used for the reasons set forth in the sick leave provisions of the Illinois School Code.

3249123.1

All sick days outside the normal allotment may be subject to reduction to the extent the Illinois Teachers' Retirement System's <u>three-part test</u> is applicable in the school year for which the days are granted.

**B. Temporary Illness or Temporary Incapacity - Tenured Teachers**

<u>Board Policy 5-180</u>: A temporary illness or temporary incapacity is an illness or other capacity of ill-being that renders an employee physically or mentally unable to perform assigned duties. During such a period, the employee must use accumulated sick leave benefits and any leave benefits available under the Family and Medical Leave Act (FMLA). However, income received from other sources (worker's compensation, District-paid insurance programs, etc.) will be deducted from the District's compensation liability to the employee. The Board's intent is that in no case will the employee, who is temporarily disabled, receive more than 100 percent of his or her gross salary. Those insurance plans privately purchased by the employee and to which the District does not contribute, are not applicable to this policy.

Any employee who is absent because of illness, disability, or incapacity, shall be deemed temporarily disabled for up to 90 consecutive work days, 90 out of 180 work days from the same illness or incapacity, as calculated from the employee's first day of absence, and will be granted a leave of absence for the period of temporary disability. This temporary disability leave time shall run concurrently with the employee's use of any accumulated sick days and FMLA time, if eligible.

If illness, incapacity, or any other condition causes an employee to be absent, after exhaustion of all available leave, for more than 90 consecutive work days, 90 out of 180 work days from the same illness, such absence may be considered a permanent disability and the Board may act to terminate the employee subject to state and federal law, including the Americans with Disabilities Act. Time periods under this policy are computed at the start of each new school year. However, if an employee remains ill or incapacitated at the start of a new school year from the same or a related condition that caused the employee to be absent the previous school year, then the time period will not be computed anew but will be continued from the previous school year. The Board, in its sole discretion, may grant an employee whose temporary disability period has expired an extended leave of absence. The Superintendent may recommend this paragraph's use when circumstances strongly suggest that the employee returned to work intermittently in order to avoid this paragraph's application. This paragraph shall not be considered a limitation on the Board's authority to take any action concerning an employee that is authorized by state and federal law.

Any employee may be required to have an examination, at the District's expense, by a physician who is licensed in Illinois to practice medicine and surgery in all its branches, a licensed advanced practice registered nurse, or a licensed physician assistant if the examination is job-related and consistent with business necessity.

LEGAL REF.: 42 U.S.C. §12101 et seq., Americans with Disabilities Act

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

## C. Religious Leave

LSMs will be granted up to two (2) days of paid leave for observance of a religious holiday, upon approval from their Building Principal. These days shall not accumulate from year to year, and will not be converted to sick or other leave days. LSM's who wish to take additional leave for religious observances may utilize their personal leave days for this purpose. The restrictions applicable to use of personal leave shall not apply to leaves for religious observance.

## D. Personal Leave

All LSMs shall receive three (3) personal days. If an LSM coaches a District 113 sport or sponsors a District 113 activity, they shall receive a fourth personal day. If three (3) consecutive personal days are requested or if any personal days precede or follow holiday or break periods, then prior approval from the Principal is required. In the event that the Principal denies the approval, the LSM may appeal the decision to the Chief Human Resources Officer. LSMs may not take four (4) consecutive personal days. Personal days must be used during the work year in which they were received and any days unused by the end of the work year shall convert into accumulated sick leave. Personal leave must be approved in advance by the Department Chair. Personal leave days may be taken in whole day, half day, or quarter day increments, which shall be defined as set forth in *Article X, Section A, Sick Leave*.

## E. Parental Leave

1. **Paid Leave for Birth/Adoption/Foster Care Placement**

   LSMs will be granted thirty (30) days of paid leave upon the birth or adoption of a child, or placement of a child from foster care. This leave will be granted to the LSM for this purpose and will not be deducted from accumulated paid sick leave days, provided that the LSM returns to full-time or part-time employment in accordance with the provisions of this Agreement. Leave may be used for up to thirty (30) working school days, which may be used at any time within the twelve (12) month period following the birth or placement of the child. The use of these days will not be diminished because of any intervening period of non-working days or because school is not in session (e.g., winter, summer break).

2. **Additional Paid Parental Leave for LSMs with at Least One Year of Service**

   In addition to the thirty (30) days of paid leave provided for in *Paid Leave for Birth/Adoption/Foster Care Placement,* above, in this Agreement, LSMs who have completed one-year of full-time service are eligible for an additional thirty (30) days of paid parental leave. Parental leave will not be deducted from accumulated sick leave, provided that the LSM returns to full or part-time employment in accordance with the terms set forth in this Agreement. Paid parental leave must be taken immediately after the LSM's paid leave under the birth/adoption/foster care provision ends. Leave will be utilized for working school days and will not be diminished for holidays and breaks within the school year, however, paid parental leave will not exceed beyond the school year in which it commences.

3249123.1

3. **Unpaid Parental Leave** - After paid parental leave has been exhausted, full-time LSMs who have completed at least one year of probationary service may access an additional twelve (12) weeks of unpaid leave in accordance with the Family and Medical Leave Act. Such leave will not be diminished for holidays and breaks in the school calendar, and may be taken any time within twelve (12) months of the birth/adoption/foster care placement.

After the twelve (12) weeks of unpaid leave set forth above is exhausted, tenured LSMs may elect to take additional unpaid leave until the end of the school year during which the birth/adoption/foster care placement occurred.

Tenured LSMs may request an additional year of unpaid parental leave, to be taken in the school year subsequent to the birth/adoption/foster care placement. Such leave must be requested in writing to the Chief Human Resources Officer, or their designee, no later than January 15th of the year preceding the leave and will be granted at the discretion of the Board based on the staffing needs of the District. LSMs who are granted such leave will maintain their place on the District's seniority list.

LSMs on unpaid leave during the year of the birth/adoption/foster care placement may continue to receive health insurance benefits under the District's plan provided the LSM continues payment of the employee contribution to the insurance premium cost. LSMs who are granted an additional year of unpaid parental leave may continue benefits under the District's insurance plan provided that they pay the full cost (employee and Board portion) of the premium.

LSMs who are granted unpaid leave in the year after the birth/adoption must notify in writing the Chief Human Resources Officer, or their designee, of their intent to return to full-time or part-time teaching by January 15th of the year in which the leave is taken.

4. **Part-Time Status in the Year Following Parental Leave**
Full-time, tenured LSMs who wish to go on part-time status in the year following the birth/adoption/foster care placement will be granted such status upon written request to the Chief Human Resources Officer, or designee by January 15th in the year preceding the planned part-time service. LSMs granted such status will maintain their tenure status.

Tenured LSMs may request an additional year of part-time status. Requests to continue part-time status must be submitted in writing to the Chief Human Resources Officer, or their designee, no later than January 15th, will be granted at the discretion of the Board based on the staffing needs of the District. LSMs who are granted such leave will maintain their tenure and accrue seniority.

## F. Grandchild Leave

Tenured LSMs shall receive up to two (2) days of paid leave for the birth of a grandchild, upon notification of the birth/adoption.

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

## G. FMLA Leave

Eligible employees may access unpaid leave in accordance with the Family and Medical Leave Act, which entitles eligible employees to twelve (12) weeks of leave in a 12-month period for birth, adoption, care for a newly born or placed child, care for a spouse, child or parent with a serious health condition, care for the employee's serious health condition, or qualifying exigency arising out of the fact that the employee's spouse, son, daughter, or parent is a covered military member or on "covered active duty", as defined by the FMLA. Further information regarding leave benefits under the FMLA may be accessed in Board Policy 5-185, Family and Medical Leave Act, and on the U.S. Department of Labor's website https://www.dol.gov/agencies/whd/fmla.

## H. Unpaid Leaves of Absence

1. **Full-Time** - The Board may, in its discretion and based on the needs and circumstances of the District, grant full-time unpaid leaves of absence of up to one (1) year to tenured LSMs for the following reasons:

   a. Sabbatical Leave, pursuant to Illinois School Code Section 5/24-6.1 and Board Policy 5-250.
   b. Extended illness of the LSM or an immediate family member for which other applicable leave is exhausted or unavailable.

   Tenured LSMs requesting a full-time unpaid leave of absence must submit such requests to the Chief Human Resources Officer, or designee, no later than January 15th in the year preceding the anticipated leave, with a statement indicating the reason for the leave.

   Tenured LSMs who are granted a full-time unpaid leave of absence must provide written notice of their intent to return to full-time or part-time service to the Chief Human Resources Officer, or designee, by January 15th of the year preceding the return. LSMs who return from an approved leave of absence will be placed in a position similar to the one formerly occupied, to the greatest extent possible, however, the District may consider the LSMs licensure and past teaching experience in making such assignments.

   Tenured LSMs returning to service will be placed on the same step of the salary schedule they were on prior to the leave of absence.

2. **Part-Time** - The Board may, in its discretion, grant up to one year of part-time status to a tenured LSM, for personal reasons outside of the part-time parental leave granted above.

   Tenured LSMs requesting part-time status must submit such requests to the Chief Human Resources Officer, or designee, no later than January 15th in the year preceding the anticipated part-time employment, with a statement indicating the reason for the leave and the requested part-time assignment based on full-time equivalency (e.g., 0.8 FTE).

   LSMs who are granted part-time status must provide written notice of their intent to return to full-time service to the Chief Human Resources Officer, or designee, by January 15th of the year preceding the return to full-time service.

3249123.1

LSMs on part-time status who work 0.5 FTE or more will be provided access to health insurance and other benefits available to full-time LSMs.

LSMs using part-time leave of absence will be moved on the salary schedule in the same manner as LSMs completing a full year of service, and will accrue seniority based on their actual service.

## I. Procedures for LSMs Granted Part-Time Status

Pursuant to <u>Board Policy 5-250</u>, these procedures provide guidance for full-time tenured LSMs who request part-time employment but anticipate returning to full-time status at some future point.

1. All leaves are at the recommendation of the Superintendent or designee with ratification by the Board. The District retains the right to approve or deny applications for part-time leaves based on the best interests of the District.

2. Part-time leaves may be granted for professional advancement, research, study, travel, extended illness, or for other reasons as approved by the Board.

3. Licensed staff members may request up to two consecutive, one-year, part-time leaves of absence and return to a full-time position without losing their tenure status. A request for such a leave must be made by January 15th in the year preceding the anticipated leave of absence. The Board will notify LSMs of its decision by April 30th.

4. A part-time leave may be extended beyond two years without the staff member losing tenured status. An LSM applies for this extension by January 15th in the year preceding the anticipated leave of absence. The Board will notify the LSM of its decision by April 30th.
   a. If a part-time leave extension is not granted to an LSM, the staff member may either a) choose to return to a full-time position or b) voluntarily resign from employment with the District, thus terminating the employment relationship, and then subsequently reapply for a non-tenured part-time position.
   b. If the non-tenured part-time LSM returns to a full-time position at a later date, the LSM will begin the LSM's full-time position as a first-year non-tenured LSM and will be subject to the terms and conditions of employment accordingly.

5. Licensed staff members who have been granted part-time leave extensions and who have remained part-time beyond two years with a leave extension may request a return to a full-time position by January 15th in the year preceding the anticipated return to a full-time position. Staff members may only return to full-time status when a full-time position is available. The part-time tenured staff member retains tenured status until such a full-time position becomes available.

6. When requesting part-time leaves, LSMs may request a specific amount of Full-time Equivalency (FTE) to constitute a leave, but there is no guarantee that a specific FTE request will be granted. The Board reserves the right to make final decisions regarding allocation of part-time FTE. Requests for leaves must be submitted in writing no later than

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

January 15th. No changes in the submitted request will be allowed, nor can the leave requests be withdrawn after the January deadline unless approved by the Superintendent or designee.

7. Part-time LSMs who continue to work at least 0.5 FTE will receive full insurance and other benefits.

8. In cases where LSMs wish to return to full-time work prior to the expiration of their leave, upon their written request, the leave of absence may be terminated by the Board at its discretion.

9. Licensed staff members returning from a part-time leave (one or two years):
   a. Will provide written notice of their intent to return to full-time work no later than January 15th.
   b. Will be placed in a position substantially equivalent to that formerly occupied, to the greatest extent possible.
   c. Will be given the appropriate base salary predicated on the partial step movement that occurs during the part-time leave. The partial step movement is based on the amount of FTE the LSM is assigned when on part-time leave (0.5 FTE moves $1/2$ step per year). Lane placement is determined based on degree status upon return to full-time work.

      i. *Example*: In year 1, an employee is at step 5 and works 1.0 FTE. In year 2, the employee moves to step 6, but begins a part-time leave and works at 0.6 FTE, receiving a prorated amount of step 6 based upon the employee's 0.6 FTE. In year 3, the employee moves to step 6.6 and continues the part-time leave at 0.6 FTE, receiving a prorated amount of step 6.6 based upon the employee's 0.6 FTE. In year 4, the employee moves to step 7.2 and resumes employment in a 1.0 FTE position, receiving 100% of step 7.2.

10. After returning to full-time status for one full academic year, the LSM may again apply for part-time leave.

11. There is no limit to the number of times an LSM can apply for part-time leave.

12. Licensed staff members on leave of absence may continue to earn professional development credit in accordance with *Article XI, Section C, PARC Funds.*

13. The Superintendent, when it is deemed suitable, may request the Board to grant exceptions to the above conditions of this policy based upon special or exigent circumstances.

## J. Catastrophic Leave

In the case of a catastrophic event in the life of an LSM that causes the LSM to be absent from work and does not otherwise qualify the LSM for any sort of paid leave (including personal leave), such as significant destruction of property (defined as making said property uninhabitable) due to natural disaster (tornado, fire, flood, etc.). Upon approval by the Board and the Association,

3249123.1

absences for catastrophic leave are authorized without loss of pay up to fifteen (15) days. The LSM may also opt to convert up to fifteen (15) additional sick days to personal days to tend to the catastrophic event.

### K. Bereavement

LSMs may access up to five (5) days of paid bereavement leave, which will not be deducted from accumulated sick leave, for the death of a parent, spouse, partner, sibling, child, grandparent, grandchild, parents-in law, sisters-in-law, brothers-in-law, children-in law, aunts, uncles, and legal guardians. Extensions may be granted by the Chief Human Resources Officer in cases of special need. Such days will expire at the end of each school year and will not accumulate.

An LSM can use up to two (2) bereavement days per school year for bereavement leave for someone other than the immediate family, as referenced above, with approval by the supervisor. Any requests beyond must be approved by the Chief Human Resources Officer. LSMs can also use a bereavement day to attend a current student's funeral. Such days will expire at the end of each school year and will not accumulate.

### L. Jury Duty

LSMs will be provided paid leave days when summoned to serve on a jury.

# ARTICLE XI - SALARY AND BENEFITS

## A. Salary

**1. Salary Schedule**

The Salary Schedules shall be as set forth in *Appendices A - C* of this Agreement. Each year of this Agreement will include an increase to the schedule as set forth immediately below. The "raise to the base" shall be applied to steps 1 to 24. Steps 25 through 28 will be increased pursuant to *Part d, Longevity Pay,* below.

| **2023-2024** | **2024-2025** | **2025-2026** |
|:---:|:---:|:---:|
| 4.34% raise to base | 3.9% raise to base | 2023 CPI*<br>(3% floor, 5% ceiling) |

*\*CPI defined as December 2023 CPI% (This is December-to-December % change in the national Consumer Price Index (CPI) for all items and all urban consumers published by the United States Bureau of Labor Statistics in January of each year).*

**2. Salary Payments**

LSMs will be paid their total salary over twelve (12) equal monthly payments starting mid-September.

**3. Salary Schedule Placement**

**a. New Hires**

Salary schedule years of experience credit for LSMs hired during the term of this Agreement will be limited to twelve (12) years (i.e. new teachers will begin no higher than Step 12). Exceptions may be made, but only based on need and with the approval of the Superintendent.

**b. Adjustments**

Current LSMs hired between July 2011 and June 2019 will have their step placement adjusted, pursuant to *Addendum A* of this agreement.

**c. Advancement**

An LSM who has earned the right to move to a higher salary lane by additional professional training shall be placed at the higher salary level at the beginning of the next contract year. Refer to *Section C, PARC Funds* below.

    **d. Longevity Pay**
For 2023-24, steps 25 through 28 shall be calculated as follows:

Step 25 will be $1250 more than Step 24
Step 26 will be $1250 more than Step 25
Step 27 will be $1250 more than Step 26
Step 28 will be $1250 more than Step 27

For 2024-25 and 2025-26, steps 25 through 28 shall be calculated as follows:

Step 25 will be $1500 more than Step 24
Step 26 will be $1500 more than Step 25
Step 27 will be $1500 more than Step 26
Step 28 will be $1500 more than Step 27

## B. Additional Compensation / Benefits

**1. Medicare Contributions**
The Board pays each LSM's Medicare premium of 1.45% on the base salary. These are not creditable earnings for TRS.

**2. PhD Stipend**
Licensed staff members who possess a PhD or equivalent degree shall receive a $1,000 annual stipend in addition to their base salary.

**3. Compensation for an Overage (Sixth Assignments)**
The Administration may ask an LSM to work an overage in situations where it is difficult to hire a qualified part-time or full-time LSM to take the assignment. Overages will be compensated with additional salary based on the length of the assignment, as a percentage of the individual LSM's per diem rate based on their salary grid placement.

**4. Internal Substitutes**
LSMs who substitute for another LSM shall be paid in accordance with the following rates:
- One period equal to or less than 50 minutes: **$60.00**
- One period greater than 50 minutes: **$80.00**

**5. Homebound Tutors**
The hourly rate for homebound tutors is **$54.00** per hour.

**6. Summer Workshops**
The hourly rate for summer workshops is **$50.00** per hour.

**7. LSM License Renewal Fees**
The Board shall pay the cost of LSM license renewals for a 5-year renewal period.

**8. Tax-Sheltered Annuity**

The Board shall maintain current offerings of 403(b) and 457 plans, and add Roth versions of each.

9. **Benefit for TRS Tier 2 Participants**
   Upon the attainment of tenure, the District will match 403(b)/457 contributions for TRS Tier 2 LSMs up to $500 for the 2023-2024 school year, and $750 for the 2024-2025 and 2025-2026 school years. Part-time TRS Tier 2 LSMs are eligible for a prorated match based on their FTE.

## C. PARC (Professional Advancement Review Committee) Funds

1. **Purpose and Eligibility**
   Funds will be provided to LSMs in order to advance professional learning with the goal of increasing student achievement.

   To qualify for reimbursement and changes, the following criteria must be met:

   a. **For college/university credits:**
   - Courses must be offered by an accredited college/university;
   - Courses must be at the graduate level;
   - Courses must be in the LSM's content area or in an area which will enhance pedagogical practices;
   - The grade earned in the course must be a "B" or above.

   Other courses, including undergraduate courses and graduate level courses outside the LSM's content area, may be approved by the Building Principal or designee, with the written request for approval submitted to the principal/designee at least fifteen (15) school business days prior to a course's start date.

   b. **For other professional development:**
   LSMs may also use professional development funds to attend educational conferences and workshops. To be eligible for reimbursement, such conferences/workshops must advance the professional learning of the LSM as related to their assigned job duties and must be approved at least fifteen (15) school business days in advance of the conference/workshop by the Building Principal or designee, using the workshop/conference approval form.

2. **Professional Development Funding**
   The Board will help defray an LSM's professional advancement expenses. Licensed staff members are eligible for reimbursement following documented completion of their activities. Over the duration of this three-year Agreement, LSMs will receive the following reimbursement funds based on their lane placement. There will be no rollover of PARC funds from the previous Agreement.

BA, BA+15          $5,000
MA+0/15/30/45      $3,500
MA+60              $2,750

If an LSM voluntarily leaves the district for other employment within one (1) year of receiving tuition reimbursement, they shall pay the district back for that tuition expense.

Additional tuition reimbursement in the amount of $1,500 may be granted, upon approval of the Superintendent or designee, for course work expenses in which a separate residence or travel outside of the continental United States is necessary to complete the course work.

3. **Lane Changes**

Newly hired LSMs will be placed on a lane commensurate with their level of educational attainment. A lane change refers to an LSM's lane adjustment based on accrual of graduate and other credits. Lane changes do not have to be completed within a defined time frame.

Additionally, in order to honor a lane or degree change during the current school year, evidence of payment and completion for any coursework (e.g. copy of unofficial transcript or grade report) or professional development taken must be submitted by September 1st to receive lane change credit for the entire school year; LSMs may also submit evidence of payment and completion after September 1st but before October 31st in order to receive lane change credit for the period of November 15th through the end of the school year. Lane changes are granted based on an LSM's accrual of academic credit or experience credits "E-credits" as described below.

For the 2023-2024 school year only, LSMs must submit evidence of lane change credit by October 31st.

Experience Credits "E-credits" may include the following:

| Activity | Hours Required | Evidence required |
|---|---|---|
| **Creation/Revision of Curricular Content** (Available for writing course curriculum for newly approved courses; curriculum redevelopment (under DC supervision); or College Board directed AP revision). | A minimum of thirty hours. | Curriculum documents developed. Verification of participation by Chair. |

| Participation/attendance at District-sponsored Professional Development Course/Workshop District workshops which are offered with the same title but which include significantly different or updated content will be credited each time the workshop is completed. | A minimum of thirty hours including seat time and "logged" time. | Successful completion of course (and log) as determined by the instructor. |
|---|---|---|
| Other Activities Publication of a professional article, with a maximum of three articles counted per lane. Extended inquiry project as pre-approved by Building Principal or designee. | A minimum of thirty hours per credit. Publications may include books, articles, prints, musical scores or performances, choreography, engravings, drawings, and computer programs. No honorarium may be received. | Activities to be determined by the LSM and Chair. Proposal must be approved by the Building Principal or designee. |

Credits for lane changes will be granted as follows:
- BA to BA15 – 15 hours of graduate credits toward a masters' degree.
- BA 15 to MA – award of masters degree.
- MA to MA 15, MA15 to MA30, MA 30 to MA 45, and MA 45 to MA 60 – a total of 15 hours of credit, with minimum 8 hours of graduate level coursework or other coursework pre-approved by Building Principal or designee and the remaining balance of either academic credits pre-approved by Building Principal or designee or E-credits.
- MA 60 to Ph.D. or equivalent – award of Ph.D or equivalent.

## D. Summer School

### Summer School LSM (except Science)

| | | |
|---|---|---|
| Summer 2024 | $3,876/semester course | $7,752/full-year course |
| Summer 2025 | $4,027/semester course | $8,054/full-year course |
| Summer 2026 | (12.47% of 2025-2026 BA, Step 1) | |

### Summer School Science LSM (additional 9.5% for longer day/lab requirements)

| | | |
|---|---|---|
| Summer 2024 | $4,244/semester course | $8,488/full-year course |
| Summer 2025 | $4,410/semester course | $8,820/full-year course |
| Summer 2026 | (12.47% of 2025-2026 BA, Step 1 + 9.5%) | |

### Summer School Dean - $1,000 per week

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

**Summer School Nurse -** Per Diem hourly rate based on current salary for providing nursing services for summer school students.

### E. Creditable Earnings

The Parties hereby agree that the District and DEA makes no representations regarding the creditable earnings status with respect to any compensation received by LSMs pursuant to the terms of this Agreement. Any and all determinations regarding creditable earnings, creditable service and related TRS issues shall be made by TRS and, where applicable, a court of competent jurisdiction.

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

# ARTICLE XII - LEADERSHIP STIPENDS AND NON-CLASSROOM LSMs

It is understood that any LSM who meets regularly with administration shall not have the authority to make agreements on behalf of DEA unless they have been explicitly authorized by the DEA President or their designee to serve as a representative for that purpose. Notice of proposed changes to LSM working conditions must follow the notice requirements in *Article II, Section I, Association's Right to Information*.

## A. Dean of Students

A Dean is a (10) ten-month employee. A Dean shall receive four (4) personal days a year and a stipend of 17.5% of the LSM's base salary to cover their additional leadership responsibilities. Such responsibilities often extend beyond the school day, and include, but are not limited to:

- Seven (7) additional work days, including five (5) days of work prior to the start of the school year, and two (2) flex days, to be assigned by the building principal;
- Supervision of activities outside of regular school hours;
- Participation in building committees will be limited to committees that concern the supervision and discipline of students, or management/supervision of building security and/or student well-being and safety. Deans will also participate in building administration meetings (BAM/AC) or any subsequent version of these committees.

1. **Supervisory Duties:**
   a. Deans shall supervise all home varsity football games, all home varsity boys basketball games, the homecoming dance, prom, graduation, and the Deerfield boat party. In addition, Deans from both high schools will attend DHS vs HPHS varsity football and basketball games regardless of where the games are played. Deans may be asked to attend up to one additional after school event at the discretion of their building principal.
   b. Deans may be assigned to supervise the following on a rotating basis: home and away athletic events, concerts, plays, and other events deemed necessary by Administration. For away events, Deans will receive mileage reimbursement.
   c. Deans will not be in charge of LSM supervision schedules.

2. **Additional Compensation:** Additional hours worked beyond the above seven (7) additional days shall be paid at their per diem hourly rate.

## B. Director of Instructional Technology

A Director of Instructional Technology is a (10) ten-month employee. They shall receive a stipend of 13% of the LSM's base salary to cover the scope of their work, which includes teaching one (1) year-long course, five (5) days of work prior to the start of the school year, support to onboard new staff during orientation, and coordinating the maker space in each building. Participation in building committees will be limited to meetings that include a specific agenda item regarding instructional technology.

3249123.1

## C. Nurse

A Nurse is a (10) ten-month employee and is not required to work additional days before the start of the school year.

1. **Additional Compensation / Reimbursement:**
   a. Summer work, such as review of physicals and other records outside of the hours when the summer school nurse is on duty, is paid at the $50 per hour summer workshop rate.
   b. Summer IEP/504 evaluations are paid at a per diem hourly rate.
   c. The District will pay 100% for license renewal fees, conferences/workshops required for the maintenance of their license to work in the school setting, vision and hearing recertification, and CPR recertification. The aforementioned recertification workshops or hours may not apply towards A or E credits, or towards a lane change.

## D. School Psychologist

A School Psychologist is a (10) ten-month employee. A School Psychologist will be paid at their per diem hourly rate for summer work related to job responsibilities/duties.

1. **Supervisory Duties:** School Psychologists will be assigned a supervision related to their role at the discretion of the principal under the same terms as supervisory assignments given to other LSMs. *(See Article VI, Working Conditions, Section C).*

2. **Additional Compensation / Reimbursement:**
   a. When a psychologist must stay beyond the hours of the school day to attend to a student crisis, the psychologist shall be paid at their per diem hourly rate.
   b. Summer IEP/504 evaluations are paid at a per diem hourly rate.
   c. The District will pay 100% for license renewal fees and conferences/workshops required for the maintenance of their license to work in the school setting. The aforementioned recertification workshops or hours may not apply towards A or E credits, or towards a lane change.

## E. Social Worker

A Social Worker is a (10) ten-month employee.

1. **Supervisory Duties:** Social Workers will be assigned a supervision related to their role at the discretion of the principal under the same terms as supervisory assignments given to other LSMs. *(See Article VI, Working Conditions, Section C).*

2. **Additional Compensation / Reimbursement:**
   a. When a social worker must stay beyond the hours of the school day to attend to a student crisis, the social worker shall be paid at their per diem hourly rate.
   b. Social workers will be paid at their per diem hourly rate for summer work related to scheduling social work service minutes and/or case assignments.

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

    c.  Summer IEP/504 evaluations are paid at a per diem hourly rate.
    d.  The District will pay 100% for license renewal fees and conference/workshops required for the maintenance of their license to work in the school setting. The aforementioned recertification workshops or hours may not apply towards A or E credits, or towards a lane change.

## F. Speech Pathologist

A Speech Pathologist is a (10) ten-month employee.

1. **Supervisory Duties:** Speech Pathologists will be assigned a supervision related to their role at the discretion of the principal under the same terms as supervisory assignments given to other LSMs. *(See Article VI, Working Conditions, Section C).*

2. **Additional Compensation / Reimbursement:**
    a.  Summer evaluations are paid at a per diem hourly rate.
    b.  The District will pay 100% for license renewal fees and conference/workshops required for the maintenance of their license to work in the school setting. The aforementioned recertification workshops or hours may not apply towards A or E credits, or towards a lane change.

## G. 504 Coordinator

A 504 Coordinator is a (10) ten-month employee. The 504 Coordinator shall receive a stipend of 13% of the LSM's base salary to cover five (5) additional days at the beginning of the school year and their additional responsibilities.

1. **Supervisory Duties:** A 504 Coordinator will not be assigned a supervision.

2. **Additional Compensation / Reimbursement:**
    a.  Summer 504 evaluations are paid at a per diem hourly rate.
    b.  If approved by the building principal or designee, a 504 Coordinator will be paid for summer work at a per diem hourly rate.

## H. Special Education Team Lead

Special Education Team Leads are (10) ten-month employees. The Special Education Team Leads shall receive a stipend of 3% of their base salary to cover the additional responsibilities associated with leading IEP meetings.

1. **Supervisory Duties**: The Special Education Team Leads will not be assigned a supervision.
2. **Additional Compensation/Reimbursement:**
    a.  Summer IDEA evaluations are paid at the per diem hourly rate.
    b.  If other work is assigned by the building principal or other special education supervisor, the Special Education Team Lead will be paid at the per diem hourly rate.

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

**I. Counselor**

A Counselor shall receive their per diem hourly rate to cover a total of an additional six (6) days of work. Additional summer hours will be paid at their per diem hourly rate.

**J. District Outplacement Coordinator**

The District Outplacement Coordinator is a (10) ten-month employee who serves as the District's liaison for students who are placed in separate special education programs/schools. The District Outplacement Coordinator shall be placed on the appropriate lane and step as determined by their educational attainment and years of experience, and will receive the per diem rate for each day worked outside of the established LSM work calendar, as approved by the Assistant Superintendent of Student Services or designee.

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

# ARTICLE XIII - ATHLETICS, ACTIVITIES, AND EXTRA DUTIES

## A. Athletics and Activities

The Board sponsors a variety of extracurricular activities for students, including athletics and student clubs. Student clubs must be supervised by an LSM or other District employee as approved by the Student Activities Director and the School Principal per Board Policy 6-190. In regard to athletic coaching positions, members of the bargaining unit will be given priority consideration, however, the Athletic Director retains the discretion to recommend outside candidates for such positions.

Coaching and activity sponsorship appointments are made on an annual basis by the Administration. Coaching and activity sponsorship assignments are not licensed positions and are not subject to tenure, position on the sequence of honorable dismissal list, or seniority. Paid chaperoning and extra-duty assignments are subject to annual approval by the building principal or designee.

Payment of the stipend amount to coaches and sponsors will be prorated to the time worked. For example, a coach who works 100% of the athletic season will be paid 100% of the stipend; a coach who takes a leave of absence, and only works 75% of the season, will receive 75% of the stipend. In the event an LSM takes a leave of absence, it will be up to the Athletic Director and/or the Activities Director to determine how the vacant position will be filled and the stipend will be allocated or reallocated.

## B. Stipend Review Advisory Committee (SRAC)

1. A Stipend Review Advisory Committee (SRAC) will be established consisting of an equal number of representatives from the DEA and from the Administration. The purpose of the committee will be to review existing stipends and advise the Superintendent and Athletic and Activities Directors on the number of stipends, the category in which the stipended position is placed, discontinuation of existing stipends, and/or addition of new stipends. The SRAC will consider length of season, number of contests, and preparation time to determine category placement. To determine the number of coaches/activity sponsors assigned to a sport/activity, the SRAC will consider the nature of the sport/activity and the number of student participants.

2. During the 2023-2024 school year, the SRAC will develop a process for students and school staff members to propose additional stipends for activities and athletics, which will be posted on the District's website and available for use by February 1, 2024.

   Thereafter, the SRAC shall convene each school year no later than September 30th to review and evaluate stipends for all existing activities and sports. The SRAC will recommend changes to existing stipends, including category placement, discontinuation, and addition of new or additional stipends, to the Superintendent and to DEA leadership no later than February 15th. The Superintendent will review the recommendations of the SRAC and may amend such recommendations, after consultation with the SRAC, upon

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

determination that the SRAC's initial recommendation does not align with the criteria set forth above. The Superintendent will notify all employees eligible to fill a stipend position of any changes in stipends no later than April 15th of the school year prior to the change taking place.

## C. Stipends

Athletic and Activity stipends fall within the categories set forth in *Appendices D - F* of this Agreement.

1. **Category Placement**: Changes in the category placement of any athletic or activity stipend, as well as placement of any new stipends, will be determined by the parameters established in *Section B, Stipend Review Advisory Committee (SRAC),* above.

2. **Personal Day**: As stated in *Article X, Section D, Personal Leave,* coaches and activity sponsors receive an additional personal day during each year that they coach/sponsor (maximum one (1) per person).

3. **Playoff Compensation:** The paid coaching staff of any athletic team or activity that extends their season by advancing beyond the first round of the state/playoff competition series will be paid an extra stipend. Coaches and activity sponsors who advance will be paid as follows.*

   | | |
   |---|---|
   | Head Coach: | $300 per week |
   | Assistant Coach(es): | $200 per week |
   | Activity Sponsor: | $300 per week by which the season is extended |

The Athletic Director has the discretion to approve the number of assistant coaches who will advance with the head coach.

*Because not all football teams qualify for the state competition, the football coaches will be paid for the first round and any subsequent rounds of the state competition.*

4. **Regulations for Lane Placement:**
   a. Newly hired coaches/sponsors shall be placed up to step three (3) on the stipend grid for previous non-District 113 experience coaching/sponsoring the same activity for which they were hired. This may include coaching experience at a professional, collegiate, other high schools, or club level. When hiring a head coach, the Athletic Director with approval of the Superintendent, will have the discretion to exceed this placement to hire qualified candidates.

   b. Any District 113 coach/sponsor who adds and/or transfers coaching assignments to another District 113 sport/activity will be granted up to three (3) years of credit for prior District 113 coaching/sponsor experience.

      i. ***Example 1***: Coach A will be at step 6 as an assistant swimming coach for next year. They are offered the head coaching position for water polo for next year.

They will receive credit for completing three (3) years prior District 113 coaching experience because they changed sports; thus, they will begin as a head coach on step 4 next year.

ii. ***Example 2***: Coach B will be at step 3 as a head tennis coach for next year. They are offered the head coaching position for softball. This individual will stay at step 3 because any coach not yet to step 3 will not have to slide back when making a change.

iii. ***Example 3***: Sponsor C has been in charge of the Chess Club for 20 years. They are at the maximum on the scale. If they decide to take on a new activity next year, they will receive credit for completing 3 years' prior District 113 activity sponsor experience because they changed activities; thus, they will begin as an activity sponsor on step 4 next year.

iv. ***Example 4***: Sponsor D will be at step 3 as a newspaper sponsor for next year. They are offered the sponsor position for model UN. This individual will stay at step 3 because any sponsor not yet to step 3 will not have to slide back when making a change.

c. Full credit for District 113 assistant coaching/sponsoring experience will be granted if the LSM becomes head coach of the same sport/activity.

i. ***Example 1***: Coach E will be at step 5 as an assistant baseball coach for next year. They are offered the head coaching position for baseball. This person will stay at step 5 for next year as a head coach because they remained in the same sport.

ii. ***Example 2***: Sponsor F will be at step 5 as an assistant robotics sponsor for next year. They are offered the head sponsor position for robotics. This person will stay at step 5 for next year as a head sponsor because they have remained in the same activity.

## 5. Placement of LSMs Returning to Coaching / Sponsorship

All LSMs who have held a coaching/sponsor position in District 113 during their term of employment as an LSM in the District will be placed on the salary grid to reflect total years of past service. Upon returning to a coaching/sponsorship position in the same sport or activity, an LSM must work with the District to ensure placement is correct before signing their contract.

● ***Example 1:*** Coach G coached football for 8 years, starting in the 2002-2003 school year, and ending with the 2009-2010 school year. Coach G returns to coaching football for the 2023-2024 school year, and is placed on Step 9.

● ***Example 2:*** Sponsor H was an assistant debate coach for 7 years, starting in 2009-2010, and ending with the 2015-2016 school year. Sponsor H returns to debate in 2025-26, and is placed on Step 8.

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

## D. Chaperone Duty Compensation

For those events that require a chaperone, as determined by the building principals, compensation rates will be as set forth below. Chaperone duty spots will first be filled on a volunteer basis, including non-LSMs. If spots remain unfilled, LSMs who have not volunteered may be assigned up to one (1) chaperone duty (on a rotating basis). This compensation does not apply to a paid coach/sponsor already receiving a stipend for the team/activity/event.

**Compensation Rates:**
- A. School Sponsored Event / Activity      **$30**    **per hour**
- B. Overnight Field Trip Supervision*      **$225**    **per night**

*as approved by the Building Principal within the parameters of Board Policy*

## E. Extra Duty Compensation

**Category A:**      **$37**    **per hour**

Football Chain Gang Crew, Videographers, Timers, Scorers, Announcers, Lab Supervision, Chemistry Lab Aide (college degree not required), Stage Manager (non-school events)

**Category B:**      **$32**    **per hour**

Saturday Detention, Fitness Center Supervisor, Ticket-Takers and Sellers, Crowd Control, Street Supervision (permit check, traffic, etc.)

| | | |
|---|---|---|
| ● Curriculum Rate (incl. summer professional development work) | **$50** | **per hour** |
| ● Driver's Education: Behind the Wheel (outside school hours) | **$55** | **per hour** |
| Driver's Education: Behind the Wheel (during school hours) | | **internal sub rate** |
| ● CPR Certification Trainers | **$55** | **per hour** |
| ● Debate Judge | **$75** | **per round** |
| | **$225** | **per day** |
| ● SEED Facilitator | **$2500** | **per year** |
| ● Mentor Advisor | **$500** | **per year** |
| ● Year 1 and Year 2 Mentor | **Base of $1000 + $625** | **per mentee** |
| ● Athletic Supervisor | **0.085 times BA Step 1 per season** | |

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

# ARTICLE XIV - FRINGE BENEFITS AND INSURANCE

### A. Insurance Coverage -- Group Coverage

Life insurance, accidental death and dismemberment insurance, health insurance, and dental insurance shall be provided by the Board, pursuant to the following specifications and conditions:

1. All LSMs who are employed on a 0.5 FTE basis or higher are eligible to participate in the District's insurance plans at the contribution rates set forth below. An LSM's insurance coverage shall run from July 1st through June 30th provided the LSM remains employed for the full school year.

2. Coverage for new hires will begin the first day they are required to report to work (orientation, inservice, and/or teaching, whichever comes first).

### B. Insurance - Health, Dental, Vision

During open enrollment, or within thirty (30) days of experiencing a qualifying major life change, LSMs will be provided PPO/HMO/Dental/Vision options for contribution. Dental PPO/HMO percentages will match the Board health insurance contributions in the chart below; vision insurance is currently included in District 113 health plans.

|  | **2023-2024** | **2024-2025** | **2025-2026** |
|---|---|---|---|
| **PPO** | The Board will pay **100%** of the **single** premium for eligible LSMs.<br><br>The Board will pay **76%** of the **family** premium for eligible LSMs. | The Board will pay **95%** of the **single** premium for eligible LSMs.<br><br>The Board will pay **80%** of the **family** premium for eligible LSMs. | The Board will pay **90%** of the **single** premium for eligible LSMs.<br><br>The Board will pay **80%** of the **family** premium for eligible LSMs. |
| **HMO** | The Board will pay **100%** of the **single** premium for eligible LSMs.<br><br>The Board will pay **76%** of the **family** premium for eligible LSMs. | The Board will pay **100%** of the **single** premium for eligible LSMs.<br><br>The Board will pay **85%** of the **family** premium for eligible LSMs. | The Board will pay **100%** of the **single** premium for eligible LSMs.<br><br>The Board will pay **85%** of the **family** premium for eligible LSMs. |

Employees with domestic partners who comply with the Illinois Civil Union Law shall be afforded access to family medical and dental benefits at the premium cost splits above.

Beginning with open enrollment for the 2024-25 school year, LSMs who do not elect health insurance benefits will receive $2,000 in lieu of insurance payment. This payment will be disbursed as a lump sum and will be included in the final paycheck of the fiscal year.

3249123.1

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

**C. Term Life Insurance**

LSMs are entitled to life insurance coverage of $125,000 with 100% of the premium paid by the Board. LSMs may opt for coverage of $50,000 to avoid taxation starting with the 2024-2025 school year.

**D. Accidental Death and Dismemberment Insurance**

The Board provides $125,000 for Accidental Death and Dismemberment to LSMs, which is paid at 100% by the Board.

**E. Income Protection / Disability Stipend**

The Board shall provide full individual disability insurance coverage under the District's Group Long Term Disability Plan at no cost to the individual LSM.

**F. Flexible Benefits Plan**

The Board shall maintain a "flexible benefits plan" which meets the requirements of <u>Section 125 of the Internal Revenue Code</u>. If at any time such Section 125 or its underlying regulations shall be amended, the parties shall promptly meet to agree upon an amendment of such plan.

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

# ARTICLE XV - RETIREMENT

## A. Voluntary Retirement Incentive Plan

District 113 offers voluntary retirement incentive plans to eligible LSMs, which includes a retirement incentive bonus and post-retirement insurance supplements. Incentives for eligible LSMs are set forth below.

## B. Voluntary Retirement Incentive Plan Eligibility

1. LSMs must be employed at a full-time and/or part-time status for at least the equivalent of 10 years of 1.0 FTE teaching service (i.e. 20 years of 0.5 FTE is equivalent to 10 years 1.0 FTE) with District 113, including being employed with District 113 as a full-time or part-time LSM for the last five (5) consecutive school years prior to retirement. Summer employment in District 113 does not contribute towards an LSM's years of service.

2. LSMs must submit an irrevocable notice of retirement with a specific retirement date by December 31st during the school year in which the LSM desires to begin receiving the retirement incentive bonus. The retirement notice cannot be submitted more than 69.5 months prior to the LSM's official retirement date with TRS. The final deadline for the retirement notice under this Agreement is December 31, 2025 and the final retirement date that will be honored under this Agreement is June of 2031.

3. The LSM's retirement must not cause District 113 to pay any excess salary penalties to TRS.

4. LSMs must sign and submit a promissory note stating all retirement benefits will be paid back/forfeited if a TRS excess salary penalty occurs.

5. LSMs must be eligible to retire with TRS on the retirement date set forth in the retirement notice.

6. LSMs must retire no later than the end of the school year at which the LSM is first eligible for a non-discounted TRS annuity.

## C. Retirement Incentive Bonuses

Eligible LSMs will have a choice of two (2) retirement incentive bonus options under this Agreement. An LSM must be eligible to retire under TRS rules and meet current eligibility requirements stated above.

An LSM cannot change selection once elected. The District, the Human Resources Department, and/or the Business Office will not determine potential retirement benefits under either plan; the employee assumes responsibility for the option elected. The District will not be liable for any claims by employees alleging they should have chosen one option over the other.

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

1. **Retirement Incentive Bonus: Option 1**

   This option/benefit is extended to LSMs who meet existing eligibility requirements for the term of the Agreement.

   Option 1 will not be available upon the expiration of this agreement.

   a. **Bonus Amount:** The amount of the retirement incentive bonus is based on the number of equivalent 1.0 FTE years of service as an LSM in District 113. LSMs with a partial year of service will receive the corresponding fractional amount between steps. For example, an LSM with 16.5 years of D113 service receives a bonus amount at year 16 + 0.5 of the increase between years 16 and 17 on the bonus chart below.

   b. **Payment of Bonus:** The Assistant Superintendent of Finance and the Chief Human Resources Officer will meet with each eligible LSM to determine a bonus distribution plan that will NOT cause the District to pay a TRS excess salary penalty. The agreed upon amounts will be paid by June 30th of each school year prior to retirement. In the event that there is a portion of the retirement bonus that has not been paid by the date of retirement, such portion shall be paid to the LSM in a lump sum payment to be made no later than 60 calendar days after the employee's official TRS retirement date.

   c. **Continued Service:** Employees must continue to provide substantial services as determined by the Chief Human Resources Officer in order to continue eligibility to receive the full retirement incentive bonus. Employees who cease to provide substantial services (i.e. resign or dismissed) at any time prior to the date provided in the irrevocable notice of retirement shall forfeit any remaining unpaid retirement incentive bonus. In addition, if the LSM causes the District to pay a TRS excess salary penalty, all retirement benefits shall be paid back/forfeited.

   d. **Repayment:** If an LSM is required to repay retirement benefits previously received, repayment shall be made by salary withholding to the extent possible, but in any event, the LSM must make full repayment within 30 calendar days after the date of the LSMs resignation or, if later, after the Board's receipt of notice of a TRS excess salary penalty. If the LSM fails to make payment when due and the Board incurs attorney's fees to collect such repayment, through litigation or other collection efforts, the LSM shall reimburse the Board for its reasonable attorney's fees and other costs and expenses of collection. Upon repayment, an amended creditable earnings report shall be made by the Board to TRS.

3249123.1

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

## Retirement Incentive Bonus: Option 1

| District 113 Yrs of Service | Bonus Amount |
|---|---|
| 10 | $20,000 |
| 11 | $22,000 |
| 12 | $24,000 |
| 13 | $26,000 |
| 14 | $28,000 |
| 15 | $30,000 |
| 16 | $32,000 |
| 17 | $34,500 |
| 18 | $37,000 |

| District 113 Yrs of Service | Bonus Amount |
|---|---|
| 19 | $39,500 |
| 20 | $42,000 |
| 21 | $44,500 |
| 22 | $47,000 |
| 23 | $50,000 |
| 24 | $53,000 |
| 25 | $56,000 |
| 26 | $59,000 |
| 27 | $62,000 |

| District 113 Yrs of Service | Bonus Amount |
|---|---|
| 28 | $65,000 |
| 29 | $68,500 |
| 30 | $72,000 |
| 31 | $75,500 |
| 32 | $79,000 |
| 33 | $82,500 |
| 34 | $86,000 |
| 35 | $89,500 |
|  |  |

2. **Retirement Incentive Bonus: Option 2**

   a. **Bonus Amount**: The LSM shall receive four 6% salary increases to their base salary in the final four years of employment with the district.

   b. **Payment of Bonus:** The Assistant Superintendent of Finance and the Chief Human Resources Officer will meet with each eligible LSM to review the impact of the 6% increases. The bonus will be paid by June 30th of each school year prior to retirement.

   c. **Continued Service:** Employees must continue to provide substantial services as determined by the Chief Human Resources Officer in order to continue eligibility to receive the full retirement incentive bonus. In addition, per *Section B, Voluntary Retirement Incentive Plan Eligibility,* above, if the LSM causes the District to pay a TRS excess salary penalty, all retirement benefits shall be paid back/forfeited.

   d. **Repayment:** If an LSM is required to repay retirement benefits previously received, repayment shall be made by salary withholding to the extent possible, but in any event, the LSM must make full repayment within 30 calendar days after the date of the LSMs resignation or, if later, after the Board's receipt of notice of a TRS excess salary penalty. If the LSM fails to make payment when due and the Board incurs attorney's fees to collect such repayment, through litigation or other collection efforts, the LSM shall reimburse the Board for its reasonable attorney's fees and other costs and expenses of collection. Upon repayment, an amended creditable earnings report shall be made by the Board to TRS.

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

## D. Post-Retirement Insurance Supplement

LSMs receive medical and dental supplements based on the plan they elected during the final year of service within District 113. LSMs on the family plan during their final year of employment are eligible for the family supplement amounts. LSMs on the single plan during their final year of employment will be eligible for the single supplement amounts.

LSMs are eligible to receive the medical insurance supplement as long as they are not on a District 113 medical plan. Should a retired LSM be covered under a spouse's District 113 medical insurance plan, the member will not be eligible to receive the medical insurance supplement during that period of coverage. Should the retired LSM switch to a non-District 113 medical insurance plan at any time during their eligible period, the retired LSM will receive the full eligible monthly amount until the retired LSM turns 65. Likewise, if a retiree is receiving the supplement, but switches to a District 113 medical insurance plan as part of a spouse's coverage, the retiree would stop receiving the supplement while on the District 113 medical insurance plan. If, at any point, the retiree switched back to a non-District 113 medical insurance plan before turning 65, they would again be eligible to receive the monthly medical insurance supplement.

**Post-Retirement Insurance Supplement**

| District 113 LSM Service Requirement | 10-16 Years Accumulated D113 Service | 17-22 Years Accumulated D113 Service | 23-28 Years Accumulated D113 Service | 29-35 Years Accumulated D113 Service |
|---|---|---|---|---|
| **Life Insurance** Post-Retirement Incentive - Until age 65 | $50,000 | $50,000 | $50,000 | $50,000 |
| **Medical Insurance** Post-Retirement Incentive - Until age 65 | **Family**: $420 / month **Single**: $168 / month | **Family**: $510 / month **Single**: $204 / month | **Family**: $600 / month **Single**: $240 / month | **Family**: $700 / month **Single**: $280 / month |
| **Dental Insurance** Post-Retirement Incentive - Until age 65 | **Family**: $50 / month **Single**: $20 / month | **Family**: $65 / month **Single**: $30 / month | **Family**: $80 / month **Single**: $40 / month | **Family**: $95 / month **Single**: $50 / month |

## E. Revocation

By mutual agreement between the Board and the LSM, an LSM's notice of intent to retire may be revoked or modified. The reasons for such an agreement may include, but are not limited to, the death of a spouse, divorce between the LSM and spouse, or serious illness of the LSM or a spouse which would likely cause the use of sick leave otherwise necessary to achieve retirement without reduced benefit from TRS.

# ARTICLE XVI - GRIEVANCE PROCEDURES

## A. Grievance - Purpose

The primary purpose of this procedure is to secure the resolution of grievances at the lowest level possible.

## B. Grievance - Defined

A grievance is a claim, by a bargaining unit member or the Association, that there has been a violation, misinterpretation, or misapplication of any of the provisions of this Agreement. In order to utilize this process, grievances must be raised within sixty (60) calendar days of when the event or occurrence should reasonably have been known.

## C. Informal Resolution

The Association and the Board agree it is expected an employee and their immediate supervisor will try to resolve problems through free and informal communications without resorting to the formal grievance procedure. To this end, employees who believe they have a grievance may discuss the matter informally with their immediate supervisor in an effort to resolve the matter before undertaking the formal grievance procedure set forth below.

The formal timeline outlined below for the written grievance can start no later than fifteen (15) school days after the last meeting or good faith effort at informal resolution.

## D. Procedures for Adjustment of a Grievance

- **Step 1 - Immediate Supervisor**. All grievances must be presented in writing within fifteen (15) school days following the last meeting or good faith effort at informal resolution, including an attempt to meet to resolve. The written grievance shall specifically identify the contract provision allegedly violated and the remedy sought. A grievance may be presented:

  a. by an employee in person
  b. by an employee accompanied by an Association representative
  c. through an Association representative if the employee so requests; or
  d. by an Association representative in the name of the Association

  Upon receiving the written grievance, the supervisor shall set a meeting to discuss the grievance within five (5) school days. The supervisor shall issue a written determination with the resolution to the grievance to the grievant(s) within five (5) school days of such meeting, with copies of such decision shared with the Building Principal, the Chief Human Resources Officer, and the Association representative. In the event the matter is resolved at this stage, and an Association representative was not present at the adjustment of the grievance, the supervisor shall also provide a copy of the decision to the Association.

- **Step 2 - Principal/District Administrator Level.** In the event the matter is not resolved at Step 1, the grievance shall be referred to either the Principal of the School (for school-specific issues) or to the Chief Human Resources Officer within ten (10) school days of the receipt of the decision at Step 1.

  Within ten (10) school days after receiving the grievance, the Principal or Chief Human Resources Officer shall hold a meeting with the grievant to discuss the nature of the grievance.

  Within ten (10) school days after the meeting, the Principal or Chief Human Resources Officer shall state their decision and reasoning in writing, and shall furnish copies to the employee, if any, who lodged the grievance, and the Association representative.

- **Step 3 - Superintendent Level.** Within ten (10) school days after receiving the decision of the Principal or Chief Human Resources Officer, an appeal of the decision may be made to the Superintendent. The appeal shall be in writing and shall set forth specifically the act or conditions and the grounds on which the grievance is based and shall be accompanied by a copy of the decision at Step 2.

  The Superintendent shall meet with the grievant and the Association representative with a goal of arriving at a mutually satisfactory adjustment. Within fourteen (14) school days after receiving the appeal, the Superintendent shall communicate their decision, and reasoning in writing, to the Principal/Assistant Superintendent, the Association representative, the DEA President, and to the aggrieved employee, if any.

- **Step 4 - Board of Education.** If the grievance is not resolved at Step 3, the Association may appeal the grievance in writing to the Board within ten (10) school days after receipt of the Superintendent's written determination. The Board shall consider the grievance within thirty (30) calendar days after receipt of the appeal. Within ten (10) days after the Board's consideration of the appeal, the Board shall provide the Association with a written response to the grievance.

- **Step 5 – Binding Arbitration.** If the Association is not satisfied with the Board's decision, the Association may refer the grievance to binding arbitration within twenty-five (25) school days after receiving the Step 4 decision. If the Association refers a grievance in timely fashion to arbitration, the following provisions shall be applicable:

  a. The arbitration request shall be submitted to the American Arbitration Association and the arbitrator shall be selected under the Voluntary Labor Arbitration rules of the American Arbitration Association. The AAA shall act as the Administrator of the proceedings.

  b. More than one grievance may be submitted to the same arbitrator if both Parties agree in writing.

   c. The arbitrator shall have no right to amend, modify, nullify, ignore, add to, or subtract from the provisions of the Agreement. The arbitrator shall consider and decide only whether there has been a violation, misinterpretation, or misapplication of the express terms of this Agreement based on the issue(s) raised by the Agreement or as amended during Steps 1-4, and shall have no authority to make a decision on any issue not submitted or raised. If the arbitrator determines that there has been such a violation, they will have the authority, consistent with the terms of this subparagraph, to provide for appropriate relief. The decision of the arbitrator shall be binding to the Board, the Association, and the grievant.

   d. The fees and expenses of the arbitrator shall be divided equally between the Board and the Association; provided, however, that each party is responsible for compensating its own representatives and witnesses.

## E. General Provisions

1. No employee at any formal or informal stage of the grievance procedure shall be required to meet with an administrator without Association representation.

2. If a grievance arises from the action of authority higher than the principal of a school, the Association may present the grievance at the appropriate step of the grievance procedure. An informal conference shall be held as the initial step in such a situation, and no further conference shall be required after the formal filing of the grievance.

3. If the grievance is of such a nature as to require immediate action such as may be required in transfer cases, the person acting for the Association may appeal immediately to the office or person empowered to act and said office or person shall endeavor to resolve the matter jointly with the Association representative. If the matter is not satisfactorily resolved, it may be appealed through the grievance procedure beginning with Step 3 - Superintendent Level.

4. Failure at any step of this procedure to appeal a grievance to the next step within the specified time limits shall be deemed acceptance of the decision rendered at that step. Failure at any step of this procedure to communicate the decision on a grievance within the specified time limits shall permit the aggrieved party to proceed to the next step.

5. The time limits specified in this procedure may be extended in any specific instance by mutual agreement in writing.

6. Employees shall be free to participate in the grievance process without interference or penalty.

7. All documents, communications, and records dealing with the processing of a grievance shall be filed separately from the personnel files of the participants.

8. Grievance hearings and discussions may be conducted during school hours when the employees involved are free of classroom responsibilities. When it becomes necessary for

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

individuals to be involved during school hours, they shall be excused with pay for that purpose.

9. During the school year, "school days" shall be defined as days on which bargaining unit members are required to report to work. During summer break, the days are defined as those days on which the business office of the District is open. The Association will make best efforts to procure the information and employees needed to assist the Administration to complete any investigation.

10. By mutual agreement, the Parties may elect to enter into grievance mediation sponsored by the Federal Mediation and Conciliation Services (FMCS) prior to submitting a grievance to final and binding arbitration.

11. The withdrawal or settlement of a grievance shall not establish a precedent unless the Parties agree otherwise.

12. In agreeing that the decision of the arbitrator is final and binding to the Board, the Association, and the grievant, the Parties mutually agree that this provision shall not be construed to restrict the right of either party to seek review of the arbitrator's award.

# ARTICLE XVII - PERSONNEL FILES

## A. Official Personnel File

Personnel files for each LSM shall be maintained by the Board. Summative evaluations are maintained exclusively on an electronic database to which all LSMs have access to their personal evaluation documents and records. All other personnel records shall be maintained in a central file located in the Human Resources Department (either in paper or electronic format, depending on the system used by the District) in accordance with the confidentiality requirements within state and federal law.

## B. File - Defined

"File" shall mean any device for the collection and/or maintenance of documents or materials, a document or other piece of material itself or a collection of such, or any point at which a document or piece of material or collection of such may be held, stored, or temporarily rested.

## C. Timely Insertion

All material to be placed in the official personnel file shall be time stamped and inserted within a reasonable time, not to exceed forty-five (45) calendar days from the event giving rise to the material to be inserted or forty-five (45) calendar days after the Board, through the use of reasonable diligence, should have become aware of the event giving rise to the material to be inserted. Supervisory documents found in the personnel file should always have the name of the supervisor listed on the document(s).

## D. Right of Access

All LSMs shall have reasonable access to all materials in their official personnel file except for credentials provided by LSM placement offices and letters of recommendation provided in confidence by persons outside the District. Licensed staff members may inspect their personnel files upon three (3) days written notice to the Human Resources Department. A representative of the Association may accompany the LSM.  If an LSM brings independent counsel, the LSM must notify the Human Resources Department in the written request, or through a follow-up request, in writing.

## E. Confidentiality and Notice

An LSM's personnel file and its contents are confidential and shall not be copied or provided to a third party outside of the District unless requested by the LSM, required by law, or as required in a legal action or arbitration. The Board will comply with all state and federal laws as applicable to LSMs' personnel files and the retention and release of contents therein. In the event the Board is required to disclose any or all of an LSM's personnel file, except if requested by the LSM, the Board will provide the LSM with written notice of the disclosure.

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

### F. Right of Fair Evaluation Record

No material related to evaluations of LSMs, other than official components of the evaluation process, shall be included in the personnel file.

### G. Right of Copy

Any material that is evaluative in nature shall be reviewed with the LSM prior to its placement in the personnel file, and a copy of such material shall be provided to the LSM.

### H. Right of Addition and Attachment

Every LSM shall have the right to add a reasonable amount of pertinent material to their official personnel file and to attach dissenting or explanatory material to any document or other piece of material in their official personnel file.

### I. Right of Integrity of File

No person shall remove any material from an LSM's official personnel file without the mutual consent of the LSM and the Superintendent or designee.

### J. Rights When Cleared of a Criminal or Disciplinary Charge

If a criminal charge is brought against an LSM and the charge is dismissed or the LSM is subsequently found not guilty, the Board shall thereafter delete from the LSM's personnel file within five (5) working days, any specific reference to the criminal charge, and shall not rely on said criminal charge in any other proceeding.

In the event a disciplinary charge is brought against an LSM by any other person and the LSM is subsequently cleared of the charge in a disciplinary hearing, all reference to the charge will be removed from the LSM's personnel file within five (5) working days thereafter.

If a complaint is lodged against an LSM by another LSM, and upon investigation the LSM is not subject to any discipline, there shall be no reference to this in their personnel file, and any document found in the personnel file to have such a reference will be removed.

### K. Grievances

No grievances filed by an LSM, nor responses to grievances, shall be part of an LSM's personnel file.

# ARTICLE XVIII - DISTRICT COMMITTEES

In order to maximize the shared rich history of the District, promote shared leadership, and enhance collaboration, the Parties have established committees as set forth below. All committees, except the Performance Evaluation Review Act (PERA) Joint Committee, are advisory in nature.

The committees will typically be chaired by an administrator, as appointed by the Superintendent. The committee chair shall be responsible for scheduling committee meetings, collaborating on agendas and minutes with committee members, and producing all written reports. Minutes from committee meetings will be posted on the staff portal.

## A. Calendar Committee

The Administration and the DEA will form a Calendar Committee consisting of no more than six (6) representatives from each school in order to recommend a school year calendar which includes 177 student attendance days, four (4) institute days, two (2) inservice days, and five (5) emergency days.

## B. Curriculum, Instruction, and Assessment Committee

The Committee on Curriculum, Instruction, and Assessment will jointly develop proposals and policies related to the following topics: course proposal work, the design and goals of institute days, a review of district professional development efforts, district grading and assessment policies, and similar topics. This committee shall meet at least twice annually, and shall make recommendations, by consensus, to the Superintendent, on the issues identified above. The committee shall be composed of an equal number of LSMs (appointed by DEA) and representatives from the administration (appointed by the Superintendent); the committee shall be limited to a maximum ten (10) total members. Recommendations proposed by the committee will be subject to the approval of the Superintendent; recommendations so approved will be shared with the DEA President, via email.

## C. Insurance Advisory Committee (IAC)

The Insurance Advisory Committee (IAC) will review and consider changes to the health, dental, and vision insurance plan designs which will enhance plan offerings and control premium costs. The committee will not have the authority to alter contribution rates set forth in *Article XIV, Fringe Benefits and Insurance, Section B* of this Agreement. Annual premium rates will be set in accordance with the actuarial recommendation provided by the insurer. The committee will make recommendations in regard to plan design and offerings. The Board will have final approval of all changes to the plan design.

1. **Composition**: The committee will be composed of four (4) members appointed by the Superintendent and four (4) members appointed by the DEA. The committee will be chaired by one (1) of the Superintendent's appointees. The above members are the only voting members of the IAC; however, the committee will generally work by consensus and will only vote if consensus is not reached. Either party may invite up to two (2) observers

per meeting. Additionally, one (1) representative from each of the other employee groups covered under the District's plan, will be invited to attend. Consultants may be invited to the meeting if approved by the IAC.

2. **Duties**: The IAC will make recommendations concerning an insurance carrier, and plan design and benefits. The agenda for each meeting will be created in collaboration with all members of the committee. The committee will present an annual report to the Board regarding recommended changes to plan design.

3. **Meetings**: The IAC will meet at least two (2) times per school year and any member of the committee can request additional meetings during the year. The committee chair will provide a summary of major items discussed at the meetings to the Superintendent, DEA President, IAC, and each representative from the other employee groups covered under the plans.

4. **Reports**: The DEA President, the Superintendent, and the IAC shall receive reports regarding the financial status of the District 113 Health/Dental/Vision Plans prior to all meetings of the IAC. Each member of the IAC will also receive a copy of the consultant's reports at least one (1) day in advance of the meeting. Members of the committee will have access to all policies and documents describing benefit coverage, claims, procedures, and utilization numbers. However, the confidentiality of individual plan participants shall be protected as required by law. The IAC shall create and distribute an annual report to educate the membership on current cost savings measures, plan changes, and other insurance information.

## D. Multi-Tiered System of Support (MTSS) Advisory Committee

The reauthorization in 2007 of the *Individuals with Disabilities Education Act* requires that schools provide a system for response to intervention, which is a methodology required to determine eligibility for special education services. The District provides such a system through a multi-tiered system of support (MTSS). An advisory committee to review the District's MTSS program will be established. The committee will consist of three (3) LSMs from each school selected by the DEA and an equal number of representatives from the administration, as appointed by the Superintendent. The committee will review the services being provided to support the MTSS program, the allocation of resources used within the program, and the student outcomes after participation in the program. The committee will have an initial meeting each year prior to October 1st, and will meet to review progress by January 31st.

## E. Professional Advancement Review Committee (PARC)

Each LSM shall be provided with professional learning funds, referred to as PARC funds. These funds may be used as stated in accordance with the requirements set forth in *Article XI, Section C, PARC Funds*.

In the event a PARC expenditure is not approved, the affected LSM may appeal that determination by submitting a request in writing to the Chief Human Resources Officer, who will refer the appeal to the PARC committee. Members of the committee will include two (2) DEA members from each

school, one (1) Assistant Principal from Highland Park, one (1) Assistant Principal from Deerfield, the Chief Human Resources Officer, and the Principal from the affected school. The chair of the committee will be a DEA member. The committee will issue a determination on the appeal within ten (10) school days of receipt of the written appeal.

## F. Performance Evaluation Review Act (PERA) Joint Committee

The Performance Evaluation Review Act (PERA) Joint Committee has been established in accordance with the requirements of the Performance Evaluation Review Act. The PERA Joint Committee shall consist of equal representation of both the district administration and the DEA, with each side having one (1) vote. All agreements finalized by the PERA Joint Committee will be posted on the District's employee portal.

The PERA Joint Committee will have the authority to establish and subsequently modify the Evaluation Plan (including a detailed monthly calendar) on a yearly basis. Any changes to these components must be approved by the Committee by May 15th for the following year. The official version will be made available electronically or by hard copy to LSMs by the first day of student attendance. If the committee cannot agree upon a plan by May 15th for the following school year, the previous year's plan will be maintained.

The PERA Joint Committee will explore options for evaluation of non-classroom LSMs as an alternative to the student growth component.

## G. Special Education Workload Plan Committee

*See Article VIII, Section D.*

## H. Stipend Review Advisory Committee (SRAC)

*See Article XIII, Section B.*

## I. Student Behavior & Security Committee

A Student Behavior & Security Committee shall be established. The Committee shall consist of one (1) dean from each school, two (2) LSMs from each school, selected by the DEA, and six (6) representatives from the administration, as appointed by the Superintendent. District security personnel may also be included. The chair of the committee shall be appointed by the Superintendent. The committee will meet at least two (2) times per year to review disciplinary data and discuss current disciplinary practices. The notes from this committee shall be provided to the District's Parent Teacher Advisory Committee, per Board Policy 2-150.

## J. Special Committee for a Common Schedule

The Board and the DEA acknowledge a shared interest in continuing to foster equitable educational opportunities to all students in the District, including the establishment of District-wide standards in regard to instructional minutes and use of resources. To that end, a committee for the establishment of a common schedule will be formed by October 1st, 2023.

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

For the 2024-2025 school year, the District will pilot a joint application of the Deerfield High School Schedule, in order to have a schedule that reflects equitable teaching, homeroom, supervisory, and collaboration minutes. For the 2025-2026 school year, a common schedule, as determined by the committee process set forth below, will be fully implemented on the first student attendance day.

The committee shall consist of three (3) DEA representatives from each building as appointed by the DEA leadership, and an equal number of representatives from the administration, as appointed by the Superintendent.

The committee will be responsible for the following tasks:
1. Conduct a review of the potential school schedules, gather input from stakeholders, and create a written report, presenting at least two (2) options for a common schedule, to the Board of Education no later than June 1st, 2024.
2. Gather feedback, revise and present a written report with the final recommendation for the shared schedule and any professional development or resources needed to implement the common schedule by December 1st, 2024.

The Special Committee for a Common Schedule will sunset upon conclusion of its work.

## K. Other Working Committees

It is a shared interest of the DEA and the Administration to facilitate LSM participation in working committees to review policies, practices, and the operation of programs in the school district. Working committees may be proposed by the DEA or the Superintendent. The scope of such committees must be clearly identified, with a time frame established for the completion of the committee's work.

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

# ARTICLE XIX - EVALUATIONS

The evaluation of LSMs will be conducted in accordance with the requirements of Article 24A of the *Illinois School Code*, using the evaluation plan agreed upon by the District PERA Joint Committee and posted on the District's intranet. The official evaluation plan will be made available electronically or by hard copy to LSMs by the first day of student attendance each school year. Starting with the 2024-2025 school year, the evaluation plan will reflect a (3) three-year evaluation cycle for tenured LSMs who meet the criteria set forth in Article 24 of the School Code.

The procedural requirements associated with LSM evaluation [notice, timelines, provision of written documents] as set forth in the District's Licensed Staff Member Evaluation Plan are incorporated into this Agreement and are subject to the grievance provision of this Agreement, up to the Board of Education level. The Parties recognize and agree, however, that the criteria and substance of the evaluation plan shall be determined by the District Joint PERA Committee in accordance with the requirements of Article 24 A of the School Code, and that such criteria and substance, as well as an LSM's overall rating on their summative evaluation, are not subject to the grievance procedure.

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

## ARTICLE XX - NO STRIKE / NO LOCKOUT

During the term of this Agreement there shall be no strike, work stoppage, picketing, or any other form of concerted activity by the educators, the purpose of which is to cause District employees to render less than full and complete services to the District and/or to intentionally interrupt the operation of the District, by the Association, its members, or any employees covered by this Agreement. Nothing in this subsection shall be construed as prohibiting employees from engaging in any lawful protected concerted activity that is not intended to interrupt the operations of the District. The Board agrees it will not lock out employees during the term of this Agreement as a result of a dispute with the Association.

# ARTICLE XXI - TERM OF THE AGREEMENT

This Agreement shall become effective August 1, 2023 and remain in effect until the first day of LSM attendance for the 2026-2027 school year.

Should any article, section, or clause of this Agreement be declared illegal or unenforceable by a court of competent jurisdiction, said article, section, or clause, shall be automatically deleted from this Agreement to the extent that it violated the law, but shall not affect the enforceability or validity of any other article, section, or clause.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed the day and year first above written.

Martin D. Esgar, President
District 113 Education Association

Daniel Struck, President
Township High School District No.113

Robin Gapinski, Bargaining Team Chair
District 113 Education Association

Bruce Law, Superintendent
Township High School District No.113

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

# APPENDIX A

**Salary Schedule 2023-2024**

| STEP | BA-0 | BA-15 | MA-0 | MA-15 | MA-30 | MA-45 | MA-60 |
|---|---|---|---|---|---|---|---|
| 1 | $62,160 | $64,985 | $70,974 | $72,896 | $75,608 | $77,982 | $81,372 |
| 2 | $64,646 | $67,583 | $73,813 | $75,811 | $78,632 | $81,100 | $84,626 |
| 3 | $67,101 | $70,152 | $76,618 | $78,692 | $81,620 | $84,183 | $87,843 |
| 4 | $69,517 | $72,676 | $79,376 | $81,525 | $84,557 | $87,213 | $91,005 |
| 5 | $71,881 | $75,148 | $82,075 | $84,296 | $87,433 | $90,178 | $94,099 |
| 6 | $74,253 | $77,627 | $84,783 | $87,079 | $90,319 | $93,154 | $97,203 |
| 7 | $76,666 | $80,151 | $87,539 | $89,908 | $93,255 | $96,181 | $100,460 |
| 8 | $79,120 | $82,717 | $90,340 | $92,786 | $96,238 | $99,260 | $103,725 |
| 9 | $81,612 | $85,321 | $93,186 | $95,708 | $99,269 | $102,385 | $106,992 |
| 10 | $84,142 | $87,967 | $96,075 | $98,674 | $102,347 | $105,560 | $110,256 |
| 11 | $86,707 | $90,650 | $99,004 | $101,684 | $105,468 | $108,779 | $113,508 |
| 12 | $89,309 | $93,370 | $101,974 | $104,734 | $108,633 | $112,043 | $116,743 |
| 13 | $91,944 | $96,125 | $104,983 | $107,825 | $111,838 | $115,349 | $119,954 |
| 14 | $94,611 | $98,912 | $108,027 | $110,951 | $115,080 | $118,692 | $123,133 |
| 15 | $97,307 | $101,732 | $111,106 | $114,115 | $118,360 | $122,075 | $126,271 |
| 16 | $100,032 | $104,580 | $114,218 | $117,309 | $121,675 | $125,494 | $129,429 |
| 17 | $102,733 | $107,403 | $117,301 | $120,476 | $124,959 | $128,882 | $132,599 |
| 18 | $105,404 | $110,197 | $120,351 | $123,610 | $128,209 | $132,233 | $135,783 |
| 19 | $108,038 | $112,952 | $123,359 | $126,700 | $131,414 | $135,538 | $138,973 |
| 20 | $110,632 | $115,662 | $126,320 | $129,741 | $134,567 | $138,791 | $142,170 |
| 21 | $113,176 | $118,322 | $129,225 | $132,724 | $137,662 | $141,984 | $145,369 |
| 22 | $115,667 | $120,925 | $132,069 | $135,644 | $140,691 | $145,108 | $148,566 |
| 23 | $118,096 | $123,465 | $134,843 | $138,493 | $143,646 | $148,155 | $151,761 |
| 24 | $120,458 | $125,934 | $137,539 | $141,262 | $146,519 | $151,119 | $154,948 |
| 25 | $121,708 | $127,184 | $138,789 | $142,512 | $147,769 | $152,369 | $156,198 |
| 26 | $122,958 | $128,434 | $140,039 | $143,762 | $149,019 | $153,619 | $157,448 |
| 27 | $124,208 | $129,684 | $141,289 | $145,012 | $150,269 | $154,869 | $158,698 |
| 28 | $125,458 | $130,934 | $142,539 | $146,262 | $151,519 | $156,119 | $159,948 |

3249123.1

# APPENDIX B

**Salary Schedule 2024-2025**

| STEP | BA-0 | BA-15 | MA-0 | MA-15 | MA-30 | MA-45 | MA-60 |
|------|------|-------|------|-------|-------|-------|-------|
| 1 | $64,584 | $67,519 | $73,742 | $75,739 | $78,557 | $81,023 | $84,546 |
| 2 | $67,167 | $70,219 | $76,692 | $78,768 | $81,699 | $84,263 | $87,926 |
| 3 | $69,718 | $72,888 | $79,606 | $81,761 | $84,803 | $87,466 | $91,269 |
| 4 | $72,228 | $75,510 | $82,472 | $84,704 | $87,855 | $90,614 | $94,554 |
| 5 | $74,684 | $78,079 | $85,276 | $87,584 | $90,843 | $93,695 | $97,769 |
| 6 | $77,149 | $80,654 | $88,090 | $90,475 | $93,841 | $96,787 | $100,994 |
| 7 | $79,656 | $83,277 | $90,953 | $93,414 | $96,892 | $99,932 | $104,378 |
| 8 | $82,206 | $85,943 | $93,863 | $96,405 | $99,991 | $103,131 | $107,770 |
| 9 | $84,795 | $88,649 | $96,820 | $99,441 | $103,140 | $106,378 | $111,165 |
| 10 | $87,424 | $91,398 | $99,822 | $102,522 | $106,339 | $109,677 | $114,556 |
| 11 | $90,089 | $94,185 | $102,865 | $105,650 | $109,581 | $113,021 | $117,935 |
| 12 | $92,792 | $97,011 | $105,951 | $108,819 | $112,870 | $116,413 | $121,296 |
| 13 | $95,530 | $99,874 | $109,077 | $112,030 | $116,200 | $119,848 | $124,632 |
| 14 | $98,301 | $102,770 | $112,240 | $115,278 | $119,568 | $123,321 | $127,935 |
| 15 | $101,102 | $105,700 | $115,439 | $118,565 | $122,976 | $126,836 | $131,196 |
| 16 | $103,933 | $108,659 | $118,673 | $121,884 | $126,420 | $130,388 | $134,477 |
| 17 | $106,740 | $111,592 | $121,876 | $125,175 | $129,832 | $133,908 | $137,770 |
| 18 | $109,515 | $114,495 | $125,045 | $128,431 | $133,209 | $137,390 | $141,079 |
| 19 | $112,251 | $117,357 | $128,170 | $131,641 | $136,539 | $140,824 | $144,393 |
| 20 | $114,947 | $120,173 | $131,246 | $134,801 | $139,815 | $144,204 | $147,715 |
| 21 | $117,590 | $122,937 | $134,265 | $137,900 | $143,031 | $147,521 | $151,038 |
| 22 | $120,178 | $125,641 | $137,220 | $140,934 | $146,178 | $150,767 | $154,360 |
| 23 | $122,702 | $128,280 | $140,102 | $143,894 | $149,248 | $153,933 | $157,680 |
| 24 | $125,156 | $130,845 | $142,903 | $146,771 | $152,233 | $157,013 | $160,991 |
| 25 | $126,656 | $132,345 | $144,403 | $148,271 | $153,733 | $158,513 | $162,491 |
| 26 | $128,156 | $133,845 | $145,903 | $149,771 | $155,233 | $160,013 | $163,991 |
| 27 | $129,656 | $135,345 | $147,403 | $151,271 | $156,733 | $161,513 | $165,491 |
| 28 | $131,156 | $136,845 | $148,903 | $152,771 | $158,233 | $163,013 | $166,991 |

3249123.1

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

# APPENDIX C

**Salary Schedule 2025-2026 (TBD)**

# APPENDIX D

**Stipend Schedule 2023-2024**

| STEP | Category 1 | Category 2 | Category 3 | Category 4 | Category 5 |
|------|-----------|-----------|-----------|-----------|-----------|
| 1 | $7,738 | $7,007 | $5,961 | $5,334 | $4,810 |
| 2 | $8,523 | $7,765 | $6,562 | $5,909 | $5,229 |
| 3 | $9,203 | $8,392 | $7,085 | $6,457 | $5,647 |
| 4 | $9,882 | $8,994 | $7,607 | $6,928 | $6,039 |
| 5 | $10,587 | $9,621 | $8,131 | $7,398 | $6,484 |
| 6 | $11,975 | $10,980 | $9,412 | $8,628 | $7,529 |
| 7 | $12,235 | $11,215 | $9,621 | $8,837 | $7,660 |
| 8 | $12,575 | $11,557 | $9,882 | $9,098 | $7,896 |
| 9 | $12,862 | $11,817 | $10,144 | $9,308 | $8,053 |
| 10 | $13,439 | $12,289 | $10,562 | $9,621 | $8,367 |
| | | | | | |
| STEP | Category 6 | Category 7 | Category 8 | Category 9 | Category 10 |
| 1 | $4,078 | $3,660 | $2,928 | $2,615 | $1,882 |
| 2 | $4,445 | $3,974 | $3,190 | $2,877 | $2,013 |
| 3 | $4,785 | $4,287 | $3,399 | $3,059 | $2,170 |
| 4 | $5,072 | $4,601 | $3,608 | $3,268 | $2,300 |
| 5 | $5,438 | $4,941 | $3,817 | $3,451 | $2,458 |
| 6 | $6,432 | $5,647 | $4,758 | $4,367 | $2,588 |
| 7 | $6,537 | $6,066 | $4,863 | $4,445 | $3,320 |
| 8 | $6,746 | $6,248 | $5,019 | $4,576 | $3,451 |
| 9 | $6,876 | $6,379 | $5,124 | $4,706 | $3,504 |
| 10 | $7,216 | $6,588 | $5,282 | $4,915 | $3,660 |

3249123.1

# APPENDIX E

**Stipend Schedule 2024-2025**

| STEP | Category 1 | Category 2 | Category 3 | Category 4 | Category 5 |
|------|------------|------------|------------|------------|------------|
| 1 | $7,854 | $7,112 | $6,051 | $5,414 | $4,882 |
| 2 | $8,651 | $7,881 | $6,660 | $5,998 | $5,308 |
| 3 | $9,341 | $8,518 | $7,191 | $6,554 | $5,732 |
| 4 | $10,030 | $9,129 | $7,722 | $7,032 | $6,130 |
| 5 | $10,746 | $9,766 | $8,253 | $7,509 | $6,581 |
| 6 | $12,155 | $11,145 | $9,553 | $8,757 | $7,642 |
| 7 | $12,418 | $11,383 | $9,766 | $8,969 | $7,775 |
| 8 | $12,763 | $11,730 | $10,030 | $9,235 | $8,014 |
| 9 | $13,055 | $11,994 | $10,296 | $9,447 | $8,174 |
| 10 | $13,640 | $12,473 | $10,721 | $9,766 | $8,492 |

| STEP | Category 6 | Category 7 | Category 8 | Category 9 | Category 10 |
|------|------------|------------|------------|------------|-------------|
| 1 | $4,139 | $3,715 | $2,972 | $2,654 | $1,910 |
| 2 | $4,511 | $4,033 | $3,238 | $2,920 | $2,043 |
| 3 | $4,856 | $4,352 | $3,450 | $3,105 | $2,203 |
| 4 | $5,148 | $4,670 | $3,662 | $3,317 | $2,334 |
| 5 | $5,520 | $5,015 | $3,875 | $3,503 | $2,495 |
| 6 | $6,529 | $5,732 | $4,830 | $4,432 | $2,627 |
| 7 | $6,635 | $6,157 | $4,936 | $4,511 | $3,370 |
| 8 | $6,847 | $6,342 | $5,094 | $4,644 | $3,503 |
| 9 | $6,979 | $6,475 | $5,201 | $4,776 | $3,556 |
| 10 | $7,324 | $6,687 | $5,361 | $4,988 | $3,715 |

# APPENDIX F

**Stipend Schedule 2025-2026**

| STEP | Category 1 | Category 2 | Category 3 | Category 4 | Category 5 |
|------|-----------|-----------|-----------|-----------|-----------|
| 1 | $7,972 | $7,218 | $6,141 | $5,495 | $4,955 |
| 2 | $8,781 | $7,999 | $6,760 | $6,088 | $5,387 |
| 3 | $9,481 | $8,646 | $7,299 | $6,653 | $5,818 |
| 4 | $10,181 | $9,266 | $7,837 | $7,138 | $6,222 |
| 5 | $10,907 | $9,912 | $8,377 | $7,622 | $6,680 |
| 6 | $12,337 | $11,312 | $9,697 | $8,888 | $7,757 |
| 7 | $12,605 | $11,554 | $9,912 | $9,104 | $7,892 |
| 8 | $12,955 | $11,906 | $10,181 | $9,373 | $8,134 |
| 9 | $13,251 | $12,174 | $10,451 | $9,589 | $8,296 |
| 10 | $13,845 | $12,660 | $10,881 | $9,912 | $8,620 |

| STEP | Category 6 | Category 7 | Category 8 | Category 9 | Category 10 |
|------|-----------|-----------|-----------|-----------|-----------|
| 1 | $4,202 | $3,771 | $3,017 | $2,694 | $1,939 |
| 2 | $4,579 | $4,094 | $3,287 | $2,963 | $2,074 |
| 3 | $4,929 | $4,417 | $3,502 | $3,152 | $2,236 |
| 4 | $5,225 | $4,740 | $3,717 | $3,367 | $2,370 |
| 5 | $5,603 | $5,090 | $3,933 | $3,555 | $2,533 |
| 6 | $6,626 | $5,818 | $4,902 | $4,499 | $2,666 |
| 7 | $6,734 | $6,249 | $5,010 | $4,579 | $3,420 |
| 8 | $6,950 | $6,437 | $5,171 | $4,714 | $3,555 |
| 9 | $7,083 | $6,572 | $5,279 | $4,848 | $3,610 |
| 10 | $7,434 | $6,787 | $5,442 | $5,063 | $3,771 |

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

# ADDENDUM

**LSM Step Adjustments**

**A. Adjustments from Prior Salary Schedule**

Current LSMs hired between July 2011 and June 2019, who were capped at the six (6) year maximum allowable service credit under prior agreements, will have their step placement adjusted on the current salary schedule, up to six (6) additional steps. No retroactive pay will be awarded.

Current LSMs hired between July 2011 and June 2019 will have both their original step placement and progression on the salary schedule reviewed jointly by DEA representatives, the Chief Human Resources Officer, and the Assistant Superintendent of Finance. LSMs will be candidates for an adjustment of step placement for 2023-24 when 1) initial step placement was limited by prior agreements that restricted new hires to a maximum of six (6) years of allowed service credit and/or 2) an LSM's actual movement on the 2nd salary grid resulted in half-steps not ameliorated by the transfer process to the Unified Grid.

Each LSM with a discrepancy between number of years taught and the numerical step placement on the Unified Grid of 2019-2020 will have the difference calculated. The difference will be added to the LSMs step movement between 2022-23 and 2023-24. No LSM will receive an adjustment of more than six (6) steps.

a. ***Example 1*** (adjustment due to initial step placement): An LSM with 8 years of prior experience was initially placed at step 6 for 2018-19. At the end of 2018-19, the LSM had 9 years of teaching experience. The placement on the Unified Grid was G(7), which created a difference of three (10th year of teaching but step 7). In 2022-23 the LSM was at step 10. The LSM will be adjusted to step 14 for 2023-24.

b. ***Example 2*** (adjustment due to half-steps): An LSM with 5 years of prior experience was initially placed at Step 6, which led to half-step movements in the subsequent years. At the end of 2018-19, the LSM had 12 years of teaching experience. The placement on the Unified Grid was L(12), which created a difference of one (13th year of teaching but step 12). In 2022-23 the LSM was at step 15. The LSM will be adjusted to step 17 for 2023-24.

c. ***Example 3*** (adjustment due to both initial placement and half-steps): An LSM with 8 years of prior experience was initially placed at step 6, which led to half-step movements in the subsequent years. At the end of 2018-19, the LSM had 11 years of teaching experience. The placement on the Unified Grid was I(9), which created a difference of 3 (12th year of teaching but step 9). In 2022-23 the LSM was at step 12. The LSM will be adjusted to step 16 for 2023-24.

d. ***Example 4*** (no adjustment): An LSM with 2 years of prior experience was initially placed at step 2. Full-steps from 2 to 3 and from 3 to 4 were followed by half-steps. At the end of 2018-19, the LSM had 6 years of teaching experience. The placement on the Unified Grid was G(7), which created no difference (7th year of teaching and step 7). No adjustment will be made for 2023-24.

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

**B. Adjustments to BA Step Placement**

Beginning with this Agreement, all LSMs in the BA and BA+15 lanes will advance on the salary schedule in the same manner as LSMs in the MA and higher lanes. Current LSMs who had been previously frozen and who lost steps will have their step placement adjusted.

> ***Example***: An LSM was at BA+15 step 12 for 3 years and subsequently became unfrozen by earning a master's degree. The LSM lost 2 years of step movement, so the LSM shall advance 3 steps from the 2022-23 school year to the 2023-24 school year.

# EXHIBIT B

EXHIBIT B

12:09    ..ll LTE 🔋

 J 
Active now

I probably should not even be telling you this but am just giving you a heads up that students and families of seniors are EXTREMELY upset and angry that they were not prioritized for roles in the musical this year given the current environment. I am just letting you know because you may hear from them. These seniors have missed out on so much & this is a slap in the face for most of them especially since there will be ample opportunities for others but for many this will be their last show. Just an fyi 🙁

11:54 AM

 told me you said you would talk after break. That is fine and  will be ok.

You have seniors who are beyond upset and crying. I dont think given their emotional state and what is going on it is right for you to wait to address this. These are still kids who are going through a hell of a year and I am begging you not to discount their emotional fragility. This is such a different year and I find it hard to believe it would really make such a difference in quality of show to have given some of those parts to seniors instead of juniors.

It is what it is but it was unnecessary

Message...

  
 environment. I am just letting you know because you may hear from them. These seniors have missed out on so much & this is a slap in the face for most of them especially since there will be ample opportunities for others but for many this will be their last show. Just an fyi 🙁

11:54 AM

████ told me you said you would talk after break. That is fine and ████ will be ok.

You have seniors who are beyond upset and crying. I dont think given their emotional state and what is going on it is right for you to wait to address this. These are still kids who are going through a hell of a year and I am begging you not to discount their emotional fragility. This is such a different year and I find it hard to believe it would really make such a difference in quality of show to have given some of those parts to seniors instead of juniors.

It is what it is but it was unnecessary and sad and now these kids go into a bleak winter break feeling like crap. I don't mean to unload on you but its just not ok to treat the seniors this way this year. It's just not.



 Message...   

 
away so we these conversations can be emotionally and educationally beneficial to each student who would like to talk. Again, I appreciate you, Jared, and what you shared.

It is what it is and I get that its done. Talking to these kids won't change anything.

I do hope you will strongly consider Seniors more for the final play this year in May. My girlfriend is the theater director at an arts school in NYC and she made their big spring musical this year seniors only. This is an arts school with insanely talented and gifted students yet everyone thought that was special and the right thing to do. Its possible these R-hall seniors wont set foot in the door this year and something needs to be done for them.



I wish we had time to do a senior-only show... but we are going to do another small production in MTCO, so there will be more opportunities and ways for them to be honored. Thanks again.

Thanks for your response. Unfortunately I don't think that is a satisfactory response during a global pandemic. Good luck with your shows.

Message...

# EXHIBIT C

 **December 9**  3:46 PM

IXK.

When a people are ethnically cleansed, the perpetrators usually come for the people's writers. By targeting writers, they can kill the memory of the people. Attempts to wipe a people off the face of the earth are often paired with attempts to wipe the people from the face of history. What the Israeli military is doing in Gaza is not only a crime against humanity. It is a crime against history. What is humanity without history? What is history without memory? What is memory without the writer? The true writer who is not a voice of the people, but a voice from the people. An eternal voice. That must be silenced to truly kill a people. And birth denial.

@ibramxk

Activity          Share     Highlight     More

 **December 9** 3:46 PM

**IXK.**

Perhaps that is why antiracist Jews are joining with Palestinians and the rest of world to oppose all this carnage from October 7 in Israel to what has happened ever since in Gaza and the West Bank. Jews have experienced the horror of Holocaust, and the double horror right now of people inexplicably denying all that they have suffered. I know as a Black person what it is like for people to deny the horror of anti-Black racism, and attack the writers bringing that horror—and the antiracist resistance—to memory.

@ibramxk

 Share     Highlight    ⋯ More

 December 9  3:46 PM



IXK.

Writers producing memory like Claude McKay, who amid White supremacist attacks on Black American communities in the "Red Summer" of 1919, wrote the poem:

"If we must die"

On November 1, 2023, amid even more violent attacks on Palestinian communities in Gaza, Palestinian writer Refaat Alareer wrote the poem:

"If I must die"

*let it be hope*

*let it be a tale."*

If we must die, let our writers live to tell the tales of us.

@ibramxk








# EXHIBIT D



**Deerfield High School...**

Comment as Lori Gardberg Gross



**Michelle Leah**
6d · 

These memes slandering the IDF and Israel were on Ms. Kenyon's, (the DHS Theater Director) social media account, which has a link to DHS and all her students follow her page.

This is not the message that should be represented by our staff/school. We have seen this kind of propaganda at Universities and it is not going over well.

Feel free to call Kathy and send to the Board if you agree.



When a people are ethnically cleansed, the perpetrators usually come for the people's writers. By targeting writers, they can kill the memory of the people. Attempts to wipe a people off the face of the earth are often paired with attempts to wipe the people from the face of history. What the Israeli military is doing in Gaza is not only a crime against humanity. It is a crime against history. What is humanity without history? What is history without memory? What is memory without the writer? The true writer who is not a voice of the people, but a voice from the people. An eternal voice. That must be silenced to truly kill a people. And birth denial.

IXK.

Perhaps that is why antiracist Jews are joining with Palestinians and the rest of world to oppose all this carnage from October 7 in Israel to what has happened ever since in Gaza and the West Bank. Jews have experienced the horror of Holocaust, and the double horror right now of people inexplicably denying all that they have suffered. I know as a Black person what it is like for people to deny the horror of anti-Black racism, and attack the writers bringing that horror—and the antiracist resistance—to memory.

😡👍 4                                        6 comments

# EXHIBIT E



**Michelle Leah**
I love the fine arts dept!! They are amazing. However...The memes below slandering the IDF and Israel were on Ms. Kenyon's, (the DHS Theater Director) social media account, which has a link to DHS and all her students follow her page.

This is not the message that should be represented by our staff/school district. We have seen this kind of propaganda at Universities and it is not going over well.

Feel free to call Bruce and send to the D113 Board if you agree.



38m　Like　Reply　Message　Hide

 **Michelle Leah**



 Comment as Deerfield H...   

# EXHIBIT F

**EXHIBIT F**



< Michelle's post ···

 **Highland park / Highwood, Planning Our future.**

Michelle Leah · 5h · 🌐

These memes slandering the IDF and Israel were on Ms. Kenyon's, (the DHS Theater Director) social media account, which has a link to DHS and all her students follow her page.

This is not the message that should be represented by our staff/school district. We have seen this kind of propaganda at Universities and it is not going over well.

Feel free to call Bruce and send to the D113 Board if you agree.



👍 Like     💬 Comment     🔗 Copy     ↗ Share

Rules

📷   Comment as Susie...  😊 GIF ☺

# EXHIBIT G

# TOWNSHIP HIGH SCHOOL DISTRICT 113
## *A Passion for Potential*

December 14, 2023

Dear District 113 School Community,

It has come to our attention that a staff member made a post on a personal social media page that implicitly disparages the personal beliefs and human decency of a substantial portion of our student body. The staff member has taken down the post.

While we cannot comment on the status of ongoing personnel matters, we are taking this very seriously. We will not tolerate statements and actions that cause harm to our students.

I stand by what I said in my October 10 President's Report, that, "Given the close connection that our communities have to Israel, there is a good chance that we know someone, or at the very least know someone who knows someone, who has suffered due to the barbaric and cowardly acts of hatred and brutality by the Hamas terror organization." Our first priority is to the well-being of our students, as I said in October: "There is no doubt that these incomprehensible acts of terror have resulted in pain, in anxiety, and in considerable uncertainty for students, staff, and families. This is a time to come together as a school community, as families, and as a broader community to provide support for each other."

We live in a time when statements about current events are judged to determine on whose side the speaker is. As a school district, we are on the side of protecting all our students and abiding by the highest standards of conduct to create a school environment that nurtures and provides a safe and secure place to develop the unique talents of all our students, which is especially important now.

Daniel Struck
President, Board of Education

# EXHIBIT H

**Final Reprimand**
To Be Filed Under Seal Upon the
Entry of a Protective order

# EXHIBIT I





EXHIBIT I



**Highland park / Highwood, Planning Our future.**

... ✕

Michelle Leah · 41m · 🌐

I am reposting these antisemitic memes since shamefully nothing was done about Britnee, the antisemitic Theatre Director at DHS. Are we just going to give her a pass? Since then at least one antisemitic incident happened in her program between students. I guess when the students see that their leader can come back to school with zero consequences or accountability, it's open season for hating the Jews. Sadly, many parents, even Jewish parents are defending Britnee in order to secure their kids a good part in future performances. ie selling their souls to the devil. As we watch antisemitic behaviors from professors at universities all over the country, as well as a walk-out which took place in CPS schools today in support of Hamas, why are we allowing antisemitism in our own backyard in a heavily Jewish district??

How can we be silent ? Has history taught us nothing??
Peggy Shapiro
StandWithUs
ADL
Jonathan Greenblatt
Alison Pure-Slovin
Illinois State Board of Education

Please email Bruce and the Board.

blaw@dist113.org
jshapira@dist113.org
dstruck@dist113.org

# EXHIBIT B

| STATE OF ILLINOIS, CIRCUIT COURT | | SUMMONS | *For Court Use Only* |
|---|---|---|---|
| Lake ▼ COUNTY | | | |

| **Instructions** ▼ | |
|---|---|
| Enter above the county name where the case was filed. | Britnee Kenyon<br>**Plaintiff / Petitioner** *(First, middle, last name)* |
| Enter your name as Plaintiff/Petitioner. | v. |
| Below "Defendants/ Respondents," enter the names of all people you are suing. | **Defendants / Respondents** *(First, middle, last name)*<br>Board of Education Township High School District 113,<br>Daniel Struck, Thomas Krieger, Michelle Hammer<br>Bernstein, ███████ |
| Enter the Case Number given by the Circuit Clerk. | ☒ **Alias Summons** *(Check this box if this is not the 1st Summons issued for this Defendant.)* |

| | |
|---|---|
| 2024 LA 441 | |
| **Case Number** | |

---

# IMPORTANT: You have been sued.

- Read all documents attached to this *Summons*.

- You MUST file an official document with the court within the time stated on this *Summons* called an *Appearance* and a document called an *Answer/Response*. If you do not file an *Appearance* and *Answer/Response* on time, the judge may decide the case without hearing from you. This is called "default." As a result, you could lose the case.

- All documents referred to in this Summons can be found at **ilcourts.info/forms**. Other documents may be available from your local Circuit Court Clerk's office or website.

- After you fill out the necessary documents, you need to electronically file (e-file) them with the court. To e-file, you must create an account with an e-filing service provider. For more information, go to **ilcourts.info/efiling**. If you cannot e-file, you can get an exemption that allows you to file in-person or by mail.

- You may be charged filing fees, but if you cannot pay them, you can file an *Application for Waiver of Court Fees*.

- It is possible that the court will allow you to attend the first court date in this case in-person or remotely by video or phone. Contact the Circuit Court Clerk's office or visit the Court's website to find out whether this is possible and, if so, how to do this.

- Need help? Call or text Illinois Court Help at 833-411-1121 or go to **ilcourthelp.gov** for information about going to court, including how to fill out and file documents. You can also get free legal information and legal referrals at **illinoislegalaid.org**. All documents referred to in this Summons can be found at **ilcourts.info/forms**. Other documents may be available from your local Circuit Court Clerk's office or website.

- ¿Necesita ayuda? Llame o envíe un mensaje de texto a Illinois Court Help al 833-411-1121, o visite **ilcourthelp.gov** para obtener información sobre los casos de la corte y cómo completar y presentar formularios.

---

**Plaintiff/Petitioner:**

**Do not use this form** in these types of cases:

- All criminal cases
- Detinue
- Order of protection
- Divorce
- Administrative review cases
- Eviction
- Stalking no contact orders
- Paternity
- Adult guardianship
- Foreclosure
- Civil no contact orders
- Small Claims

For eviction, small claims, divorce, and orders of protection, use the forms available at **ilcourts.info/forms**. If your case is a detinue, visit **illinoislegalaid.org** for help.

**If you are suing more than 1 Defendant/Respondent**, attach an *Additional Defendant/Respondent Address and Service Information* form for **each** additional Defendant/Respondent.

<table>
<tr><td>

In **1a**, enter the name and address of the first Defendant/ Respondent you are serving. If you are serving a Registered Agent, include the Registered Agent's name and address here.

</td><td>

**1.** **Defendant/Respondent's address and service information:**

a. Defendant/Respondent's primary address/information for service:

Name *(First, Middle, Last)*: Board of Education Township High School District 113

Registered Agent's name, if any: _____

Street Address, Unit #: 1040 Park Avenue West

City, State, ZIP: Highland Park, Illinois 60035

Telephone: _____ Email: _____

</td></tr>
</table>

In **1b**, enter a second address for the first Defendant/ Respondent, if you have one.

b. If you have more than one address where Defendant/Respondent might be found, list that here:

Name *(First, Middle, Last)*: _____

Street Address, Unit #: _____

City, State, ZIP: _____

Telephone: _____ Email: _____

In **1c**, check how you are sending your documents to this Defendant/ Respondent.

c. Method of service on Defendant/Respondent:

☐ Sheriff    ☐ Sheriff outside Illinois: _____
*County & State*

☒ Special process server    ☐ Licensed private detective

---

Check here if you are serving more than 1 Defendant/ Respondent. Attach an *Additional Defendant/ Respondent Address and Service Information* form for each additional Defendant/Respondent and write the number of forms you attached.

☐ **I am serving more than 1 Defendant/Respondent.**

I have attached    4    *Additional Defendant/Respondent Address*
*Number*
*and Service Information* forms.

In **2a**, enter the amount of money owed to you. Check **2b** if you are asking for the return of tangible personal property.

**2.** **Information about the lawsuit:**

a. Amount claimed: $ 50,000.00

b. ☐ I am asking for the return of tangible personal property (items in the Defendant/Respondent's possession).

In **3**, enter your complete address, telephone number, and email address, if you have one.

**3.** **Contact information for the Plaintiff/Petitioner:**

Name *(First, Middle, Last)*: Adam M. Berger

Street Address, Unit #: 20 N Clark St., Ste. 525

City, State, ZIP: Chicago, Illinois 60602

Telephone: (312) 283-4563    Email: adam@millerberger.com

**GETTING COURT DOCUMENTS BY EMAIL:** You should use an email account that you do not share with anyone else and that you check every day. If you do not check your email every day, you may miss important information, notice of court dates, or documents from other parties.

---

**Important information for the person getting this form**

You have been sued. Read all of the documents attached to this *Summons*.
To participate in the case, you must follow the instructions listed below. If you do not, the court may decide the case without hearing from you and you could lose the case. *Appearance* and *Answer/Response* forms can be found at: ilcourts.info/forms.

---

Check **4a** or **4b**. If Defendant/ Respondent only needs to file an *Appearance* and *Answer/Response* within 30 days, check box **4a**. Otherwise, if the clerk gives you a court date, check box **4b**.

**4.** **Instructions for person receiving this *Summons* *(Defendant)*:**

☒ a. To respond to this *Summons,* you must file *Appearance* and *Answer/Response* forms with the court within 30 days after you have been served (*not counting the day of service*) by e-filing or at:

Address: Lake County Courthouse, 18 N County St

City, State, ZIP: Waukegan, IL 60085

---

In **4a,** fill out the address of the court building where the Defendant may file or e-file their *Appearance* and *Answer/ Response.*

In **4b,** fill out:
- The court date and time the clerk gave you.
- The courtroom and address of the court building.
- The call-in or video information for remote appearances (if applicable).
- The clerk's phone number and website.

All of this information is available from the Circuit Clerk.

☐ b.  Attend court:

On: _____ at _____ ☐ a.m. ☐ p.m. in _____
       *Date*        *Time*                      *Courtroom*

**In-person at:**

_____
*Courthouse Address*      *City*          *State*      *ZIP*

OR

**Remotely** (You may be able to attend this court date by phone or video conference. This is called a "Remote Appearance")**:**

    By telephone: _____
                     *Call-in number for telephone remote appearance*

    By video conference: _____
                           *Video conference website*

    _____
    *Video conference log-in information (meeting ID, password, etc.)*

Call the Circuit Clerk _____ or visit their website
                         *Circuit Clerk's phone number*

at: _____ to find out more about how to do this.
   *Website*

**STOP!**
The Circuit Clerk will fill in this section.

**Witness this Date:** _____ 9/16/2024 _____

**Clerk of the Court:** *Erin Cartwright Weinstein* CO



**STOP! The officer or process server will fill in the Date of Service**

**Note to officer or process server:**
- If 4a is checked, this *Summons* must be served within 30 days of the witness date.
- If 4b is checked, this *Summons* must be served at least 21 days before the court date, unless 2b is also checked.
  - If 4b and 2b are checked, the *Summons* must be served at least 3 days before the court date.

Date of Service: _____
                     *(Date to be entered by an officer or process server on the copy of this Summons left with the Defendant or other person.)*

**This form is approved by the Illinois Supreme Court and must be accepted in all Illinois Courts.**
**Forms are free at ilcourts.info/forms.**

| | | |
|---|---|---|
| **STATE OF ILLINOIS,** **CIRCUIT COURT** <br><br> Lake ▼ **COUNTY** | **PROOF OF SERVICE OF SUMMONS AND COMPLAINT/PETITION** | *For Court Use Only* |

| **Instructions** | | |
|---|---|---|
| Enter above the county name where the case was filed. | Britnee Kenyon <br> **Plaintiff / Petitioner** *(First, middle, last name)* | |
| Enter your name as Plaintiff/Petitioner. | | |
| Enter the names of all people you are suing as Defendants/ Respondents. | v. <br><br> Board of Education Township High School District 113, <br> **Defendant / Respondent** *(First, middle, last name)* | 2024 LA 441 <br> **Case Number** |
| Enter the Case Number given by the Circuit Clerk. | ☒ **Alias Summons** *(Check this box if this is not the 1st Summons issued for this Defendant.)* | |

**\*\*Stop. Do not complete the form. The sheriff or special process server will fill in the form. Give them one copy of this blank *Proof of Service* form for each Defendant/Respondent.\*\***

**My name is** _____ **and I state**
         *First, Middle, Last*

☐ **I served the *Summons* and Complaint/Petition on the Defendant/Respondent**

_____ **as follows:**
*First, Middle, Last*

     ☐ Personally on the Defendant/Respondent:

         ☐ Male   ☐ Female   ☐ Non-Binary    Approx. Age: _____   Race: _____

         On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

         Address, Unit#: _____

         City, State, ZIP: _____

     ☐ On someone else at the Defendant/Respondent's home who is at least 13 years old and is a family member or lives there:

         On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

         Address, Unit#: _____

         City, State, ZIP: _____

         And left it with: _____
                   *First, Middle, Last*

         ☐ Male   ☐ Female   ☐ Non-Binary    Approx. Age: _____   Race: _____

         and by sending a copy to this defendant in a postage-paid, sealed envelope to the above address on this date: _____ .

     ☐ On the Corporation's agent, _____
                                     *First, Middle, Last*

         ☐ Male   ☐ Female   ☐ Non-Binary    Approx. Age: _____   Race: _____

         On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

         Address: _____

         City, State, ZIP: _____

☐ **I was not able to serve the *Summons* and Complaint/Petition on Defendant/Respondent:**

_____
*First, Middle, Last*

I made the following attempts to serve the *Summons* and Complaint/Petition on the Defendant/Respondent:

1. On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
   Address: _____
   City, State, ZIP: _____
   Other information about service attempt: _____
   _____
   _____
   _____

2. On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
   Address: _____
   City, State, ZIP: _____
   Other information about service attempt: _____
   _____
   _____
   _____

3. On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
   Address: _____
   City, State, ZIP: _____
   Other information about service attempt: _____
   _____
   _____
   _____

| | |
|---|---|
| **DO NOT** complete this section. The sheriff or private process server will complete it. | **If you are a special process server, sheriff outside Illinois, or licensed private detective, your signature certifies that everything on the *Proof of Service of Summons* is true and correct to the best of your knowledge. You understand that making a false statement on this form could be perjury.** |

Under the Code of Civil Procedure, 735 ILCS 5/1-109, making a statement on this form that you know to be false is perjury, a Class 3 Felony.

**By:**

*Signature by:* ☐ Sheriff
_____ ☐ Sheriff outside Illinois:

_____
*County and State*
☐ Special process server
☐ Licensed private detective

_____
*Print Name*

**FEES**

Service and Return: $ _____
Miles _____ $ _____
Total $ 0.00 _____

If *Summons* is served by licensed private detective or private detective agency:
License Number: _____

| STATE OF ILLINOIS, CIRCUIT COURT | ADDITIONAL DEFENDANT/RESPONDENT ADDRESS AND SERVICE INFORMATION FOR SUMMONS | For Court Use Only |
|---|---|---|

Lake ▼ COUNTY

| **Instructions** | |
|---|---|
| Enter above the county name where the case was filed. | **Plaintiff / Petitioner** *(First, middle, last name)* <br> Britnee Kenyon |
| Enter your name as Plaintiff/Petitioner. | |
| Below "Defendants/ Respondents," enter the names of all people you are suing. | v. <br><br> **Defendants / Respondents** *(First, middle, last name)* <br> Board of Education Township High School District 113, |
| Enter the Case Number given by the Circuit Clerk. | Daniel Struck, Thomas Krieger, Michelle Hammer <br> Bernstein, ██████████ |

2024 LA 441

**Case Number**

☒ **Alias Summons** *(Check this box if this is not the 1st Summons issued for this Defendant.)*

1.  **Next Defendant/Respondent's address and service information:**
    a.  Defendant/Respondent's primary address/information for service:
        Name *(First, Middle, Last):*  Daniel Struck
        Registered Agent's name, if any:
        Street Address, Unit #:  1730 Winthrop Rd
        City, State, ZIP:  Highland Park, IL 60035
        Telephone:                        Email:
    b.  If you have more than one address where Defendant/Respondent might be found, list that here:
        Name *(First, Middle, Last):*
        Street Address, Unit #:
        City, State, ZIP:
        Telephone:                        Email:
    c.  Method of service on Defendant/Respondent:
        ☐ Sheriff        ☐ Sheriff outside Illinois:  _____
                                                        *County & State*
        ☒ Special process server        ☐ Licensed private detective

| STATE OF ILLINOIS, CIRCUIT COURT | ADDITIONAL DEFENDANT/RESPONDENT ADDRESS AND SERVICE INFORMATION FOR SUMMONS | For Court Use Only |
|---|---|---|

Lake COUNTY

| **Instructions** | |
|---|---|
| Enter above the county name where the case was filed. | **Plaintiff / Petitioner** *(First, middle, last name)* |
| Enter your name as Plaintiff/Petitioner. | Britnee Kenyon |
| Below "Defendants/Respondents," enter the names of all people you are suing. | v. |
| | **Defendants / Respondents** *(First, middle, last name)* |
| Enter the Case Number given by the Circuit Clerk. | Board of Education Township High School District 113, Daniel Struck, Thomas Krieger, Michelle Hammer Bernstein, ████████ |

2024 LA 441

**Case Number**

☒ **Alias Summons** *(Check this box if this is not the 1st Summons issued for this Defendant.)*

1. **Next Defendant/Respondent's address and service information:**

   In **1a**, enter the name and address of the next Defendant/ Respondent you are serving. If you are serving a Registered Agent, include the Registered Agent's name and address here.

   a. Defendant/Respondent's primary address/information for service:
   Name *(First, Middle, Last):* Thomas Krieger
   Registered Agent's name, if any:
   Street Address, Unit #: 1040 Park Avenue West
   City, State, ZIP: Highland Park, Illinois 60035
   Telephone: _____ Email: _____

   In **1b**, enter a second address for this Defendant/ Respondent if you have one.

   b. If you have more than one address where Defendant/Respondent might be found, list that here:
   Name *(First, Middle, Last):* _____
   Street Address, Unit #: _____
   City, State, ZIP: _____
   Telephone: _____ Email: _____

   In **1c**, check how you are sending your documents to this Defendant/ Respondent.

   c. Method of service on Defendant/Respondent:
   ☐ Sheriff          ☐ Sheriff outside Illinois: _____
   *County & State*
   ☒ Special process server          ☐ Licensed private detective

| STATE OF ILLINOIS, CIRCUIT COURT | ADDITIONAL DEFENDANT/RESPONDENT ADDRESS AND SERVICE INFORMATION FOR SUMMONS | For Court Use Only |
|---|---|---|

Lake ▼ COUNTY

| Instructions | |
|---|---|
| Enter above the county name where the case was filed. | **Plaintiff / Petitioner** *(First, middle, last name)* |
| Enter your name as Plaintiff/Petitioner. | Britnee Kenyon |
| Below "Defendants/Respondents," enter the names of all people you are suing. | v. |
| | **Defendants / Respondents** *(First, middle, last name)* |
| Enter the Case Number given by the Circuit Clerk. | Board of Education Township High School District 113, Daniel Struck, Thomas Krieger, Michelle Hammer Bernstein, ▓▓▓▓▓▓ |

2024 LA 441

**Case Number**

☒ **Alias Summons** *(Check this box if this is not the 1st Summons issued for this Defendant.)*

---

In **1a**, enter the name and address of the next Defendant/Respondent you are serving. If you are serving a Registered Agent, include the Registered Agent's name and address here.

In **1b**, enter a second address for this Defendant/Respondent if you have one.

In **1c**, check how you are sending your documents to this Defendant/Respondent.

1. **Next Defendant/Respondent's address and service information:**

   a. Defendant/Respondent's primary address/information for service:
      Name *(First, Middle, Last):*   Michelle Hammer Bernstein
      Registered Agent's name, if any:
      Street Address, Unit #:   1103 W Camino Real, Apt 718
      City, State, ZIP:   Boca Raton, FL 33432
      Telephone: _____ Email: _____

   b. If you have more than one address where Defendant/Respondent might be found, list that here:
      Name *(First, Middle, Last):* _____
      Street Address, Unit #: _____
      City, State, ZIP: _____
      Telephone: _____ Email: _____

   c. Method of service on Defendant/Respondent:
      ☐ Sheriff          ☒ Sheriff outside Illinois:   Palm Beach County, Florida
                                                        *County & State*

      ☐ Special process server          ☐ Licensed private detective

---

| STATE OF ILLINOIS, CIRCUIT COURT | ADDITIONAL DEFENDANT/RESPONDENT ADDRESS AND SERVICE INFORMATION FOR SUMMONS | *For Court Use Only* |
|---|---|---|
| Lake ▾ COUNTY | | |

| **Instructions** | | |
|---|---|---|
| Enter above the county name where the case was filed. | | |
| Enter your name as Plaintiff/Petitioner. | **Plaintiff / Petitioner** *(First, middle, last name)*<br>Britnee Kenyon | |
| Below "Defendants/ Respondents," enter the names of all people you are suing. | v. | |
| | **Defendants / Respondents** *(First, middle, last name)*<br>Board of Education Township High School District 113, | 2024 LA 441 |
| Enter the Case Number given by the Circuit Clerk. | Daniel Struck, Thomas Krieger, Michelle Hammer<br>Bernstein, █████████ | **Case Number** |
| | ☒ **Alias Summons** *(Check this box if this is not the 1st Summons issued for this Defendant.)* | |

**1.     Next Defendant/Respondent's address and service information:**

   a.   Defendant/Respondent's primary address/information for service:

In **1a**, enter the name and address of the next Defendant/ Respondent you are serving. If you are serving a Registered Agent, include the Registered Agent's name and address here.

Name *(First, Middle, Last)*: ███████████ _____

Registered Agent's name, if any: _____

Street Address, Unit #: ████████ _____

City, State, ZIP: █████████████ _____

Telephone: _____ Email: _____

   b.   If you have more than one address where Defendant/Respondent might be found, list that here:

In **1b**, enter a second address for this Defendant/ Respondent if you have one.

Name *(First, Middle, Last)*: _____

Street Address, Unit #: _____

City, State, ZIP: _____

Telephone: _____ Email: _____

   c.   Method of service on Defendant/Respondent:

In **1c**, check how you are sending your documents to this Defendant/ Respondent.

☐ Sheriff          ☐ Sheriff outside Illinois: _____
                                                        *County & State*

☒ Special process server          ☐ Licensed private detective

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

| | | |
|---|---|---|
| BRITNEE KENYON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2024 LA 441 |
| v. | ) | |
| | ) | |
| BOARD OF EDUCATION TOWNSHIP | ) | |
| HIGH SCHOOL DISTRICT 113, DANIEL | ) | **JURY DEMAND** |
| STRUCK, Individually and in his Official | ) | |
| Capacity, THOMAS KRIEGER, | ) | |
| Individually and in his Official Capacity, | ) | |
| and MICHELLE HAMMER BERNSTEIN, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| J.L., | ) | |
| | ) | |
| Respondent-In-Discovery. | ) | |

### PLAINTIFF'S MOTION TO SEAL COMPLAINT AT LAW, SUMMONS, AND FIRST ALIAS SUMMONS, AND FOR LEAVE TO FILE FIRST AMENDED COMPLAINT AT LAW, *INSTANTER*

Plaintiff, Britnee Kenyon ("Plaintiff"), by and through her attorneys, Miller Berger, LLC, for her Motion to Seal Plaintiff's Complaint at Law, Summons, and First Alias Summons, and for Leave to File an Amended Complaint at Law, *instanter*, states:

1.     Plaintiff filed her Verified Complaint at Law on June 21, 2024 ("Verified Complaint"). Plaintiff then filed a summons on July 24, 2024, followed by an alias summons on September 16, 2024.

2.     On September 18, 2024, defendants Board of Education Township High School District 113 (the "Board"), Daniel Struck ("Mr. Struck"), and Thomas Krieger ("Mr. Krieger"), were served with Plaintiff's Verified Complaint and alias summons.

3.     Although Respondent-In-Discovery J.L. is not a student at Deerfield High School, one of her children is.

4.    Out of an abundance of caution, Plaintiff requests the Court seal Plaintiff's Verified Complaint, summons, and alias summons to prevent the unintentional disclosure of the identity of J.L.'s children.

5.    Also, and pursuant to 735 ILCS 5/2-616(g), Plaintiff seeks leave to file the attached Amended Complaint attached hereto as Exhibit A, *instanter*. The proposed Amended Complaint removes any information that could lead to the discovery of the name of Respondent-In-Discovery's child. It does not change any substantive aspect of the original Complaint.

6.    Plaintiff's instant motion is brought in good faith and not for the purpose of delay.

7.    The granting of Plaintiff's motion will not impede the progress of litigation, since none of the Defendants have filed a responsive pleading.

WHEREFORE, Plaintiff respectfully requests the Court enter an Order:

   a) Granting Plaintiff's Motion to Seal Plaintiff's Verified Complaint, Summons, and Alias Summons, and for Leave to File Amended Complaint, *Instanter*;

   b) Ordering the Clerk of the Court to seal Plaintiff's Verified Complaint, Summons, and Alias Summons;

   c) Granting Plaintiff leave to file the proposed Amended Complaint attached as Exhibit A, *instanter*.

   d) Awarding Plaintiff such further or other relief this Court deems just or proper.

Respectfully submitted,

Britnee Kenyon,

Adam M. Berger (ARDC No. 6269402)          By:    /s/ Adam M. Berger
Myles R. Carroll (ARDC No. 6335660)                One of Her Attorneys
MILLER BERGER, LLC
20 N. Clark St., Ste. 525
Chicago, IL 60602
(312) 283-4563
Firm No.: 64620
Adam@MillerBerger.com
Myles@MillerBerger.com

2

# EXHIBIT A

## IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
## LAKE COUNTY, ILLINOIS

| | | |
|---|---|---|
| BRITNEE KENYON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2024 LA 441 |
| v. | ) | |
| | ) | |
| BOARD OF EDUCATION TOWNSHIP | ) | |
| HIGH SCHOOL DISTRICT 113, DANIEL | ) | **JURY DEMAND** |
| STRUCK, Individually and in his Official | ) | |
| Capacity, THOMAS KRIEGER, | ) | |
| Individually and in his Official Capacity, | ) | |
| and MICHELLE HAMMER BERNSTEIN, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| J.L., | ) | |
| | ) | |
| Respondent-In-Discovery. | ) | |

## VERIFIED AMENDED COMPLAINT AT LAW

NOW COMES Plaintiff, Britnee Kenyon ("Plaintiff" or "Ms. Kenyon"), by and through

her attorneys, Miller Berger, LLC, and for her Verified Amended Complaint at Law against the

BOARD OF EDUCATION TOWNSHIP HIGH SCHOOL DISTRICT 113, DANIEL STRUCK,

Individually and in his Official Capacity, THOMAS KRIEGER, Individually and in his Official

Capacity, and MICHELLE HAMMER BERNSTEIN, hereby states as follows:

## PARTIES, JURISDICTION, and VENUE

1.     At all times relevant, Britnee Kenyon ("Ms. Kenyon") was employed by the Board

of Education of Township High School District 113 as the Deerfield High School ("DHS") Theatre

Director.  Ms. Kenyon is Jewish.

2.     Defendant Board of Education Township of High School District 113 ("Board of

Education") is a group of private citizens who have been elected to their offices and have all

powers given to them, express or implied, by § 5/10 of the Illinois School Code.

3. Defendant Daniel Struck ("Struck"), was at all times relevant to the matters at issue in this Verified Complaint the President of the Board of Education, who on information and belief, resides in the Village of Deerfield, State of Illinois. Struck is named in his individual and official capacities. Struck resigned from his position as Board President on or about February 7, 2024, in connection with the matters at issue in this Verified Complaint.

4. Defendant Thomas Krieger ("Krieger") is the Chief Human Resources Officer for the Board of Education, who on information and belief, resides in the Village of Deerfield, State of Illinois. Krieger is named in his individual and official capacities.

5. Defendant Michelle Hammer Bernstein ("Bernstein") is an individual, who on information and belief, resides at 1430 Waukegan Road, in the Village of Deerfield, State of Illinois.

6. Respondent-in-discovery J.L. is an individual, who on information and belief, resides at 1580 Country Lane, in the Village of Deerfield, State of Illinois.

7. Jurisdiction is proper under 735 ILCS 5/2-209(b)(2), as Struck, Krieger, Bernstein, and J.L. are natural persons domiciled within this State when the causes of action herein arose.

8. Venue is proper in Lake County pursuant to 735 ILCS 5/2-101 since Lake County is the county of residence of the Board of Education, Struck, Krieger, Bernstein, and J.L. who are joined in this lawsuit in good faith and with probable cause for the purpose of obtaining judgment against them, and not solely for the purpose of fixing venue in this County.

## FACTS COMMON TO ALL COUNTS

9. Ms. Kenyon has been employed as DHS's Theatre Director since 2019.

10. In Ms. Kenyon's capacity as DHS's Theatre Director, Ms. Kenyon is considered a "public employee."

2

11.     Prior to the beginning of the 2023-2024 school year, the Board of Education and the union of which Ms. Kenyon is a member, District 113 Education Association, IEA-NEA, executed a certain Collective Bargaining Agreement ("CBA"). A copy of the signed CBA is attached hereto as <u>Exhibit A</u>.

12.     The CBA provides in relevant part,

## ARTICLE IV – RIGHTS OF LICENSED STAFF MEMBERS ["LSM"]

\*      \*      \*

### D. Privacy / Non-School Activities

Neither the Board nor the Administration shall make regulations that attempt to govern employees' non-school activities save in exceptional circumstances where such activities can be proven to have had a substantial negative impact on the LSMs ability to perform the duties associated with their assigned role.

\*      \*      \*

### M. Parent Complaints

Any complaint by a parent of a student directed toward an LSM which is to be used for evaluative purposes shall be reported to the LSM in writing. No disciplinary action shall be taken without following the guidelines established within this Agreement.

\*      \*      \*

## ARTICLE V – DISCIPLINE

### C. Investigation of Complaints and Alleged Misconduct

Complaints regarding an LSM upon which disciplinary action may occur will be reported to the LSM within five (5) school days. In the event a meeting with an administrator is required to discuss and/or investigate such a complaint or allegation, the LSM may be accompanied to such a meeting by a DEA representative. LSMs will be provided at least 24 hours notice of such a meeting and informed of their right to have a DEA representative present at the meeting. Where a complaint or allegation involves a matter related to the safety of a student or the school community, 24 hours notice shall not be required.
Notice will be provided in writing and will state the complaint or allegation being investigated. The LSM will have the opportunity to respond to the complaint/investigation. The Administration may direct that during the investigation, all information related to the complaint or allegation remain confidential. Retaliation against any individual who makes a complaint is not permitted.

3

*    *    *

**C. Just Cause**

The District shall inform an employee of the right to Association representation during a meeting which may lead to disciplinary action. The District shall give an employee 24 hours notice before holding a meeting related to potential disciplinary action except in an egregious situation.

Employees shall only be disciplined for just cause.

The Association and the District agree that discipline should be timely, progressive (when appropriate) and accompanied by counseling (where appropriate). The Parties agree that progressive discipline typically includes, in order: oral reprimand; written reprimand; suspension; and termination. The District may combine steps of progressive discipline if the severity and facts of the situation warrant such action.

*    *    *

*Id.* at §§ IV(D); IV(M); V(A); and V(C).

13.     At all times relevant, Ms. Kenyon was, and continues to be, generally well-liked by DHS students, parents, colleagues, and the community at large.

14.     During Ms. Kenyon's tenure as DHS's Theatre Director, she has received all positive performance evaluations from her supervisors.

15.     Throughout her employment at DHS, Ms. Kenyon received numerous compliments and accolades from students, parents, teachers, and the community at large for her hard work, dedication, and successful direction of the DHS Theater program. In fact, in February of 2022, Ms. Kenyon was selected as one of the thirty (30) finalists for the 2022 Golden Apple Award for Excellence in Teaching.

16.     One exception to that is J.L., who, in 2020, targeted Ms. Kenyon with both private and public campaigns of harassment, defamation, and coercion.

17.     In December of 2020, a DHS student's mother, J.L., contacted Ms. Kenyon via a direct message on Ms. Kenyon's personal Instagram account.  J.L.'s communication was unsolicited.

4

18.     The purpose of the unsolicited personal Instagram message was to verbally attack Ms. Kenyon for not assigning her son (who was at that time a Senior) the role of "dance captain" and for allowing Juniors to be cast in lead roles.  A true and accurate copy of J.L.'s Instagram message is attached hereto as Exhibit B.

19.     Due to the harassing and abusive nature of J.L.'s messages, Ms. Kenyon blocked her from further direct Instagram communications.

20.     J.L. then complained to DHS Principal Kathryn Anderson, Assistant Principal and 504 Co-Coordinator Dan Chamberlin, Superintendent Bruce Law, and Fine Arts Department Chair Paul Hengels (each individually and collectively "DHS Administration") that she could no longer communicate with Ms. Kenyon via her personal Instagram account.  J.L. did not provide DHS Administration copies of the harassing and abusive direct messages she sent to Ms. Kenyon.

21.     DHS Administration sided with J.L..

22.     In the fall of 2021, J.L. emailed Ms. Kenyon to demand that Ms. Kenyon cast J.L.'s daughter in the DHS musical.  In that email, J.L. states that "Whatever happens, I promise you will not hear one word from me on this topic/these issues again."  This statement was false when made.

23.     After J.L. was not cast in the DHS musical based on merit (meaning she simply did not have the same level of singing or dancing talent as the other students who did get cast), J.L. again contacted DHS Administration to falsely and maliciously accuse Ms. Kenyon of violating J.L.'s daughter's special education 504 plan [1].

---

[1] In Illinois, a "504 plan" refers to Section 504 of the Illinois Rehabilitation Act of 1973 which outlines the accommodations, modifications, and services a student with disabilities can receive to help her participate in her educational and school-related activities.

#447731v1

24.     J.L. then met with DHS Administration, which followed up by sending Ms. Kenyon an email which took J.L.'s side and contained numerous lies. Ms. Kenyon was never given the same opportunity to meet with Administration.

25.     In the fall of 2022, J.L. contacted DHS Administration to maliciously disparage Ms. Kenyon as an anti-Semite (even though Ms. Kenyon is Jewish). J.L.'s accusations included, but were not limited to the following: (1) that Ms. Kenyon was discriminating against Jews for having auditions on Yom Kippur prior to sundown and in the allotted time dictated by the DHS Activities Director; and (2) Ms. Kenyon was violating J.L.'s daughter's special education 504 plan by not giving J.L.'s daughter priority access to audition sign-ups.

26.     Once again, the DHS Administration sided with J.L. and ordered Ms. Kenyon to cast J.L. in the show, regardless of the quality of her audition. Ms. Kenyon complied.

27.     In the winter of 2022, J.L. again falsely and maliciously accused Ms. Kenyon of violating J.L.'s daughter's special education 504 plan. She was not privy to the conversations J.L. had with DHS Administration about this new round of allegations.

28.     In April or May 2023, Ms. Kenyon's student teacher and Drama 2 class chose "Columbinus" for the class staged reading. Columbinus is a play about the events that led to the well-known Columbine High School shooting. The choice was based on the students' interest in addressing the July 2022 parade shooting in Highland Park in a creative and thought-provoking manner. J.L.'s daughter voted to do that play and said she would play any role in it. She never expressed any discomfort to Ms. Kenyon, the student teacher, or the rest of the class.

29.     Despite those facts, J.L. falsely claimed to DHS Administration that J.L.'s daughter was "damaged" by the choice of reading and "terrified" that she would have to play the shooter.

6

J.L. also orchestrated a public Facebook post attacking Ms. Kenyon in virtually identical wording as the emails she sent to DHS Administration.

30.     DHS Administration again sided with J.L. and Ms. Kenyon again complied with the demand to provide J.L. with an alternative assignment. The alternative assignment was for her to read play and create a community outreach plan. J.L. requested a play that focused on women's issues, so that is what was provided.

31.     Yet again, J.L. contacted DHS Administration to attack Ms. Kenyon under the guise of concern over the choice of play J.L.'s daughter chose to read. Yet again, DHS Administration sided with J.L. and forced Ms. Kenyon to personally meet with J.L. in its presence. The purpose of the meeting was to intimidate and coerce Ms. Kenyon into apologizing to J.L. for offering the "women's issues" play as an alternative to the Columbinus play. This was particularly outrageous because the same three plays offered by Ms. Kenyon to J.L.'s daughter have been used as curricular materials in other nearby high schools.

32.     The tone of the meeting was very demeaning and patronizing. Nonetheless, Ms. Kenyon apologized to J.L. that the issues had caused her stress.

33.     In the fall of 2023 school year, J.L.'s daughter approached Ms. Kenyon and proceeded to apologize to her for everything J.L. had done to her in the past school year. J.L.'s daughter admitted that she never had an issue with anything Ms. Kenyon had done. J.L.'s daughter explained that J.L. is "crazy" and uncontrollable. J.L.'s daughter also stated that J.L. used her 504 plan as a weapon. Ms. Kenyon reported the substance of this meeting to DHS Administration.

34.     On September 14, 2023 DHS Administration (by way of Kathryn Anderson) contacted Ms. Kenyon to advise her that DHS Administration was launching a formal investigation into allegations of "retaliation" against J.L. during the casting process of the play "Mean Girls."

7

The allegations of retaliation made by J.L. were false and made for the purpose of subjecting Ms. Kenyon to prejudicial scrutiny and attempting to get her fired from her position as DHS Theater Director.

35. At that time, final casting decisions were made by three people: Anastasia Balmer, Nikki Lazzaretto, and Ms. Kenyon ("Casting Committee").

36. The Casting Committee used a rubric created by the Educational Theatre Association to score each audition. The Casting Committee's scores for each student are then averaged and calculated as a percentage.

37. The year of the "Mean Girls" audition, the Casting Committee cut every auditioner who scored under 60%.

38. J.L.'s daughter received 73% so she was not cut. The emails sent by J.L. to DHS Administration were false and willfully intended to defame Ms. Kenyon in order to get her punished or fired.

39. Prior to December 2023, and other than the harassing communications received from J.L. as described above, Ms. Kenyon had never been accused of any wrongdoing or inappropriate behavior by the Board of Education, her peers, her students, or parents of students.

40. Prior to December 2023, Ms. Kenyon has never been subjected to disciplinary action or warning by either DHS or the Board of Education on any allegation of misconduct.

41. On Saturday, December 9, 2023, Ms. Kenyon shared a story on her private Instagram account ("December 9 Instagram Story"). A screenshot of the December 9 Instagram Story is attached hereto as Exhibit C.

8

42. The December 9 Instagram Story was not Ms. Kenyon's original post; it was a repost of an "antiracist" author named Ibram X. Kendi concerning the military conflict in Israel and Gaza.

43. The December 9 Instagram Story was automatically removed from Ms. Kenyon's Instagram account 24 hours after it was shared.

44. The December 9 Instagram Story did not in any way relate to, involve, interfere with, or detract from her employment as DHS's Theatre Director.

45. Ms. Kenyon posted the December 9 Instagram Story privately. It was *not* published for the purpose of expressing her political views and/or beliefs in her capacity as DHS's Theatre Director.

46. Ms. Kenyon began following Ibram X. Kendi in 2019 after District 113 Associate Superintendent of Diversity, Equity, and Inclusion, Mirah Anti, organized a book study of Ibram X. Kendi's book, *How to be an Anti-Racist*.

47. Mirah Anti's book study of Ibram X. Kendi's book, *How to be an Anti-Racist* was authorized and endorsed by School District 113, which includes DHS.

48. Defendant Bernstein saw or otherwise learned about the December 9 Instagram Story.

49. In response to the December 9 Instagram Story, Defendant Bernstein, using the pseudonym "Michelle Leah," created a post on the DHS Parent Group Facebook Page accusing Ms. Kenyon, a Jewish woman, of posting "memes" that "slandered" Israel ("Bernstein's First Facebook Post"). A copy of Bernstein's First Facebook Post is attached hereto as Exhibit D.

50. At no time had Ms. Kenyon ever posted memes that slandered Israel.

9

51. Defendant Bernstein's First Facebook Post demanded that parents "call Bruce [Law] and send to the [Board of Education] if you agree." *Id.*

52. Defendant Bernstein also posted the content of Bernstein's First Facebook Post on "Deerfield High School – Friend of the Arts" Facebook Page ("Bernstein's Second Facebook Post"), then again on the "Highland Park / Highwood, Planning Our Future" Facebook page ("Bernstein's Third Facebook Post"). Bernstein's Second Facebook Post and Bernstein's Third Facebook Post are attached hereto as Exhibit E and Exhibit F, respectively.

53. On December 14, 2023, at 1:15 p.m., Defendant Krieger emailed Ms. Kenyon and ordered her to attend a pre-disciplinary meeting on December 15, 2023, at 2:27 p.m. concerning the December 9 Instagram Story. Krieger only advised Ms. Kenyon that her private sharing of a story constituted "harassment or bullying."

54. On December 14, 2023, at approximately 4:00 p.m., Ms. Kenyon spoke with DHS Principal Kathryn Anderson about Defendant Bernstein's false and defamatory Facebook posts circulating throughout the greater Deerfield community.

55. Upon information and belief, and based on Defendant Bernstein's three Facebook posts, Defendant Bernstein complained to the Board of Education, falsely claiming that Ms. Kenyon was an anti-Semite and that her December 9 Instagram Story "slandered" Israel.

56. At approximately 6:10 p.m. on December 14, 2023 and in response to the December 9 Instagram Story, Defendant Struck, purporting to act on the Board of Education's behalf, issued the statement ("December 14 Statement") attached hereto as Exhibit G.

57. Struck's December 14 Statement maliciously and recklessly portrayed Ms. Kenyon as an anti-Semite who "disparages the personal beliefs and human decency of a substantial portion of our student body." *Id.*

10

58.     Lending credence to the claims of anti-Semitism and an attack on the "human decency of a substantial portion of our student body," Struck then maliciously described the situation with Ms. Kenyon as an "ongoing personnel matter" which "we are taking...very seriously." *Id.*

59.     Upon information and belief, the December 14 Statement was issued in direct response to Ms. Kenyon's December 9 Instagram Story following the false claims of "harassment" and "antisemitism" circulated by Defendant Bernstein.

60.     Upon information and belief, the December 14 Statement was published to more than 40,000 individuals in the in the Deerfield, Bannockburn, Riverwoods, Highland Park, and Highwood communities.

61.     The December 14 Statement maliciously and recklessly accused Ms. Kenyon of "disparag[ing] the personal belief and human decency of a substantial portion of our student body." *Id.*

62.     The December 14 Statement was published to the greater Deerfield community before any DHS Administration, school official, or Board of Education member communicated with Ms. Kenyon to gather necessary facts and information.

63.     Defendant Struck never communicated with Ms. Kenyon to gather necessary facts before issuing the December 14 Statement.

64.     Defendant Struck's December 14 Statement directly violated the CBA by attempting to restrain Ms. Kenyon's personal free speech and regulate Ms. Kenyon's non-school-related activities.

65.     After the December 14 Statement was published by Struck, the amount of patently false, harassing, and threatening communications Ms. Kenyon received from parents in the

11

community increased exponentially. Those communications accused Ms. Kenyon of being an antisemite and called for Ms. Kenyon's termination.

66. On December 15, 2023, Ms. Kenyon met with Defendant Krieger, DEA Representative Jason Smith, and DHS Principal Kathryn Anderson pursuant to Krieger's prior email regarding the pre-disciplinary meeting ("First Pre-Disciplinary Meeting").

67. During the First Pre-Disciplinary Meeting, Ms. Kenyon explained that she shared the December 9 Instagram Story because she firmly believed that it was not an "anti-Israel" post, but rather a call for peace. Ms. Kenyon further explained that as a practicing Jewish woman, Ms. Kenyon would never speak out against Jewish people.

68. On December 15, 2023, at approximately 4:35 p.m., Krieger advised Ms. Kenyon that the Board of Education scheduled a second pre-disciplinary meeting on December 18, 2023, at 9:00 a.m. "to discuss complaints received regarding [Ms. Kenyon's] use of Snapchat to communicate with students, in violation of Board Policy 5-125 and 5-125 Aps 1 and 2." ("Second Pre-Disciplinary Meeting").

69. Ms. Kenyon, Ms. Kenyon's representative Jason Smith, DHS Principal Kathryn Anderson, IEA Uniserv Director Mark Stein, and Board of Education attorney Dana Fattore Crumley attended the Second Pre-Disciplinary Meeting

70. After the Second Pre-Disciplinary Meeting, the Board of Education conducted an investigation into Ms. Keyon's use of Instagram and Snapchat.

71. The Board of Education's investigation failed to comply with the requirements set forth in the CBA, the District's Written Policies and Procedures, and Illinois Law by:

      a. Failing to ensure Ms. Kenyon had an equal opportunity to present evidence during the investigation;

      b. Failing to produce and/or provide Ms. Kenyon with statements from the complainant;

12

c. Failing to remain objective during the investigation; and

d. Failing to keep the investigation and findings confidential.

72. On January 9, 2024, Defendant Krieger sent Ms. Kenyon a document titled "Written Reprimand." The Written Reprimand was to be made a part of her employment record and used as a basis for limiting her freedom of speech and expression as well as future discipline and/or termination.

73. The Written Reprimand included a narrative section revealing that Krieger had investigated Ms. Kenyon's past posts on her private Instagram account and her allegedly inappropriate communication with students using Snapchat's messaging feature. Krieger took these actions to manufacture a reason to discipline Ms. Kenyon.

74. For example, Krieger claimed that pictures on Ms. Kenyon's private Instagram account which were admittedly "personal in nature" were also somehow violative of school or District policy. The personal photographs referenced included Ms. Kenyon in a bathing suit, Ms. Kenyon in bed, and Ms. Kenyon smoking a cigarette.

75. One of the photographs referenced in Krieger's Written Reprimand related to a post detailing Ms. Kenyon's experience as a victim of sexual assault at age 19.

76. The Written Reprimand stated, "The caption on at least one of the photos referenced your experience with sexual assault when you were 19." Krieger's reference to Ms. Kenyon's sexual assault was made with reckless disregard to the effects it would have and ultimately did have upon Ms. Kenyon's mental, emotional, and physical health and wellbeing.

77. The Written Reprimand also falsely accused Ms. Kenyon of "communicating with students on Snapchat about inappropriate topics, such as birth control."

78. Ms. Kenyon never initiated contact with any students via Snapchat. Instead, it was the students who initiated contact with Ms. Kenyon.

13

79. Based on his willful and wanton invasion of Ms. Kenyon's privacy, Krieger determined, on behalf of the Board of Education, that Ms. Kenyon violated:

   a. Policy 5-120, Exhibit 5-120 E2 and Administrative Procedure 5-120-AP2 by allowing students to follow Ms. Kenyon's Snapchat and Instagram accounts;

   b. Policy 5-120, Exhibit 5-120 E2 and Administrative Procedure 5-120-AP2 by permitting students to view personal photographs of Ms. Kenyon in which she was drinking alcohol, smoking a cigarette, and partially unclothed; and

   c. Policy 5-125, and Administrative Procedures 5-125 AP1 and AP2 by communicating with current students on her personal Instagram and Snapchat accounts.

80. Defendant Krieger concluded the Written Reprimand by stating,

It is without question that the content in question, both in regard to the Dr. Kendi quote and photographs where you are partially clothed and engaged in adult activities, has undermined your ability to maintain the standards set forth above, and has undermined the trust that parents have in us to provide a safe and appropriate climate for instruction.

81. The Written Reprimand was not supported by any documentary evidence and did not identify any complainant, in violation of the CBA and District Policy.

82. Ms. Kenyon objected to the Written Reprimand on both substantive and procedural grounds. She was advised that the Written Reprimand was likely to be released to the public. As a result, she asked to edit it so that it did not contain references to her sexual assault.

83. On January 19, 2024, Krieger and Ms. Kenyon met to discuss Ms. Kenyon's proposed amendments to the Written Reprimand.

84. Defendant Krieger, DHS Principal Kathryn Anderson, DEA President Marty Esgar, and representative Jason Smith attended the January 19, 2024 meeting.

85. During the January 19, 2024 meeting, Ms. Kenyon presented proposed changes to the Written Reprimand.

86. Before Defendant Krieger would consider Ms. Kenyon's proposed edits to the Written Reprimand, it forced Ms. Kenyon to describe why she posted about her sexual assault on

14

her private Instagram account, forced Ms. Kenyon to recount her traumatic experience, and forced Ms. Kenyon to defend herself from Krieger's and the Board of Education's sexist and false accusations of impropriety.

87.     The forced recounting of her sexual assault trauma was willful, wanton, and reckless on the part of the Board of Education, DHS Administration, Struck, and Krieger and caused Ms. Kenyon great mental, emotional, and physical damage.

88.     On January 25, 2024, Krieger sent Ms. Kenyon the revised Written Reprimand ("Final Written Reprimand"). A true and accurate copy of the Final Written Reprimand will be filed under-seal as Exhibit H following the entry of a protective and confidentiality order.

89.     While the Final Reprimand removed reference to Ms. Kenyon's sexual assault, it also removed the full quote from the December 9 Instagram Story. This had the effect of camouflaging the truth behind the purpose of the December 9 Instagram Story and materially altering the meaning of the Kendi post. All other findings and conclusions from the Written Reprimand remained intact as originally intended.

90.     The Final Written Reprimand was placed in Ms. Kenyon's personnel file, where it will remain in perpetuity to diminish Ms. Kenyon's future employment opportunities.

91.     Defendants' foregoing accusations of wrongdoing were false and known to be false at the time they were made.

92.     The allegations of wrongdoing and the subsequent investigation by the Board of Education, Struck, and Krieger concerning Ms. Kenyon's use of Instagram and Snapchat was pretextual. They were done to curtail Ms. Kenyon's freedom of speech and expression and to form a basis for either a direct or constructive termination of Ms. Kenyon's employment.

15

93.    The Board of Education, Struck, and Krieger launched the campaign to harass Ms. Kenyon and force a direct or constructive termination of Ms. Kenyon's employment because they were under pressure to do so by the Board of Education and/or the above-described members of the greater Deerfield community, including Defendant Bernstein and J.L., who disagreed with Ms. Kenyon's personal beliefs.

94.    Because of the Board of Education's pretextual investigation into Ms. Keyon's Instagram and Snapchat accounts, Ms. Kenyon has been the recipient of incessant harassment and abuse from members of the community.

95.    Upon information and belief, the Board of Education and/or Krieger released the contents of the investigation to members of the community, including but not limited to, Bernstein.

96.    After Defendant Bernstein learned that Ms. Kenyon was not terminated from her position as DHS's Theatre Director, Bernstein once again disseminated patently false and disparaging statements concerning Ms. Kenyon ("Bernstein's Fourth Facebook Post"), as depicted below and attached hereto as <u>Exhibit I</u>:



97.     Defendant Bernstein's Fourth Facebook Post, like Bernstein's First Facebook Post, Bernstein's Second Facebook Post, and Bernstein's Third Facebook Post, falsely and maliciously asserts that Ms. Kenyon is antisemitic without any factual basis and with reckless disregard for truth of Defendant Bernstein's published statements. *Id.*

98.     As a direct result of Defendant Bernstein's Fourth Facebook Post and Struck's December 14, Statement, Ms. Kenyon received additional threats and harassment, including one believed to be someone from as far away as Canada.

99.     Because of the constant harassment, bullying, and abuse, Ms. Kenyon was forced to take a mental health leave of absence from her position as DHS's Theatre Director and undergo extensive therapy.

100.    As a result of Stuck's publication of the December 14 Statement, Ms. Kenyon was unfairly targeted, harassed, bullied, and abused, causing irreparable damage to Ms. Kenyon's professional reputation and mental well-being, effectively creating an environment of hostility and prejudice.

101.    Krieger's reckless and malicious actions in reopening Ms. Kenyon's past traumatic events unrelated to any legitimate investigation of wrongdoing had a profound impact on Ms. Kenyon's mental health. Krieger's disregard for Ms. Kenyon's mental and emotional well-being magnifies the stress and anxiety Ms. Kenyon was forced to endure.

102.    The December 14 Statement and release of confidential information from the Board of Education's investigation to parents in the community subjected Ms. Kenyon to constant abuse and harassment and the further dissemination of false statements concerning Ms. Kenyon. The relentless nature of the harassment instills fear and anxiety, making it increasingly difficult for Ms.

Kenyon to fulfill her professional duties and maintain a healthy mental, emotional, or physical state.

103. Struck and the Board of Education felt it was necessary to share the "Board of Education's" political view and stance on the Israel-Gaza conflict by explicitly stating to the parents and students in the community which political views are "correct."

104. The mental anguish that Ms. Kenyon was forced to endure would have been avoided had Struck communicated with Ms. Kenyon before issuing the December 14 Statement to 40,000+ members of the District 113 Community.

105. The December 14 Statement was published with reckless disregard of any consequences it could have, and did have, on Ms. Kenyon's wellbeing and professional reputation.

106. The December 14 Statement and the pretextual investigation which followed caused irreparable harm to Ms. Kenyon's mental, emotional, and physical health and professional reputation.

**COUNT I – FIRST AMENDMENT VIOLATION, 42 U.S.C. § 1983**
***(Britnee Kenyon v. Board of Education Township of High School District 113)***

107. Ms. Kenyon reincorporates and realleges Paragraphs 1 through and including 106 as though fully set forth herein as Paragraph 107 of Count I of Ms. Kenyon's Verified Complaint at Law.

108. Ms. Kenyon was harassed, targeted, and subject to a pretextual investigation, solely because Ms. Kenyon exercised her First Amendment rights by sharing the December 9 Instagram Story on her private Instagram account.

109. The Board of Education is the entity with final policy-making authority in the decision to investigate and subsequently reprimand Ms. Kenyon resulting from the expression of her First Amendment rights. By sharing the December 9 Instagram Story on her private Instagram

18

account, Ms. Kenyon was speaking as a citizen engaged in Constitutionally protected First Amendment activity and was not acting as an employee of the Board of Education.

110.    The Constitutionally protected First Amendment includes Ms. Kenyon's right to express her political opinion regarding the ongoing conflict in Gaza, and more specifically, calling for peace.

111.    The adverse action taken by the Board of Education against Ms. Kenyon was motivated as a response to Ms. Kenyon's exercise of her Constitutional free speech rights.

112.    Ms. Kenyon's free speech was a matter of public concern as it related to her political opinions and beliefs as a private citizen.

113.    Ms. Kenyon has a valid interest as a citizen of the community to comment on matters of public concern, which outweighs any purported concerns of the Board of Education, which led to the Board of Education reprimanding Ms. Kenyon and subjecting Ms. Kenyon to harassment by parents in the community.

114.    The Board of Education's adverse action against Ms. Kenyon has caused Ms. Kenyon to suffer mental, emotional, physical, and economic injuries that are likely to chill a person of ordinary firmness from engaging in Constitutionally protected free speech.

WHEREORE, Britnee Kenyon respectfully requests the Court enters judgment in her favor and against Defendant Board of Education Township of High School District 113 on Count I of Ms. Kenyon's Verified Complaint at Law and awards damages in excess of $50,000, plus attorneys' fees, costs, punitive damages, prejudgment interest, and for such other or further relief the Court deems just and proper.

## COUNT II – BREACH OF COLLECTIVE BARGAINING AGREEMENT
### *(Britnee Kenyon v. Board of Education Township of High School District 113)*

19

115.     Ms. Kenyon reincorporates and realleges Paragraphs 1 through and including 114 as though fully set forth herein as Paragraph 115 of Count II of Ms. Kenyon's Verified Complaint at Law.

116.     The CBA is a valid and enforceable contract between, among others, Ms. Kenyon and the Board of Education.

117.     At all times relevant, Ms. Kenyon performed all the duties and obligations of her employment pursuant to the CBA.

118.     The Board of Education breached the CBA in the following respects:

a.  Reprimanded Ms. Kenyon for engaging in non-school related activities, namely, posting the December 9 Instagram Story on her private Instagram account, in violation of Article IV (D) of the CBA;

b.  Failed to ensure Ms. Kenyon had an equal opportunity to present evidence during the Board of Education's investigation;

c.  Failed to produce and/or provide Ms. Kenyon with statements from the complainant in connection with the Board of Education's investigation.

d.  Failed to identify the complainant.

e.  Failed to remain objective during the investigation;

f.  Failed to keep the investigation and findings confidential and released sensitive information concerning the investigation to Defendant Bernstein; and

g.  Issued a Written Reprimand to Ms. Kenyon despite failing to abide by the investigation requirements set forth in the CBA.

119.     As a direct and proximate cause of the Board of Education's material breaches of the CBA, Ms. Kenyon has suffered monetary, mental, and emotional damages, and has been subjected to harassment from a substantial portion of the greater Deerfield community.

WHEREORE, Britnee Kenyon respectfully requests the Court enters judgment in her favor and against Defendant Board of Education Township of High School District 113 on Count II of Ms. Kenyon's Verified Complaint at Law and awards damages in excess of $50,000, plus

attorneys' fees, costs, punitive damages, prejudgment interest, and for such other or further relief the Court deems necessary and just.

## COUNT III – DEFAMATION *PER SE*
### (*Britnee Kenyon v. Daniel Struck*)

120.    Ms. Kenyon reincorporates and realleges Paragraphs 1 through and including 106 as though fully set forth herein as Paragraph 120 of Count III of Ms. Kenyon's Verified Complaint at Law.

121.    Defendant Struck's December 14 Statement falsely, maliciously, and recklessly portrayed Ms. Kenyon as an anti-Semite who "disparages the personal beliefs and human decency of a substantial portion of our student body." Exhibit G.

122.    Defendant Struck's December 14 Statement was disseminated to the greater Deerfield community, which compromises of roughly 40,000 individuals, in response to Ms. Kenyon's December 9 Instagram Story.

123.    Defendant Struck's December 14 Statement was published before any DHS Administration, school official, or Board of Education member communicated with Ms. Kenyon to gather necessary facts and information.

124.    After the December 14 Statement was published by Struck, the amount of patently false, harassing, and threatening communications Ms. Kenyon received from parents in the community increased exponentially. Those communications accused Ms. Kenyon of being an antisemite and called for Ms. Kenyon's termination.

125.    Struck's December 14 Statement was false and defamatory, and constitutes defamation *per se* in that it imputes an inability to perform or want of integrity in the discharge of the duties of Ms. Kenyon's employment, and in that it prejudiced Ms. Kenyon, and imputed a lack of ability in her trade, profession, and business.

21

126.     Defendant Struck's statement was made with knowledge that the statement was false or made with a reckless disregard for its truth or falsity, which constitutes actual malice to Ms. Kenyon's reputation.

127.     Defendant Struck's December 14 Statement was made with a direct intent of injuring Ms. Kenyon, in an effort to appease certain members of the greater Deerfield community.

128.     As a direct and proximate result of Defendant Struck's December 14 Statement, Ms. Kenyon suffered humiliation, loss of reputation, and emotional and mental anguish.

WHEREFORE, Britnee Kenyon respectfully requests the Court enters judgment in her favor and against Defendant Daniel Struck on Count III of Ms. Kenyon's Verified Complaint at Law and awards damages in excess of $50,000, plus attorneys' fees, costs, punitive damages, prejudgment interest, and for such other or further relief the Court deems just and proper.

## COUNT IV – FALSE-LIGHT INVASION OF PRIVACY
### (Britnee Kenyon v. Daniel Struck)

129.     Ms. Kenyon reincorporates and realleges Paragraphs 1 through and including 119 as though fully set forth herein as Paragraph 129 of Count IV of Ms. Kenyon's Verified Complaint at Law.

130.     Defendant Struck's December 14 Statement falsely, maliciously, and recklessly portrayed Ms. Kenyon as an anti-Semite who "disparages the personal beliefs and human decency of a substantial portion of our student body." Exhibit G.

131.     Defendant Struck's December 14 Statement was disseminated to the greater Deerfield community, which is comprised of roughly 40,000 individuals, in response to Ms. Kenyon's December 9 Instagram Story.

22

132. Defendant Struck's December 14 Statement was published before any DHS Administration, school official, or Board of Education member communicated with Ms. Kenyon to gather necessary facts and information.

133. After the December 14 Statement was published by Defendant Struck, the amount of patently false, harassing, and threatening communications Ms. Kenyon received from parents in the community increased exponentially. Those communications accused Ms. Kenyon of being an antisemite and called for Ms. Kenyon's termination.

134. Defendant Struck's December 14 Statement placed Ms. Kenyon in a false light before the public.

135. Defendant Struck's false December 14 Statement that Ms. Kenyon's December 9 Instagram Story "disparages the personal beliefs and human decency of a substantial portion of our student body" was highly offensive to a reasonable person.

136. Defendant Struck intended to cause Ms. Kenyon loss of reputation, humiliation, and mortification.

137. As a result of Defendant Struck placing Ms. Kenyon in a false light before the public, Ms. Kenyon suffered loss of reputation, humiliation, mental and emotional distress, and mortification.

138. The foregoing demonstrates that Defendant Struck acted with actual malice. As such, Ms. Kenyon is entitled to punitive damages.

WHEREORE, Britnee Kenyon respectfully requests the Court enters judgment in her favor and against Defendant Daniel Struck on Count IV of Ms. Kenyon's Verified Complaint at Law and awards damages in excess of $50,000, plus attorneys' fees, costs, punitive damages, prejudgment interest, and for such other or further relief the Court deems just and proper.

23

## COUNT V – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (*Britnee Kenyon v. Daniel Struck*)

139.    Ms. Kenyon reincorporates and realleges Paragraphs 1 through and including 138 as though fully set forth herein as Paragraph 139 of Count V of Ms. Kenyon's Verified Complaint at Law.

140.    The intentional conduct of Defendant Struck, namely, disseminating the December 14 Statement to the greater Deerfield community in response to Ms. Kenyon exercising her Constitutional right to free speech was extreme and outrageous, going well-beyond the ordinary bounds of decency.

141.    By wrongfully, maliciously, and recklessly portraying Ms. Kenyon as an anti-Semite who "disparages the personal beliefs and human decency of a substantial portion of our student body[,]" Defendant Struck knowingly and recklessly subjected Ms. Kenyon to personal attacks and harassment from a substantial portion of the Deerfield community.

142.    As a direct and proximate result of the Defendant Struck's unlawful, reckless, and malicious conduct, Ms. Kenyon has suffered severe emotional distress, humiliation, embarrassment, mental and emotional distress, anxiety, economic harm, and such other consequential damages flowing from the Defendant Struck's conduct.

WHEREORE, Britnee Kenyon respectfully requests the Court enters judgment in her favor and against Defendant Daniel Struck on Count V of Ms. Kenyon's Verified Complaint at Law and awards damages in excess of $50,000, plus attorneys' fees, costs, punitive damages, prejudgment interest, and for such other or further relief the Court deems just and proper.

## COUNT VI – INTENTIONAL INFLICTION OF EMOTION DISTRESS
### (*Britnee Kenyon v. Thomas Krieger*)

24

143.     Ms. Kenyon reincorporates and realleges Paragraphs 1 through and including 106 as though fully set forth herein as Paragraph 143 of Count VI of Ms. Kenyon's Verified Complaint at Law.

144.     The intentional conduct of Krieger, including Krieger's reference in the Written Reprimand to a photograph shared on Ms. Kenyon's private Instagram Account detailing Ms. Kenyon's experience as a victim of sexual assault at age 19, and forcing Ms. Kenyon to recount and describe why she posted about her sexual assault on her private Instagram Account before the Board of Education would consider editing the Written Reprimand, was extreme and outrageous, going beyond the ordinary bounds of decency.

145.     Krieger acted with reckless disregard for the physical, mental, and emotional well-being of Ms. Kenyon by forcing her to recount her past sexual assault before the Board of Education.

146.     As a direct and proximate result of the Defendant Krieger's unlawful, reckless, and malicious conduct, Ms. Kenyon has suffered severe emotional distress, humiliation, embarrassment, mental and emotional distress, anxiety, economic harm, and such other consequential damages flowing from the Defendant Krieger's conduct.

WHEREORE, Britnee Kenyon respectfully requests the Court enters judgment in her favor and against Defendant Thomas Krieger on Count VI of Ms. Kenyon's Verified Complaint at Law and awards damages in excess of $50,000, plus attorneys' fees, costs, punitive damages, prejudgment interest, and for such other or further relief the Court deems just and proper.

### COUNT VII – INDEMNIFICATION
***(Britnee Kenyon v. Board of Education Township of High School District 113)***

#447731v1

147. Ms. Kenyon reincorporates and realleges Paragraphs 1 through and including 146 as though fully set forth herein as Paragraph 147 of Count VII of Ms. Kenyon's Verified Complaint at Law.

148. Public entities are required by law to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

149. Defendants Struck and Krieger were employees of the Board of Education, who acted within the scope of their employment in committing the tortious acts alleged herein.

WHEREFORE, should Defendants Daniel Struck and/or Thomas Krieger be found liable for the acts alleged herein, Defendant Board of Education Township of High School District 113 would be liable to pay any judgment obtained against those defendants.

## COUNT VIII – DEFAMATION *PER SE*
### (*Britnee Kenyon v. Michelle Hammer Bernstein*)

150. Ms. Kenyon reincorporates and realleges Paragraphs 1 through and including 106 as though fully set forth herein as Paragraph 150 of Count VIII of Ms. Kenyon's Verified Complaint at Law.

151. Defendant Bernstein, using the pseudonym "Michelle Leah," created and published the First Facebook Post, maliciously, and intentionally accusing Ms. Kenyon, a Jewish woman, of posting anti-Semitic "memes" that "slandered" Israel. *See* Exhibit D.

152. Defendant Bernstein's First Facebook Post demanded that parents "call Bruce [Law] and send to the [Board of Education] if you agree." *Id.* The obvious intent behind Bernstein's First Facebook Post was to harm Ms. Kenyon and motivate Bruce Law to terminate her.

26

153. Defendant Bernstein also posted the content of Bernstein's First Facebook Post on "Deerfield High School – Friend of the Arts" Facebook Page, then again on the "Highland Park / Highwood, Planning Our Future" Facebook page. Exhibit E and Exhibit F.

154. After Bernstein learned that Ms. Keynon was not terminated from her position as DHS's Theatre Director, Bernstein once again disseminated patently false and disparaging statements concerning Ms. Kenyon, once again falsely declaring that Ms. Kenyon is "antisemitic." *See* Exhibit I.

155. Defendant Bernstein's First, Second, Third, and Fourth Facebook Posts contain statements regarding Ms. Kenyon that were unequivocally false and maliciously accused Ms. Kenyon of being anti-Semitic without any factual basis and with reckless disregard for the truth.

156. Bernstein's First, Second, Third, and Fourth Facebook Posts concerning Ms. Kenyon were published and disseminated to thousands of individuals in the greater Deerfield community.

157. As a direct result of Defendant Bernstein's various Facebook posts concerning Ms. Kenyon, Ms. Kenyon received numerous threats and harassing communications from people she did not know, including one believed to be someone from as far away as Canada.

158. Bernstein's First, Second, Third, and Fourth Facebook Posts concerning Ms. Kenyon were false and defamatory and constitute defamation *per se* in that they impute an inability to perform or want of integrity in the discharge of the duties of Ms. Kenyon's employment, and in that they prejudiced Ms. Kenyon, and imputed a lack of ability in her trade, profession, and business.

159. Bernstein's statements were made and published with the direct intent of injuring Ms. Kenyon.

27

160.    As a direct and proximate result of Defendant Bernstein's statements, Ms. Kenyon suffered humiliation, loss of reputation, and emotional and mental anguish.

WHEREORE, Britnee Kenyon respectfully requests the Court enters judgment in her favor and against Defendant Michelle Hammer Bernstein on Count VIII of Ms. Kenyon's Verified Complaint at Law and awards damages in excess of $50,000, plus attorneys' fees, costs, punitive damages, prejudgment interest, and for such other or further relief the Court deems just and proper.

### COUNT IX – FALSE-LIGHT INVASION OF PRIVACY
***(Britnee Kenyon v. Michelle Hammer Bernstein)***

161.    Ms. Kenyon reincorporates and realleges Paragraphs 1 through and including 106 as though fully set forth herein as Paragraph 161 of Count IX of Ms. Kenyon's Verified Complaint at Law.

162.    Defendant Bernstein, using the pseudonym "Michelle Leah," created and published the First Facebook Post, maliciously, and intentionally accusing Ms. Kenyon, a Jewish woman, of posting anti-Semitic "memes" that "slandered" Israel. *See* Exhibit D.

163.    Defendant Bernstein's First Facebook Post demanded that parents "call Bruce [Law] and send to the [Board of Education] if you agree." *Id.* The obvious intent behind Bernstein's First Facebook Post was to harm Ms. Kenyon and motivate Bruce Law to terminate her.

164.    Defendant Bernstein also posted the content of Bernstein's First Facebook Post on "Deerfield High School – Friend of the Arts" Facebook Page, then again on the "Highland Park / Highwood, Planning Our Future" Facebook page. Exhibit E and Exhibit F.

165.    After Bernstein learned that Ms. Keynon was not terminated from her position as DHS's Theatre Director, Bernstein once again disseminated patently false and disparaging

28

statements concerning Ms. Kenyon, once again falsely declaring that Ms. Kenyon is "antisemitic." *See* Exhibit I.

166.    Defendant Bernstein's First, Second, Third, and Fourth Facebook Posts concerning Ms. Kenyon were unequivocally false and each maliciously accused Ms. Kenyon of being antisemitic without any factual basis and with reckless disregard for the truth.

167.    Bernstein's First, Second, Third, and Fourth Facebook Posts concerning Ms. Kenyon were published and disseminated to thousands of individuals in the greater Deerfield 113 community.

168.    Bernstein's First, Second, Third, and Fourth Facebook Posts concerning Ms. Kenyon placed Ms. Kenyon in a false light before the public.

169.    The false statements contained in Defendant Bernstein's First, Second, Third, and Fourth Facebook Posts concerning Ms. Kenyon were highly offensive to a reasonable person.

170.    Bernstein intended to cause Ms. Kenyon loss of reputation, humiliation, and mortification.

171.    As a result of Bernstein placing Ms. Kenyon in a false light before the public, Ms. Kenyon suffered loss of reputation, humiliation, mental and emotional distress, and mortification.

172.    The foregoing demonstrates that Defendant Bernstein acted with actual malice. As such, Ms. Kenyon is entitled to punitive damages.

WHEREORE, Britnee Kenyon respectfully requests the Court enters judgment in her favor and against Defendant Michelle Hammer Bernstein on Count IX of Ms. Kenyon's Verified Complaint at Law and awards damages in excess of $50,000, plus attorneys' fees, costs, punitive damages, prejudgment interest, and for such other or further relief the Court deems just and proper.

## COUNT X – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### *(Britnee Kenyon v. Michelle Hammer Bernstein)*

29

173. Ms. Kenyon reincorporates and realleges Paragraphs 1 through and including 106 and Paragraphs 150 through and including 172 as though fully set forth herein as paragraph 173 of Count X of Ms. Kenyon's Verified Complaint at Law.

174. The CBA constitutes a valid and enforceable contract between Ms. Kenyon and the Board of Education.

175. Bernstein had knowledge of the CBA between Ms. Kenyon and the Board of Education, as Defendant Bernstein was aware that Ms. Kenyon was employed as DHS Theatre Director and actively called for Ms. Kenyon's termination.

176. Bernstein intentionally and without justification, induced and caused the Board of Education to breach the CBA via her relentless—yet patently false—claims to the Board of Education of "harassment" and "antisemitism" in response to Ms. Kenyon's December 9 Instagram Story. Defendant Bernstein on numerous occasions called for Ms. Kenyon's termination. *See* Exhibit D.

177. As a direct and proximate result of Bernstein's unjustified inducement, the Board of Education breached the CBA via its erroneous investigation aimed at harassing Ms. Kenyon and forcing a direct or constructive termination of Ms. Kenyon because of Ms. Kenyon's exercise of protected free speech via her December 9 Instagram Story.

178. Ms. Kenyon has suffered and continues to suffer damages, including but not limited to economic loss and mental, physical, and emotional damage as a result of Bernstein's unjustified inducement of the Board of Education's breach of the CBA.

WHEREFORE, Britnee Kenyon respectfully requests the Court enters judgment in her favor and against Defendant Michelle Hammer Bernstein on Count X of Ms. Kenyon's Verified

30

Complaint at Law and awards damages in excess of $50,000, plus attorneys' fees, costs, punitive damages, prejudgment interest, and for such other or further relief the Court deems just and proper.

## COUNT XI – RESPONDENT-IN-DISCOVERY
### (*J.L.*)

179.    Ms. Kenyon reincorporates and realleges Paragraphs 1 through and including 106 as though fully set forth herein as Paragraph 179 of Count XI of Ms. Kenyon's Verified Complaint at Law.

180.    Pursuant to 735 ILCS 5/2-402, Ms. Kenyon has a good faith belief that J.L. has information essential to the determination of who should properly be named as additional defendants to this action, including, without limitation, J.L.

WHEREFORE, Ms. Kenyon requests this Court to enter an order requiring respondent-in-discovery J.L. to promptly respond to all discovery within the time allocated by the Illinois Supreme Court rules.

## JURY DEMAND

Ms. Kenyon demands a trial by jury on all issues so triable.

Respectfully submitted,

Britnee Kenyon,

By:    */s/ Adam M. Berger*
One of Her Attorneys

Adam M. Berger (ARDC No. 6269402)
Myles R. Carroll (ARDC No. 6335660)
MILLER BERGER, LLC
20 N. Clark St., Ste. 525
Chicago, IL 60602
(312) 283-4563
Firm No.: 64620
Adam@MillerBerger.com
Myles@MillerBerger.com

## VERIFICATION

Under penalties as provided by law pursuant to Section 5/1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in the foregoing Amended Complaint are true and correct, except as to those matters stated to be on information and belief, and as to such matters, the undersigned certifies as aforesaid that she verily believes the same to be true.

By: _____
Britnee Kenyon

| | | |
|---|---|---|
| BRITNEE KENYON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2024 LA 441 |
| v. | ) | |
| | ) | |
| BOARD OF EDUCATION TOWNSHIP | ) | |
| HIGH SCHOOL DISTRICT 113, DANIEL | ) | **JURY DEMAND** |
| STRUCK, Individually and in his Official | ) | |
| Capacity, THOMAS KRIEGER, | ) | |
| Individually and in his Official Capacity, | ) | |
| and MICHELLE HAMMER BERNSTEIN, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| J.L., | ) | |
| | ) | |
| Respondent-In-Discovery | ) | |

## RULE 222(b) AFFIDAVIT

NOW COMES the Affiant, ADAM M. BERGER, and states the following under oath:

1. That he is one of the attorneys for the Plaintiff in this matter;

2. The total money damages sought in this matter exceeds $50,000.00, exclusive of interests and costs.

Further affiant sayeth naught.

*/s/ Adam M. Berger*

[X]    Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, I certify that the statements set forth herein are true and correct.

Adam M. Berger (ARDC No.  6269402)
Myles R. Carroll  (ARDC No. 6335660)
MILLER BERGER, LLC
20 N. Clark St., Ste. 525
Chicago, IL 60602
(312) 283-4563
Firm No.: 64620
Adam@MillerBerger.com
Myles@MillerBerger.com

33

#447731v1

# EXHIBIT A

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C



# COLLECTIVE BARGAINING AGREEMENT

between

The Board of Education of
Township High School District 113

and

## The District 113 Education Association
## IEA-NEA (DEA)



DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

# COLLECTIVE BARGAINING AGREEMENT

**hereinafter referred to as "The Agreement"**

## between

## The Board of Education of Township High School District 113

## and the District 113 Education Association, IEA-NEA (DEA)

# TABLE OF CONTENTS

ARTICLE I - INTRODUCTION ....................................................................................... 7

    A. Recognition ................................................................................................................ 7

    B. Shared Commitment to Non-Discrimination / Equal Employment Opportunity Practices ...... 7

ARTICLE II - ASSOCIATION RIGHTS AND RESPONSIBILITIES ......................................... 8

    A. Association's Exclusive Bargaining Rights ................................................................... 8

    B. Recognition of this Agreement ..................................................................................... 8

    C. Resolution of Questions .............................................................................................. 8

    D. Association Announcements ......................................................................................... 8

    E. Association Meetings ................................................................................................... 8

    F. Dues Deductions ......................................................................................................... 9

    G. DEA Release Time ...................................................................................................... 9

    H. Job Descriptions ......................................................................................................... 9

    I. Association's Right to Information ................................................................................. 9

    J. Association's Right to Appear before the Board .......................................................... 10

    K. Association's Right to Address Employees ................................................................. 10

    L. Association/Administration Meetings .......................................................................... 10

    M. Response to FOIA Requests ...................................................................................... 10

    N. Changes in the Status of Bargaining Unit Members ................................................... 10

    O. Visits by IEA Representatives .................................................................................... 11

    P. Association's Use of Phones, Network, Equipment ..................................................... 11

    Q. Office Space ............................................................................................................ 11

    R. Faculty Handbook .................................................................................................... 11

ARTICLE III - MANAGEMENT RIGHTS AND RESPONSIBILITIES ................................... 12

ARTICLE IV - RIGHTS OF LICENSED STAFF MEMBERS ............................................... 13

    A. Non Discrimination Clause ....................................................................................... 13

    B. Shared Discipline Responsibility ............................................................................... 13

    C. Academic Freedom / Recognition of LSM Professional Judgment ............................... 13

    D. Privacy / Non-School Activities ................................................................................. 13

    E. Outside Employment .................................................................................................. 14

    F. Tentative Teaching/Work Assignments ....................................................................... 14

    G. Substitute Teachers ................................................................................................... 14

H. Mandated Training Tutorials ..................................................................................................14

I. Building Access/Safety ............................................................................................................14

J. Biometrics ................................................................................................................................14

K. Health Requirements for LSMs ..............................................................................................15

L. Safe Work Environment ..........................................................................................................15

M. Parent Complaints ..................................................................................................................15

N. LSM Protection from Suit .......................................................................................................15

ARTICLE V - DISCIPLINE ............................................................................................................16

A. Investigation of Complaints and Alleged Misconduct ...........................................................16

B. Meetings / Representation ......................................................................................................16

C. Just Cause ..............................................................................................................................16

ARTICLE VI - EMPLOYMENT .......................................................................................................18

A. Notice of Vacancies ................................................................................................................18

B. Voluntary Transfer ..................................................................................................................18

C. Involuntary Transfer ...............................................................................................................18

D. Promotion ...............................................................................................................................19

E. Seniority .................................................................................................................................20

F. Reduction in Force ..................................................................................................................21

G. Sequence of Honorable Dismissal .........................................................................................21

H. Re-employment Procedures for RIFed LSMs (Recall) ...........................................................21

ARTICLE VII - WORKING CONDITIONS .....................................................................................24

A. School Year .............................................................................................................................24

B. LSM Workload and Work Day .................................................................................................24

C. Full-Time Teaching Load ........................................................................................................24

D. Class Size ...............................................................................................................................25

E. Full-Time Non-Classroom LSM Student Assignments ...........................................................26

F. Homeroom ...............................................................................................................................26

G. Preparations ...........................................................................................................................26

H. Co-teaching and Interdisciplinary Teaching ..........................................................................26

I. Summer Work ..........................................................................................................................27

J. Overage (Sixth Assignments) .................................................................................................27

K. Open House and Graduation ..................................................................................................27

L. Learning Management System, Student Information System, and Grading ...........................28

M. Internal Substitute Teaching.................................................................28

N. Letters of Recommendation....................................................................28

O. New LSM Orientation............................................................................28

**ARTICLE VIII - SPECIAL EDUCATION** ...............................................29

A. Special Education - Teaching Assignments ...........................................29

B. Special Education - Optimal Class Sizes and Caseloads .......................29

C. IEP Meetings, Paperwork, and Summer Evaluations.............................29

D. Special Education Workload Plan Committee .......................................30

**ARTICLE IX - PART-TIME LICENSED STAFF MEMBERS** ...............32

A. Part-Time LSM Workload ......................................................................32

B. Salary and Benefits ................................................................................32

C. Leaves ...................................................................................................33

**ARTICLE X - LEAVES OF ABSENCE** .................................................34

A. Sick Leave .............................................................................................34

B. Temporary Illness or Temporary Incapacity - Tenured Teachers...........35

C. Religious Leave ......................................................................................36

D. Personal Leave .......................................................................................36

E. Parental Leave ........................................................................................36

F. Grandchild Leave....................................................................................37

G. FMLA Leave ..........................................................................................38

H. Unpaid Leaves of Absence .....................................................................38

I. Procedures for LSMs Granted Part-Time Status .....................................39

J. Catastrophic Leave .................................................................................40

K. Bereavement ..........................................................................................41

L. Jury Duty ...............................................................................................41

**ARTICLE XI - SALARY AND BENEFITS** ............................................42

A. Salary......................................................................................................42

B. Additional Compensation / Benefits .....................................................43

C. PARC (Professional Advancement Review Committee) Funds..............44

D. Summer School.......................................................................................46

E. Creditable Earnings ...............................................................................47

**ARTICLE XII - LEADERSHIP STIPENDS AND NON-CLASSROOM LSMs** ...........48

A. Dean of Students.....................................................................................48

B. Director of Instructional Technology .................................................48

C. Nurse ...........................................................................................49

D. School Psychologist ......................................................................49

E. Social Worker ...............................................................................49

F. Speech Pathologist ........................................................................50

G. 504 Coordinator ...........................................................................50

H. Special Education Team Lead .........................................................50

I. Counselor .....................................................................................51

J. District Outplacement Coordinator .................................................51

ARTICLE XIII - ATHLETICS, ACTIVITIES, AND EXTRA DUTIES .....................52

A. Athletics and Activities .................................................................52

B. Stipend Review Advisory Committee (SRAC) ...................................52

C. Stipends.......................................................................................53

D. Chaperone Duty Compensation ......................................................55

E. Extra Duty Compensation ..............................................................55

ARTICLE XIV - FRINGE BENEFITS AND INSURANCE ................................56

A. Insurance Coverage -- Group Coverage ..........................................56

B. Insurance - Health, Dental, Vision .................................................56

C. Term Life Insurance .....................................................................57

D. Accidental Death and Dismemberment Insurance .............................57

E. Income Protection / Disability Stipend ...........................................57

F. Flexible Benefits Plan ...................................................................57

ARTICLE XV - RETIREMENT ...............................................................58

A. Voluntary Retirement Incentive Plan..............................................58

B. Voluntary Retirement Incentive Plan Eligibility ...............................58

C. Retirement Incentive Bonuses........................................................58

D. Post-Retirement Insurance Supplement ...........................................61

E. Revocation ...................................................................................61

ARTICLE XVI - GRIEVANCE PROCEDURES ............................................62

A. Grievance - Purpose .....................................................................62

B. Grievance - Defined.......................................................................62

C. Informal Resolution ......................................................................62

D. Procedures for Adjustment of a Grievance.......................................62

E. General Provisions .................................................................................................64

**ARTICLE XVII - PERSONNEL FILES** ........................................................................66

A. Official Personnel File ...........................................................................................66

B. File - Defined ........................................................................................................66

C. Timely Insertion ...................................................................................................66

D. Right of Access .....................................................................................................66

E. Confidentiality and Notice ....................................................................................66

F. Right of Fair Evaluation Record ..............................................................................67

G. Right of Copy .......................................................................................................67

H. Right of Addition and Attachment ...........................................................................67

I. Right of Integrity of File .........................................................................................67

J. Rights When Cleared of a Criminal or Disciplinary Charge ...........................................67

K. Grievances ..........................................................................................................67

**ARTICLE XVIII - DISTRICT COMMITTEES** ...........................................................68

A. Calendar Committee .............................................................................................68

B. Curriculum, Instruction, and Assessment Committee ..................................................68

C. Insurance Advisory Committee (IAC) ........................................................................68

D. Multi-Tiered System of Support (MTSS) Advisory Committee ........................................69

E. Professional Advancement Review Committee (PARC) ..................................................69

F. Performance Evaluation Review Act (PERA) Joint Committee ........................................70

G. Special Education Workload Plan Committee ..............................................................70

H. Stipend Review Advisory Committee (SRAC) ...............................................................70

I. Student Behavior & Security Committee .....................................................................70

J. Special Committee for a Common Schedule ................................................................70

K. Other Working Committees .....................................................................................71

**ARTICLE XIX - EVALUATIONS** .............................................................................72

**ARTICLE XX - NO STRIKE / NO LOCKOUT** ...........................................................73

**ARTICLE XXI - TERM OF THE AGREEMENT** .........................................................74

**APPENDIX A** ...................................................................................................75

**APPENDIX B** ...................................................................................................76

**APPENDIX C** ...................................................................................................77

**APPENDIX D** ...................................................................................................78

**APPENDIX E** ...................................................................................................79

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

**APPENDIX F** ............................................................................................................80

**ADDENDUM** ...........................................................................................................81

    **LSM Step Adjustments**..................................................................................81

# ARTICLE I - INTRODUCTION

## A. Recognition

The bargaining unit is clarified as follows:

**Included**: All full-time and part-time regularly employed licensed staff members ("LSMs") which include teachers, librarians, deans of students, school nurses, school social workers, counselors, psychologists (including building or district level outplacement coordinators), speech pathologists and building level directors/coordinators.

**Excluded**: Department chairs (including the Director of the Highland Park High School Library and the MTSS Directors), special education administrators, athletic directors, activities directors, assistant athletic directors, assistant activities directors, non-certified staff, and all supervisors, managers, confidential and short-term employees as defined in the Illinois Education Labor Relations Act.

## B. Shared Commitment to Non-Discrimination / Equal Employment Opportunity Practices

The Board and the Association affirm their continued support of the Board's policies prohibiting discrimination on account of race, religion, color, nationality, gender, gender identity, sexual orientation, marital status, age, or disability in accordance with law.

# ARTICLE II - ASSOCIATION RIGHTS AND RESPONSIBILITIES

## A. Association's Exclusive Bargaining Rights

All collective bargaining shall be conducted between the duly authorized representatives of the Association and the Board, and the Board shall not negotiate with any other individual, group, or organization purporting to collectively represent employees covered by this Agreement; provided, however, this Agreement shall not be construed to prevent the Board or any administrator from meeting with an employee or group of employees for the purpose of hearing the views of such employee or group of employees, but not for the purpose of negotiating with any employee or group of employees. There shall be no substantial changes in any terms and conditions of employment specifically set forth in this Agreement, without mutual written agreement between the Association and the Board.

## B. Recognition of this Agreement

This Agreement and all of its provisions shall be the policy of the Board and supersede any Board policy presently to the contrary. Board policy established during the term of this Agreement shall be in conformity with its provisions. Individual LSM contracts shall be so drawn as to indicate that they are subject to the provisions of this Agreement.

## C. Resolution of Questions

The Association and the Board and/or its representatives shall meet within a reasonable time upon request of either party for the purpose of resolving questions concerning the implementation of this Agreement and related matters. When Association representatives meet with the Board, or its duly authorized representatives, to discuss the implementation of this Agreement, they shall suffer no loss of pay or other benefits.

## D. Association Announcements

The Association shall have the right to freely communicate through the intra-district mail system and LSM mailboxes, district email, and bulletin boards in the staff cafeterias. All emails must comport with Board Policy 6-235, Access to Electronic Networks. Only an Association designee shall post or remove materials from Association bulletin boards. The Association shall have the right to make reports and announcements at general, building, and department meetings. Notice of Association activities shall be included and published in general and school calendars.

## E. Association Meetings

The Association shall have the right to conduct meetings using district facilities so long as the facilities are not already reserved or in use. The Association will schedule use of the facility in the same manner that the rooms are currently reserved.

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

## F. Dues Deductions

The Board agrees to deduct Association membership dues on standard LSM payroll dates, divided evenly starting in October of each school year and ending in June, from the pay of those employees who individually request in writing that such deductions be made. After the dues deductions are made, they shall be remitted together with an itemized statement to the Treasurer of the Association. Authorization for each deduction shall be in effect for the duration of the Agreement unless a written notice of revocation is given by the DEA to the Board on behalf of the employee. Revocation shall become effective as soon as possible after such notice is given.

## G. DEA Release Time

The Board shall grant a release of four (4) classes (two for the DEA President and one each for the two DEA Vice Presidents) for each semester of each academic year of this Agreement. The District shall be responsible for the payment of all costs associated with the release granted to the DEA President and to the two Vice Presidents. The FTE granted shall be in addition to each school's standard FTE allotment. In addition, the DEA President and both Vice Presidents shall be exempt from all supervisory assignments, assignments to a homeroom, and all similar assignments given to other LSMs as part of their duties.

The Board shall grant up to twenty-five (25) full days to the Association to allocate for professional duties or professional development of its members. The assignment of these days will be at the sole discretion of the DEA. The DEA shall reimburse the District for the full cost of providing substitutes on these days. The District will continue to provide and pay for substitutes for any meetings that may occur during the school day where DEA and the Administration are negotiating or meeting as part of their joint work together and where substitutes are required.

Association officers shall be granted professional leave to attend national and/or state organization meetings. The Association shall be responsible for all costs relative to attendance at such meetings and shall pay the District the cost of substitutes. A maximum of ten (10) days shall be allowed for this leave.

## H. Job Descriptions

The Board shall provide the Association with a complete set of job descriptions for all positions covered by this Agreement. If any of the said job descriptions are subsequently revised or modified, the board shall provide the Association with a copy of the new job description. The Association shall have an opportunity to request impact bargaining on any changes, additions, or revisions to any job description prior to implementation.

## I. Association's Right to Information

The Board shall furnish the Association with the following documents and types of information as they are received, completed, or compiled as otherwise indicated:
1. Board agendas via email notice with link
2. Official minutes of Board meetings via publication on the public website

3249123.1

3. Board School policy and procedures manuals with updated revisions via publication on the public website. The DEA will be provided agendas for all policy committee meetings so that it is aware of proposed additions and revisions to Board policy prior to final approval.
4. Upon request, any and all information, statistics, and records which may be relevant to negotiations or necessary for the proper enforcement of this Agreement, provided nothing herein shall require the Board to research or develop any information or reports that are not already prepared and available.
5. Proposed changes to school or District policy that impact LSM working conditions will be shared with the DEA President via email from the Building Principal or Superintendent/designee.

The Board shall provide to the DEA any information as required by law. Nothing in this provision shall limit what the Board must provide the DEA in compliance with the law.

## J. Association's Right to Appear before the Board

The Association President or their designee shall have the right to address the Board during public comment. The Association speaker, shall, whenever possible, give notice through the Superintendent of their intention to address the Board.

## K. Association's Right to Address Employees

The Association President or their designee shall have the right to address new employees at their new staff orientation meetings near the beginning of the school year. In addition, the President or their designee may address members at the first all-district meeting of the year. The DEA Vice Presidents or their designees may address members at the opening meetings of their respective high schools. The Vice Presidents, or their designees, will also be able to give short announcements at all-staff meetings in the high schools.

## L. Association/Administration Meetings

DEA officers shall meet with district-level administrators monthly to discuss matters concerning the implementation of this Agreement and related matters. The Association Vice Presidents, or their designee, shall meet monthly with the principal of their respective buildings to discuss matters concerning the implementation of this Agreement and related matters.

## M. Response to FOIA Requests

The Association President shall be notified within three (3) business days of the employer's receipt of a Freedom of Information Act (FOIA) request that asks for any information about any bargaining unit member(s).

## N. Changes in the Status of Bargaining Unit Members

After the first day of the school year, the Association will be provided the change in status of any bargaining unit member within ten (10) workdays of the change.

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

## O. Visits by IEA Representatives

Non-employee representatives of the IEA shall be permitted access to school buildings for the purpose of representing employees covered in this Agreement, provided the official will present identification to the security officers at the building entrance. Any such visits shall be made in a manner so as not to disrupt the operation of the school.

## P. Association's Use of Phones, Network, Equipment

The Association shall have, without charge, use of the school telephones for intra-district calls, use of photocopiers, and use of email and the district network. The DEA will pay for any costs of copies made, and shall comply with current district practices regarding email and use of networks.

## Q. Office Space

The Association will be provided work space in each high school building upon request for such space through the procedures established by each building.

## R. Faculty Handbook

The Faculty Handbook shall be available to all LSMs. DEA Representatives will be provided the opportunity to propose revisions and review changes prior to publication. The Faculty Handbook will be updated annually and posted on the District website by the first day of New Staff Orientation each school year.

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

# ARTICLE III - MANAGEMENT RIGHTS AND RESPONSIBILITIES

The Board shall not be required to bargain over matters of inherent managerial policy, which shall include such areas of discretion or policy as to the functions of the District, standards of service, its overall budget, the organizational structure and selection of new employees, and direction of employees. If there is a dispute concerning whether any issue that arises during the term of this Agreement raises a mandatory subject of bargaining or is a matter of inherent managerial authority, the parties will first attempt to resolve the dispute informally. Nothing in this section prevents the DEA from filing an unfair labor practice in regard to an action which they believe impacts their rights under the Illinois Educational Labor Relations Act.

3249123.1

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

# ARTICLE IV - RIGHTS OF LICENSED STAFF MEMBERS

## A. Non Discrimination Clause

The Board agrees that membership in the Association, participation in any activities of the Association, or the institution of any grievance, complaint, or proceeding under this Agreement, shall not affect the terms or conditions of employment of any LSM. It is understood that opinions and views relating to supervisor-staff member or school board-staff member relationships will not be discussed in the presence of students.

## B. Shared Discipline Responsibility

LSMs will be given reasonable support and assistance by the Board and the Administration with respect to the management and discipline of students. A committee, which includes building principals, deans, classroom teachers selected by DEA, and school mental health professionals will meet at least two (2) times per year to review disciplinary data and discuss current disciplinary practices.

## C. Academic Freedom / Recognition of LSM Professional Judgment

It is the intent of the Parties to ensure that LSMs enjoy academic freedom in the District.

Academic freedom shall mean that LSMs are free to present instructional materials which are pertinent to the subject and level taught, within the outlines of appropriate course content and within the planned instructional program, as determined by the Illinois Learning Standards, as memorialized in Board Policy 6-60 and as approved by the District.

Academic freedom shall also mean that LSMs shall be entitled to freedom of discussion within the classroom on all matters which are relevant to the subject matter under study and within their area of professional competence, assuming that all facts concerning controversial issues shall be presented in a scholarly and objective manner that is viewpoint neutral, and assuming that all discussion shall be maintained within the outlines of appropriate course content, and be pedagogically justifiable.

Any allegation that there has been a violation of academic freedom shall be processed through the grievance procedure provided by this Agreement up to the level of the Board of Education.

## D. Privacy / Non-School Activities

Neither the Board nor the Administration shall make regulations that attempt to govern employees' non-school activities save in exceptional circumstances where such activities can be proven to have had a substantial negative impact on the LSMs ability to perform the duties associated with their assigned role.

3249123.1

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

## E. Outside Employment

The employment of an LSM outside of the school during the school year shall be at the discretion of the LSM, but any such employment must not interfere with the efficiency of the LSM in the school or conflict with any school responsibility or ethical obligation in relation to their duty as a public school employee.

## F. Tentative Teaching/Work Assignments

LSMs shall be notified prior to the last day of student attendance of the school year of their tentative teaching or work assignments for the following school year. It is understood that some changes may occur.

## G. Substitute Teachers

In no case shall an LSM planning to be absent be held responsible for obtaining a substitute teacher. LSMs shall not be required to substitute for another LSM.

## H. Mandated Training Tutorials

LSMs are required by Illinois law to complete compliance training across various topics. These trainings will be required in accordance with the schedule established by Illinois law and regulations. LSMs may use independent work time or professional duty periods (when not assigned to other professional work duties) to complete such trainings. This section only applies to state-mandated compliance trainings and does not apply to professional development required by the District.

## I. Building Access/Safety

In part of the joint interest in maintaining a safe and welcoming school environment for students, staff, and the community, LSMs understand that controlling access to our buildings is essential. LSMs understand that they will use their building ID whenever entering the school building. An ID swipe may be required when exiting unstaffed security doors at the end of the school day, or at any door when exiting the building during school hours. Recording of LSMs using IDs to enter or leave the building or rooms within the campuses, shall not be used as a part of evaluation or discipline and will only be used to create a record of who is in the building for safety purposes.

## J. Biometrics

Other than those procedures required for background checks and for initial employment purposes, staff shall not be required to provide or use biometric data as part of their employment in the District. This includes fingerprint scans, retina scans, voice scans, face identification, and/or any other biometric data.

Should the District be required to initiate a security system utilizing biometric data of any kind for its network or access to its buildings/facilities, or determine to institute such a system in the interest

of the safety and security of students, staff, and visitors, the Board will initiate impact bargaining with the DEA prior to initiating any such system.

## K. Health Requirements for LSMs

LSMs will only be required to have vaccinations and other medical examinations as required by state law or as a result of an executive order issued by the Illinois Governor, as a condition of employment. Should the Board determine that additional health precautions are necessary for the safe operation of the schools, it will initiate decisional bargaining on this matter with the DEA. Both the Board and the DEA acknowledge their duty to initiate bargaining within two (2) school business days of such determination, and to bargain in good faith on this issue. If no agreement is reached, the provisions of this section will remain in full effect.

## L. Safe Work Environment

An LSM who becomes aware of a potentially unsafe or hazardous condition, such as mold or poor air quality, shall report the situation by submitting a ticket via the Maintenance Direct (or equivalent) platform. A response will be provided to the LSM within five (5) days. Conditions which pose an immediate threat to the health and safety of students or staff members must be immediately reported to the building manager.

## M. Parent Complaints

Any complaint by a parent of a student directed toward an LSM which is to be used for evaluative purposes shall be reported to the LSM in writing. No disciplinary action shall be taken without following the guidelines established within this Agreement.

## N. LSM Protection from Suit

In accordance with the Section 10-20.20 (105 ILCS 5/10-20.20), the Board shall provide indemnification and protection against claims and suits.

An LSM shall not suffer any loss of salary if they are required to be absent from their duties because of court proceedings or related appearances, meetings, or investigations arising out of performance of their duties in accordance with Board policy.

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

# ARTICLE V - DISCIPLINE

## A. Investigation of Complaints and Alleged Misconduct

Complaints regarding an LSM upon which disciplinary action may occur will be reported to the LSM within five (5) school days. In the event a meeting with an administrator is required to discuss and/or investigate such a complaint or allegation, the LSM may be accompanied to such a meeting by a DEA representative. LSMs will be provided at least 24 hours notice of such a meeting and informed of their right to have a DEA representative present at the meeting. Where a complaint or allegation involves a matter related to the safety of a student or the school community, 24 hours notice shall not be required.

Notice will be provided in writing and will state the complaint or allegation being investigated. The LSM will have the opportunity to respond to the complaint/investigation. The Administration may direct that during the investigation, all information related to the complaint or allegation remain confidential. Retaliation against any individual who makes a complaint is not permitted.

The LSM shall have the right to be accompanied by their DEA representative(s) to any subsequent investigatory meeting, or a meeting to share the results of the investigation. LSMs will be informed, in writing, of the conclusions of an investigation into a complaint or allegation of misconduct at the conclusion of the investigation. In addition, if an investigation is not concluded within ten (10) school days, the administration shall provide an update, and periodic updates of the status of the investigation; the LSM or the DEA representative may also ask for such updates via an email to the administrator conducting the investigation.

Any complaint raised regarding an LSM that implicates a duty under the *Abused and Neglected Child Reporting Act* will be processed in accordance with the requirements of the Act.

Department Chairs, Activities Directors, or any member of the bargaining unit shall not conduct investigations.

## B. Meetings / Representation

In accordance with the *Weingarten* rule, an LSM is entitled to DEA representation at any meeting with a supervisor that may result in disciplinary action.

## C. Just Cause

The District shall inform an employee of the right to Association representation during a meeting which may lead to disciplinary action. The District shall give an employee 24 hours notice before holding a meeting related to potential disciplinary action except in an egregious situation.

Employees shall only be disciplined for just cause.

The Association and the District agree that discipline should be timely, progressive (when appropriate) and accompanied by counseling (where appropriate). The Parties agree that

3249123.1

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

progressive discipline typically includes, in order: oral reprimand; written reprimand; suspension; and termination. The District may combine steps of progressive discipline if the severity and facts of the situation warrant such action.

Tenured LSM dismissal proceedings are not subject to this provision.

3249123.1

# ARTICLE VI - EMPLOYMENT

## A. Notice of Vacancies

A vacancy occurs when an LSM resigns or is terminated from a position or when a new position is created. This provision does not apply to circumstances where there has been a reduction in force and an LSM with recall rights moves into the open position.

During the school year, the Board agrees to post all vacancies on the District website for at least five (5) business days prior to filling the position. The notice shall clearly set forth the specifications and/or qualifications, the compensation for the position, and worksite, when known.

## B. Voluntary Transfer

Any LSM who meets the specified requirements for a vacancy and desires a transfer to a different building or to a different position within the same building shall notify the Human Resources Department in writing within five (5) business days following the announcement of the vacancy. All qualified internal LSM applicants for a vacancy will be offered an opportunity to interview for the position; however, the decision to fill the vacancy remains within the discretion of the District. Internal LSM candidates will be evaluated for the position based on the following factors (in no particular order):

- Qualifications including degree(s) and special expertise
- Seniority
- Experience
- Effect of extra-curricular assignments

In the event that an LSM chooses not to accept a position offered, it shall have no effect upon the LSM's future opportunities for other positions that are created or become vacant.

If the request for transfer is not approved, notice will be provided to the LSM by the Department of Human Resources no later than ten (10) days after the position has been filled, with a statement of the reason for non-approval.

## C. Involuntary Transfer

An involuntary transfer occurs when an LSM's building assignment is changed unrelated to a reduction in force (RIF). Before any involuntary transfer from one building occurs, the Administration shall first seek qualified volunteers. The Administration shall consider the following factors (in no particular order) in determining the LSM to transfer:

1. Qualifications of the LSM, including degree(s), special expertise
2. Seniority
3. Experience
4. LSM preference

5. Effect of extra-curricular assignments
6. Best interest of the District

Notice of involuntary transfer shall be given to the LSM as soon as practicable (no later than May 1st if for the subsequent school year). If notice is given after May 1st, the Principal will notify the Association President of the reason for the post-May 1st notice.

Within ten (10) business days after receipt of notification of an involuntary transfer, an LSM dissatisfied with the new assignment may make a request in writing for a meeting with the principal under whom the LSM was assigned prior to the transfer to discuss reasons for the transfer. Within five (5) business days after such a meeting, the LSM, if dissatisfied with the reasons given for the transfer, shall have the further right to request a meeting with the Superintendent to discuss said reasons. Such meeting shall be held five (5) business days after receipt of a request thereof by the Superintendent. The Association President or designee may be present at the LSM's request in any involuntary transfer meeting.

If circumstances arise where a fully qualified (as determined by licensure and local qualifications) tenured LSM must be offered a full-time position in another building to avoid a reduction in force (RIF), and a vacancy occurs prior to July 1st in their home school, the LSM will be notified by the Chief Human Resources Officer via telephone call to the phone number on record with the District and via email with a description of the open position. The LSM may accept this position and avoid transfer by providing written notice to the Chief Human Resources Officer within 48 hours of receiving notice of the vacancy.

## D. Promotion

1. **Rationale** - It is desirable to recognize professional employees by promotion from within the ranks whenever practical, educationally desirable, and consistent with the educational needs of the students.

2. **Posting of Promotional Positions** - All permanent vacancies for promotional positions shall be publicized. Notice shall be announced via email to all LSMs and posted internally for at least five (5) calendar days in advance of posting the vacancy publicly. Such notice shall clearly set forth the title of the position, qualifications required, compensation rate or range, and licensure requirements of the position.

3. **Temporary Appointments** - Nothing in this Agreement shall prevent the Board from making temporary appointments until positions are filled on a permanent basis. Temporary appointments are not subject to the posting requirements listed above. At the end of a temporary appointment, if a permanent position is available, the position will be posted for five (5) days internally before the public posting.

4. **Interviewing for Vacant Positions** - All internal candidates who meet all the qualifications listed on the posting shall be granted an interview.

### E. Seniority

1. **Definition of Seniority**
   Full-time LSMs and part-time tenured LSMs shall accrue seniority. Seniority shall be determined by the staff member's continuous length of service in District 113 as a full-time LSM and/or part-time tenured LSM. Accumulation of seniority shall begin on the staff member's first day of actual work for the District in a full-time licensed position and shall accrue for each year of service as a full-time LSM or a part-time tenured LSM. Non-tenured part-time LSMs are not eligible for seniority. Full-time LSMs and part-time tenured LSMs granted leaves of absence, both sabbatical and non-sabbatical, will not lose their seniority while on the approved leaves and will continue to accrue seniority while they are on a granted leave of absence.

   Beginning with the effective date of this Agreement, for the initial placement on the seniority list, the District will consider total years of service as an LSM, as verified by written documentation from the Illinois State Board of Education or comparable agency issuing such license. Written documentation verifying licensure must be provided within ten (10) calendar days of hire.

   > *Example:* if two LSMs are hired in the same school year—one with three years of experience and one with two years—the LSM with three years of experience will be placed above the other LSM. Both of these newly hired LSMs will be placed below all LSMs currently on the Seniority List.

   Should there be a tie in seniority after consideration of this information, it will be broken by the drawing of lots. Two (2) members of the central administration along with the President and two (2) Vice Presidents of the DEA will meet to do the drawing of lots. The LSMs will be placed on the seniority list in an order determined by this process, and that seniority shall be maintained over time.

2. **Maintaining and Posting of Seniority Lists**
   The Department of Human Resources shall prepare and maintain the District Seniority List. The List shall include all full-time LSMs and part-time tenured LSMs in the District, broken down by areas of certification and any other qualifications agreed upon by the PERA Joint Committee. The Human Resources Department shall submit a copy of the District Seniority List to the President and Vice Presidents of the DEA by November 1st of each school year. The Human Resources Department will distribute an updated District Seniority List to the LSMs by November 15th of each school year.

   Within fifteen (15) days of the Seniority List's distribution, LSMs must confirm to the Chief Human Resources Officer in writing (which includes email) that they have seen the list and state whether their placement is accurate/inaccurate. Any corrections or additions to the list will be submitted to the DEA for purposes of maintaining accurate records. Once the fifteen (15) work days have expired, the District Seniority List shall be deemed accurate for that school year.

## F. Reduction in Force

In the event of a need for District 113 to implement a reduction in force (RIF), the Chief Human Resources Officer will meet with representatives of the DEA Executive Board to share the details of the pending RIF. While the Administration retains the right to determine if RIFs are necessary, and who will be affected by such RIF, pursuant to the provisions of this Agreement consistent with the law, the meeting allows advance notice to the DEA and the opportunity for DEA representatives to provide feedback and ask questions regarding the pending RIF. In addition, LSMs who may be affected by a RIF will be notified by the Human Resources Department prior to the Board taking final action to approve the RIF. This section not only governs a full dismissal, but also a reduction in a staff member's FTE status.

If any full-time LSM or part-time tenured LSM is removed or dismissed as a result of a decision by the Board of Education to decrease the number of LSMs or to discontinue some particular type of teaching service in the District, then the affected LSM/s shall be given a written statement of honorable dismissal with the reason by April 15th. The statement of honorable dismissal shall be sent by regular mail, and by either certified mail, return receipt requested, or personal delivery with receipt.

Nothing in this Agreement affects the Board's right to dismiss a non-tenured LSM in accordance with Section 24-11 of the Illinois School Code.

## G. Sequence of Honorable Dismissal

Each school year, the District, in consultation with the DEA, will establish a Sequence of Honorable Dismissal List categorized by positions and in groups 1 through 4. All full-time LSMs and part-time tenured LSMs shall be categorized into one or more positions for which the staff members are qualified to hold, based upon legal qualifications and any other qualifications established in a district job description that was in effect on or before May 10th of the previous school year. Copies of this list must be distributed to the DEA at least seventy-five (75) calendar days before the end of the school year.

Among LSMs qualified to hold a position, the staff members shall be dismissed in accordance with the law and any agreements made by the Joint RIF Committee. If the Joint RIF Committee makes changes to these groupings, the changes will be documented and posted on the employee portal.

Performance evaluation ratings from other school districts will not be considered when placing LSMs into a group.

## H. Re-employment Procedures for RIFed LSMs (Recall)

An LSM who is subject to a RIF will be recalled in accord with the law.

With respect to all tenured LSMs (full-time and part-time), if the District has any vacancies for the following school year or within two (2) calendar years from the beginning of the school year following the year in which the staff member was honorably dismissed, the vacancy shall be

tendered to the staff members who were dismissed. Licensed staff members shall be recalled based on their group order, seniority, and qualifications (both legal qualifications and those outlined in the district job description posted by May 10th prior to the school year the position becomes available).

With respect to full-time non-tenured LSMs, if the District has any vacancies for the following school year or within one (1) calendar year from the beginning of the school term following the year in which the staff member was honorably dismissed, the vacancy shall be tendered to the staff members who were dismissed. Licensed staff members shall be recalled based on their group order, seniority, and qualifications (both legal qualifications and those outlined in the district job description posted by May 10th prior to the school year the position becomes available).

Recalled LSMs shall be reinstated to the lane and step previously earned. No new waiting period or probationary period is required. The recalled staff member will also be immediately eligible for benefits available to other staff. Vacant positions shall be offered to RIFed licensed staff members in order of their group and their seniority.

> ***Example***: If two RIFed licensed staff members, one from group 3 and one from group 4 are qualified to teach biology, the staff member in group 4 shall be offered the vacant biology position first. If the two RIFed staff members are both in group 4, the staff member with the greatest amount of seniority shall be offered the vacant biology position first.

The District is responsible for sending notice by certified mail, return receipt requested, to the most senior LSM who is qualified for the available position. Notice will be sent to the last address on file with the District. The staff member is responsible for informing the Human Resources Department of any changes in residence by email or by certified mail. The staff member must respond in writing to the acceptance or rejection of the position being offered within ten (10) calendar days of receipt of the District's notice. The notice given to the LSM must contain a copy of this policy and clear specifications that written notice is required within ten (10) calendar days. If the recall notice is issued within fifteen (15) calendar days of the start of the school year, the recalled staff member must accept or reject the position within five (5) calendar days or by the first day of school, whichever is shorter.

Any LSM who does not accept a proper notice of recall for a full-time (1.0 FTE) position will be removed from the recall list.

Temporary or part-time positions will be first offered to LSMs with recall rights in the same order as for full-time or permanent positions. Refusal of a temporary or part-time position will constitute a resignation and removal from the recall list if, and only if, the temporary or part-time position for which the staff member is being recalled is equal to or greater than the FTE held by that staff member at the time of RIF. A staff member offered a temporary or part-time position that is less than the FTE held at the time of RIF may elect to be passed over for the position, in which case the staff member retains the same position on the recall list, and the District will offer the available position to the next most senior qualified LSM. The staff member on the recall list who elects to be passed over for part-time or temporary positions (of lesser FTE than they held at time of RIF) does so by giving written notice to the Human Resources Department within ten (10) calendar days of receiving a notice of recall. If the recall notice is issued within fifteen (15) calendar days

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

of the start of the school year, the recalled staff member must accept the position or elect to be passed over within five (5) calendar days or by the first day of school, whichever is shorter.

Tenured LSMs who have been RIFed shall, upon application and at their option, be granted priority status in serving as a substitute teacher for the District. Those RIFed tenured LSMs with the greatest seniority will receive priority over those with lesser district seniority except in long-term substituting assignments where the RIFed staff member may not be properly licensed and endorsed. Substitute teaching or refusing to substitute teach will not affect recall rights of the LSM.

If an LSM who was RIFed from group 3 or 4 obtains additional licensure and endorsements during the applicable recall period, then, for the purpose of recall to future vacancies, that staff member shall be placed on the recall list for any positions that the staff member is now qualified for. However, the RIFed staff member would not be able to use the newly obtained certification/qualifications to bump a currently employed LSM.

The LSM shall have the responsibility of keeping the District informed of any additional licensure and endorsements. Such additional licensure and endorsements shall not be added to the District Seniority List until verification has been shared with the District by the LSM.

# ARTICLE VII - WORKING CONDITIONS

## A. School Year

LSMs will work according to the school calendar recommended by the Calendar Committee *(See Article XVIII, Section A)* and adopted by the Board.

## B. LSM Workload and Work Day

The Board recognizes the professionalism and commitment of LSMs in educating our students. All full-time LSMs will be on-duty, in the building, for seven (7) periods out of the eight (8) period day (or for an equivalent amount of time for non-classroom LSMs). With the current schedules at Deerfield and Highland Park, that equates to twenty-eight (28) on-duty periods out of thirty-two (32) total periods per typical week.

LSMs are considered "on-duty" when instructing classes, planning for instruction, meeting with students, collaborating with colleagues, attending IEP meetings, calling parents, conducting any business or work associated with their assigned responsibilities, or performing an assigned supervisory assignment.

LSMs will complete supervision duties not to exceed any of the following: two (2) supervision periods per week, no more than one (1) daily, and a maximum of 97 minutes in total.

All LSMs will have one duty-free lunch.

Department chairs will consider LSM requests for the first and/or last period of unscheduled time, in a fair, equitable, and transparent manner, as allowed by the master schedule.

## C. Full-Time Teaching Load

The workload for a full-time teacher consists of:
- Five (5) instructional periods (consisting of five 0.2 FTE courses or four 0.25 courses plus the associated lab work time)
- Two (2) professional duty periods (planning for instruction, meeting with students, attending IEP and other meetings, meetings with supervisors/department chairs, or performing an assigned supervisory assignment)
- One (1) independent work period
- One (1) homeroom
- One (1) duty-free lunch

LSMs who have the following assignments will be exempt from the supervision requirement:
- LSMs assigned to teach an overage or AP science
- LSMs assigned to teach special education
- LSMs with four (4) different course preparations

- LSMs participating in the mentoring program. Mentees and mentors will be exempt from supervisory assignments in year one of the mentoring program; in year two, only mentors will be exempt.
- Non-classroom LSMs as specified in *Article XII: Leadership Stipends and Non-Classroom LSMs*.
- DEA President and Vice President

The DEA and the Building Administration may agree upon additional release from supervisory assignments on a temporary basis when special projects or other circumstances arise.

In the case an LSM's FTE is less than 1.0, as a result of being assigned one or more 0.25 FTE courses, they will be considered to be 1.0 by being assigned additional duties as determined by the Building Principal and Department Chair in consultation with the LSM.

Licensed staff members may be assigned to an early bird schedule. In making such assignments, the administration will consider teacher qualifications, overall caseload/class assignment, and teacher preference. Licensed staff members assigned to an early bird schedule will be given notification of the assignment no later than one week prior to the end of the previous school year. Early bird teachers will not be assigned to teach the period that most frequently falls at the end of the day, unless so requested by the teacher.

### D. Class Size

**Sectioning:**
>The divisors set forth below will be used for initial sectioning purposes.

- Standard, Honors and AP classes = **25**
- Any class that has been de-surveyed within the last four (4) years = **20**
- Interdisciplinary classes = **50** (25 per course)
- Physical Education classes = **35** (including PE leaders)
- Specialty PE classes (e.g., yoga, outdoor education, health) = **25**
- Traffic Safety = **6** per car available at the individual school per semester
- Science Laboratory classes = **24**
- Computer Science and Fine/Applied Arts classes = limited to a maximum room space or number of supplies
- EL (English Language Learners) will be sectioned according to 23 Ill. Adm Code 228.30.
- Band, Orchestra, and Chorale, Theater = according to the activity

1. **Day Ten of Student Attendance / Class Overages:**
   The roster for each class cannot exceed the divisor plus one (1) student *(for example 25+1 in a standard class)* on the tenth (10th) day of student attendance.

   Students moved into the course after the tenth (10th) day of student attendance cannot exceed the initial sectioning divisor plus three (3) students *(for example 25+3 in a standard class)*.

Where a class size exceeds the maximum for more than ten (10) school days per semester, LSMs will be compensated an extra $1000 per class, per semester. No LSM will be assigned more than two (2) classes that are above the maximum class size.

2. **Additional Requirements:**
Where safety, number of workstations, or physical size of the classroom is at issue, the number of students per class will be limited in accordance with these considerations.

When a new class is created, the divisor shall be set at the level which reflects the intended purpose of the instruction and the needs of the students being taught.

## E. Full-Time Non-Classroom LSM Student Assignments

1. **School Counseling:**
The total number of students assigned to school counselors will be consistent with recommendations set forth by the American School Counselor Association, which is 250 students. Should the number of students assigned to a counselor exceed the recommendation by more than 10%, the counselor may set a meeting with the Department Chair to review whether additional support will be needed.

2. **Post-Secondary Counseling:**
The total number of seniors assigned to a post-secondary counselor will be consistent with recommendations set forth by the American School Counselor Association, which is 250 students. Should the number of seniors assigned to a post-secondary counselor exceed the recommendation by more than 10%, the post-secondary counselor may set a meeting with the Department Chair to review whether additional support will be needed.

## F. Homeroom

LSMs shall be provided a script for implementation of any lessons beyond surveys and announcements, and will not be required to create curriculum.

## G. Preparations

A preparation shall be defined as any portion of a teaching assignment that requires planning (course, level, etc.). Homeroom is not considered a preparation. Where it is necessary to assign more than three (3) preparations to an LSM, such assignments shall be reasonable and equitable and in the best interests of the students' and teachers' needs.

## H. Co-teaching and Interdisciplinary Teaching

For LSMs assigned to a co-teaching or interdisciplinary teaching, the District shall make every effort to:
- provide teachers engaged in co-teaching and interdisciplinary teaching a common planning time of at least two (2) periods per week.
- consider co-teacher and interdisciplinary partner requests based on departmental need and identified staff.

### I. Summer Work

1. **Curriculum Planning and Review**
   The DEA and the Board recognize that summer work may be necessary to plan curriculum and provide for quality programming. LSMs may present proposals for summer curriculum work to their Department Chair for approval. The proposal will include the number of hours expected to complete the work, as well as a description of the final product to be created by the working group. Such proposals must be approved in writing by the Department Chair and Building Principal prior to starting the work, and the final product will be presented to the Department Chair. Curriculum planning and review work may also be designated by the Department Chair. All summer work to plan and review curriculum will be paid at the curriculum rate established in *Article XIII, Section E, Extra Duty Compensation,* of this Agreement.

2. **Summer Case Study Evaluations / IEP and 504 Meetings under IDEA and 504**
   In accordance with applicable state/federal law, the District may be required to complete a case study evaluation of a student under the Individuals with Disabilities Education Act or Section 504 of the Rehabilitation Act of 1973 during the summer months. Summer evaluations will be paid at a per diem hourly rate and will be assigned on a voluntary and rotating basis. If there are no volunteers, the District may use outside contractors to complete such evaluations.

### J. Overage (Sixth Assignments)

The Administration may ask an LSM to work an overage in situations where it is difficult to hire a qualified part-time or full-time LSM to take the assignment. Overages will be compensated with additional salary based on the length of the assignment, as a percentage of the individual LSM's per diem rate based on their salary grid placement.

### K. Open House and Graduation

1. **Open House**
   Early in the first semester, LSMs shall be required to attend a two-hour and thirty minute Open House under the following parameters:

   - LSMs are free to leave the building before Open House.
   - The following school day there shall be a late arrival day for students and LSMs.

2. **Graduation**
   All LSMs will attend graduation. Should an LSM have a legitimate conflict with the ceremony date and time, they may be excused from this duty by their building Principal.

   - LSMs are free to leave the building before graduation.
   - The following school day there shall be a late arrival day for students and LSMs.

## L. Learning Management System, Student Information System, and Grading

Grades are to be entered directly into the Learning Management System (LMS) or Student Information System (SIS) selected by the District. The LSM is responsible for syncing of grades from one system to another if they choose to use both systems. Grades shall be updated every two (2) weeks. Semester grading deadlines will be determined by each building's administrative team and shared with teachers well in advance of summative assessment week. There will be adequate time provided at the beginning of each semester to ensure that gradebooks and syncing are configured correctly.

No grade shall be changed without notifying the teacher of the nature and reason(s) for the change. The person who makes the change shall initial the change and shall become responsible thereupon for the revised grade or evaluation.

LSMs shall post their current schedule, course syllabi, and course rules and procedures on their classroom LMS pages. Teachers will not be required to create or maintain any additional website or online class page.

## M. Internal Substitute Teaching

The Administration will continue to make every effort to secure a substitute teacher for all full-day and long-term absences, multiple-period meetings, and professional development training involving large numbers of staff. The purpose of the internal substitution program is to fill unexpected substitute needs that occur throughout the school day and those needs that require less than a full day of service.

Internal substitute teaching will be voluntary. All LSMs interested in serving as an internal substitute will notify the administration of their intent on an annual basis. Building Principals have the discretion to determine who will be assigned to internal subbing.

Due to the unique school code and work requirements of nurses, the District will make all efforts to bring in substitute nurses, so that internal substitute teaching is voluntary for District 113 nurses.

## N. Letters of Recommendation

Licensed staff members may have a conversation with their supervisor to determine reasonable release time to write letters on behalf of their students and may be approved by their supervisor for a half or full-day of professional leave.

## O. New LSM Orientation

The Board may require new LSMs to attend and participate in new LSM orientation shortly before the beginning of the school year. Such orientation will consist of up to two (2) weekdays preceding the day on which the returning faculty report. New LSMs shall be paid a stipend of $250 per day of orientation attended, and shall be paid on or before the last day of August.

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

# ARTICLE VIII - SPECIAL EDUCATION

## A. Special Education - Teaching Assignments

Special Education teaching assignments shall be made after considering the LSM's preparation, preference, experience, current co-teacher(s), as well as the assignments being offered. The duties of an LSM assigned to the roles of case manager, learning strategies teacher, or co-teacher will be set forth in the job descriptions for each role.

LSMs will only be assigned case management duties for students who are placed in their Learning Strategies or Learning Methods class(es). An LSM may be assigned as a case manager for a student in their co-taught class that is not in the LSM's Learning Strategies or Learning Methods class. This will occur if the student is not scheduled for any Learning Strategies or Learning Methods class. Special Education Teachers will fulfill case management responsibilities exclusively for students on their caseloads.

## B. Special Education - Optimal Class Sizes and Caseloads

Special Education class sizes and caseloads will be evaluated in accordance with the District's workload plan, and will not exceed the limitations set forth in 23 Ill. Admin. Code 226.730; however, starting with the 2024-2025 school year, the District will identify optimal class sizes/caseloads boundaries as set forth below for special education classes:

- Learning Methods Only: **14** students per class
- Combined Learning Methods + Learning Strategies: **12** students per class
- Learning Strategies: **10** students per class
- Self-Contained: **8** students per class
- Regular education class co-taught with a Special Education teacher: **8** students with IEPs per class

LSMs assigned as related service providers will have a caseload limited by the number of instructional minutes available for providing services. An LSM related service provider will be assigned instructional minutes (including individual, group, and consult minutes) which do not exceed the number of instructional minutes taught within a 1.0 FTE classroom LSM. Licensed staff members assigned as related service providers who have concerns about their caseload assignment may follow the process set forth in *Section D, Special Education Workload Plan Committee,* below.

Team Leads will be assigned to teaching duties for two (2) periods only. The team lead's caseload will not exceed eight (8) students, not including bridging students who may be assigned.

## C. IEP Meetings, Paperwork, and Summer Evaluations

All LSMs may be required to attend IEP meetings for students assigned to their classes. Every effort will be made to schedule IEP meetings outside an LSM's duty-free lunch period. If

unavoidable, LSM's will be compensated at the internal substitute rate for IEP meetings scheduled during their duty-free lunch period.

Release time for legal paperwork will be considered in the formation of the special education workload plan. LSMs who believe their paperwork responsibilities exceed what is designated by the workload plan may either request additional release time from their department chair or access the process set forth in *Section D, Special Education Workload Plan Committee,* below. Summer evaluations will be paid at a per diem hourly rate and assigned on a voluntary and rotating basis; the District reserves the right to use an outside provider where LSMs are not available to conduct a summer case study evaluation.

## D. Special Education Workload Plan Committee

1. **Special Education Teacher and Related Service Workload Committee**
   There will be an annual Workload Committee meeting to review all areas under 23 Illinois Administrative Code 226.735. The Workload Committee will consist of six (6) administrators, six (6) special education DEA members, and one (1) DEA executive board member serving in an advisory role.

   The committee will work to reach consensus on the workload recommendations. The first meeting will be set no later than October 15th of the year preceding the implementation of the workload plan. Additional meetings will be scheduled as needed. The recommended Special Education Workload Plan will be provided to the Superintendent by January 15th.

2. **Process for Addressing Workload Concerns**
   If a special education LSM has an assignment that exceeds the optimal class sizes set forth above, or other factors of the special education LSM's assignment create an unmanageable workload, the LSM may address their assignment through the following process:
   a. The LSM will schedule a meeting with their Department Chair to present data including class size assignment, caseload, required service minutes, collaboration time, required documentation and recordkeeping, and other factors that support the workload concern.
   b. The Department Chair will review the concern and develop a written document setting forth options and strategies to address the LSMs workload concern. This document will be provided to the LSM within three (3) school days of the meeting. The Building Administrator responsible for Special Education will be copied on this document. If the Department Chair determines that the present assignment is in the best interest of the students and there is no reasonable adjustment that can be made to remedy the workload concern, the LSM will receive a $1000 stipend per semester.
   c. A follow-up meeting will take place no later than ten (10) school days from the initial discussion, to determine if the strategies were effective. If the LSM does not believe their situation has been resolved, the LSM may appeal to the Assistant Superintendent of Student Services.
   d. The Assistant Superintendent of Student Services will issue a determination to the LSM within five (5) school days.

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

c. If the LSM is not satisfied with the determination of the Assistant Superintendent of Student Services, they may grieve the determination up to Step 3 of the Grievance Procedure, as set forth in *Article XVI, Section D, Procedures for Adjustment of a Grievance*.

3249123.1

# ARTICLE IX - PART-TIME LICENSED STAFF MEMBERS

## A. Part-Time LSM Workload

1. **Homeroom** - LSMs with less than 0.6 FTE shall not be assigned a homeroom unless teacher-student ratio requires assignment of part-time staff to such roles; the District will fill such roles with volunteer part-time LSMs prior to making assignments. Part-time LSMs who request a homeroom will be considered for a homeroom assignment.

2. **Collaboration / Building Meetings** - As part-time LSMs are integral to the success of the District's instructional program, they will be required to attend course team /department / staff collaboration meetings proportional to the LSM's part-time teaching load. This assignment will be determined after discussion with their supervisor. Part-time LSMs will be responsible for reviewing minutes of course team meetings, keeping abreast of course team work, and implementing decisions or other initiatives as determined by the course team and department.

3. **Institute / Inservice Days and Required Trainings** - Part-time LSMs will be required to attend all institute/inservice days and complete online trainings required by Illinois law.

4. **Supervision** - LSMs who have an assignment of 0.5 FTE or more will complete a supervision (totaling of a maximum of 97 minutes per week) for one semester only. Part-time LSMs who work less than 0.5 FTE may volunteer for a supervision assignment.

5. **Special Schedules** - It is the intention of the Parties to limit the number of school days with special schedules. However, special schedules will be in place to accommodate SAT/PSAT, pep rallies and all-school assemblies, Focus on the Arts, Open House, Graduation, and final exams. If an event arises that requires a special schedule but is not listed herein, the Principal will meet with the DEA building leadership to determine the schedule to accommodate the event.

   Should a special schedule be required with less than two (2) weeks' notice to part-time LSMs, the part-time LSM will have the option of taking a personal day, which cannot be denied. If working pursuant to a special schedule requires an LSM to exceed their assigned FTE for each semester, the District will compensate for the additional FTE at their per diem rate, using the increments set forth in *Article X, Section A, Sick Leave.*

## B. Salary and Benefits

Part-time employees' salaries will be prorated according to their assigned percentage of full-time employment. Advancement on the salary schedule will proceed according to the fraction of the teaching assignment. Thus, a part-time assignment does not advance the faculty member on the salary schedule until successive part-time assignments equal the equivalent of a full-time assignment (i.e. 10/10ths). Placement on the salary schedule will be determined at the start of each school year and will remain in effect for that school year.

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

Employees who have a part-time assignment of 0.5 FTE or more will receive the same benefits as full-time LSMs.

## C. Leaves

Part-time LSMs will be granted leaves in accordance with the provisions of *Article X, Leaves of Absence*.

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

# ARTICLE X - LEAVES OF ABSENCE

## A. Sick Leave

### 1. Full-Time, Full School Year LSMs
The normal allotment of sick leave days for LSMs who are employed full-time for the full school year is as follows:
   a. Upon hire, thirty (30) days for the first full school year of full-time employment in the District.
   b. 150 days at the start of the second consecutive full school year of full-time employment in the District; however, if the LSM has already completed one full school year of full-time employment in the District before the start of the 2023-2024 school year, 150 days at the start of the 2023-2024 school year.
   c. 15 days at the start of each school year after the school year in which the LSM receives 150 days.
   d. Unused personal leave days converted to sick leave in accordance with *Section D, Personal Leave,* below, in this Agreement.

### 2. Part-Time LSMs
The normal allotment of sick leave days for part-time LSMs (employed for less than 1.0 full-time equivalency ("FTE")) who work a full school year is as follows:
   a. 30 days for the first full school year of employment.
   b. 15 days at the start of each full school year after the school year in which the LSM receives 30 days.
   c. Unused personal leave days converted to sick leave in accordance with *Section D, Personal Leave,* below, in this Agreement.

### 3. Proration of the Normal Allotment
For full-time and part-time LSMs who begin work after the start of the school year or who are contracted to work only for a portion of the school year, the normal allotment of thirty (30) sick days, provided for in *Sections 1 and 2* above, shall be prorated days after the start date to the completion of the school year or, if applicable, the contract end date.

### 4. Accrual, Accumulation and Use
   a. The sequence of benefits, provided for in *Sections 1 and 2* above, will not start until the first full school year of employment.
   b. All sick leave days accrue in full, and are immediately available for use, as of the start of the applicable school year, or, if later, as of the work start date.
   c. All sick leave days accumulate without limit.
   d. All sick leave days are subject to reduction to the extent the Illinois Teachers' Retirement System's three-part test is applicable in the school year for which the days are granted.
   e. Sick leave may be taken in whole-day, half-day (3.5 hours, 8:00–11:30 or 11:30-3:00) or one-quarter day (less than 2 hours) increments.
   f. Sick leave may be used for the reasons set forth in the sick leave provisions of the Illinois School Code.

3249123.1

All sick days outside the normal allotment may be subject to reduction to the extent the Illinois Teachers' Retirement System's three-part test is applicable in the school year for which the days are granted.

## B. Temporary Illness or Temporary Incapacity - Tenured Teachers

Board Policy 5-180: A temporary illness or temporary incapacity is an illness or other capacity of ill-being that renders an employee physically or mentally unable to perform assigned duties. During such a period, the employee must use accumulated sick leave benefits and any leave benefits available under the Family and Medical Leave Act (FMLA). However, income received from other sources (worker's compensation, District-paid insurance programs, etc.) will be deducted from the District's compensation liability to the employee. The Board's intent is that in no case will the employee, who is temporarily disabled, receive more than 100 percent of his or her gross salary. Those insurance plans privately purchased by the employee and to which the District does not contribute, are not applicable to this policy.

Any employee who is absent because of illness, disability, or incapacity, shall be deemed temporarily disabled for up to 90 consecutive work days, 90 out of 180 work days from the same illness or incapacity, as calculated from the employee's first day of absence, and will be granted a leave of absence for the period of temporary disability. This temporary disability leave time shall run concurrently with the employee's use of any accumulated sick days and FMLA time, if eligible.

If illness, incapacity, or any other condition causes an employee to be absent, after exhaustion of all available leave, for more than 90 consecutive work days, 90 out of 180 work days from the same illness, such absence may be considered a permanent disability and the Board may act to terminate the employee subject to state and federal law, including the Americans with Disabilities Act. Time periods under this policy are computed at the start of each new school year. However, if an employee remains ill or incapacitated at the start of a new school year from the same or a related condition that caused the employee to be absent the previous school year, then the time period will not be computed anew but will be continued from the previous school year. The Board, in its sole discretion, may grant an employee whose temporary disability period has expired an extended leave of absence. The Superintendent may recommend this paragraph's use when circumstances strongly suggest that the employee returned to work intermittently in order to avoid this paragraph's application. This paragraph shall not be considered a limitation on the Board's authority to take any action concerning an employee that is authorized by state and federal law.

Any employee may be required to have an examination, at the District's expense, by a physician who is licensed in Illinois to practice medicine and surgery in all its branches, a licensed advanced practice registered nurse, or a licensed physician assistant if the examination is job-related and consistent with business necessity.

LEGAL REF.: 42 U.S.C. §12101 et seq., Americans with Disabilities Act

## C. Religious Leave

LSMs will be granted up to two (2) days of paid leave for observance of a religious holiday, upon approval from their Building Principal. These days shall not accumulate from year to year, and will not be converted to sick or other leave days. LSM's who wish to take additional leave for religious observances may utilize their personal leave days for this purpose. The restrictions applicable to use of personal leave shall not apply to leaves for religious observance.

## D. Personal Leave

All LSMs shall receive three (3) personal days. If an LSM coaches a District 113 sport or sponsors a District 113 activity, they shall receive a fourth personal day. If three (3) consecutive personal days are requested or if any personal days precede or follow holiday or break periods, then prior approval from the Principal is required. In the event that the Principal denies the approval, the LSM may appeal the decision to the Chief Human Resources Officer. LSMs may not take four (4) consecutive personal days. Personal days must be used during the work year in which they were received and any days unused by the end of the work year shall convert into accumulated sick leave. Personal leave must be approved in advance by the Department Chair. Personal leave days may be taken in whole day, half day, or quarter day increments, which shall be defined as set forth in *Article X, Section A, Sick Leave*.

## E. Parental Leave

1. **Paid Leave for Birth/Adoption/Foster Care Placement**
   LSMs will be granted thirty (30) days of paid leave upon the birth or adoption of a child, or placement of a child from foster care. This leave will be granted to the LSM for this purpose and will not be deducted from accumulated paid sick leave days, provided that the LSM returns to full-time or part-time employment in accordance with the provisions of this Agreement. Leave may be used for up to thirty (30) working school days, which may be used at any time within the twelve (12) month period following the birth or placement of the child. The use of these days will not be diminished because of any intervening period of non-working days or because school is not in session (e.g., winter, summer break).

2. **Additional Paid Parental Leave for LSMs with at Least One Year of Service**
   In addition to the thirty (30) days of paid leave provided for in *Paid Leave for Birth/Adoption/Foster Care Placement,* above, in this Agreement, LSMs who have completed one-year of full-time service are eligible for an additional thirty (30) days of paid parental leave. Parental leave will not be deducted from accumulated sick leave, provided that the LSM returns to full or part-time employment in accordance with the terms set forth in this Agreement. Paid parental leave must be taken immediately after the LSM's paid leave under the birth/adoption/foster care provision ends. Leave will be utilized for working school days and will not be diminished for holidays and breaks within the school year, however, paid parental leave will not exceed beyond the school year in which it commences.

3. **Unpaid Parental Leave** - After paid parental leave has been exhausted, full-time LSMs who have completed at least one year of probationary service may access an additional twelve (12) weeks of unpaid leave in accordance with the Family and Medical Leave Act. Such leave will not be diminished for holidays and breaks in the school calendar, and may be taken any time within twelve (12) months of the birth/adoption/foster care placement.

After the twelve (12) weeks of unpaid leave set forth above is exhausted, tenured LSMs may elect to take additional unpaid leave until the end of the school year during which the birth/adoption/foster care placement occurred.

Tenured LSMs may request an additional year of unpaid parental leave, to be taken in the school year subsequent to the birth/adoption/foster care placement. Such leave must be requested in writing to the Chief Human Resources Officer, or their designee, no later than January 15th of the year preceding the leave and will be granted at the discretion of the Board based on the staffing needs of the District. LSMs who are granted such leave will maintain their place on the District's seniority list.

LSMs on unpaid leave during the year of the birth/adoption/foster care placement may continue to receive health insurance benefits under the District's plan provided the LSM continues payment of the employee contribution to the insurance premium cost. LSMs who are granted an additional year of unpaid parental leave may continue benefits under the District's insurance plan provided that they pay the full cost (employee and Board portion) of the premium.

LSMs who are granted unpaid leave in the year after the birth/adoption must notify in writing the Chief Human Resources Officer, or their designee, of their intent to return to full-time or part-time teaching by January 15th of the year in which the leave is taken.

4. **Part-Time Status in the Year Following Parental Leave**
Full-time, tenured LSMs who wish to go on part-time status in the year following the birth/adoption/foster care placement will be granted such status upon written request to the Chief Human Resources Officer, or designee by January 15th in the year preceding the planned part-time service. LSMs granted such status will maintain their tenure status.

Tenured LSMs may request an additional year of part-time status. Requests to continue part-time status must be submitted in writing to the Chief Human Resources Officer, or their designee, no later than January 15th, will be granted at the discretion of the Board based on the staffing needs of the District. LSMs who are granted such leave will maintain their tenure and accrue seniority.

## F. Grandchild Leave

Tenured LSMs shall receive up to two (2) days of paid leave for the birth of a grandchild, upon notification of the birth/adoption.

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

## G. FMLA Leave

Eligible employees may access unpaid leave in accordance with the Family and Medical Leave Act, which entitles eligible employees to twelve (12) weeks of leave in a 12-month period for birth, adoption, care for a newly born or placed child, care for a spouse, child or parent with a serious health condition, care for the employee's serious health condition, or qualifying exigency arising out of the fact that the employee's spouse, son, daughter, or parent is a covered military member or on "covered active duty", as defined by the FMLA. Further information regarding leave benefits under the FMLA may be accessed in Board Policy 5-185, Family and Medical Leave Act, and on the U.S. Department of Labor's website https://www.dol.gov/agencies/whd/fmla.

## H. Unpaid Leaves of Absence

1. **Full-Time** - The Board may, in its discretion and based on the needs and circumstances of the District, grant full-time unpaid leaves of absence of up to one (1) year to tenured LSMs for the following reasons:

   a. Sabbatical Leave, pursuant to Illinois School Code Section 5/24-6.1 and Board Policy 5-250.
   b. Extended illness of the LSM or an immediate family member for which other applicable leave is exhausted or unavailable.

   Tenured LSMs requesting a full-time unpaid leave of absence must submit such requests to the Chief Human Resources Officer, or designee, no later than January 15th in the year preceding the anticipated leave, with a statement indicating the reason for the leave.

   Tenured LSMs who are granted a full-time unpaid leave of absence must provide written notice of their intent to return to full-time or part-time service to the Chief Human Resources Officer, or designee, by January 15th of the year preceding the return. LSMs who return from an approved leave of absence will be placed in a position similar to the one formerly occupied, to the greatest extent possible, however, the District may consider the LSMs licensure and past teaching experience in making such assignments.

   Tenured LSMs returning to service will be placed on the same step of the salary schedule they were on prior to the leave of absence.

2. **Part-Time** - The Board may, in its discretion, grant up to one year of part-time status to a tenured LSM, for personal reasons outside of the part-time parental leave granted above.

   Tenured LSMs requesting part-time status must submit such requests to the Chief Human Resources Officer, or designee, no later than January 15th in the year preceding the anticipated part-time employment, with a statement indicating the reason for the leave and the requested part-time assignment based on full-time equivalency (e.g., 0.8 FTE).

   LSMs who are granted part-time status must provide written notice of their intent to return to full-time service to the Chief Human Resources Officer, or designee, by January 15th of the year preceding the return to full-time service.

3249123.1

LSMs on part-time status who work 0.5 FTE or more will be provided access to health insurance and other benefits available to full-time LSMs.

LSMs using part-time leave of absence will be moved on the salary schedule in the same manner as LSMs completing a full year of service, and will accrue seniority based on their actual service.

## I. Procedures for LSMs Granted Part-Time Status

Pursuant to Board Policy 5-250, these procedures provide guidance for full-time tenured LSMs who request part-time employment but anticipate returning to full-time status at some future point.

1. All leaves are at the recommendation of the Superintendent or designee with ratification by the Board. The District retains the right to approve or deny applications for part-time leaves based on the best interests of the District.

2. Part-time leaves may be granted for professional advancement, research, study, travel, extended illness, or for other reasons as approved by the Board.

3. Licensed staff members may request up to two consecutive, one-year, part-time leaves of absence and return to a full-time position without losing their tenure status. A request for such a leave must be made by January 15th in the year preceding the anticipated leave of absence. The Board will notify LSMs of its decision by April 30th.

4. A part-time leave may be extended beyond two years without the staff member losing tenured status. An LSM applies for this extension by January 15th in the year preceding the anticipated leave of absence. The Board will notify the LSM of its decision by April 30th.
   a. If a part-time leave extension is not granted to an LSM, the staff member may either a) choose to return to a full-time position or b) voluntarily resign from employment with the District, thus terminating the employment relationship, and then subsequently reapply for a non-tenured part-time position.
   b. If the non-tenured part-time LSM returns to a full-time position at a later date, the LSM will begin the LSM's full-time position as a first-year non-tenured LSM and will be subject to the terms and conditions of employment accordingly.

5. Licensed staff members who have been granted part-time leave extensions and who have remained part-time beyond two years with a leave extension may request a return to a full-time position by January 15th in the year preceding the anticipated return to a full-time position. Staff members may only return to full-time status when a full-time position is available. The part-time tenured staff member retains tenured status until such a full-time position becomes available.

6. When requesting part-time leaves, LSMs may request a specific amount of Full-time Equivalency (FTE) to constitute a leave, but there is no guarantee that a specific FTE request will be granted. The Board reserves the right to make final decisions regarding allocation of part-time FTE. Requests for leaves must be submitted in writing no later than

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

January 15th. No changes in the submitted request will be allowed, nor can the leave requests be withdrawn after the January deadline unless approved by the Superintendent or designee.

7. Part-time LSMs who continue to work at least 0.5 FTE will receive full insurance and other benefits.

8. In cases where LSMs wish to return to full-time work prior to the expiration of their leave, upon their written request, the leave of absence may be terminated by the Board at its discretion.

9. Licensed staff members returning from a part-time leave (one or two years):
   a. Will provide written notice of their intent to return to full-time work no later than January 15th.
   b. Will be placed in a position substantially equivalent to that formerly occupied, to the greatest extent possible.
   c. Will be given the appropriate base salary predicated on the partial step movement that occurs during the part-time leave. The partial step movement is based on the amount of FTE the LSM is assigned when on part-time leave (0.5 FTE moves 1/2 step per year). Lane placement is determined based on degree status upon return to full-time work.

      i. ***Example***: In year 1, an employee is at step 5 and works 1.0 FTE. In year 2, the employee moves to step 6, but begins a part-time leave and works at 0.6 FTE, receiving a prorated amount of step 6 based upon the employee's 0.6 FTE. In year 3, the employee moves to step 6.6 and continues the part-time leave at 0.6 FTE, receiving a prorated amount of step 6.6 based upon the employee's 0.6 FTE. In year 4, the employee moves to step 7.2 and resumes employment in a 1.0 FTE position, receiving 100% of step 7.2.

10. After returning to full-time status for one full academic year, the LSM may again apply for part-time leave.

11. There is no limit to the number of times an LSM can apply for part-time leave.

12. Licensed staff members on leave of absence may continue to earn professional development credit in accordance with *Article XI, Section C, PARC Funds.*

13. The Superintendent, when it is deemed suitable, may request the Board to grant exceptions to the above conditions of this policy based upon special or exigent circumstances.

## J. Catastrophic Leave

In the case of a catastrophic event in the life of an LSM that causes the LSM to be absent from work and does not otherwise qualify the LSM for any sort of paid leave (including personal leave), such as significant destruction of property (defined as making said property uninhabitable) due to natural disaster (tornado, fire, flood, etc.). Upon approval by the Board and the Association,

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

absences for catastrophic leave are authorized without loss of pay up to fifteen (15) days. The LSM may also opt to convert up to fifteen (15) additional sick days to personal days to tend to the catastrophic event.

## K. Bereavement

LSMs may access up to five (5) days of paid bereavement leave, which will not be deducted from accumulated sick leave, for the death of a parent, spouse, partner, sibling, child, grandparent, grandchild, parents-in law, sisters-in-law, brothers-in-law, children-in law, aunts, uncles, and legal guardians. Extensions may be granted by the Chief Human Resources Officer in cases of special need. Such days will expire at the end of each school year and will not accumulate.

An LSM can use up to two (2) bereavement days per school year for bereavement leave for someone other than the immediate family, as referenced above, with approval by the supervisor. Any requests beyond must be approved by the Chief Human Resources Officer. LSMs can also use a bereavement day to attend a current student's funeral. Such days will expire at the end of each school year and will not accumulate.

## L. Jury Duty

LSMs will be provided paid leave days when summoned to serve on a jury.

3249123.1

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

# ARTICLE XI – SALARY AND BENEFITS

## A. Salary

### 1. Salary Schedule

The Salary Schedules shall be as set forth in *Appendices A - C* of this Agreement. Each year of this Agreement will include an increase to the schedule as set forth immediately below. The "raise to the base" shall be applied to steps 1 to 24. Steps 25 through 28 will be increased pursuant to *Part d, Longevity Pay,* below.

| 2023-2024 | 2024-2025 | 2025-2026 |
|---|---|---|
| 4.34% raise to base | 3.9% raise to base | 2023 CPI*<br>(3% floor, 5% ceiling) |

*\*CPI defined as December 2023 CPI% (This is December-to-December % change in the national Consumer Price Index (CPI) for all items and all urban consumers published by the United States Bureau of Labor Statistics in January of each year).*

### 2. Salary Payments

LSMs will be paid their total salary over twelve (12) equal monthly payments starting mid-September.

### 3. Salary Schedule Placement

#### a. New Hires

Salary schedule years of experience credit for LSMs hired during the term of this Agreement will be limited to twelve (12) years (i.e. new teachers will begin no higher than Step 12). Exceptions may be made, but only based on need and with the approval of the Superintendent.

#### b. Adjustments

Current LSMs hired between July 2011 and June 2019 will have their step placement adjusted, pursuant to *Addendum A* of this agreement.

#### c. Advancement

An LSM who has earned the right to move to a higher salary lane by additional professional training shall be placed at the higher salary level at the beginning of the next contract year. Refer to *Section C, PARC Funds* below.

3249123.1

**d. Longevity Pay**

For 2023-24, steps 25 through 28 shall be calculated as follows:

Step 25 will be $1250 more than Step 24
Step 26 will be $1250 more than Step 25
Step 27 will be $1250 more than Step 26
Step 28 will be $1250 more than Step 27

For 2024-25 and 2025-26, steps 25 through 28 shall be calculated as follows:

Step 25 will be $1500 more than Step 24
Step 26 will be $1500 more than Step 25
Step 27 will be $1500 more than Step 26
Step 28 will be $1500 more than Step 27

## B. Additional Compensation / Benefits

**1. Medicare Contributions**

The Board pays each LSM's Medicare premium of 1.45% on the base salary. These are not creditable earnings for TRS.

**2. PhD Stipend**

Licensed staff members who possess a PhD or equivalent degree shall receive a $1,000 annual stipend in addition to their base salary.

**3. Compensation for an Overage (Sixth Assignments)**

The Administration may ask an LSM to work an overage in situations where it is difficult to hire a qualified part-time or full-time LSM to take the assignment. Overages will be compensated with additional salary based on the length of the assignment, as a percentage of the individual LSM's per diem rate based on their salary grid placement.

**4. Internal Substitutes**

LSMs who substitute for another LSM shall be paid in accordance with the following rates:
- One period equal to or less than 50 minutes: **$60.00**
- One period greater than 50 minutes: **$80.00**

**5. Homebound Tutors**

The hourly rate for homebound tutors is **$54.00** per hour.

**6. Summer Workshops**

The hourly rate for summer workshops is **$50.00** per hour.

**7. LSM License Renewal Fees**

The Board shall pay the cost of LSM license renewals for a 5-year renewal period.

**8. Tax-Sheltered Annuity**

The Board shall maintain current offerings of 403(b) and 457 plans, and add Roth versions of each.

9. **Benefit for TRS Tier 2 Participants**
Upon the attainment of tenure, the District will match 403(b)/457 contributions for TRS Tier 2 LSMs up to $500 for the 2023-2024 school year, and $750 for the 2024-2025 and 2025-2026 school years. Part-time TRS Tier 2 LSMs are eligible for a prorated match based on their FTE.

## C. PARC (Professional Advancement Review Committee) Funds

1. **Purpose and Eligibility**
Funds will be provided to LSMs in order to advance professional learning with the goal of increasing student achievement.

To qualify for reimbursement and changes, the following criteria must be met:

   a. **For college/university credits:**
   - Courses must be offered by an accredited college/university;
   - Courses must be at the graduate level;
   - Courses must be in the LSM's content area or in an area which will enhance pedagogical practices;
   - The grade earned in the course must be a "B" or above.

   Other courses, including undergraduate courses and graduate level courses outside the LSM's content area, may be approved by the Building Principal or designee, with the written request for approval submitted to the principal/designee at least fifteen (15) school business days prior to a course's start date.

   b. **For other professional development:**
   LSMs may also use professional development funds to attend educational conferences and workshops. To be eligible for reimbursement, such conferences/workshops must advance the professional learning of the LSM as related to their assigned job duties and must be approved at least fifteen (15) school business days in advance of the conference/workshop by the Building Principal or designee, using the workshop/conference approval form.

2. **Professional Development Funding**
The Board will help defray an LSM's professional advancement expenses. Licensed staff members are eligible for reimbursement following documented completion of their activities. Over the duration of this three-year Agreement, LSMs will receive the following reimbursement funds based on their lane placement. There will be no rollover of PARC funds from the previous Agreement.

| BA, BA+15 | $5,000 |
| MA+0/15/30/45 | $3,500 |
| MA+60 | $2,750 |

If an LSM voluntarily leaves the district for other employment within one (1) year of receiving tuition reimbursement, they shall pay the district back for that tuition expense.

Additional tuition reimbursement in the amount of $1,500 may be granted, upon approval of the Superintendent or designee, for course work expenses in which a separate residence or travel outside of the continental United States is necessary to complete the course work.

3. **Lane Changes**

Newly hired LSMs will be placed on a lane commensurate with their level of educational attainment. A lane change refers to an LSM's lane adjustment based on accrual of graduate and other credits. Lane changes do not have to be completed within a defined time frame.

Additionally, in order to honor a lane or degree change during the current school year, evidence of payment and completion for any coursework (e.g. copy of unofficial transcript or grade report) or professional development taken must be submitted by September 1st to receive lane change credit for the entire school year; LSMs may also submit evidence of payment and completion after September 1st but before October 31st in order to receive lane change credit for the period of November 15th through the end of the school year. Lane changes are granted based on an LSM's accrual of academic credit or experience credits "E-credits" as described below.

For the 2023-2024 school year only, LSMs must submit evidence of lane change credit by October 31st.

Experience Credits "E-credits" may include the following:

| Activity | Hours Required | Evidence required |
|---|---|---|
| **Creation/Revision of Curricular Content** (Available for writing course curriculum for newly approved courses; curriculum redevelopment (under DC supervision); or College Board directed AP revision). | A minimum of thirty hours. | Curriculum documents developed. Verification of participation by Chair. |

| | | |
|---|---|---|
| **Participation/attendance at District-sponsored Professional Development Course/Workshop** District workshops which are offered with the same title but which include significantly different or updated content will be credited each time the workshop is completed. | A minimum of thirty hours including seat time and "logged" time. | Successful completion of course (and log) as determined by the instructor. |
| **Other Activities** Publication of a professional article, with a maximum of three articles counted per lane. Extended inquiry project as pre-approved by Building Principal or designee. | A minimum of thirty hours per credit. Publications may include books, articles, prints, musical scores or performances, choreography, engravings, drawings, and computer programs. No honorarium may be received. | Activities to be determined by the LSM and Chair. Proposal must be approved by the Building Principal or designee. |

Credits for lane changes will be granted as follows:
- BA to BA15 – 15 hours of graduate credits toward a masters' degree.
- BA 15 to MA – award of masters degree.
- MA to MA 15, MA15 to MA30, MA 30 to MA 45, and MA 45 to MA 60 – a total of 15 hours of credit, with minimum 8 hours of graduate level coursework or other coursework pre-approved by Building Principal or designee and the remaining balance of either academic credits pre-approved by Building Principal or designee or E-credits.
- MA 60 to Ph.D. or equivalent – award of Ph.D or equivalent.

## D. Summer School

### Summer School LSM (except Science)

| | | |
|---|---|---|
| Summer 2024 | $3,876/semester course | $7,752/full-year course |
| Summer 2025 | $4,027/semester course | $8,054/full-year course |
| Summer 2026 | (12.47% of 2025-2026 BA, Step 1) | |

### Summer School Science LSM (additional 9.5% for longer day/lab requirements)

| | | |
|---|---|---|
| Summer 2024 | $4,244/semester course | $8,488/full-year course |
| Summer 2025 | $4,410/semester course | $8,820/full-year course |
| Summer 2026 | (12.47% of 2025-2026 BA, Step 1 + 9.5%) | |

### Summer School Dean - $1,000 per week

**Summer School Nurse -** Per Diem hourly rate based on current salary for providing nursing services for summer school students.

## E. Creditable Earnings

The Parties hereby agree that the District and DEA makes no representations regarding the creditable earnings status with respect to any compensation received by LSMs pursuant to the terms of this Agreement. Any and all determinations regarding creditable earnings, creditable service and related TRS issues shall be made by TRS and, where applicable, a court of competent jurisdiction.

# ARTICLE XII - LEADERSHIP STIPENDS AND NON-CLASSROOM LSMs

It is understood that any LSM who meets regularly with administration shall not have the authority to make agreements on behalf of DEA unless they have been explicitly authorized by the DEA President or their designee to serve as a representative for that purpose. Notice of proposed changes to LSM working conditions must follow the notice requirements in *Article II, Section I, Association's Right to Information.*

## A. Dean of Students

A Dean is a (10) ten-month employee. A Dean shall receive four (4) personal days a year and a stipend of 17.5% of the LSM's base salary to cover their additional leadership responsibilities. Such responsibilities often extend beyond the school day, and include, but are not limited to:

- Seven (7) additional work days, including five (5) days of work prior to the start of the school year, and two (2) flex days, to be assigned by the building principal;
- Supervision of activities outside of regular school hours;
- Participation in building committees will be limited to committees that concern the supervision and discipline of students, or management/supervision of building security and/or student well-being and safety. Deans will also participate in building administration meetings (BAM/AC) or any subsequent version of these committees.

1. **Supervisory Duties:**
   a. Deans shall supervise all home varsity football games, all home varsity boys basketball games, the homecoming dance, prom, graduation, and the Deerfield boat party. In addition, Deans from both high schools will attend DHS vs HPHS varsity football and basketball games regardless of where the games are played. Deans may be asked to attend up to one additional after school event at the discretion of their building principal.
   b. Deans may be assigned to supervise the following on a rotating basis: home and away athletic events, concerts, plays, and other events deemed necessary by Administration. For away events, Deans will receive mileage reimbursement.
   c. Deans will not be in charge of LSM supervision schedules.

2. **Additional Compensation:** Additional hours worked beyond the above seven (7) additional days shall be paid at their per diem hourly rate.

## B. Director of Instructional Technology

A Director of Instructional Technology is a (10) ten-month employee. They shall receive a stipend of 13% of the LSM's base salary to cover the scope of their work, which includes teaching one (1) year-long course, five (5) days of work prior to the start of the school year, support to onboard new staff during orientation, and coordinating the maker space in each building. Participation in building committees will be limited to meetings that include a specific agenda item regarding instructional technology.

## C. Nurse

A Nurse is a (10) ten-month employee and is not required to work additional days before the start of the school year.

1. **Additional Compensation / Reimbursement:**
   a. Summer work, such as review of physicals and other records outside of the hours when the summer school nurse is on duty, is paid at the $50 per hour summer workshop rate.
   b. Summer IEP/504 evaluations are paid at a per diem hourly rate.
   c. The District will pay 100% for license renewal fees, conferences/workshops required for the maintenance of their license to work in the school setting, vision and hearing recertification, and CPR recertification. The aforementioned recertification workshops or hours may not apply towards A or E credits, or towards a lane change.

## D. School Psychologist

A School Psychologist is a (10) ten-month employee. A School Psychologist will be paid at their per diem hourly rate for summer work related to job responsibilities/duties.

1. **Supervisory Duties:** School Psychologists will be assigned a supervision related to their role at the discretion of the principal under the same terms as supervisory assignments given to other LSMs. *(See Article VI, Working Conditions, Section C).*

2. **Additional Compensation / Reimbursement:**
   a. When a psychologist must stay beyond the hours of the school day to attend to a student crisis, the psychologist shall be paid at their per diem hourly rate.
   b. Summer IEP/504 evaluations are paid at a per diem hourly rate.
   c. The District will pay 100% for license renewal fees and conferences/workshops required for the maintenance of their license to work in the school setting. The aforementioned recertification workshops or hours may not apply towards A or E credits, or towards a lane change.

## E. Social Worker

A Social Worker is a (10) ten-month employee.

1. **Supervisory Duties:** Social Workers will be assigned a supervision related to their role at the discretion of the principal under the same terms as supervisory assignments given to other LSMs. *(See Article VI, Working Conditions, Section C).*

2. **Additional Compensation / Reimbursement:**
   a. When a social worker must stay beyond the hours of the school day to attend to a student crisis, the social worker shall be paid at their per diem hourly rate.
   b. Social workers will be paid at their per diem hourly rate for summer work related to scheduling social work service minutes and/or case assignments.

    c.  Summer IEP/504 evaluations are paid at a per diem hourly rate.
    d.  The District will pay 100% for license renewal fees and conference/workshops required for the maintenance of their license to work in the school setting. The aforementioned recertification workshops or hours may not apply towards A or E credits, or towards a lane change.

## F. Speech Pathologist

A Speech Pathologist is a (10) ten-month employee.

1. **Supervisory Duties:** Speech Pathologists will be assigned a supervision related to their role at the discretion of the principal under the same terms as supervisory assignments given to other LSMs. *(See Article VI, Working Conditions, Section C).*

2. **Additional Compensation / Reimbursement:**
    a.  Summer evaluations are paid at a per diem hourly rate.
    b.  The District will pay 100% for license renewal fees and conference/workshops required for the maintenance of their license to work in the school setting. The aforementioned recertification workshops or hours may not apply towards A or E credits, or towards a lane change.

## G. 504 Coordinator

A 504 Coordinator is a (10) ten-month employee. The 504 Coordinator shall receive a stipend of 13% of the LSM's base salary to cover five (5) additional days at the beginning of the school year and their additional responsibilities.

1. **Supervisory Duties:** A 504 Coordinator will not be assigned a supervision.

2. **Additional Compensation / Reimbursement:**
    a.  Summer 504 evaluations are paid at a per diem hourly rate.
    b.  If approved by the building principal or designee, a 504 Coordinator will be paid for summer work at a per diem hourly rate.

## H. Special Education Team Lead

Special Education Team Leads are (10) ten-month employees. The Special Education Team Leads shall receive a stipend of 3% of their base salary to cover the additional responsibilities associated with leading IEP meetings.

1. **Supervisory Duties**: The Special Education Team Leads will not be assigned a supervision.
2. **Additional Compensation/Reimbursement:**
    a.  Summer IDEA evaluations are paid at the per diem hourly rate.
    b.  If other work is assigned by the building principal or other special education supervisor, the Special Education Team Lead will be paid at the per diem hourly rate.

## I. Counselor

A Counselor shall receive their per diem hourly rate to cover a total of an additional six (6) days of work. Additional summer hours will be paid at their per diem hourly rate.

## J. District Outplacement Coordinator

The District Outplacement Coordinator is a (10) ten-month employee who serves as the District's liaison for students who are placed in separate special education programs/schools. The District Outplacement Coordinator shall be placed on the appropriate lane and step as determined by their educational attainment and years of experience, and will receive the per diem rate for each day worked outside of the established LSM work calendar, as approved by the Assistant Superintendent of Student Services or designee.

# ARTICLE XIII - ATHLETICS, ACTIVITIES, AND EXTRA DUTIES

## A. Athletics and Activities

The Board sponsors a variety of extracurricular activities for students, including athletics and student clubs. Student clubs must be supervised by an LSM or other District employee as approved by the Student Activities Director and the School Principal per Board Policy 6-190. In regard to athletic coaching positions, members of the bargaining unit will be given priority consideration, however, the Athletic Director retains the discretion to recommend outside candidates for such positions.

Coaching and activity sponsorship appointments are made on an annual basis by the Administration. Coaching and activity sponsorship assignments are not licensed positions and are not subject to tenure, position on the sequence of honorable dismissal list, or seniority. Paid chaperoning and extra-duty assignments are subject to annual approval by the building principal or designee.

Payment of the stipend amount to coaches and sponsors will be prorated to the time worked. For example, a coach who works 100% of the athletic season will be paid 100% of the stipend; a coach who takes a leave of absence, and only works 75% of the season, will receive 75% of the stipend. In the event an LSM takes a leave of absence, it will be up to the Athletic Director and/or the Activities Director to determine how the vacant position will be filled and the stipend will be allocated or reallocated.

## B. Stipend Review Advisory Committee (SRAC)

1. A Stipend Review Advisory Committee (SRAC) will be established consisting of an equal number of representatives from the DEA and from the Administration. The purpose of the committee will be to review existing stipends and advise the Superintendent and Athletic and Activities Directors on the number of stipends, the category in which the stipended position is placed, discontinuation of existing stipends, and/or addition of new stipends. The SRAC will consider length of season, number of contests, and preparation time to determine category placement. To determine the number of coaches/activity sponsors assigned to a sport/activity, the SRAC will consider the nature of the sport/activity and the number of student participants.

2. During the 2023-2024 school year, the SRAC will develop a process for students and school staff members to propose additional stipends for activities and athletics, which will be posted on the District's website and available for use by February 1, 2024.

   Thereafter, the SRAC shall convene each school year no later than September 30th to review and evaluate stipends for all existing activities and sports. The SRAC will recommend changes to existing stipends, including category placement, discontinuation, and addition of new or additional stipends, to the Superintendent and to DEA leadership no later than February 15th. The Superintendent will review the recommendations of the SRAC and may amend such recommendations, after consultation with the SRAC, upon

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

determination that the SRAC's initial recommendation does not align with the criteria set forth above. The Superintendent will notify all employees eligible to fill a stipend position of any changes in stipends no later than April 15th of the school year prior to the change taking place.

## C. Stipends

Athletic and Activity stipends fall within the categories set forth in *Appendices D - F* of this Agreement.

1. **Category Placement**: Changes in the category placement of any athletic or activity stipend, as well as placement of any new stipends, will be determined by the parameters established in *Section B, Stipend Review Advisory Committee (SRAC)*, above.

2. **Personal Day**: As stated in *Article X, Section D, Personal Leave*, coaches and activity sponsors receive an additional personal day during each year that they coach/sponsor (maximum one (1) per person).

3. **Playoff Compensation:** The paid coaching staff of any athletic team or activity that extends their season by advancing beyond the first round of the state/playoff competition series will be paid an extra stipend. Coaches and activity sponsors who advance will be paid as follows.*

   | | |
   |---|---|
   | Head Coach: | $300 per week |
   | Assistant Coach(es): | $200 per week |
   | Activity Sponsor: | $300 per week by which the season is extended |

The Athletic Director has the discretion to approve the number of assistant coaches who will advance with the head coach.

*Because not all football teams qualify for the state competition, the football coaches will be paid for the first round and any subsequent rounds of the state competition.*

4. **Regulations for Lane Placement:**
   a. Newly hired coaches/sponsors shall be placed up to step three (3) on the stipend grid for previous non-District 113 experience coaching/sponsoring the same activity for which they were hired. This may include coaching experience at a professional, collegiate, other high schools, or club level. When hiring a head coach, the Athletic Director with approval of the Superintendent, will have the discretion to exceed this placement to hire qualified candidates.

   b. Any District 113 coach/sponsor who adds and/or transfers coaching assignments to another District 113 sport/activity will be granted up to three (3) years of credit for prior District 113 coaching/sponsor experience.

      i. ***Example 1***: Coach A will be at step 6 as an assistant swimming coach for next year. They are offered the head coaching position for water polo for next year.

They will receive credit for completing three (3) years prior District 113 coaching experience because they changed sports; thus, they will begin as a head coach on step 4 next year.

ii.  **Example 2**: Coach B will be at step 3 as a head tennis coach for next year. They are offered the head coaching position for softball. This individual will stay at step 3 because any coach not yet to step 3 will not have to slide back when making a change.

iii.  **Example 3**: Sponsor C has been in charge of the Chess Club for 20 years. They are at the maximum on the scale. If they decide to take on a new activity next year, they will receive credit for completing 3 years' prior District 113 activity sponsor experience because they changed activities; thus, they will begin as an activity sponsor on step 4 next year.

iv.  **Example 4**: Sponsor D will be at step 3 as a newspaper sponsor for next year. They are offered the sponsor position for model UN. This individual will stay at step 3 because any sponsor not yet to step 3 will not have to slide back when making a change.

c.  Full credit for District 113 assistant coaching/sponsoring experience will be granted if the LSM becomes head coach of the same sport/activity.

i.  **Example 1**: Coach E will be at step 5 as an assistant baseball coach for next year. They are offered the head coaching position for baseball. This person will stay at step 5 for next year as a head coach because they remained in the same sport.

ii.  **Example 2**: Sponsor F will be at step 5 as an assistant robotics sponsor for next year. They are offered the head sponsor position for robotics. This person will stay at step 5 for next year as a head sponsor because they have remained in the same activity.

5. **Placement of LSMs Returning to Coaching / Sponsorship**

All LSMs who have held a coaching/sponsor position in District 113 during their term of employment as an LSM in the District will be placed on the salary grid to reflect total years of past service. Upon returning to a coaching/sponsorship position in the same sport or activity, an LSM must work with the District to ensure placement is correct before signing their contract.

- **Example 1:** Coach G coached football for 8 years, starting in the 2002-2003 school year, and ending with the 2009-2010 school year. Coach G returns to coaching football for the 2023-2024 school year, and is placed on Step 9.

- **Example 2:** Sponsor H was an assistant debate coach for 7 years, starting in 2009-2010, and ending with the 2015-2016 school year. Sponsor H returns to debate in 2025-26, and is placed on Step 8.

## D. Chaperone Duty Compensation

For those events that require a chaperone, as determined by the building principals, compensation rates will be as set forth below. Chaperone duty spots will first be filled on a volunteer basis, including non-LSMs. If spots remain unfilled, LSMs who have not volunteered may be assigned up to one (1) chaperone duty (on a rotating basis). This compensation does not apply to a paid coach/sponsor already receiving a stipend for the team/activity/event.

**Compensation Rates:**
    A. School Sponsored Event / Activity       **$30**   **per hour**
    B. Overnight Field Trip Supervision*       **$225**  **per night**
      *as approved by the Building Principal within the parameters of Board Policy*

## E. Extra Duty Compensation

**Category A:**                                      **$37**   **per hour**

Football Chain Gang Crew, Videographers, Timers, Scorers, Announcers, Lab Supervision, Chemistry Lab Aide (college degree not required), Stage Manager (non-school events)

**Category B:**                                      **$32**   **per hour**

Saturday Detention, Fitness Center Supervisor, Ticket-Takers and Sellers, Crowd Control, Street Supervision (permit check, traffic, etc.)

- Curriculum Rate (incl. summer professional development work)   **$50**   **per hour**
- Driver's Education: Behind the Wheel (outside school hours)   **$55**   **per hour**
   Driver's Education: Behind the Wheel (during school hours)   **internal sub rate**
- CPR Certification Trainers   **$55**   **per hour**
- Debate Judge   **$75**   **per round**
                                        **$225**  **per day**
- SEED Facilitator   **$2500** **per year**
- Mentor Advisor   **$500**  **per year**
- Year 1 and Year 2 Mentor   **Base of $1000 + $625 per mentee**
- Athletic Supervisor   **0.085 times BA Step 1 per season**

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

# ARTICLE XIV - FRINGE BENEFITS AND INSURANCE

## A. Insurance Coverage -- Group Coverage

Life insurance, accidental death and dismemberment insurance, health insurance, and dental insurance shall be provided by the Board, pursuant to the following specifications and conditions:

1. All LSMs who are employed on a 0.5 FTE basis or higher are eligible to participate in the District's insurance plans at the contribution rates set forth below. An LSM's insurance coverage shall run from July 1st through June 30th provided the LSM remains employed for the full school year.

2. Coverage for new hires will begin the first day they are required to report to work (orientation, inservice, and/or teaching, whichever comes first).

## B. Insurance - Health, Dental, Vision

During open enrollment, or within thirty (30) days of experiencing a qualifying major life change, LSMs will be provided PPO/HMO/Dental/Vision options for contribution. Dental PPO/HMO percentages will match the Board health insurance contributions in the chart below; vision insurance is currently included in District 113 health plans.

|  | **2023-2024** | **2024-2025** | **2025-2026** |
|---|---|---|---|
| **PPO** | The Board will pay **100%** of the **single** premium for eligible LSMs. | The Board will pay **95%** of the **single** premium for eligible LSMs. | The Board will pay **90%** of the **single** premium for eligible LSMs. |
|  | The Board will pay **76%** of the **family** premium for eligible LSMs. | The Board will pay **80%** of the **family** premium for eligible LSMs. | The Board will pay **80%** of the **family** premium for eligible LSMs. |
| **HMO** | The Board will pay **100%** of the **single** premium for eligible LSMs. | The Board will pay **100%** of the **single** premium for eligible LSMs. | The Board will pay **100%** of the **single** premium for eligible LSMs. |
|  | The Board will pay **76%** of the **family** premium for eligible LSMs. | The Board will pay **85%** of the **family** premium for eligible LSMs. | The Board will pay **85%** of the **family** premium for eligible LSMs. |

Employees with domestic partners who comply with the Illinois Civil Union Law shall be afforded access to family medical and dental benefits at the premium cost splits above.

Beginning with open enrollment for the 2024-25 school year, LSMs who do not elect health insurance benefits will receive $2,000 in lieu of insurance payment. This payment will be disbursed as a lump sum and will be included in the final paycheck of the fiscal year.

3249123.1

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

### C. Term Life Insurance

LSMs are entitled to life insurance coverage of $125,000 with 100% of the premium paid by the Board. LSMs may opt for coverage of $50,000 to avoid taxation starting with the 2024-2025 school year.

### D. Accidental Death and Dismemberment Insurance

The Board provides $125,000 for Accidental Death and Dismemberment to LSMs, which is paid at 100% by the Board.

### E. Income Protection / Disability Stipend

The Board shall provide full individual disability insurance coverage under the District's Group Long Term Disability Plan at no cost to the individual LSM.

### F. Flexible Benefits Plan

The Board shall maintain a "flexible benefits plan" which meets the requirements of <u>Section 125 of the Internal Revenue Code</u>. If at any time such Section 125 or its underlying regulations shall be amended, the parties shall promptly meet to agree upon an amendment of such plan.

3249123.1

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

# ARTICLE XV - RETIREMENT

## A. Voluntary Retirement Incentive Plan

District 113 offers voluntary retirement incentive plans to eligible LSMs, which includes a retirement incentive bonus and post-retirement insurance supplements. Incentives for eligible LSMs are set forth below.

## B. Voluntary Retirement Incentive Plan Eligibility

1. LSMs must be employed at a full-time and/or part-time status for at least the equivalent of 10 years of 1.0 FTE teaching service (i.e. 20 years of 0.5 FTE is equivalent to 10 years 1.0 FTE) with District 113, including being employed with District 113 as a full-time or part-time LSM for the last five (5) consecutive school years prior to retirement. Summer employment in District 113 does not contribute towards an LSM's years of service.

2. LSMs must submit an irrevocable notice of retirement with a specific retirement date by December 31st during the school year in which the LSM desires to begin receiving the retirement incentive bonus. The retirement notice cannot be submitted more than 69.5 months prior to the LSM's official retirement date with TRS. The final deadline for the retirement notice under this Agreement is December 31, 2025 and the final retirement date that will be honored under this Agreement is June of 2031.

3. The LSM's retirement must not cause District 113 to pay any excess salary penalties to TRS.

4. LSMs must sign and submit a promissory note stating all retirement benefits will be paid back/forfeited if a TRS excess salary penalty occurs.

5. LSMs must be eligible to retire with TRS on the retirement date set forth in the retirement notice.

6. LSMs must retire no later than the end of the school year at which the LSM is first eligible for a non-discounted TRS annuity.

## C. Retirement Incentive Bonuses

Eligible LSMs will have a choice of two (2) retirement incentive bonus options under this Agreement. An LSM must be eligible to retire under TRS rules and meet current eligibility requirements stated above.

An LSM cannot change selection once elected. The District, the Human Resources Department, and/or the Business Office will not determine potential retirement benefits under either plan; the employee assumes responsibility for the option elected. The District will not be liable for any claims by employees alleging they should have chosen one option over the other.

3249123.1

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

1. **Retirement Incentive Bonus: Option 1**

   This option/benefit is extended to LSMs who meet existing eligibility requirements for the term of the Agreement.

   Option 1 will not be available upon the expiration of this agreement.

   a. **Bonus Amount:** The amount of the retirement incentive bonus is based on the number of equivalent 1.0 FTE years of service as an LSM in District 113. LSMs with a partial year of service will receive the corresponding fractional amount between steps. For example, an LSM with 16.5 years of D113 service receives a bonus amount at year 16 + 0.5 of the increase between years 16 and 17 on the bonus chart below.

   b. **Payment of Bonus:** The Assistant Superintendent of Finance and the Chief Human Resources Officer will meet with each eligible LSM to determine a bonus distribution plan that will NOT cause the District to pay a TRS excess salary penalty. The agreed upon amounts will be paid by June 30th of each school year prior to retirement. In the event that there is a portion of the retirement bonus that has not been paid by the date of retirement, such portion shall be paid to the LSM in a lump sum payment to be made no later than 60 calendar days after the employee's official TRS retirement date.

   c. **Continued Service:** Employees must continue to provide substantial services as determined by the Chief Human Resources Officer in order to continue eligibility to receive the full retirement incentive bonus. Employees who cease to provide substantial services (i.e. resign or dismissed) at any time prior to the date provided in the irrevocable notice of retirement shall forfeit any remaining unpaid retirement incentive bonus. In addition, if the LSM causes the District to pay a TRS excess salary penalty, all retirement benefits shall be paid back/forfeited.

   d. **Repayment:** If an LSM is required to repay retirement benefits previously received, repayment shall be made by salary withholding to the extent possible, but in any event, the LSM must make full repayment within 30 calendar days after the date of the LSMs resignation or, if later, after the Board's receipt of notice of a TRS excess salary penalty. If the LSM fails to make payment when due and the Board incurs attorney's fees to collect such repayment, through litigation or other collection efforts, the LSM shall reimburse the Board for its reasonable attorney's fees and other costs and expenses of collection. Upon repayment, an amended creditable earnings report shall be made by the Board to TRS.

## Retirement Incentive Bonus: Option 1

| District 113 Yrs of Service | Bonus Amount |
|---|---|
| 10 | $20,000 |
| 11 | $22,000 |
| 12 | $24,000 |
| 13 | $26,000 |
| 14 | $28,000 |
| 15 | $30,000 |
| 16 | $32,000 |
| 17 | $34,500 |
| 18 | $37,000 |

| District 113 Yrs of Service | Bonus Amount |
|---|---|
| 19 | $39,500 |
| 20 | $42,000 |
| 21 | $44,500 |
| 22 | $47,000 |
| 23 | $50,000 |
| 24 | $53,000 |
| 25 | $56,000 |
| 26 | $59,000 |
| 27 | $62,000 |

| District 113 Yrs of Service | Bonus Amount |
|---|---|
| 28 | $65,000 |
| 29 | $68,500 |
| 30 | $72,000 |
| 31 | $75,500 |
| 32 | $79,000 |
| 33 | $82,500 |
| 34 | $86,000 |
| 35 | $89,500 |
|  |  |

2. **Retirement Incentive Bonus: Option 2**

    a. **Bonus Amount**: The LSM shall receive four 6% salary increases to their base salary in the final four years of employment with the district.

    b. **Payment of Bonus:** The Assistant Superintendent of Finance and the Chief Human Resources Officer will meet with each eligible LSM to review the impact of the 6% increases. The bonus will be paid by June 30th of each school year prior to retirement.

    c. **Continued Service:** Employees must continue to provide substantial services as determined by the Chief Human Resources Officer in order to continue eligibility to receive the full retirement incentive bonus. In addition, per *Section B, Voluntary Retirement Incentive Plan Eligibility,* above, if the LSM causes the District to pay a TRS excess salary penalty, all retirement benefits shall be paid back/forfeited.

    d. **Repayment:** If an LSM is required to repay retirement benefits previously received, repayment shall be made by salary withholding to the extent possible, but in any event, the LSM must make full repayment within 30 calendar days after the date of the LSMs resignation or, if later, after the Board's receipt of notice of a TRS excess salary penalty. If the LSM fails to make payment when due and the Board incurs attorney's fees to collect such repayment, through litigation or other collection efforts, the LSM shall reimburse the Board for its reasonable attorney's fees and other costs and expenses of collection. Upon repayment, an amended creditable earnings report shall be made by the Board to TRS.

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

## D. Post-Retirement Insurance Supplement

LSMs receive medical and dental supplements based on the plan they elected during the final year of service within District 113. LSMs on the family plan during their final year of employment are eligible for the family supplement amounts. LSMs on the single plan during their final year of employment will be eligible for the single supplement amounts.

LSMs are eligible to receive the medical insurance supplement as long as they are not on a District 113 medical insurance plan. Should a retired LSM be covered under a spouse's District 113 medical insurance plan, the member will not be eligible to receive the medical insurance supplement during that period of coverage. Should the retired LSM switch to a non-District 113 medical insurance plan at any time during their eligible period, the retired LSM will receive the full eligible monthly amount until the retired LSM turns 65. Likewise, if a retiree is receiving the supplement, but switches to a District 113 medical insurance plan as part of a spouse's coverage, the retiree would stop receiving the supplement while on the District 113 medical insurance plan. If, at any point, the retiree switched back to a non-District 113 medical insurance plan before turning 65, they would again be eligible to receive the monthly medical insurance supplement.

### Post-Retirement Insurance Supplement

| District 113 LSM Service Requirement | 10-16 Years Accumulated D113 Service | 17-22 Years Accumulated D113 Service | 23-28 Years Accumulated D113 Service | 29-35 Years Accumulated D113 Service |
|---|---|---|---|---|
| **Life Insurance** Post-Retirement Incentive<br> - Until age 65 | $50,000 | $50,000 | $50,000 | $50,000 |
| **Medical Insurance** Post-Retirement Incentive<br> - Until age 65 | **Family:** $420 / month **Single:** $168 / month | **Family:** $510 / month **Single:** $204 / month | **Family:** $600 / month **Single:** $240 / month | **Family:** $700 / month **Single:** $280 / month |
| **Dental Insurance** Post-Retirement Incentive<br> - Until age 65 | **Family:** $50 / month **Single:** $20 / month | **Family:** $65 / month **Single:** $30 / month | **Family:** $80 / month **Single:** $40 / month | **Family:** $95 / month **Single:** $50 / month |

## E. Revocation

By mutual agreement between the Board and the LSM, an LSM's notice of intent to retire may be revoked or modified. The reasons for such an agreement may include, but are not limited to, the death of a spouse, divorce between the LSM and spouse, or serious illness of the LSM or a spouse which would likely cause the use of sick leave otherwise necessary to achieve retirement without reduced benefit from TRS.

3249123.1

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

# ARTICLE XVI - GRIEVANCE PROCEDURES

## A. Grievance - Purpose

The primary purpose of this procedure is to secure the resolution of grievances at the lowest level possible.

## B. Grievance - Defined

A grievance is a claim, by a bargaining unit member or the Association, that there has been a violation, misinterpretation, or misapplication of any of the provisions of this Agreement. In order to utilize this process, grievances must be raised within sixty (60) calendar days of when the event or occurrence should reasonably have been known.

## C. Informal Resolution

The Association and the Board agree it is expected an employee and their immediate supervisor will try to resolve problems through free and informal communications without resorting to the formal grievance procedure. To this end, employees who believe they have a grievance may discuss the matter informally with their immediate supervisor in an effort to resolve the matter before undertaking the formal grievance procedure set forth below.

The formal timeline outlined below for the written grievance can start no later than fifteen (15) school days after the last meeting or good faith effort at informal resolution.

## D. Procedures for Adjustment of a Grievance

- **Step 1 - Immediate Supervisor**. All grievances must be presented in writing within fifteen (15) school days following the last meeting or good faith effort at informal resolution, including an attempt to meet to resolve. The written grievance shall specifically identify the contract provision allegedly violated and the remedy sought. A grievance may be presented:

    a. by an employee in person
    b. by an employee accompanied by an Association representative
    c. through an Association representative if the employee so requests; or
    d. by an Association representative in the name of the Association

    Upon receiving the written grievance, the supervisor shall set a meeting to discuss the grievance within five (5) school days. The supervisor shall issue a written determination with the resolution to the grievance to the grievant(s) within five (5) school days of such meeting, with copies of such decision shared with the Building Principal, the Chief Human Resources Officer, and the Association representative. In the event the matter is resolved at this stage, and an Association representative was not present at the adjustment of the grievance, the supervisor shall also provide a copy of the decision to the Association.

3249123.1

- **Step 2 - Principal/District Administrator Level.** In the event the matter is not resolved at Step 1, the grievance shall be referred to either the Principal of the School (for school-specific issues) or to the Chief Human Resources Officer within ten (10) school days of the receipt of the decision at Step 1.

  Within ten (10) school days after receiving the grievance, the Principal or Chief Human Resources Officer shall hold a meeting with the grievant to discuss the nature of the grievance.

  Within ten (10) school days after the meeting, the Principal or Chief Human Resources Officer shall state their decision and reasoning in writing, and shall furnish copies to the employee, if any, who lodged the grievance, and the Association representative.

- **Step 3 - Superintendent Level.** Within ten (10) school days after receiving the decision of the Principal or Chief Human Resources Officer, an appeal of the decision may be made to the Superintendent. The appeal shall be in writing and shall set forth specifically the act or conditions and the grounds on which the grievance is based and shall be accompanied by a copy of the decision at Step 2.

  The Superintendent shall meet with the grievant and the Association representative with a goal of arriving at a mutually satisfactory adjustment. Within fourteen (14) school days after receiving the appeal, the Superintendent shall communicate their decision, and reasoning in writing, to the Principal/Assistant Superintendent, the Association representative, the DEA President, and to the aggrieved employee, if any.

- **Step 4 - Board of Education.** If the grievance is not resolved at Step 3, the Association may appeal the grievance in writing to the Board within ten (10) school days after receipt of the Superintendent's written determination. The Board shall consider the grievance within thirty (30) calendar days after receipt of the appeal. Within ten (10) days after the Board's consideration of the appeal, the Board shall provide the Association with a written response to the grievance.

- **Step 5 – Binding Arbitration.** If the Association is not satisfied with the Board's decision, the Association may refer the grievance to binding arbitration within twenty-five (25) school days after receiving the Step 4 decision. If the Association refers a grievance in timely fashion to arbitration, the following provisions shall be applicable:

  a. The arbitration request shall be submitted to the American Arbitration Association and the arbitrator shall be selected under the Voluntary Labor Arbitration rules of the American Arbitration Association. The AAA shall act as the Administrator of the proceedings.

  b. More than one grievance may be submitted to the same arbitrator if both Parties agree in writing.

c.  The arbitrator shall have no right to amend, modify, nullify, ignore, add to, or subtract from the provisions of the Agreement. The arbitrator shall consider and decide only whether there has been a violation, misinterpretation, or misapplication of the express terms of this Agreement based on the issue(s) raised by the Agreement or as amended during Steps 1-4, and shall have no authority to make a decision on any issue not submitted or raised. If the arbitrator determines that there has been such a violation, they will have the authority, consistent with the terms of this subparagraph, to provide for appropriate relief. The decision of the arbitrator shall be binding to the Board, the Association, and the grievant.

d.  The fees and expenses of the arbitrator shall be divided equally between the Board and the Association; provided, however, that each party is responsible for compensating its own representatives and witnesses.

## E. General Provisions

1.  No employee at any formal or informal stage of the grievance procedure shall be required to meet with an administrator without Association representation.

2.  If a grievance arises from the action of authority higher than the principal of a school, the Association may present the grievance at the appropriate step of the grievance procedure. An informal conference shall be held as the initial step in such a situation, and no further conference shall be required after the formal filing of the grievance.

3.  If the grievance is of such a nature as to require immediate action such as may be required in transfer cases, the person acting for the Association may appeal immediately to the office or person empowered to act and said office or person shall endeavor to resolve the matter jointly with the Association representative. If the matter is not satisfactorily resolved, it may be appealed through the grievance procedure beginning with Step 3 - Superintendent Level.

4.  Failure at any step of this procedure to appeal a grievance to the next step within the specified time limits shall be deemed acceptance of the decision rendered at that step. Failure at any step of this procedure to communicate the decision on a grievance within the specified time limits shall permit the aggrieved party to proceed to the next step.

5.  The time limits specified in this procedure may be extended in any specific instance by mutual agreement in writing.

6.  Employees shall be free to participate in the grievance process without interference or penalty.

7.  All documents, communications, and records dealing with the processing of a grievance shall be filed separately from the personnel files of the participants.

8.  Grievance hearings and discussions may be conducted during school hours when the employees involved are free of classroom responsibilities. When it becomes necessary for

individuals to be involved during school hours, they shall be excused with pay for that purpose.

9. During the school year, "school days" shall be defined as days on which bargaining unit members are required to report to work. During summer break, the days are defined as those days on which the business office of the District is open. The Association will make best efforts to procure the information and employees needed to assist the Administration to complete any investigation.

10. By mutual agreement, the Parties may elect to enter into grievance mediation sponsored by the Federal Mediation and Conciliation Services (FMCS) prior to submitting a grievance to final and binding arbitration.

11. The withdrawal or settlement of a grievance shall not establish a precedent unless the Parties agree otherwise.

12. In agreeing that the decision of the arbitrator is final and binding to the Board, the Association, and the grievant, the Parties mutually agree that this provision shall not be construed to restrict the right of either party to seek review of the arbitrator's award.

# ARTICLE XVII - PERSONNEL FILES

## A. Official Personnel File

Personnel files for each LSM shall be maintained by the Board. Summative evaluations are maintained exclusively on an electronic database to which all LSMs have access to their personal evaluation documents and records. All other personnel records shall be maintained in a central file located in the Human Resources Department (either in paper or electronic format, depending on the system used by the District) in accordance with the confidentiality requirements within state and federal law.

## B. File - Defined

"File" shall mean any device for the collection and/or maintenance of documents or materials, a document or other piece of material itself or a collection of such, or any point at which a document or piece of material or collection of such may be held, stored, or temporarily rested.

## C. Timely Insertion

All material to be placed in the official personnel file shall be time stamped and inserted within a reasonable time, not to exceed forty-five (45) calendar days from the event giving rise to the material to be inserted or forty-five (45) calendar days after the Board, through the use of reasonable diligence, should have become aware of the event giving rise to the material to be inserted. Supervisory documents found in the personnel file should always have the name of the supervisor listed on the document(s).

## D. Right of Access

All LSMs shall have reasonable access to all materials in their official personnel file except for credentials provided by LSM placement offices and letters of recommendation provided in confidence by persons outside the District. Licensed staff members may inspect their personnel files upon three (3) days written notice to the Human Resources Department. A representative of the Association may accompany the LSM. If an LSM brings independent counsel, the LSM must notify the Human Resources Department in the written request, or through a follow-up request, in writing.

## E. Confidentiality and Notice

An LSM's personnel file and its contents are confidential and shall not be copied or provided to a third party outside of the District unless requested by the LSM, required by law, or as required in a legal action or arbitration. The Board will comply with all state and federal laws as applicable to LSMs' personnel files and the retention and release of contents therein. In the event the Board is required to disclose any or all of an LSM's personnel file, except if requested by the LSM, the Board will provide the LSM with written notice of the disclosure.

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

## F. Right of Fair Evaluation Record

No material related to evaluations of LSMs, other than official components of the evaluation process, shall be included in the personnel file.

## G. Right of Copy

Any material that is evaluative in nature shall be reviewed with the LSM prior to its placement in the personnel file, and a copy of such material shall be provided to the LSM.

## H. Right of Addition and Attachment

Every LSM shall have the right to add a reasonable amount of pertinent material to their official personnel file and to attach dissenting or explanatory material to any document or other piece of material in their official personnel file.

## I. Right of Integrity of File

No person shall remove any material from an LSM's official personnel file without the mutual consent of the LSM and the Superintendent or designee.

## J. Rights When Cleared of a Criminal or Disciplinary Charge

If a criminal charge is brought against an LSM and the charge is dismissed or the LSM is subsequently found not guilty, the Board shall thereafter delete from the LSM's personnel file within five (5) working days, any specific reference to the criminal charge, and shall not rely on said criminal charge in any other proceeding.

In the event a disciplinary charge is brought against an LSM by any other person and the LSM is subsequently cleared of the charge in a disciplinary hearing, all reference to the charge will be removed from the LSM's personnel file within five (5) working days thereafter.

If a complaint is lodged against an LSM by another LSM, and upon investigation the LSM is not subject to any discipline, there shall be no reference to this in their personnel file, and any document found in the personnel file to have such a reference will be removed.

## K. Grievances

No grievances filed by an LSM, nor responses to grievances, shall be part of an LSM's personnel file.

3249123.1

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

# ARTICLE XVIII - DISTRICT COMMITTEES

In order to maximize the shared rich history of the District, promote shared leadership, and enhance collaboration, the Parties have established committees as set forth below. All committees, except the Performance Evaluation Review Act (PERA) Joint Committee, are advisory in nature.

The committees will typically be chaired by an administrator, as appointed by the Superintendent. The committee chair shall be responsible for scheduling committee meetings, collaborating on agendas and minutes with committee members, and producing all written reports. Minutes from committee meetings will be posted on the staff portal.

## A. Calendar Committee

The Administration and the DEA will form a Calendar Committee consisting of no more than six (6) representatives from each school in order to recommend a school year calendar which includes 177 student attendance days, four (4) institute days, two (2) inservice days, and five (5) emergency days.

## B. Curriculum, Instruction, and Assessment Committee

The Committee on Curriculum, Instruction, and Assessment will jointly develop proposals and policies related to the following topics: course proposal work, the design and goals of institute days, a review of district professional development efforts, district grading and assessment policies, and similar topics. This committee shall meet at least twice annually, and shall make recommendations, by consensus, to the Superintendent, on the issues identified above. The committee shall be composed of an equal number of LSMs (appointed by DEA) and representatives from the administration (appointed by the Superintendent); the committee shall be limited to a maximum ten (10) total members. Recommendations proposed by the committee will be subject to the approval of the Superintendent; recommendations so approved will be shared with the DEA President, via email.

## C. Insurance Advisory Committee (IAC)

The Insurance Advisory Committee (IAC) will review and consider changes to the health, dental, and vision insurance plan designs which will enhance plan offerings and control premium costs. The committee will not have the authority to alter contribution rates set forth in *Article XIV, Fringe Benefits and Insurance, Section B* of this Agreement. Annual premium rates will be set in accordance with the actuarial recommendation provided by the insurer. The committee will make recommendations in regard to plan design and offerings. The Board will have final approval of all changes to the plan design.

1. **Composition**: The committee will be composed of four (4) members appointed by the Superintendent and four (4) members appointed by the DEA. The committee will be chaired by one (1) of the Superintendent's appointees. The above members are the only voting members of the IAC; however, the committee will generally work by consensus and will only vote if consensus is not reached. Either party may invite up to two (2) observers

per meeting. Additionally, one (1) representative from each of the other employee groups covered under the District's plan, will be invited to attend. Consultants may be invited to the meeting if approved by the IAC.

2. **Duties**: The IAC will make recommendations concerning an insurance carrier, and plan design and benefits. The agenda for each meeting will be created in collaboration with all members of the committee. The committee will present an annual report to the Board regarding recommended changes to plan design.

3. **Meetings**: The IAC will meet at least two (2) times per school year and any member of the committee can request additional meetings during the year. The committee chair will provide a summary of major items discussed at the meetings to the Superintendent, DEA President, IAC, and each representative from the other employee groups covered under the plans.

4. **Reports**: The DEA President, the Superintendent, and the IAC shall receive reports regarding the financial status of the District 113 Health/Dental/Vision Plans prior to all meetings of the IAC. Each member of the IAC will also receive a copy of the consultant's reports at least one (1) day in advance of the meeting. Members of the committee will have access to all policies and documents describing benefit coverage, claims, procedures, and utilization numbers. However, the confidentiality of individual plan participants shall be protected as required by law. The IAC shall create and distribute an annual report to educate the membership on current cost savings measures, plan changes, and other insurance information.

## D. Multi-Tiered System of Support (MTSS) Advisory Committee

The reauthorization in 2007 of the *Individuals with Disabilities Education Act* requires that schools provide a system for response to intervention, which is a methodology required to determine eligibility for special education services. The District provides such a system through a multi-tiered system of support (MTSS). An advisory committee to review the District's MTSS program will be established. The committee will consist of three (3) LSMs from each school selected by the DEA and an equal number of representatives from the administration, as appointed by the Superintendent. The committee will review the services being provided to support the MTSS program, the allocation of resources used within the program, and the student outcomes after participation in the program. The committee will have an initial meeting each year prior to October 1st, and will meet to review progress by January 31st.

## E. Professional Advancement Review Committee (PARC)

Each LSM shall be provided with professional learning funds, referred to as PARC funds. These funds may be used as stated in accordance with the requirements set forth in *Article XI, Section C, PARC Funds.*

In the event a PARC expenditure is not approved, the affected LSM may appeal that determination by submitting a request in writing to the Chief Human Resources Officer, who will refer the appeal to the PARC committee. Members of the committee will include two (2) DEA members from each

school, one (1) Assistant Principal from Highland Park, one (1) Assistant Principal from Deerfield, the Chief Human Resources Officer, and the Principal from the affected school. The chair of the committee will be a DEA member. The committee will issue a determination on the appeal within ten (10) school days of receipt of the written appeal.

## F. Performance Evaluation Review Act (PERA) Joint Committee

The Performance Evaluation Review Act (PERA) Joint Committee has been established in accordance with the requirements of the Performance Evaluation Review Act. The PERA Joint Committee shall consist of equal representation of both the district administration and the DEA, with each side having one (1) vote. All agreements finalized by the PERA Joint Committee will be posted on the District's employee portal.

The PERA Joint Committee will have the authority to establish and subsequently modify the Evaluation Plan (including a detailed monthly calendar) on a yearly basis. Any changes to these components must be approved by the Committee by May 15th for the following year. The official version will be made available electronically or by hard copy to LSMs by the first day of student attendance. If the committee cannot agree upon a plan by May 15th for the following school year, the previous year's plan will be maintained.

The PERA Joint Committee will explore options for evaluation of non-classroom LSMs as an alternative to the student growth component.

## G. Special Education Workload Plan Committee

*See Article VIII, Section D.*

## H. Stipend Review Advisory Committee (SRAC)

*See Article XIII, Section B.*

## I. Student Behavior & Security Committee

A Student Behavior & Security Committee shall be established. The Committee shall consist of one (1) dean from each school, two (2) LSMs from each school, selected by the DEA, and six (6) representatives from the administration, as appointed by the Superintendent. District security personnel may also be included. The chair of the committee shall be appointed by the Superintendent. The committee will meet at least two (2) times per year to review disciplinary data and discuss current disciplinary practices. The notes from this committee shall be provided to the District's Parent Teacher Advisory Committee, per Board Policy 2-150.

## J. Special Committee for a Common Schedule

The Board and the DEA acknowledge a shared interest in continuing to foster equitable educational opportunities to all students in the District, including the establishment of District-wide standards in regard to instructional minutes and use of resources. To that end, a committee for the establishment of a common schedule will be formed by October 1st, 2023.

For the 2024-2025 school year, the District will pilot a joint application of the Deerfield High School Schedule, in order to have a schedule that reflects equitable teaching, homeroom, supervisory, and collaboration minutes. For the 2025-2026 school year, a common schedule, as determined by the committee process set forth below, will be fully implemented on the first student attendance day.

The committee shall consist of three (3) DEA representatives from each building as appointed by the DEA leadership, and an equal number of representatives from the administration, as appointed by the Superintendent.

The committee will be responsible for the following tasks:
1. Conduct a review of the potential school schedules, gather input from stakeholders, and create a written report, presenting at least two (2) options for a common schedule, to the Board of Education no later than June 1st, 2024.
2. Gather feedback, revise and present a written report with the final recommendation for the shared schedule and any professional development or resources needed to implement the common schedule by December 1st, 2024.

The Special Committee for a Common Schedule will sunset upon conclusion of its work.

## K. Other Working Committees

It is a shared interest of the DEA and the Administration to facilitate LSM participation in working committees to review policies, practices, and the operation of programs in the school district. Working committees may be proposed by the DEA or the Superintendent. The scope of such committees must be clearly identified, with a time frame established for the completion of the committee's work.

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

# ARTICLE XIX - EVALUATIONS

The evaluation of LSMs will be conducted in accordance with the requirements of Article 24A of the *Illinois School Code*, using the evaluation plan agreed upon by the District PERA Joint Committee and posted on the District's intranet. The official evaluation plan will be made available electronically or by hard copy to LSMs by the first day of student attendance each school year. Starting with the 2024-2025 school year, the evaluation plan will reflect a (3) three-year evaluation cycle for tenured LSMs who meet the criteria set forth in Article 24 of the School Code.

The procedural requirements associated with LSM evaluation [notice, timelines, provision of written documents] as set forth in the District's Licensed Staff Member Evaluation Plan are incorporated into this Agreement and are subject to the grievance provision of this Agreement, up to the Board of Education level. The Parties recognize and agree, however, that the criteria and substance of the evaluation plan shall be determined by the District Joint PERA Committee in accordance with the requirements of Article 24 A of the School Code, and that such criteria and substance, as well as an LSM's overall rating on their summative evaluation, are not subject to the grievance procedure.

3249123.1

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

# ARTICLE XX - NO STRIKE / NO LOCKOUT

During the term of this Agreement there shall be no strike, work stoppage, picketing, or any other form of concerted activity by the educators, the purpose of which is to cause District employees to render less than full and complete services to the District and/or to intentionally interrupt the operation of the District, by the Association, its members, or any employees covered by this Agreement. Nothing in this subsection shall be construed as prohibiting employees from engaging in any lawful protected concerted activity that is not intended to interrupt the operations of the District. The Board agrees it will not lock out employees during the term of this Agreement as a result of a dispute with the Association.

3249123.1

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

# ARTICLE XXI - TERM OF THE AGREEMENT

This Agreement shall become effective August 1, 2023 and remain in effect until the first day of LSM attendance for the 2026-2027 school year.

Should any article, section, or clause of this Agreement be declared illegal or unenforceable by a court of competent jurisdiction, said article, section, or clause, shall be automatically deleted from this Agreement to the extent that it violated the law, but shall not affect the enforceability or validity of any other article, section, or clause.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed the day and year first above written.

Martin D. Esgar, President
District 113 Education Association

Daniel Struck, President
Township High School District No.113

Robin Gapinski, Bargaining Team Chair
District 113 Education Association

Bruce Law, Superintendent
Township High School District No.113

# APPENDIX A

**Salary Schedule 2023-2024**

| STEP | BA-0 | BA-15 | MA-0 | MA-15 | MA-30 | MA-45 | MA-60 |
|------|------|-------|------|-------|-------|-------|-------|
| 1 | $62,160 | $64,985 | $70,974 | $72,896 | $75,608 | $77,982 | $81,372 |
| 2 | $64,646 | $67,583 | $73,813 | $75,811 | $78,632 | $81,100 | $84,626 |
| 3 | $67,101 | $70,152 | $76,618 | $78,692 | $81,620 | $84,183 | $87,843 |
| 4 | $69,517 | $72,676 | $79,376 | $81,525 | $84,557 | $87,213 | $91,005 |
| 5 | $71,881 | $75,148 | $82,075 | $84,296 | $87,433 | $90,178 | $94,099 |
| 6 | $74,253 | $77,627 | $84,783 | $87,079 | $90,319 | $93,154 | $97,203 |
| 7 | $76,666 | $80,151 | $87,539 | $89,908 | $93,255 | $96,181 | $100,460 |
| 8 | $79,120 | $82,717 | $90,340 | $92,786 | $96,238 | $99,260 | $103,725 |
| 9 | $81,612 | $85,321 | $93,186 | $95,708 | $99,269 | $102,385 | $106,992 |
| 10 | $84,142 | $87,967 | $96,075 | $98,674 | $102,347 | $105,560 | $110,256 |
| 11 | $86,707 | $90,650 | $99,004 | $101,684 | $105,468 | $108,779 | $113,508 |
| 12 | $89,309 | $93,370 | $101,974 | $104,734 | $108,633 | $112,043 | $116,743 |
| 13 | $91,944 | $96,125 | $104,983 | $107,825 | $111,838 | $115,349 | $119,954 |
| 14 | $94,611 | $98,912 | $108,027 | $110,951 | $115,080 | $118,692 | $123,133 |
| 15 | $97,307 | $101,732 | $111,106 | $114,115 | $118,360 | $122,075 | $126,271 |
| 16 | $100,032 | $104,580 | $114,218 | $117,309 | $121,675 | $125,494 | $129,429 |
| 17 | $102,733 | $107,403 | $117,301 | $120,476 | $124,959 | $128,882 | $132,599 |
| 18 | $105,404 | $110,197 | $120,351 | $123,610 | $128,209 | $132,233 | $135,783 |
| 19 | $108,038 | $112,952 | $123,359 | $126,700 | $131,414 | $135,538 | $138,973 |
| 20 | $110,632 | $115,662 | $126,320 | $129,741 | $134,567 | $138,791 | $142,170 |
| 21 | $113,176 | $118,322 | $129,225 | $132,724 | $137,662 | $141,984 | $145,369 |
| 22 | $115,667 | $120,925 | $132,069 | $135,644 | $140,691 | $145,108 | $148,566 |
| 23 | $118,096 | $123,465 | $134,843 | $138,493 | $143,646 | $148,155 | $151,761 |
| 24 | $120,458 | $125,934 | $137,539 | $141,262 | $146,519 | $151,119 | $154,948 |
| 25 | $121,708 | $127,184 | $138,789 | $142,512 | $147,769 | $152,369 | $156,198 |
| 26 | $122,958 | $128,434 | $140,039 | $143,762 | $149,019 | $153,619 | $157,448 |
| 27 | $124,208 | $129,684 | $141,289 | $145,012 | $150,269 | $154,869 | $158,698 |
| 28 | $125,458 | $130,934 | $142,539 | $146,262 | $151,519 | $156,119 | $159,948 |

# APPENDIX B

**Salary Schedule 2024-2025**

| STEP | BA-0 | BA-15 | MA-0 | MA-15 | MA-30 | MA-45 | MA-60 |
|------|------|-------|------|-------|-------|-------|-------|
| 1 | $64,584 | $67,519 | $73,742 | $75,739 | $78,557 | $81,023 | $84,546 |
| 2 | $67,167 | $70,219 | $76,692 | $78,768 | $81,699 | $84,263 | $87,926 |
| 3 | $69,718 | $72,888 | $79,606 | $81,761 | $84,803 | $87,466 | $91,269 |
| 4 | $72,228 | $75,510 | $82,472 | $84,704 | $87,855 | $90,614 | $94,554 |
| 5 | $74,684 | $78,079 | $85,276 | $87,584 | $90,843 | $93,695 | $97,769 |
| 6 | $77,149 | $80,654 | $88,090 | $90,475 | $93,841 | $96,787 | $100,994 |
| 7 | $79,656 | $83,277 | $90,953 | $93,414 | $96,892 | $99,932 | $104,378 |
| 8 | $82,206 | $85,943 | $93,863 | $96,405 | $99,991 | $103,131 | $107,770 |
| 9 | $84,795 | $88,649 | $96,820 | $99,441 | $103,140 | $106,378 | $111,165 |
| 10 | $87,424 | $91,398 | $99,822 | $102,522 | $106,339 | $109,677 | $114,556 |
| 11 | $90,089 | $94,185 | $102,865 | $105,650 | $109,581 | $113,021 | $117,935 |
| 12 | $92,792 | $97,011 | $105,951 | $108,819 | $112,870 | $116,413 | $121,296 |
| 13 | $95,530 | $99,874 | $109,077 | $112,030 | $116,200 | $119,848 | $124,632 |
| 14 | $98,301 | $102,770 | $112,240 | $115,278 | $119,568 | $123,321 | $127,935 |
| 15 | $101,102 | $105,700 | $115,439 | $118,565 | $122,976 | $126,836 | $131,196 |
| 16 | $103,933 | $108,659 | $118,673 | $121,884 | $126,420 | $130,388 | $134,477 |
| 17 | $106,740 | $111,592 | $121,876 | $125,175 | $129,832 | $133,908 | $137,770 |
| 18 | $109,515 | $114,495 | $125,045 | $128,431 | $133,209 | $137,390 | $141,079 |
| 19 | $112,251 | $117,357 | $128,170 | $131,641 | $136,539 | $140,824 | $144,393 |
| 20 | $114,947 | $120,173 | $131,246 | $134,801 | $139,815 | $144,204 | $147,715 |
| 21 | $117,590 | $122,937 | $134,265 | $137,900 | $143,031 | $147,521 | $151,038 |
| 22 | $120,178 | $125,641 | $137,220 | $140,934 | $146,178 | $150,767 | $154,360 |
| 23 | $122,702 | $128,280 | $140,102 | $143,894 | $149,248 | $153,933 | $157,680 |
| 24 | $125,156 | $130,845 | $142,903 | $146,771 | $152,233 | $157,013 | $160,991 |
| 25 | $126,656 | $132,345 | $144,403 | $148,271 | $153,733 | $158,513 | $162,491 |
| 26 | $128,156 | $133,845 | $145,903 | $149,771 | $155,233 | $160,013 | $163,991 |
| 27 | $129,656 | $135,345 | $147,403 | $151,271 | $156,733 | $161,513 | $165,491 |
| 28 | $131,156 | $136,845 | $148,903 | $152,771 | $158,233 | $163,013 | $166,991 |

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

# APPENDIX C

**Salary Schedule 2025-2026 (TBD)**

# APPENDIX D

**Stipend Schedule 2023-2024**

| STEP | Category 1 | Category 2 | Category 3 | Category 4 | Category 5 |
|------|-----------|-----------|-----------|-----------|-----------|
| 1 | $7,738 | $7,007 | $5,961 | $5,334 | $4,810 |
| 2 | $8,523 | $7,765 | $6,562 | $5,909 | $5,229 |
| 3 | $9,203 | $8,392 | $7,085 | $6,457 | $5,647 |
| 4 | $9,882 | $8,994 | $7,607 | $6,928 | $6,039 |
| 5 | $10,587 | $9,621 | $8,131 | $7,398 | $6,484 |
| 6 | $11,975 | $10,980 | $9,412 | $8,628 | $7,529 |
| 7 | $12,235 | $11,215 | $9,621 | $8,837 | $7,660 |
| 8 | $12,575 | $11,557 | $9,882 | $9,098 | $7,896 |
| 9 | $12,862 | $11,817 | $10,144 | $9,308 | $8,053 |
| 10 | $13,439 | $12,289 | $10,562 | $9,621 | $8,367 |

| STEP | Category 6 | Category 7 | Category 8 | Category 9 | Category 10 |
|------|-----------|-----------|-----------|-----------|-----------|
| 1 | $4,078 | $3,660 | $2,928 | $2,615 | $1,882 |
| 2 | $4,445 | $3,974 | $3,190 | $2,877 | $2,013 |
| 3 | $4,785 | $4,287 | $3,399 | $3,059 | $2,170 |
| 4 | $5,072 | $4,601 | $3,608 | $3,268 | $2,300 |
| 5 | $5,438 | $4,941 | $3,817 | $3,451 | $2,458 |
| 6 | $6,432 | $5,647 | $4,758 | $4,367 | $2,588 |
| 7 | $6,537 | $6,066 | $4,863 | $4,445 | $3,320 |
| 8 | $6,746 | $6,248 | $5,019 | $4,576 | $3,451 |
| 9 | $6,876 | $6,379 | $5,124 | $4,706 | $3,504 |
| 10 | $7,216 | $6,588 | $5,282 | $4,915 | $3,660 |

# APPENDIX E

**Stipend Schedule 2024-2025**

| STEP | Category 1 | Category 2 | Category 3 | Category 4 | Category 5 |
|------|-----------|-----------|-----------|-----------|-----------|
| 1 | $7,854 | $7,112 | $6,051 | $5,414 | $4,882 |
| 2 | $8,651 | $7,881 | $6,660 | $5,998 | $5,308 |
| 3 | $9,341 | $8,518 | $7,191 | $6,554 | $5,732 |
| 4 | $10,030 | $9,129 | $7,722 | $7,032 | $6,130 |
| 5 | $10,746 | $9,766 | $8,253 | $7,509 | $6,581 |
| 6 | $12,155 | $11,145 | $9,553 | $8,757 | $7,642 |
| 7 | $12,418 | $11,383 | $9,766 | $8,969 | $7,775 |
| 8 | $12,763 | $11,730 | $10,030 | $9,235 | $8,014 |
| 9 | $13,055 | $11,994 | $10,296 | $9,447 | $8,174 |
| 10 | $13,640 | $12,473 | $10,721 | $9,766 | $8,492 |

| STEP | Category 6 | Category 7 | Category 8 | Category 9 | Category 10 |
|------|-----------|-----------|-----------|-----------|-----------|
| 1 | $4,139 | $3,715 | $2,972 | $2,654 | $1,910 |
| 2 | $4,511 | $4,033 | $3,238 | $2,920 | $2,043 |
| 3 | $4,856 | $4,352 | $3,450 | $3,105 | $2,203 |
| 4 | $5,148 | $4,670 | $3,662 | $3,317 | $2,334 |
| 5 | $5,520 | $5,015 | $3,875 | $3,503 | $2,495 |
| 6 | $6,529 | $5,732 | $4,830 | $4,432 | $2,627 |
| 7 | $6,635 | $6,157 | $4,936 | $4,511 | $3,370 |
| 8 | $6,847 | $6,342 | $5,094 | $4,644 | $3,503 |
| 9 | $6,979 | $6,475 | $5,201 | $4,776 | $3,556 |
| 10 | $7,324 | $6,687 | $5,361 | $4,988 | $3,715 |

# APPENDIX F

**Stipend Schedule 2025-2026**

| STEP | Category 1 | Category 2 | Category 3 | Category 4 | Category 5 |
|------|-----------|-----------|-----------|-----------|-----------|
| 1 | $7,972 | $7,218 | $6,141 | $5,495 | $4,955 |
| 2 | $8,781 | $7,999 | $6,760 | $6,088 | S5,387 |
| 3 | $9,481 | $8,646 | $7,299 | $6,653 | $5,818 |
| 4 | $10,181 | $9,266 | $7,837 | $7,138 | $6,222 |
| 5 | $10,907 | $9,912 | $8,377 | $7,622 | $6,680 |
| 6 | $12,337 | $11,312 | $9,697 | $8,888 | $7,757 |
| 7 | $12,605 | $11,554 | $9,912 | $9,104 | $7,892 |
| 8 | $12,955 | $11,906 | $10,181 | $9,373 | $8,134 |
| 9 | $13,251 | $12,174 | $10,451 | $9,589 | $8,296 |
| 10 | $13,845 | $12,660 | $10,881 | $9,912 | $8,620 |

| STEP | Category 6 | Category 7 | Category 8 | Category 9 | Category 10 |
|------|-----------|-----------|-----------|-----------|-----------|
| 1 | $4,202 | $3,771 | $3,017 | $2,694 | $1,939 |
| 2 | $4,579 | $4,094 | $3,287 | $2,963 | S2,074 |
| 3 | $4,929 | $4,417 | $3,502 | $3,152 | $2,236 |
| 4 | $5,225 | $4,740 | $3,717 | $3,367 | S2,370 |
| 5 | $5,603 | $5,090 | $3,933 | $3,555 | $2,533 |
| 6 | $6,626 | $5,818 | $4,902 | $4,499 | S2,666 |
| 7 | $6,734 | $6,249 | $5,010 | $4,579 | $3,420 |
| 8 | $6,950 | $6,437 | $5,171 | $4,714 | S3,555 |
| 9 | $7,083 | $6,572 | $5,279 | $4,848 | $3,610 |
| 10 | $7,434 | $6,787 | $5,442 | $5,063 | S3,771 |

# ADDENDUM

## LSM Step Adjustments

### A. Adjustments from Prior Salary Schedule

Current LSMs hired between July 2011 and June 2019, who were capped at the six (6) year maximum allowable service credit under prior agreements, will have their step placement adjusted on the current salary schedule, up to six (6) additional steps. No retroactive pay will be awarded.

Current LSMs hired between July 2011 and June 2019 will have both their original step placement and progression on the salary schedule reviewed jointly by DEA representatives, the Chief Human Resources Officer, and the Assistant Superintendent of Finance. LSMs will be candidates for an adjustment of step placement for 2023-24 when 1) initial step placement was limited by prior agreements that restricted new hires to a maximum of six (6) years of allowed service credit and/or 2) an LSM's actual movement on the 2nd salary grid resulted in half-steps not ameliorated by the transfer process to the Unified Grid.

Each LSM with a discrepancy between number of years taught and the numerical step placement on the Unified Grid of 2019-2020 will have the difference calculated. The difference will be added to the LSMs step movement between 2022-23 and 2023-24. No LSM will receive an adjustment of more than six (6) steps.

    a.   ***Example 1*** (adjustment due to initial step placement): An LSM with 8 years of prior experience was initially placed at step 6 for 2018-19. At the end of 2018-19, the LSM had 9 years of teaching experience. The placement on the Unified Grid was G(7), which created a difference of three (10th year of teaching but step 7). In 2022-23 the LSM was at step 10. The LSM will be adjusted to step 14 for 2023-24.

    b.   ***Example 2*** (adjustment due to half-steps): An LSM with 5 years of prior experience was initially placed at Step 6, which led to half-step movements in the subsequent years. At the end of 2018-19, the LSM had 12 years of teaching experience. The placement on the Unified Grid was L(12), which created a difference of one (13th year of teaching but step 12). In 2022-23 the LSM was at step 15. The LSM will be adjusted to step 17 for 2023-24.

    c.   ***Example 3*** (adjustment due to both initial placement and half-steps): An LSM with 8 years of prior experience was initially placed at step 6, which led to half-step movements in the subsequent years. At the end of 2018-19, the LSM had 11 years of teaching experience. The placement on the Unified Grid was I(9), which created a difference of 3 (12th year of teaching but step 9). In 2022-23 the LSM was at step 12. The LSM will be adjusted to step 16 for 2023-24.

    d.   ***Example 4*** (no adjustment): An LSM with 2 years of prior experience was initially placed at step 2. Full-steps from 2 to 3 and from 3 to 4 were followed by half-steps. At the end of 2018-19, the LSM had 6 years of teaching experience. The placement on the Unified Grid was G(7), which created no difference (7th year of teaching and step 7). No adjustment will be made for 2023-24.

DocuSign Envelope ID: AE3AF57B-39E1-4D58-9246-B1DCC05D2F1C

**B. Adjustments to BA Step Placement**

Beginning with this Agreement, all LSMs in the BA and BA+15 lanes will advance on the salary schedule in the same manner as LSMs in the MA and higher lanes. Current LSMs who had been previously frozen and who lost steps will have their step placement adjusted.

> ***Example***: An LSM was at BA+15 step 12 for 3 years and subsequently became unfrozen by earning a master's degree. The LSM lost 2 years of step movement, so the LSM shall advance 3 steps from the 2022-23 school year to the 2023-24 school year.

3249123.1

# EXHIBIT B

J 

I probably should not even be telling you this but am just giving you a heads up that students and families of seniors are EXTREMELY upset and angry that they were not prioritized for roles in the musical this year given the current environment. I am just letting you know because you may hear from them. These seniors have missed out on so much & this is a slap in the face for most of them especially since there will be ample opportunities for others but for many this will be their last show. Just an fyi ☺

 told me you said you would talk after break. That is fine and ▮▮▮ will be ok.

You have seniors who are beyond upset and crying. I dont think given their emotional state and what is going on it is right for you to wait to address this. These are still kids who are going through a hell of a year and I am begging you not to discount their emotional fragility. This is such a different year and I find it hard to believe it would really make such a difference in quality of show to have given some of those parts to seniors instead of juniors.

It is what it is but it was unnecessary

   

  
environment. I am just letting you know because you may hear from them. These seniors have missed out on so much & this is a slap in the face for most of them especially since there will be ample opportunities for others but for many this will be their last show. Just an fyi 

told me you said you would talk after break. That is fine and      will be ok.

You have seniors who are beyond upset and crying. I dont think given their emotional state and what is going on it is right for you to wait to address this. These are still kids who are going through a hell of a year and I am begging you not to discount their emotional fragility. This is such a different year and I find it hard to believe it would really make such a difference in quality of show to have given some of those parts to seniors instead of juniors.

It is what it is but it was unnecessary and sad and now these kids go into a bleak winter break feeling like crap. I don't mean to unload on you but its just not ok to treat the seniors this way this year. It's just not.


                        

  
away so we these conversations can be emotionally and educationally beneficial to each student who would like to talk. Again, I appreciate you, Jared, and what you shared.

It is what it is and I get that its done. Talking to these kids won't change anything.

I do hope you will strongly consider Seniors more for the final play this year in May. My girlfriend is the theater director at an arts school in NYC and she made their big spring musical this year seniors only. This is an arts school with insanely talented and gifted students yet everyone thought that was special and the right thing to do. Its possible these R-hall seniors wont set foot in the door this year and something needs to be done for them.



I wish we had time to do a senior-only show... but we are going to do another small production in MTCO, so there will be more opportunities and ways for them to be honored. Thanks again.

Thanks for your response. Unfortunately I don't think that is a satisfactory response during a global pandemic. Good luck with your shows.

   

# EXHIBIT C



 **December 9** 3:46 PM ✕

IXK. 

When a people are ethnically
cleansed, the perpetrators
usually come for the people's
writers. By targeting writers,
they can kill the memory of the
people. Attempts to wipe a
people off the face of the earth
are often paired with attempts to
wipe the people from the face of
history. What the Israeli military
is doing in Gaza is not only a
crime against humanity. It is a
crime against history. What is
humanity without history? What
is history without memory? What
is memory without the writer?
The true writer who is not a
voice of the people, but a voice
from the people. An eternal
voice. That must be silenced to
truly kill a people. And birth
denial.

@ibramxk



    



IXK.

Perhaps that is why antiracist Jews are joining with Palestinians and the rest of world to oppose all this carnage from October 7 in Israel to what has happened ever since in Gaza and the West Bank. Jews have experienced the horror of Holocaust, and the double horror right now of people inexplicably denying all that they have suffered. I know as a Black person what it is like for people to deny the horror of anti-Black racism, and attack the writers bringing that horror—and the antiracist resistance—to memory.

@ibramxk

 


IXK.

Writers producing memory like Claude McKay, who amid White supremacist attacks on Black American communities in the "Red Summer" of 1919, wrote the poem:

"If we must die"

On November 1, 2023, amid even more violent attacks on Palestinian communities in Gaza, Palestinian writer Refaat Alareer wrote the poem:

"If I must die"

*let it be hope*

*let it be a tale."*

If we must die, let our writers live to tell the tales of us.

@ibramxk

  

# EXHIBIT D

# EXHIBIT D



 Comment as Lori Gardberg Gross  

 **Michelle Leah** ...

6d ·

These memes slandering the IDF and Israel were on Ms. Kenyon's, (the DHS Theater Director) social media account, which has a link to DHS and all her students follow her page.

This is not the message that should be represented by our staff/school. We have seen this kind of propaganda at Universities and it is not going over well.

Feel free to call Kathy and send to the Board if you agree.

| | |
|---|---|
| When a people are ethnically cleansed, the perpetrators usually come for the people's writers. By targeting writers, they can kill the memory of the people. Attempts to wipe a people off the face of the earth are often paired with attempts to wipe the people from the face of history. What the Israeli military is doing in Gaza is not only a crime against humanity. It is a crime against history. What is humanity without history? What is history without memory? What is memory without the writer? The true writer who is not a voice of the people, but a voice from the people. An eternal voice. That must be silenced to truly kill a people. And birth denial. | INK.<br><br>Perhaps that is why antiracist Jews are joining with Palestinians and the rest of world to oppose all this carnage from October 7 in Israel to what has happened ever since in Gaza and the West Bank. Jews have experienced the horror of Holocaust, and the double horror right now of people inexplicably denying all that they have suffered. I know as a Black person what it is like for people to deny the horror of anti-Black racism, and attack the writers bringing that horror—and the antiracist resistance—to memory. |

 4                                    6 comments

# EXHIBIT E




⟨ **Deerfield High School - Friends of the Arts'...** •••



**Michelle Leah**
I love the fine arts dept!! They are amazing. However...The memes below slandering the IDF and Israel were on Ms. Kenyon's, (the DHS Theater Director) social media account, which has a link to DHS and all her students follow her page.

This is not the message that should be represented by our staff/school district. We have seen this kind of propaganda at Universities and it is not going over well.

Feel free to call Bruce and send to the D113 Board if you agree.



38m    Like    Reply    Message    Hide

 **Michelle Leah**



    Comment as Deerfield H...   

# EXHIBIT F

 **Highland park / Highwood, Planning Our future.**

Michelle Leah · 1h · 🌐

These memes slandering the IDF and Israel were on Ms. Kenyon's, (the DHS Theater Director) social media account, which has a link to DHS and all her students follow her page.

This is not the message that should be represented by our staff/school district. We have seen this kind of propaganda at Universities and it is not going over well.

Feel free to call Bruce and send to the D113 Board if you agree.



 Like     Comment     Copy     Share

 Rules

  Comment as Susie...    

# EXHIBIT G



# TOWNSHIP HIGH SCHOOL DISTRICT 113
*A Passion for Potential*

December 14, 2023

Dear District 113 School Community,

It has come to our attention that a staff member made a post on a personal social media page that implicitly disparages the personal beliefs and human decency of a substantial portion of our student body. The staff member has taken down the post.

While we cannot comment on the status of ongoing personnel matters, we are taking this very seriously. We will not tolerate statements and actions that cause harm to our students.

I stand by what I said in my October 10 President's Report, that, "Given the close connection that our communities have to Israel, there is a good chance that we know someone, or at the very least know someone who knows someone, who has suffered due to the barbaric and cowardly acts of hatred and brutality by the Hamas terror organization." Our first priority is to the well-being of our students, as I said in October: "There is no doubt that these incomprehensible acts of terror have resulted in pain, in anxiety, and in considerable uncertainty for students, staff, and families. This is a time to come together as a school community, as families, and as a broader community to provide support for each other."

We live in a time when statements about current events are judged to determine on whose side the speaker is. As a school district, we are on the side of protecting all our students and abiding by the highest standards of conduct to create a school environment that nurtures and provides a safe and secure place to develop the unique talents of all our students, which is especially important now.

Daniel Struck
President, Board of Education

# EXHIBIT H

**Final Reprimand**
To Be Filed Under Seal Upon the
Entry of a Protective order

# EXHIBIT I



# EXHIBIT I

 **Highland park / Highwood,**     ···   ×
**Planning Our future.**
Michele Leahr · Dir · 🔊

I am reposting these antisemitic memes since shamefully nothing was done about Britnee, the antisemitic Theatre Director at DHS. Are we just going to give her a pass? Since then at least one antisemitic incident happened in her program between students. I guess when the students see that their leader can come back to school with zero consequences or accountability, it's open season for hating the Jews. Sadly, many parents, even Jewish parents are defending Britnee in order to secure their kids a good part in future performances. ie selling their souls to the devil. As we watch antisemitic behaviors from professors at universities all over the country, as well as a walk-out which took place in CPS schools today in support of Hamas, why are we allowing antisemitism in our own backyard in a heavily Jewish district??

How can we be silent ? Has history taught us nothing??
Peggy Shapiro
StandWithUs
ADL
Jonathan Greenblatt
Alison Pure-Slovin
Illinois State Board of Education

Please email Bruce and the Board.

blaw@dist113.org
jshapira@dist113.org
dstruck@dist113.org

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

| | | |
|---|---|---|
| BRITNEE KENYON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2024 LA 441 |
| v. | ) | |
| | ) | |
| BOARD OF EDUCATION TOWNSHIP | ) | |
| HIGH SCHOOL DISTRICT 113, DANIEL | ) | **JURY DEMAND** |
| STRUCK, Individually and in his Official | ) | |
| Capacity, THOMAS KRIEGER, | ) | |
| Individually and in his Official Capacity, | ) | |
| and MICHELLE HAMMER BERNSTEIN, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| J.L., | ) | |
| | ) | |
| Respondent-In-Discovery. | ) | |

## NOTICE OF FILING

To:  William R. Pokorny                Sheldon T. Zenner
     Franczek P.C.                     Katten Muchin Rosenman LLP
     300 S. Wacker Dr., Suite 3400     525 W. Monroe St.
     Chicago, IL 60606                 Chicago, IL 60661
     wrp@franczek.com                  sheldon.zenner@katten.com

**PLEASE TAKE NOTICE** that on October 8, 2024, the undersigned filed with the Clerk of the Nineteenth Judicial Circuit Court of Lake County, **Britnee Kenyon's Verified Amended Complaint at Law** in the above referenced cause of action.

Respectfully submitted,

Britnee Kenyon,

By:  /s/ Myles R. Carroll
     One of Her Attorneys

Adam M. Berger (ARDC No. 6269402)
Myles R. Carroll (ARDC No. 6335660)
MILLER BERGER, LLC
20 N. Clark St., Ste. 525
Chicago, IL 60602
(312) 283-4563
Firm No.: 64620
Adam@MillerBerger.com
Myles@MillerBerger.com

#449567v1

## CERTIFICATE OF SERVICE

Under the penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned, an attorney, certifies that a copy of the foregoing Notice of Filing was emailed to the parties listed above on October 8, 2024.

*/s/ Myles R. Carroll*

**IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT**
**LAKE COUNTY, ILLINOIS**

FILED
10/1/2024 3:52 PM
ERIN CARTWRIGHT WEINSTEIN
Clerk of the Circuit Court
Lake County, Illinois

**IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT**
**LAKE COUNTY, ILLINOIS**

Britnee Kenyon
Plaintiff(s)

vs.

Board of Education Township High School District 113, et al.
Defendant(s)

Gen No: 2024LA0000441

## APPEARANCE

☑ **By an attorney:**
The undersigned Audrey H. Shinn hereby enters an appearance on behalf of Daniel Struck, Thomas Krieger, Board of Education Township District 113 in the above entitled cause.

☐ **By an individual as a Self-Represented Litigant (SRL):**
The undersigned _____ hereby enters an appearance on behalf of myself in the above entitled cause.

/s/ Audrey H. Shinn
Signature

Prepared by:
Name: Audrey H. Shinn    SRL ☐
Address: Franczek P.C., 300 S. Wacker, Suite 3400
City: Chicago    State: IL
Phone: 312-786-6141    Zip Code: 60606
ARDC #: 6339672
Fax: 312-986-9192
E-mail address: ahs@franczek.com

#171 – 8  (Rev 2/19)

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

FILED
10/1/2024 3:28 PM
ERIN CARTWRIGHT WEINSTEIN
Clerk of the Circuit Court
Lake County, Illinois

Britnee Kenyon )
)
)
Plaintiff(s) )
vs. )
)
)
Board of Education Township High School District 113, et al. )
Defendant(s) )

Gen No: 2024LA0000441

**APPEARANCE**

☑ **By an attorney**:
The undersigned William R. Pokorny hereby enters an appearance
on behalf of Daniel Struck, Thomas Krieger, Board of Education Township District 113 in the above entitled cause.

☐ **By an individual as a Self-Represented Litigant (SRL)**:
The undersigned _____ hereby enters an appearance
on behalf of myself in the above entitled cause.

/s/ William R. Pokorny
Signature

Prepared by:
Name: William R. Pokorny          SRL ☐
Address: Franczek P.C., 300 S. Wacker, Suite 3400
City: Chicago          State: IL
Phone: 312-786-6141          Zip Code: 60606
ARDC #: 6275705
Fax: 312-986-9192
E-mail address: wrp@franczek.com

#171 – 8  (Rev 2/19)

# EXHIBIT C

## CERTIFICATE OF SERVICE

IN THE CIRCUIT COURT OF LAKE COUNTY, ILLINOIS

Case #: 2024 LA 441

|                  |                   |
| ---------------- | ----------------- |
| **Britnee Kenyon** | Plaintiff |
| vs.   2024LA00000441 |  |
| **Board of Education Township High School District 113, et al.** | Defendant |

The undersigned, being first duly sworn, on oath deposes and says: That s(he) is now and at all the times herein mentioned was a citizen of the United States, over the age of 18, not a party to nor interested in the above entitled action, is competent to be witness therein, and that I served copies of the:

**Alias Summons & Complaint**

| | |
|---|---|
| PARTY SERVED: | **BOARD OF EDUCATION TOWNSHIP HIGH SCHOOL DISTRICT 113** |
| PERSON SERVED: | **THOMAS KRIEGER, HUMAN RESOURCES OFFICER** |
| METHOD OF SERVICE: | **Corporate** - By leaving copies with the person identified above, apparently in charge at the office or usual place of business. I informed him/her of the general nature of the papers. |
| DATE & TIME OF DELIVERY: | **9/18/2024 at 1:15 PM** |
| ADDRESS, CITY AND STATE: | **1040 PARK AVENUE WEST, HIGHLAND PARK, IL 60035** |

Race: **White**  Sex: **Male**  Age: **65**
Height: **6'0"**  Weight: **230**  Hair: **Bald**  Glasses: **Yes**

Judicial Attorney Services, Inc.
PO Box 583
Geneva, IL 60134
(630) 221-9007

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true. Executed on 9/18/2024.

Richard Gerber
Registration No: 117-001119

CLIENT: **Miller Berger**
FILE #:

Job #: 589448

**CERTIFICATE OF SERVICE**

IN THE CIRCUIT COURT OF LAKE COUNTY, ILLINOIS

Case #: 2024 LA 441

| | | |
|---|---|---|
| Britnee Kenyon | | Plaintiff |
| vs. | 2024LA00000441 | |
| Board of Education Township High School District 113, et al. | | Defendant |

The undersigned, being first duly sworn, on oath deposes and says: That s(he) is now and at all the times herein mentioned was a citizen of the United States, over the age of 18, not a party to nor interested in the above entitled action, is competent to be witness therein, and that I served copies of the:

**Alias Summons & Complaint**

PARTY SERVED: **THOMAS KRIEGER**

METHOD OF SERVICE: **Personal Service** - By personally delivering copies to **THOMAS KRIEGER**

DATE & TIME OF DELIVERY: **9/18/2024 at 1:15 PM**

ADDRESS, CITY AND STATE: **1040 PARK AVENUE WEST, HIGHLAND PARK, IL 60035**

DESCRIPTION: Race: **White**    Sex: **Male**    Age: **65**
Height: **6'0"**    Weight: **230**    Hair: **Bald**    Glasses: **Yes**

Judicial Attorney Services, Inc.
PO Box 583
Geneva, IL 60134
(630) 221-9007

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true. Executed on 9/18/2024.

Richard Gerber
Registration No: 117-001119

CLIENT: **Miller Berger**
FILE #:

Job #: **589450**

CERTIFICATE OF SERVICE

IN THE CIRCUIT COURT OF LAKE COUNTY, ILLINOIS            Case #: 2024 LA 441

|  |  |  |
|---|---|---|
| **Britnee Kenyon** | | |
| | | Plaintiff |
| **vs.** | 2024LA00000441 | |
| **Board of Education Township High School District 113, et al.** | | |
| | | Defendant |

The undersigned, being first duly sworn, on oath deposes and says: That s(he) is now and at all the times herein mentioned was a citizen of the United States, over the age of 18, not a party to nor interested in the above entitled action, is competent to be witness therein, and that I served copies of the:

**Alias Summons & Complaint**

| | |
|---|---|
| PARTY SERVED: | **DANIEL STRUCK** |
| METHOD OF SERVICE: | **Personal Service** - By personally delivering copies to **DANIEL STRUCK** |
| DATE & TIME OF DELIVERY: | **9/18/2024 at 1:05 PM** |
| ADDRESS, CITY AND STATE: | **1730 WINTHROP RD, HIGHLAND PARK, IL 60035** |
| DESCRIPTION: | Race: **White**   Sex: **Male**   Age: **65** |
| | Height: **5'11"**   Weight: **220**   Hair: **Black/Gray** Glasses: **Yes** |

Judicial Attorney Services, Inc.
PO Box 583
Geneva, IL 60134
(630) 221-9007

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true. Executed on 9/18/2024.

_____
Richard Gerber
Registration No: 117-001119

CLIENT: **Miller Berger**                                                                 Job #: **589449**
FILE #: